## RECORD NO. 15-1671

In The

# United States Court of Appeals

### For The Fourth Circuit

## WESTPORT PROPERTY INVESTMENT LLC,

*Plaintiff – Appellee*,

**and**

## CITIGROUP GLOBAL MARKETS REALTY CORP.

*Plaintiff*,

**v.**

## NEIL J. RUTHER,

*Defendant – Appellant*,

**and**

## PATRICK W. TURNER,

*Defendant*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT BALTIMORE

────────────

## JOINT APPENDIX
## VOLUME I OF II
## (Pages 1 – 456)

────────────

| | |
|---|---|
| Matthew G. Hjortsberg | Timothy McCormack |
| BOWIE & JENSEN, LLC | Michelle M. McGeogh |
| 29 West Susquehanna Avenue, 6th Floor | BALLARD SPAHR, LLP |
| Towson, Maryland 21204 | 300 East Lombard Street, 18th Floor |
| (410) 583-2400 | Baltimore, Maryland 21202 |
| | (410) 528-5680 |
| | |
| *Counsel for Appellant* | *Counsel for Appellee* |

# TABLE OF CONTENTS

Appendix Page

**Volume I**

Docket Entries ................................................................................................1

Complaint
    filed February 25, 2014 ............................................................................13
        Civil Coversheet .............................................................................23
        Summons .........................................................................................24
        Summons .........................................................................................25

Affidavit of Patrick Turner [Document 30-4]
    filed October 22, 2014 .............................................................................28

Order Setting Scheduling Conference
    filed November 12, 2014 ..........................................................................30
        Tentative Scheduling Order ............................................................31
        Letter to Counsel ............................................................................36

Motion to Quash Subpoena and Protective Order
    filed January 23, 2015 .............................................................................37

Answer to Complaint
    filed February 11, 2015 ............................................................................47

Motion for Summary Judgment
    filed February 27, 2015 ............................................................................52
        Table of Exhibits ............................................................................55
        Exh. 1 – Affidavit of Eric Zoellner .............................................58
        Exh. 2 – Guaranty of Non-Recourse Obligations dated
            as of July 16, 2007 ............................................................65
        Exh. 3 – Note ..................................................................................77
        Exh. 4 – Loan Agreement ..............................................................84
        Exh. 5 – IDOT Guaranty dated as of July 16, 2007 ...................273
        Exh. 6 – Indemnity Deed of Trust, Assignment of Leases and Rents,
            Security Agreement and Fixture Filing dated as of
            July 16, 2007, as modified by an Indemnity Deed of Trust
            Spreader Agreement .......................................................281
        Exh. 7 – Excerpts of Deposition Transcript of Neil Ruther ........342
        Exh. 8 – Deed in Lieu Event Agreement dated as of July 26, 2010 ..........373
        Exh. 9 – Organizational Chart ....................................................403

i

Appendix Page

Exh. 10 – Memorandum of Understanding ................................................405

Exh. 11 – Deposition of Thomas Fore........................................................417

Exh. 12 – Mutual Confidentiality and Non-Disclosure Agreement...........448

Exh. 13 – E-mail exchange between Kenneth Frank and
          Patrick Turner dated December 7, 2012 ....................................451

Exh. 14 – Affidavit of Timothy F. McCormack.........................................453

**Volume II**

Exh. 15 – Answer to Complaint for Declaratory Judgment, for
          Damages For Interference with Business Relationships,
          and Fraud, Counterclaim and Third-Party Claim of
          Westport Development, LLC, Thomas B. Fore and
          Patrick Turner, Warhorse-Baltimore Real Estate, LLC,
          et al. v. Thomas B. Fore, et al., Civil Action No.
          1:13-cv-02336-WMN, ECF No. 16 ............................................457

Exh. 16 – E-mail from Kenneth Frank to Patrick Turner and Fore
          dated January 10, 2013 ..............................................................511

Exh. 17 – E-mail exchange between Kenneth Frank and Mark
          Friedman dated January 18 and 19, 2013 ..................................513

Exh. 18 – E-mail from Kenneth Frank to Patrick Turner
          (cc: Thomas Lewis) dated January 28, 2013 .............................515

Exh. 19 – E-mail exchange between Patrick Turner, Kenneth Frank
          and Thomas Lewis dated January 28, 2013................................517

Exh. 20 – E-mail from Kenneth Frank to Patrick Turner
          dated January 29, 2013 ..............................................................520

Exh. 21 – E-mails between Kenneth Frank and Jeffrey Sirody
          dated January 29, 2013 ..............................................................522

Exh. 22 – E-mail from Kenneth Frank to Patrick Turner
          dated January 29, 2013 ..............................................................524

Exh. 23 – E-mail exchange between Patrick Turner and Kenneth Frank
          dated January 30, 2013 ..............................................................526

Exh. 24 – E-mail and attachment from Kenneth Frank to Patrick
          Turner, et al. dated February 1, 2013 (1:02 p.m.).......................528

Exh. 25 – E-mail from Kenneth Frank to Patrick Turner, et al
          Dated February 1, 2013 (6:36 p.m.) ..........................................531

Exh. 26 – E-mail from Kenneth Frank to Mark Friedman and Mark
          Fields dated February 7, 2013....................................................535

Exh. 27 – E-mail from Jeffrey Sirody to Kenneth Frank
    Dated February 7, 2013 ............................................................537

Exh. 28 – E-mails between Cara Frye and Kenneth Frank
    Dated February 8, 2013 ............................................................539

Exh. 29 – Excerpts from Deposition Transcript of Cara Frye....................541

Exh. 30 – E-mail from Robert Schulman (attorney for Dixie
    Construction) to Kenneth Frank dated February 8, 2013 ...........553

Exh. 31 – E-mail from Kenneth Frank to Robert Schulman
    (attorney for Dixie Construction) dated February 8, 2013 ........555

Exh. 32 – Involuntary Petition....................................................................557

Exh. 33 – E-mail from Kenneth Frank to Ominsky dated
    February 10, 2013 ....................................................................560

Exh. 34 – E-mail from Gerry Auchincloss to Kenneth Frank
    Dated February 11, 2013 ..........................................................562

Exh. 35 – E-mail from Jeffery Sirody to Kenneth Frank dated
    February 12, 2013 ....................................................................567

Exh. 36 – Debtor's Consent to Order for Relief..........................................569

Exh. 37 – E-mail from Kenneth Frank to Patrick Turner, et al.
    Dated February 27, 2013 ..........................................................572

Exh. 38 – E-mail from Kenneth Frank to Patrick Turner dated
    March 1, 2013 ..........................................................................575

Exh. 39 – Transcript of Oral Ruling of Judge Gordon ................................578

Exhibits to Response in Opposition to Motion for Summary Judgment

  filed on April 15, 2015
    Affidavit of Kenneth B. Frank [Document 61-1] .................................586
    Affidavit of Patrick Turner [Document 61-2].....................................596
    Deposition Transcript of Thomas Butler Fore [Document 61-3] .........601

Memorandum Opinion
  filed on May 15, 2015......................................................................696

Order
  filed on May 15, 2015......................................................................698

Judgment
  filed on May 19, 2015......................................................................699

Notice of Appeal
  Filed on June 18, 2015.....................................................................700

# EXHIBIT 15

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
(BALTIMORE DIVISION)

| | |
|---|---|
| WARHORSE-BALTIMORE REAL ESTATE, * | |
| LLC; RICHARD BURTON; DALE DOWERS; * | |
| & MICHAEL BORDEN * | CIVIL ACTION |
| * | NO. 1:13-CV-02336-WMN |
| PLAINTIFFS * | |
| COUNTERCLAIM DEFENDANTS * | |
| * | |
| V. * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| * | |
| THOMAS B. FORE; PATRICK TURNER; * | |
| WESTPORT PARTNERS, LLC, & * | |
| WESTPORT DEVELOPMENT, LLC * | |
| * | |
| DEFENDANTS * | |
| COUNTERCLAIM PLAINTIFFS * | |
| THIRD PARTY PLAINTIFFS * | |
| * | |
| V. * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| * | |
| VISION CAPITAL PARTNERS, LLC * | |
| EDWARD BAILEY * | |
| VICTOR SCHWARZ * | |
| DOUGLAS TOWLER * | |
| * | |
| THIRD PARTY DEFENDANTS * | |
| * | |
| * | |
| * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**ANSWER TO COMPLAINT FOR DECLARATORY JUDGMENT, FOR DAMAGES**
**FOR INTERFERENCE WITH BUSINESS RELATIONSHIPS, AND FRAUD,**
**COUNTERCLAIM AND THIRD PARTY CLAIM**
**OF DEVELOPMENT LLC, THOMAS B. FORE AND PATRICK TURNER**

Westport Development, LLC ("Development,") Thomas B. Fore ("Fore,") Westport

Partners, LLC ("Partners") by their undersigned attorneys, and Patrick Turner ("Turner,") hereby

[1]

458

answer the *Complaint for Declaratory Judgment, for Damages for Interference with Business Relationships, and Fraud* (the "Complaint") filed on August 12, 2013, by Plaintiffs Warhorse-Baltimore Real Estate, LLC ("Warhorse,") Richard Burton ("Burton," Dale Dowers ("Dowers,") and Michael Borden ("Borden,") (Warhorse, Burton, Dowers and Borden are hereinafter collectively referred to as "Plaintiff" or "Counter Defendant",) assert counterclaims against Counter Defendants, and file a third-party complaint `against Vision Capital Partners, LLC ("Vision,") Douglas Towler ("Towler,") Victor Schwarz ("Schwarz,") and Edward Bailey ("Bailey") (Vision, Towler, Schwarz and Towler are hereinafter collectively referred to as "Third Party Defendants"). (Development, Partners Fore and Turner are hereinafter collectively referred to herein as the context requires, as "Defendants," "Counter Plaintiffs," "Third Party Plaintiffs," or "Counter and Third Party Plaintiffs,")

## ANSWER TO COMPLAINT

The following paragraphs numbered 1-87 correspond to the numbered paragraphs of the Complaint, and constitute Defendants' answers thereto:

1.   The Defendants neither admit nor deny as they are without sufficient information as to this specific allegation.

2.   The Defendants neither admit nor deny as they are without sufficient information as to this specific allegation.

3.   The Defendants neither admit nor deny as they are without sufficient information as to this specific allegation.

4.   The Defendants neither admit nor deny as they are without sufficient information as to this specific allegation.

5.   Admit.

[2]

459

6.   Admit.

7.   The Defendants neither admit nor deny as they are without sufficient information as to this specific allegation.

8.   The Defendants neither admit nor deny as they are without sufficient information as to this specific allegation.

9.   Admit.

10. Admit.

11. Admit.

12. The Defendants neither admit nor deny as they are without sufficient information as to this specific allegation.

13. Deny.

14. Deny.

15. Admit.

16. The Defendants neither admit nor deny as they are without sufficient information as to this specific allegation.

17. The Defendants neither admit nor deny as they are without sufficient information as to this specific allegation.

18. The Defendants neither admit nor deny as they are without sufficient information as to this specific allegation.

19. The Defendants neither admit nor deny as they are without sufficient information as to this specific allegation.

20. The Defendants neither admit nor deny as they are without sufficient information as to this specific allegation.

[3]

460

21. The Defendants neither admit nor deny as they are without sufficient information as to this specific allegation.

22. The Defendants neither admit nor deny as they are without sufficient information as to this specific allegation.

23. The Defendants neither admit nor deny as they are without sufficient information as to this specific allegation.

24. The Defendants neither admit nor deny as they are without sufficient information as to this specific allegation.

25. The Defendants neither admit nor deny as they are without sufficient information as to this specific allegation.

26. The Defendants neither admit nor deny as they are without sufficient information as to this specific allegation.

27. Deny.

28. Deny.

29. Admit.

30. Deny.

31. The Defendants neither admit nor deny as they are without sufficient information as to this specific allegation.

32. Deny.

33. Deny.

34. Deny.

35. Deny.

36. Deny.

[4]

461

37. The Defendants neither admit nor deny as they are without sufficient information as to this specific allegation.

38. The Defendants neither admit nor deny as they are without sufficient information as to this specific allegation.

39. Deny.

40. The Defendants neither admit nor deny as they are without sufficient information as to this specific allegation.

41. The Defendants neither admit nor deny as they are without sufficient information as to this specific allegation.

42. Deny.

43. The Defendants neither admit nor deny as they are without sufficient information as to this specific allegation.

44. The Defendants neither admit nor deny as they are without sufficient information as to this specific allegation.

45. The Defendants neither admit nor deny as they are without sufficient information as to this specific allegation.

46. The Defendants neither admit nor deny as they are without sufficient information as to this specific allegation.

47. Deny.

48. Deny.

49. The Defendants neither admit nor deny as they are without sufficient information as to this specific allegation.

[5]

462

50. The Defendants neither admit nor deny as they are without sufficient information as to this specific allegation.

51. Deny.

52. The Defendants neither admit nor deny as they are without sufficient information as to this specific allegation.

53. The Defendants neither admit nor deny as they are without sufficient information as to this specific allegation.

54. The Defendants neither admit nor deny as they are without sufficient information as to this specific allegation.

55. Deny.

56. The Defendants neither admit nor deny as they are without sufficient information as to this specific allegation.

57. The Defendants neither admit nor deny as they are without sufficient information as to this specific allegation.

58. The Defendants neither admit nor deny as they are without sufficient information as to this specific allegation.

59. The Defendants neither admit nor deny as they are without sufficient information as to this specific allegation.

60. Deny.

61. The Defendants neither admit nor deny as they are without sufficient information as to this specific allegation.

62. The Defendants neither admit nor deny as they are without sufficient information as to this specific allegation.

[6]

463

63. Deny.

64. Deny.

65. Deny.

66. Deny.

67. Deny.

68. The Defendants neither admit nor deny as they are without sufficient information as to this specific allegation.

69. Deny. Plaintiffs mischaracterize Judge Gordon's holding. In fact the attached Court Order (Exhibit 1) specifically states "pursuant to 28 U.S.C. § 1334(c)(1), the Court will abstain from hearing this Adversary Proceeding;" and "that the Complaint is dismissed without prejudice." The decision was based on the underlying claim being primarily a matter of state law and the request for a jury trial which meant the trial would not be heard by Judge Gordon.

70. The Defendants neither admit nor deny as they are without sufficient information as to this specific allegation.

71. Deny.

72. The Defendants neither admit nor deny as they are without sufficient information as to this specific allegation.

73. Deny.

74. Deny.

75. Deny.

76. Deny.

77. Deny.

[7]

464

78. Deny.  Warhorse-Baltimore's Nevada Bankruptcy was dismissed on Citi's motion on November 26, 2013.

79. Deny.

80. Deny.

81. Deny.

82. The Defendants neither admit nor deny as they are without sufficient information as to this specific allegation.

83. Deny.

84. Deny.

85. Deny.

86. Deny.

87. Deny.

88. As more particularly set forth in the Counterclaim, Defendants have no liability to Plaintiffs and Counterclaim Defendants are liable to Counterclaim Plaintiffs for damages arising out of the facts and circumstances alleged herein.

## AFFIRMATIVE DEFENSES

Defendants assert the following affirmative defenses to the Complaint:

89.   Plaintiffs are guilty of fraud.

90. Plaintiffs' actions are unconscionable.

91. Plaintiffs' actions are contrary to public policy.

92. Plaintiffs would be unjustly enriched.

93. The Plaintiffs' claims are precluded by res judicata and/or collateral estoppel.

94. The Plaintiffs have failed to act in a commercially reasonable manner

[8]

465

95. The Plaintiffs have sustained no damages.

**STATEMENT OF FACTS FOR COUNTERCLAIM AND THIRD PARTY COMPLAINT**

96. Beginning in 2005, Turner and other partners conceived of plan to develop a mixed use real estate project (the "Project,") on land theretofore used primarily for industrial purposes located in the Middle Branch of the Baltimore Harbor. The development plan for the Project required the assembly of a number of individual parcels and the completion of numerous significant tasks, including assessment and resolution of environmental issues, securing governmental approvals such as zoning changes and tax increment financing ("TIF",) and marshalling the support of neighborhood and other special interest groups.

97. Such an undertaking required a large amount of capital, and ultimately Turner negotiated a $30 million loan (the "Loan") from Citibank Global Markets Realty Corp. ("Citibank"). Pursuant to a Loan Agreement dated as of July 16, 2007, (collectively with amendments thereto, the "Loan Agreement,") among Citibank (sometimes also referred to as "Lender,") and Middle Branch Development, LLC (the "Borrower"), Inner Harbor West, LLC (the "IHW") and Inner Harbor West II, LLC ("IHW II") (IHW and IHW II are collectively referred to as the "Mortgagor,") Lender agreed to make the Loan to Borrower, evidenced by a Promissory Note in the maximum principal amount of Thirty Million and no/100 Dollars ($30,000,000) dated as of July 16, 2007 (collectively with any subsequent amendments, referred to as the "Note"). The Loan was secured by an Indemnity Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of July 16, 2007, executed by Mortgagor in favor of Lender (the "Mortgage") encumbering approximately 42 acres of real property in Baltimore owned by Mortgagor (the "Property").

98. IHW and IHW II are single member limited liability companies wholly owned by Development. The membership interests in Development are owned 60% by Westport Property

[9]

466

Holdings, LLC ("Holdings") and 40% by CRP Westport Holdings, LLC ("CRP"). Turner is the

manager and owner of approximately 36% of the membership interests in Holdings.

      99.  The proceeds of the Loan and other funds were used to assemble the Property and

undertake the tasks described above as well as other pre-development work including but not limited to

architectural and land use planning, environmental studies and remediation, engineering for site work

and utilities, and other site infrastructure work.  Comprehensive zoning was obtained as well as other

entitlements, master plan approval, qualification of the Property for various federal, state and local

programs, and the Mayor and City Council of Baltimore (the "City") approved TIF financing for certain

public improvements for the Property.  As the Project progressed negotiations ensued with third-party

developers to purchase individual parcels of the Property for residential and other uses.

      100.     Beginning in late 2007, the real estate industry worldwide entered into an

extended period of rapid and dramatic deterioration.  Those conditions ultimately had a material,

negative impact on the Project, and in 2010, the Borrower and the Mortgagor were no longer able to

make the required payments on the Loan and Turner and others sought to refinance the Project.

      101.     As a key element of a plan to refinance the Project, the parties entered into a

Deed in Lieu Event Agreement (the "Forbearance Agreement") dated as of July 26, 2010, among

Citibank, Borrower, Mortgager, Turner and others, in which Citibank agreed to forbear from pursuing its

remedies for nonpayment and sell the Loan and other related interests for $8.5 million (the "Purchase

Price") in exchange for certain interim forbearance payments to be treated as payments of principal and

interest and applied against the Purchase Price upon completion of the purchase by an agreed-upon

deadline (the "Purchase Deadline").

      102.     The Purchase Deadline was extended nine times by amendments to the

Forbearance Agreement.  During each period covered by the Forbearance Agreement as amended, Fore

and others, individually and on behalf of the Development and related entities, made the forbearance

[10]

467

payments and paid other obligations of Mortgagor, including real estate taxes and other expenses, totaling in excess of $1.5 million.

103.    After lengthy negotiations and purported due diligence, on August 19, 2011, Fore obtained a commitment for a $9.5 million loan to acquire the Loan and provide additional capital for the Project.  The prospective lender required a substantial fee as a condition of issuance of the commitment and the parties anticipated a closing in September, 2011.  In anticipation of the scheduled closing, the last Purchase Deadline was allowed to expire on September 15, 2011.

104.    The lender continued to interpose spurious obstacles to the closing until finally on October 25, 2011, the lender notified the parties of its refusal to complete the loan.  Subsequent investigation revealed the lender was engaged in a widespread scheme to defraud numerous borrowers by accepting fees for the issuance of commitment for loans they never intended to fund.  On information and belief a class action lawsuit is currently pending against the lender and its principals, as well as one or more criminal investigations.

105.    The unanticipated collapse of their financing was a major setback for the Project. Fore, Turner and others restarted their search for a source of funds financing to purchase the Loan.  At all times, Citibank continued to cooperate notwithstanding the expiration of the Forbearance Agreement.

106.  On July 12, 2012, in a telephone conversation between Turner and Lynn Forsell ("Forsell,") one of Citibank's representatives with responsibility for the Loan, Turner again proposed terms for the purchase of the Loan, taking into account the forbearance payments made to date.  On July 13, Forsell sent an email to Turner in which she set forth the following terms, subject to the execution of binding documents:

| | |
|---|---|
| Purchase price | $6,900,000.00 |
| Expense Reimbursement | $236,028.00  Legal, taxes and utilities |
| Total Consideration | $7,136,028.00 |
| PAYMENTS: | |

[11]

468

|                  |                                          |
|------------------|------------------------------------------|
| Up-front Deposit | $3,500,000.00 Due upon signing of Purchase Agreement |
| Payment #2       | $1,818,014 Due by 9/1/12                 |
| Payment #3       | $1,818,014 Due by 11/1/12                |

107.   Believing Turner had identified a source of funds to purchase the Loan, Citibank caused a draft Loan Purchase Agreement to be prepared embodying those terms.  That source of funds did not materialize, however, and although beginning to lose patience, Citibank continued to express its willingness to complete the transaction.

### Establishment of Relationship with Vision

108.   Fore had a long-standing business relationship with Jeanine Davis ("Davis,") principal of Vortex Investments, LLC ("Vortex,") a financial consultant located in Richmond, Virginia.  An agreement was executed with Vortex on November 7, 2012, pursuant to which Vortex agreed to provide financial consulting services for the purpose of identifying potential sources of funds for Westport to purchase the Loan and refinance the Project.

109.   In an email on November 16, 2012, to Fore and Fore's Vice-President for Development Patrick Rhodes ("Rhodes,") Davis reported that Vision had made a preliminary review of information supplied by Davis and expressed an interest in the Project.  Vision was one of four potential sources of capital Davis identified for Westport.

110.   Because of the high profile nature of the Project, the involvement of the City of Baltimore and State of Maryland, and prior experiences with disreputable lenders, the integrity of any potential investors or partners was of primary concern to Counterclaim and Third Party Plaintiffs. Davis' preliminary research on Vision was positive and after an initial internet search Rhodes agreed to talk to them. Davis arranged an introductory telephone conference among Rhodes, Schwarz and other representatives of Vision at 5:00PM on November 16, 2012.  In that conference Schwarz described Vision and its method of doing business.  Shwarz said Vision's partner in its investments was MSD Capital, Inc., ("MSD,") a New York based investment firm devoted exclusively to managing the capital

[12]

469

of Michael Dell and his family. Because of Counterclaim and Third Party Plaintiffs' prior experience regarding advance payment of fees Rhodes specifically asked about financial obligations to Vision prior to receipt of a firm commitment. Schwarz said Vision would perform the necessary due diligence at their own expense except for actual out-of-pocket travel expenses to be advanced by Counterclaim and Third Party Plaintiff. Schwarz said if after completion of their due diligence Vision decided to proceed with a transaction, Counterclaim and Third Party Plaintiff would be obligated to pay Vision's attorneys fees for preparation of the necessary documentation of the transaction.

111.   Based on a "high level review" of the information supplied by Davis, Towler sent an email to Fore and Davis on November 19, 2012, containing a list of approximately 30 questions about the Project and the proposed transaction. Comprehensive answers to those questions required disclosure of confidential and proprietary information and Counterclaim and Third Party Plaintiff were unwilling to provide that information without assurance it would not be disclosed to others or used by Vision or their partners or consultants to circumvent Counterclaim and Third Party Plaintiff and acquire the Note.

## The NDA

112.   In a conference call at 12:45PM on November 20, 2012, representatives of Counterclaim and Third Party Plaintiff told Vision they required execution of a confidentiality and non-disclosure agreement prior to responding to Vision's questions. Vision agreed to sign such a document and offered to provide a draft for review.

113.   At approximately 4:30PM on November 20, Towler sent the first draft of an agreement for review. On November 21, 2012, the day before Thanksgiving, Rhodes sent Towler a revised version of the document, saying "We've added entities and non-circumvention language to your NDA. Please review and execute if you are okay with the additions and we can turn around the answers to your questions immediately." Towler replied within 10 minutes saying "We probably will not get this turned until Friday."

[13]

114.   Shortly thereafter Counterclaim and Third Party Plaintiff discovered Citibank filed a Notice of Order to Docket Foreclosure in the Circuit Court for Baltimore City on November 20, 2012, and advised Vision of that fact.

115.   On Monday, November 26, 2012, Towler sent Rhodes a final draft of the Mutual Confidentiality and Non-Disclosure Agreement (the "NDA") to be executed among Vision, Partners, Development, Turner and Fore.

116.   Rhodes received a fully executed copy of the NDA on November 27, 2012. A copy of the NDA is attached hereto as Exhibit 2.

117.   For the purposes hereof, the significant provisions of the NDA are Section 1, "Confidentiality and Non-Circumvention" and Section 4, Remedies.

118.   In Section 1(a) of the NDA the parties agree not to disclose confidential information to anyone other than the parties and their agents, partners or employees without the written consent of the other party.

119.   Section 1(b) of the NDA states as follows:

> Westport and Vision agree that they will not, and will require that their *partners, consultants and agents and any other person to whom they show the Project* to and any of that person's partners, members, officers, employees, consultants and agents, for a period of one (I) year commencing from the date of this Agreement, without the prior written consent of the other party, will not, contact directly, or indirectly, any person or entity, including but not limited to management of any person the parties have introduced the other party to or circumvent Westport and Vision position with respect to an introduced party or opportunity or any other party introduced to Westport and Vision. Westport and Vision further agrees they, or any of the other parties referred to herein, *will not enter into any agreement or relationship with any introduced party or opportunity except through the efforts and approval of Westport or Vision as the case may be*. (Emphasis supplied.)

120.   Section 4 of the NDA, "Remedies," states as follows:

> The parties hereby specifically acknowledge that monetary damages to any of them for breach of this Agreement may be difficult to determine and/or inadequate to compensate the parties for such breach and the parties hereby agree that, in the event of any breach, in addition to any other remedies a party or parties may have under the terms of this

[14]

471

Agreement or at law, *the non-breaching party or parties shall have the right to bring an action in equity for an injunction* against the breach or threatened breach or seek specific performance of the obligations of the breaching party under the terms of this Agreement. In addition to any damages awarded at law or equity, *the parties acknowledge and agree that the disclosure of information or the circumvention contemplated hereby may cause considerable damage* for which the offending party may also be held pecuniary liable. (Emphasis added.)

### Vision's Extensive Due Diligence

121.    During the ensuing two months, Counterclaim and Third Party Plaintiff supplied extensive, detailed information regarding the Property, the Project and the Loan, most of which was private, confidential information developed by Counterclaim and Third Party Plaintiff at substantial cost over a number of years, together with private access to its professionals and consultants .

122.    Shortly after receiving the fully executed NDA on November 27, 2012, Rhodes sent an email to Towler, Bailey and Schwarz providing answers to the questions posed by Vision along with copies of an environmental summary and a statement of sources and uses of funds.

123.    On November 30, 2012, Rhodes emailed Towler and Bailey advising them a complete set of due diligence files related to the Project was being uploaded to Vision's online Sharepoint account. Approximately 249 documents were uploaded, comprising approximately 675MB of data.  The overwhelming majority of those documents were not public and contained highly sensitive and proprietary information about the project including financial projections, architectural, engineering and environmental data, organizational documents, drafts of contracts, insurance documents and other documents and information not publicly available (the "Basic Documents").

124.    Because prior attempts to purchase the Note had not materialized, Turner did not wish to risk further damage to his credibility with Citibank.  Therefore, until the relationship with Vision progressed to a point where it seemed that a transaction was likely Turner did not want to put Vision in direct contact with Citibank.

[15]

472

125.   On November 30, 2012, Schwarz emailed a list of five questions to Turner which Schwarz asked Turner to submit to Citibank.  That day Turner forwarded the questions in an email to Forsell.  In that email Turner said he was working with Vision to fund the project and secure the Note. Rather than answer the questions, Forsell responded curtly and said Citibank was proceeding with its plans to foreclose the Note and was not entertaining offers at that time.

126.   Following conversations with other representatives of Citibank it was determined that Forsell's email was a reaction to the apparent preliminary nature of Vision's questions.  Those representatives suggested Citibank would be receptive to an offer from an investor who had completed its due diligence investigation and was in a position to make a firm commitment to complete a transaction without further delay.  That information was conveyed to Towler and Schwarz.

127.   From November 30 through December 3, Towler and/or other agents or employees of Vision continued an intensive review of the Basic Documents and other due diligence activities. Numerous emails were exchanged requesting detailed information on the sources and uses of funds advanced by Citibank and other investors, the cost of acquisition of the real estate, questions regarding entitlements, zoning and tax increment financing ("TIF,") engineering, environmental issues, etc.

128.   On November 30, 2012, Towler spoke to Deputy Mayor Kaliope Parthemos, who expressed the City of Baltimore's support for the project.   In an email that day, Towler characterized his conversation with Parthemos as "very productive."

129.   On December 1, 2012, Towler wrote an email to Turner reiterating his need for confirmation that Citibank was in fact willing to sell the Note, saying Schwarz was attempting to contact counsel to Counterclaim and Third Party Plaintiff to arrange a conference call with Citibank's local counsel to discuss the matter.

130.   On December 3, 2012, Towler emailed counsel for Counterclaim and Third Party Plaintiff indicating a desire to visit the Project site and meet with representatives of the Maryland Department of the Environment, the Deputy Mayor of Baltimore, other city representatives familiar with

[16]

473

the Project, the author of the appraisals of the Property, and a representative of the real estate brokerage

firm CB Richard Ellis ("CBRE") who had provided services to the Project.  Towler asked Counterclaim

and Third Party Plaintiff to purchase his airplane ticket and pay his hotel expenses which Counterclaim

and Third Party Plaintiff did.

131.   Towler arrived in Baltimore on the evening of December 4, 2012, and met with Turner

and Rhodes at Turner's office on December 5.  Turner made an extensive PowerPoint presentation about

the Project and answered many questions posed by Towler.

132.   Turner arranged a number of meetings for Towler in response to Towler's requests.

Following the Powerpoint presentation, Turner, Rhodes and Towler met for approximately 45 minutes

with the two former employees of the Baltimore Development Corporation ("BDC") who were the

City's project managers for Westport.  During that meeting they gave Towler detailed information about

BDC's involvement, their opinions of the Project, details about the TIF for the Project, the City's views

of Turner and his relationships with various local and municipal persons and entities, and answers to

questions about possible concerns about the Project's feasibility.

133.   Turner and Rhodes then took Towler to the site, where they were met by Denise

Sullivan, one of the Project's environmental consultants, and three representatives of the Maryland

Department of the Environment ("MDE") including Gary Schold, the head of MDE's Voluntary Cleanup

Program.

134.   The site inspection continued for more than 45 minutes during which time Towler

asked numerous questions about environmental conditions, potential environmental risks and related

issues.  The representatives of MDA confirmed Turner's representations that to the extent environmental

issues remained to be addressed; none were of a significant enough nature to impede development of the

Project.

135.   Turner, Rhodes and Towler then went to the offices of CBRE where they met with

John Wilhide for approximately 45 minutes.  During that meeting Wilhide gave Towler detailed

[17]

474

information about the Baltimore real estate market, including absorption rates for residential, office and commercial uses, along with Whilhide's views of the Project. Whilhide provided contact information for Michael Muldowney, CBRE's apartment specialist with whom Towler subsequently spoke.

136.   Turner, Rhodes and Towler then drove through several other areas in Baltimore city, after which they met at Fore's office for approximately 45 minutes with Greg Jones, the author of two appraisals of the Property. Towler and Jones reviewed the appraisals in depth, including Jones' appraisal methodology, and Towler asked Jones to provide a "worst case" evaluation. Towler then requested a list of comparable properties for comparison purposes which Jones provided to Towler in an email on December 6, 2012.

137.   Turner, Rhodes and Towler met for dinner that night. Towler's return to Utah was scheduled for late the next day. When Turner offered to arrange an earlier flight Towler said he planned to stay in Baltimore for the entire next day and engage in further due diligence activities.

138.   In an email on Thursday morning, December 6, 2012, Schwarz said Vision hoped to talk to Citibank that week and asked whether a call with Citibank's counsel could be arranged. In preparation for their conversation with Tom Lewis, Esquire ("Lewis,") local counsel to Citibank, Schwarz, Towler and counsel to Counterclaim and Third Party Plaintiff spoke At 1:30PM that day. Lewis joined the call thirty minutes later and counsel to Counterclaim and Third Party Plaintiff introduced Schwarz and Towler. A discussion ensued for approximately 40 minutes during which Schwarz asked a number of questions about the history of the loan and the parameters of a possible transaction. In turn, Lewis asked questions about Vision, the status of their interest and their ability to perform. In response, Schwarz described Vision's history and capabilities, saying Vision and MSD would jointly participate in the transaction.

139.   On December 7, 2012, Towler wrote counsel to Counterclaim and Third Party Plaintiff thanking him for arranging the call with Lewis and requesting a copy of the most recent draft of the Note Purchase Agreement previously negotiated between Counterclaim and Third Party Plaintiff and

[18]

475

Citibank. Later that day counsel to Counterclaim and Third Party Plaintiff sent Schwarz and Towler a copy of that document.

140. On December 10, 2012, Towler asked for overall pro-forma projections for the Project. After consultation with Turner and others, Rhodes prepared a set of projections which he emailed Towler in a PDF format later that evening.

141. On December 11, 2012, Towler requested the Excel version of the projections which Rhodes provided. Towler also sent an email to Turner, Rhodes, Fore, Bailey, and Schwarz requesting a conference call that afternoon "…to update the progress of the potential financing."

142. That conference call took place at 1:00PM on December 11, among Turner, Rhodes, Towler, Bailey, Schwarz and counsel to Counterclaim and Third Party Plaintiff. Towler said they were "very close" and were in the process of "crunching numbers" with MSD. Towler said Vision would be in a position to present a transaction structure in approximately one week. Towler explained that although Vision originally approached the investment in Westport as conforming to their "standard" model of debt with a two-year maturity and an approximately two times return, it now viewed the opportunity as a longer term investment possibly including additional funds to move the Project along with a possible equity component. The parties also discussed the alternative of debt with a right to convert all or a portion into equity.

143. On December 14, 2012, Towler indicated he was reviewing organizational documents for the entities involved in Westport and asked Turner about the existence of an amended Operating Agreement for a particular limited liability Company. An email exchange ensued and Turner said he would find the answer.

144. In the evening of December 17, 2012, Towler called Rhodes saying he was in New York with their partner MSD and asked if he could bring two of their people to Baltimore the next day to meet with Turner, see the Project, tour Baltimore and learn more about the project and the market. After

[19]

476

confirming Turner and Fore's availability, Rhodes and Towler arranged a meeting in Baltimore the next day.

145.   Turner later called Towler and asked about the purpose of the visit.  Towler said the MSD representatives had a negative view of Baltimore which he hoped to overcome.  At that time Towler also requested a copy of Fore's personal financial statement which was sent the next day.

146.   Turner met Towler and MSD representatives Marc Ostiguy and Simon Crocker at the Baltimore train station on the morning of December 18.  Turner asked whether either was familiar with Baltimore.  One said he went to college in Washington, DC and the other said his impressions of Baltimore came from watching the television series The Wire.

147.   Turner transported all three to his office where he made a presentation about the Project and responded to numerous questions.  During that meeting Towler referred to MSD as Vision's "big brother" and described their relationship.  Towler said Vision performed the due diligence for a potential investment, Vision and MSD provided the required capital with MSD usually providing the larger portion of the funds, and post-closing Vision managed the investment for which they were paid a fee.  At the conclusion of that meeting they first visited the site and then toured various areas of Baltimore.

148.   At the end of the day Turner took the MSD representatives back to the train station and asked what they now thought of Baltimore.  The person whose knowledge of Baltimore came from The Wire replied, "I could live here."

149.   Turner, Fore, Rhodes and Towler then had a late lunch and discussed the Project. Towler said they should be getting a proposal to Counterclaim and Third Party Plaintiff "quickly."  Fore purchased a plane ticket for Towler's return to Utah later that day.

150.   As part of his continuing due diligence activities, Towler spoke to representatives of Khovanian Homes on December 19, 2012.  At one time Khovanian was a contract purchaser of residential lots at the Project but the contract expired because completion of the necessary site

[20]

477

infrastructure work to prepare the lots for sale was impossible due to uncertainty surrounding the Project's financing.

151.    Turner asked for an update on December 20, 2012, and Towler replied by saying they were continuing their due diligence.  Towler requested information on competing development sites in Baltimore and details on1 public funds allocated to the Project.

152.    On December 24, 2012, Towler inquired about the state of title to the Property.  Towler was told the Citibank attorney reviewed a recent report and said the title was clean but Towler wanted a more recent report.  Rhodes sent Towler a June 8, 2012, title report and agreed to order a bring-to-date.

153.    On December 27, 2012, Rhodes sent Towler the updated title report requested on December 24.

### Negotiations to Purchase the Note
### Among Counterclaim and Third Party Plaintiffs, Vision and Citibank

154.    A number of potential investors and partners expressed interest in Westport over the period during which time Vision conducted its due diligence.  In mid-December, as Vision was completing its due diligence and nearing the point of readiness to finalize a transaction, Westport told the other potential partners about their relationship with Vision and said it would be inappropriate to continue their discussions unless the transaction with Vision did not proceed.

155.    From time to time Counsel to Counterclaim and Third Party Plaintiffs communicated with Lewis to discuss Citibank's position and the status of potential transactions.  Several times in late December, 2012, Counsel to Counterclaim and Third Party Plaintiffs advised Lewis that Vision was on the verge of submitting an offer to Citibank.  Lewis said other parties had expressed some interest and suggested Vision submit its offer without delay.

156.    On December 27, 2012, Towler sent a Letter of Intent to Forsell, communicating Vision's proposed terms for the purchase of the Note.  Towler later told Turner Vision offered approximately $5.5 million for the Note and agreed to close the purchase by January 15.  Towler later

[21]

478

sent Turner an email asking counsel to Counterclaim and Third Party Plaintiffs to inform Lewis that

Vision submitted that Letter of Intent.

157.   In an email to Towler on December 31, 2012, Forsell said Vision's offer was too low

and did not include a binding contract or a non-refundable deposit "...so we are not prepared to counter

at this time."  Towler forwarded that email to Turner, with a copy to Bailey and Schwarz, saying:

158.   In an email to Towler on December 31, 2012, Forsell said Vision's offer was too low

and did not include a binding contract or a non-refundable deposit "...so we are not prepared to counter

at this time."  Towler forwarded that email to Turner, with a copy to Bailey and Schwarz, saying:

> Here is the response from Lynn at Citi. Our LOI was the first pass at getting a firm price
> for acquiring the Note. If we can get Citi to negotiate, we are willing to work to a price
> that is acceptable to both parties. Our LOI contemplated a Purchase and Sale Agreement
> upon acceptance of the LOI. This would allow us to be engaged with Citi on an exclusive
> basis. We can do a refundable deposit during the feasibility period but can not do a non-
> refundable deposit from day 1. We have reached out to Lynn to see if she has time to
> discuss these issues today.
>
> I think it wuld [sic] be prudent to have [counsel for Counterclaim and Third Party
> Plaintiffs] reach out to Lewis to go through this information. [Counsel for Counterclaim
> and Third Party Plaintiffs] needs to reinforce that we are *extremely* [sic] *serious about
> closing this transaction by January 15, 2013*.  (Emphasis added.)

159.   At approximately 1:30PM on December 31, a conference call took place among

Towler, Schwarz, Turner, Fore, Rhodes and counsel to Counterclaim and Third Party Plaintiffs.  The

potential terms of an improved offer were discussed, including the issue of a non-refundable deposit.

Schwarz said he wanted to engage local counsel to review the loan documents prior to submission of a

contract incorporating a non-refundable deposit.  Fore asked about the terms of the transaction between

Counterclaim and Third Party Plaintiffs and Vision.  Schwarz said Vision needed to understand the

terms of the deal with Citibank before finalizing the structure with Counterclaim and Third Party

Plaintiffs.  Counsel for Counterclaim and Third Party Plaintiffs offered to recommend alternatives for

local counsel.

[22]

160.   One of the people contacted by counsel for Counterclaim and Third Party Plaintiffs in an effort to provide local counsel recommendations was Mark Friedman, Esq. ("Friedman,") a partner at DLA Piper.  Friedman was asked for suggestions of DLA Piper attorneys for recommendation to Vision. Friedman was told the matter involved refinancing of the Westport Project, including acquisition of the Note and documentation of the relationship between Westport and Vision.  Friedman asked for the identities of the parties involved to run a conflicts check, and then suggested two lawyers including Richard Levine, Esq. ("Levine").   Friedman said he would confirm DLA's willingness to consider the representation.

161.   At approximately 4:45PM on January 2, 2013, counsel for Counterclaim and Third Party Plaintiffs sent Schwarz recommendations of lawyers from two local law firms, including Richard Levine at DLA Piper.

162.   At 5PM on January 2, 2013, Friedman wrote "We are all set to go if we can help with that project." At approximately 6PM counsel to Counterclaim and Third Party Plaintiffs told Schwarz ,"I asked both firms to make sure they did not have conflicts and could undertake the representation…. just got an email from DLA saying they are all set to go if they are asked to help."

163.   On January 3, 2013, Schwarz sent an email saying Vision substantially increased its offer to Citibank and was continuing to work with Citibank's management.

164.   On Friday, January 4, 2013, Turner received an email from Addison Palmer of STV, Incorporated, civil engineers for the Project in which Palmer said "We received a call from Doug Fowler [sic] indicating you're his client and wanting some background regarding Westport and Port Covington. Do you have any objections with us meeting with him or discussing the Westport project?"  On January 7, 2013, Turner replied, "We are working with Doug Towler from Vision Capital in Utah; I assume that's who you mean. Yes they are coming in to fund the project moving forward and yes you can discuss it with him."

[23]

480

165.   In the early afternoon of January 4, Turner asked Towler if they had heard anything from Citibank, and Towler said no.

166.   Later that afternoon counsel to Counterclaim and Third Party Plaintiffs called Lewis who advised that although the financial terms of Vision's offer were "in the ballpark" Citibank was not willing to accept the offer because it did still not regard it as an unconditional, binding contract to purchase the Note including a substantial nonrefundable deposit.  After that position was conveyed to Schwarz he said Vision might be willing to agree to those terms. Counsel to Counterclaim and Third Party Plaintiffs then relayed that information to Lewis who said if that were true it might alter Citibank's position.  At approximately 6:00PM counsel to Counterclaim and Third Party Plaintiffs arranged a telephone conference between Schwarz and Lewis.

167.   After the conversation between Schwarz and Lewis, Schwarz said Vision would confirm its position after an internal meeting the next day and Lewis undertook to locate Forsell to communicate these latest developments to her.

168.   On Saturday, January 5, 2013, Turner asked Towler if Vision was going to submit a contract to Citibank. Towler replied saying they were "…discussing a couple of scenarios.  I will keep you posted."

169.   On Monday morning, January 7, Towler told Turner "I think it all depends on Citi. Let's talk after 2PM".  Schwarz said Towler was supposed to have a conference call with Citibank that day.  That evening Turner spoke to Towler who declined to provide details, but said Vision was scheduled to have an internal conference call the next morning.

170.   In an email at 10:50AM on January 8, 2013, in response to a request for an update Schwarz said "I am going to be tied up all morning in a meeting on an LOI being negotiated on another matter.  We did talk to Citi and I believe Doug is going to be flying back to Baltimore tonight."

171.   At approximately 1PM on January 8, Towler called Turner and said he was coming to Baltimore the next day to finalize deal terms and was bringing two developers from Las Vegas with

[24]

481

whom Vision had done business in the past on deals "out West."  Towler said they were consultants he asked to perform a final "litmus test" to validate Vision's due diligence.  Later that day Schwarz also confirmed the two individuals were consultants whose only role was to validate Vision's due diligence.  At the time he made those statements Towler knew they were false.

172.   At 11AM on January 9, 2013, the parties met at the Hyatt Hotel at Towler's suggestion.  Turner arrived first and Towler introduced him to three people, not two: Burton, Dowers and Borden (collectively "BDB,") again describing them as Vision's consultants to provide a "litmus test" of his due diligence.  Fore and Robert Hobson arrived shortly thereafter while Turner was talking about the Project.  Towler said he had gotten BDB "up to speed" and Burton told Fore BDB only had 72 hours to review the package of information about the Project.  Dowers said they would be in Baltimore for two days and wanted to meet with the civil and environmental engineers before they left.  Everyone then adjourned to go to the site.  Tower, Dowers, Burton and Borden knew the characterization of their role as merely consultants was false.

173.   As they were leaving the Hyatt, counsel to Counterclaim and Third Party Plaintiffs arrived in anticipation of a meeting to discuss the structure of the transaction.  Turner, Towler and BDB went to the site in one car, and Fore, Hobson and counsel to Counterclaim and Third Party Plaintiffs followed in another.

174.   Shortly after arriving at the site on January 9, Towler told Turner he was uncomfortable with the presence of counsel to Counterclaim and Third Party Plaintiffs.  After the tour of the site during which a number of questions were asked, Turner, Towler and BDB visited the adjacent neighborhood and then proceeded to Turner's office.  Counsel to Counterclaim and Third Party Plaintiffs dropped Fore and Hobson at Turner's office.  Fore joined Turner who showed Silo Point, another of his projects, to Towler and BDB.  While walking back to Turner's office Fore asked Towler about BDB's role and whether they were potential investors or substitute developers.  Towler reiterated BDB were merely

[25]

482

there as a "litmus test" and no investment or other role had been discussed. Towler knew that statement was false.

175. Turner then made a presentation about the Project and answered numerous questions. Burton and/or Dowers reiterated their role as consultants to review Towler's due diligence on the Project. At the time they made that statement they knew it was false.

176. Dowers described his and Burton's prior real estate development experience and displayed a presentation about a data center Borden purchased from Enron. Dowers said Borden "will never have to work again because he has made his fortune." Turner and Towler discussed the possibility of having dinner that evening, but Towler called later and said they were going to discuss the Project among themselves over dinner and would meet the next day to discuss deal terms.

177. At some point during their meetings on January 9, 2013, Towler said he planned to meet with Vision's counsel Richard Levine ("Levine") at DLA Piper. Counsel for Counterclaim and Third Party Plaintiffs called Levine at approximately 7:45PM and during an approximately 45 minute conversation provided Levine with detailed background information about the contemplated transaction and discussed possible deal structures between Vision and Westport. Levine raised several issues, including potential tax liabilities resulting from a foreclosure sale.

178. At 7:50AM on January 10, 2013, Towler called Turner asking for the telephone number for Addison Palmer of STV Engineers because he wanted to arrange a meeting among Palmer, himself and BDB. Turner asked about their schedule, and at 10:20AM Towler responded with an SMS message saying "We are meeting with counsel at noon. I will call you after that." At 11AM, Towler sent an SMS message asking to speak with Jim Hulbert at EA Engineering, an environmental consultant to the Project. Turner gave Hulbert's cell phone number to Towler, and called Hulbert to give permission for Hulbert to speak to Vision.

[26]

483

179.   At approximately 11:00AM on January 10, counsel for Counterclaim and Third Party Plaintiff wrote to Levine and offered to provide a complete binder of original closing documents for the Citibank transaction for his review.  Levine picked up those documents later that evening.

180.   Towler sent Turner an SMS text message at 1:52PM on January 10, asking if Turner could meet at DLA Piper's Light Street office at 2:30PM.  Turner replied by asking "What's the agenda?  Who are we meeting with?"  Towler said "Deal points. Can [Fore] come?"  Turner replied, "He's out of town I can get [counsel to Counterclaim and Third Party Plaintiffs] to come."  Towler responded, "No attorneys".

181.   When Turner advised Fore of the meeting, Fore asked Rhodes to join Turner at DLA's office.  Rhodes was in Towson and although he left immediately he did not think he could arrive by 2:30PM.  Fore asked Turner to delay the meeting if possible.

182.   Turner arrived at DLA Piper's Light Street office at 2:30PM.  Towler was seated at the head of the conference table, BDB were seated to Towler's left, and Turner sat across from BDB.  When Turner arrived, Towler and BDB were concluding a call with Hulbert on a speakerphone.  When the call ended Dowers said EA Engineering spoke very highly about both the Project and Turner, and "they were satisfied with everything he said about the Project."

183.   When Turner asked to delay the meeting until Rhodes could arrive, Dowers said there was no need to wait for Rhodes, and continued "There is only one way we are going to do this deal, and it is very simple."  Dowers then said, "[Towler], explain the offer."

184.   With some apparent discomfort, Towler outlined the terms of the proposed deal between Vision and Westport.  He said "We are willing to purchase the Note and we want to proceed with a foreclosure."  He said Counterclaim and Third Party Plaintiffs would have a one year option to pay off the note for an amount equal to twice Vision's total cost of acquisition of the note, including all costs of completion of the foreclosure, estimated at between $8-8.5 million, making the option price between $16-17 million.  Vision would not advance any funds other than those necessary to purchase the

[27]

484

Note and would not permit partial releases of any parcels or other development activities prior to full payment of the option price.

185.   When Turner asked whether they could discuss extensions of the term or other issues, Dowers said "There will be no extensions—that's the deal." Turner asked whether Towler would still be the point person, and Dowers said "Yes, deal with Doug." Although on information and belief Towler and BDB knew BDB would have a significant involvement in the transaction, that information was concealed from Turner.

186.   Turner said he would discuss the proposal with Fore. As he was leaving he was told Doug and BDB were flying out that afternoon. Dowers told Turner the proposal would be withdrawn if not accepted by 5:00PM Monday, January 14.

187.   Turner left the meeting at approximately 3PM. At 3:07PM he received an SMS message from Towler saying "Call me in the morning."

188.   Prior to this visit to Baltimore Towler was very upbeat and his attitude towards the Project and the people with whom he communicated regarding the Project was consistently positive, cooperative and flexible. Beginning with the meeting at the Hyatt on January 9, however, and continuing throughout the entire visit, Towler's demeanor was noticeably and uncharacteristically awkward and uncomfortable. He avoided eye contact and seemed reluctant to make the statements he was asked to make. On information and belief Towler knew BDB's role in the transaction was far more extensive than he disclosed, but intentionally withheld that information from Counterclaim and Third Party Plaintiffs.

189.   Shortly before 8:00AM on Friday, January 11, 2013, Turner called Towler and expressed his surprise and dismay at the terms of the proposal and the extent to which it deviated from the terms previously discussed. When Turner said the proposal bore no resemblance to any prior discussions and could never work, Towler simply said "Make a counter-offer. Let's keep talking about the deal. Tell us what works for you."

[28]

485

190.   At approximately 9:49AM on January 11, Towler wrote to Turner, with copies to

Bailey and Schwarz, and said:

> Rather than have [counsel to Counterclaim and Third Party Plaintiffs] continue to call
> Rich Levine, the most efficient [sic] method to get resolution to the terms of this
> contemplated transaction is to send us, in writing, the questions you have and a counter
> proposal, if appropriate. This will streamline the back and forth process. Based on the
> circumstances with Citi, we need to make sure that we are working efficiently and within
> a very short time frame.
>
> I am in the office today. Let me know if you need anything from me.

191.   At 10AM, approximately ten minutes later, Turner sent Towler an email in

response.  Turner wrote:

> I'm sure you can understand that your proposal came as a bit of a surprise.  Until today
> we thought we were working around a framework of at least 2 years and more in the
> spirit of a JV.  We are trying to digest your proposal but need answers to some questions
> to fully understand the implications of the deal."

Turner then asked a series of questions to clarify aspects of the proposal:

> 1. If a foreclosure is necessary (which we'd like to discuss) will you commit to
> buy the property in at the sale or agree, if a bid exceeds a predetermined price, to
> share the proceeds if you elect not to make a higher bid?
>
> 2.  What has changed to cause you to now require a 2x return in 1 year when you
> have always told us your target was a 2x return over 2 years?  Is the 1 year period
> rigid?
>
> 3. We thought you were going to include some operating funds. What happened to
> that?
>
> 4.  Are these terms driven at all by the need to bring in additional funds and *does
> this proposal reflect the requirements of those new investors?  If so, you should
> tell us because we have investors who we put off because of what we believed our
> relationship with you was to be, but who may be willing to participate in the
> investment on more realistic terms than these*.
>
> Bottom line we need to know if you are willing to negotiate a deal that makes
> business sense and provides at least a realistic expectation of success.  Obviously
> you see the potential of this project.  We hope it is your intention to structure a
> deal that lets everyone to share in its success. (Emphasis added.)

[29]

486

192.   Towler replied at 11:29AM on January 11, with copies to Bailey and Schwarz.  Towler cited difficulties with the transaction and denied that Vision had ever discussed any particular deal structure.  He said their attorneys and partners were encouraging them to pass, but did not answer any of Turner's questions.

193.   At 12:14PM on January 11, Turner wrote to Towler, Bailey and Schwarz, saying:

> Thanks for your email.  We fully understand the challenges of this deal and appreciate the time and energy you have invested.  We still need to understand exactly what you are proposing.

> Let's start with the first question I asked before:  assuming a foreclosure is the appropriate course of action once you have purchased the note, will our agreement include a commitment by you to bid the property in at the auction?  If not, what happens to the proceeds of the sale?

194.   During the prior two months Towler was in constant communication regarding this project and usually replied quickly to emails or telephone calls.  Uncharacteristically, for over seven hours Turner received no response whatsoever to his email.  Finally, at 7:45PM on January 11, Towler sent a cryptic email to Turner with copies to Fore, Rhodes, Bailey, Schwarz, and—for the first time— Burton, simply saying "Rick Burton will be the point person for this transaction. Please direct all communications to him."  Towler knew BDB was going to take Vision's place in the transaction but failed to disclose that information.  Towler knew that Counterclaim and Third Party Plaintiffs' written consent was required for disclosure of confidential information to BDB in any capacity other than Vision's consultant or agent and also knew Counterclaim and Third Party Plaintiffs' written consent was required for Vision or BDB to enter into any agreement with Citibank.

195.   Shortly thereafter Burton sent an email to the same people saying:

> I am generally available this weekend and first of the week to discuss the proposal discussed at DLA Piper.
> I look forward to hearing from you and moving this deal forward.

196.   Following receipt of the emails from Towler and Burton, Turner and Rhodes did internet searches on Burton and discovered that a personal Chapter 7 Bankruptcy case was filed by him

[30]

487

on May 30, 2012, in the United States Bankruptcy Court, District of Nevada, and was still open.  The

schedule of claims in that case listed approximately $310 million in debts and only $6,500 in assets,

including $96 in two bank accounts and a $50 watch.  Among the creditors holding unsecured non-

priority claims was a $135 million claim of the Arizona Land Department for the purchase of land from

the state of Arizona, and more than $3 million in claims of the Internal Revenue Service for unpaid

income taxes and penalties for tax years 2005, 2006 and 2007.  *See In re Richard Burton,* Case #:12-

16401-mkn.

197.  Further searches by Turner also disclosed that Dowers filed a personal Chapter 7

Bankruptcy case in the United States Bankruptcy Court, District of Nevada, in May, 2010, and was

discharged in January, 2012.  Dowers reported over $120 million in debt and approximately $1.3 million

in assets.  *See, In Re Dale Dowers,* United States Bankruptcy Court for the District of Nevada, Case #:

10-16319-bam.

198.  By Saturday, January 12, 2013, when Counterclaim and Third Party Plaintiffs still had

not received a response to the question posed to Towler about bidding at the foreclosure sale, Fore sent

an SMS text to Burton at 3:09PM asking whether Burton would authorize Levine to talk to Counterclaim

and Third Party Plaintiffs' counsel about potential "phantom income" resulting from an overbid at the

sale.  Burton said he wanted to participate in such a call and would ascertain Levine's availability.

Apparently Burton had not flown out on January 10, and he said he was staying at the Ritz Carlton in

Washington, DC.  Burton asked if the foreclosure question was the only issue.  Fore responded by saying

he was "going over the issues now…" and offered to meet Burton in Washington the next day to address

specific questions face to face.

199.  Turner and Fore travelled to Washington, DC on Sunday, January 13, 2013, and met

with Burton at 10:00AM. At the meeting they presented a list of issues they felt were essential to resolve

with Vision before agreeing to any Vision's purchase of the Loan:

a.   A willingness to evaluate the pros and cons of a foreclosure;

[31]

488

    b.   Commitments for a minimum bid;

    c.   Sharing of any sale proceeds in excess of an agreed price;

    d.   Structure of ownership;

    e.   Basis in the note;

    f.   Phantom income on an overbid;

    g.   Two year minimum term;

    h.   Extensions upon meeting specified milestones;

    i.   Terms of early payoff;

    j.   Ability to execute documents and agreements necessary to advance the project;

    k.   Partial releases for sales of development parcels;

    l.   Cost of note acquisition; and

    m.   Advances of additional working capital

200.   Burton said he was sympathetic to what they were trying to accomplish because he had been through it himself. He said he did not have the authority to commit to any terms. He later said because his "…guys were scattered between *Utah and Nevada*…" he would contact them and respond. (Emphasis added.)

201.   At 2:08PM Burton asked for the email addresses of Fore, Turner and counsel to Counterclaim and Third Party Plaintiff, and at 2:42PM he forwarded an email Levine sent to Bailey, Schwarz, Towler, Burton, Dowers and Borden, providing an explanation of "…how the 'phantom income' applies in the case of a purchase of a note at a discount and a subsequent foreclosure."

202.   At 3:06PM Fore sent an SMS message to Burton saying "Once we know the position on the foreclosure and term, then we can focus on a simple structure." At 7:10PM Fore asked whether there was any news and at 8:26PM Burton said "No sir. Some of my guys are out of pocket today, including traveling back from Denver. Probably in the am."

203.   At 10:57AM on Monday, January 14, 2013, Burton wrote:

[32]

489

OK, it is still very early in *LV and SLC*, so I haven't spoken with any of my guys this morning. My initial call to *Dale and Ed* last evening was not positive regarding a 2 year term. I will be conferencing with them today and driving back to Baltimore to meet with Rich[Levine] @ DLA Piper to discuss challenges with meeting the terms of Citibank. (Emphasis added.)

204.    At 11:40AM Fore offered to "drop down to dla with [Turner]". Burton replied saying he "…just realized [Levine] is unavailable until 4PM today.  I have a call scheduled with him at that time."  Fore replied "Ok.  If you have feedback from Doug [Towler] and the group and want to talk through things, then we can figure out if there is a structure that works for everyone without too much brain damage prior to 4 pm."  Burton responded "I will call you on my drive over."

205.    At 5:11PM on January 14, Burton told Fore "Just now getting to Baltimore. I will call later for update."  At 6:45PM Burton told Fore "Just got into hotel and headed for dinner.  Call you after your swim."

206.    On information and belief, Vision reached agreement with Citibank on the terms of their purchase of the Note by January 15, 2013, and tentatively set a closing date for sometime at the end of January.  Counterclaim and Third Party Plaintiff believes a written agreement was drafted but does not know whether that was signed.  At no time did Counterclaim and Third Party Plaintiffs provide written consent to any agreement between Vision, or anyone else, with Citibank as required by the NDA. Vision did not disclose any information to Counterclaim and Third Party Plaintiffs about their agreement with Citibank.

207.    On information and belief Vision and BDB reached agreement on or before January 15, 2013, whereby BDB assumed Vision's position in the transaction.  BDB was introduced to the transaction and to Citibank by Vision, and relied on Vision's due diligence and the confidential materials provided by Westport.  BBD knew about the NDA but BDB and Vision ignored its terms. At no time did Vision or BDB disclose their agreement to Counterclaim and Third Party Plaintiffs, and Counterclaim

[33]

490

and Third Party Plaintiffs were neither asked nor did they consent to any agreement between Warhorse and Citibank.

### Actions of BDB

208.   At approximately 11PM on January 15, Fore and Burton spoke by telephone.  Fore emphasized the need to address the issues raised during their meeting the previous day. Burton basically reiterated the same terms as Towler's prior proposal, but agreed to allow two 30 day extensions of the one year maturity for $250,000 per month.  He set a deadline for acceptance of the offer of 5:00PM EST the next day.  When Fore asked what would happen if they were unable to reach agreement, Burton said they intended to purchase the Note regardless.  Fore expressly reminded Burton Counterclaim and Third Party Plaintiff's consent was required for any transaction with Citibank regarding the Note.

209.   At 8:20AM on Tuesday, January 15, 2013, Burton copied Fore on an email to Levine, saying "We had a good conversation with Tom Fore last night and re-conveyed our proposal to him concerning the Westport Waterfront project. We will be back to you after we hear back from Tom and Pat Turner."

210.   Fore responded at approximately 1PM with an email to Burton including the following:

> I've thought about last night's conversation. You said from now on we would only be dealing with u and Dale and Pat can trust you will be fair and reasonable. Obviously because he just met you Pat must trust you and feel comfortable he won't get screwed.
>
> You intend to buy the note one way or another and believe your proposal is Pat's only chance to salvage the deal.  You guys won't promise to buy the property at foreclosure, but if you do Pat will get a one year option to buy the property at a 2X return with two 30 day extensions ($250k ea.)
>
> You're asking Pat to put his future in your hands.  I think I know what Pat's issues will be and because time is so short I need to be able to address his fears.

[34]

491

I'm sure he will want to know 2 things *before he will even consider agreeing to you buying the note*: what is in it for him if he never gets the option and who will actually call the shots? (Emphasis added.)

211.    In an SMS message at approximately 9:30PM on January 15, Burton said the

following:

I will do my best to generally answer your questions. First, as me and Dale told you last night (and Pat in our other meetings), the principals on our side that is working on this deal are Michael (Mike) Borden, Dale and myself. More than likely, all or most of the monies will be provided by us. If VCP and MSD want to participate, we will determine that *AFTER we have secured the deal with you, Pat and Citibank*. (What portion and who provides the funds should be of no concern).

Secondly, me and Dale have many years of experience and will be on point for our group and be your direct contact for all decision [sic].

We can discuss a minimum bid for the foreclosure sale that will give you some assurances. Also, you mentioned limited advertising and we can surely agree on how that is handled. (Upper case in original, italics added.)

212.    At approximately 9:30AM on January 16, 2013, Schwarz finally responded to counsel for Counterclaim and Third Party Plaintiffs' emails and voicemails from the prior week with an email saying "…I have been moved onto a different project and not involved on Westport.  Please contact Rick Burton or the Baltimore counsel."  At 10AM, counsel to Counterclaim and Third Party Plaintiffs reiterated the need to speak to Schwarz, who replied, "I am home sick today.  What do you need to talk to me about".  At 10:09AM, counsel to Counterclaim and Third Party Plaintiffs replied, "Sorry you are sick.  I need to understand what is going on. Is Vision no longer in this deal?  All of a sudden we are dealing with a new cast of characters."  Schwarz never replied.  At the time Schwarz knew Vision had allowed BDB to assume Vision's place in a transaction with Citibank but deliberately failed to disclose that information.

213.    At approximately 1:30PM on January 16, Towler sent an email to Turner with copies to Fore, Schwarz and Bailey, saying "Based on receipt of your current proposal, Vision Capital Partners,

[35]

492

LLC will not be pursuing any transaction on Westport. We wish you good luck in your future endeavors." Although Towler knew BDB was continuing to pursue the Westport transaction in Vision's place and with Vision's consent, he failed to disclose that information.

214.    At 2:15PM on January 16, Fore sent an SMS message to Burton saying, "Vision just said they're out. Should I assume they were speaking for you too?" Burton replied "No, the offer sent to you by text last night is still on the table as of now." And one-half hour later Burton said, "Tom, Unfortunately, it is almost 3:00pm and our offer was good thru 5:00pm today."

215.    At 5:01PM on January 16, Burton wrote, "It is 5:00pm and the proposal from last week is now formally withdrawn. I am still available for conversation with you and Pat [Turner] tonight."

216.    At 5:33PM on January 16, Fore asked Burton, "Since we don't have a deal, any idea what citi gonna do". Burton replied, "To my knowledge, they are proceeding with the foreclosure." At approximately 6PM, Fore wrote, "ok, thanks. we will resume our negotiations with citi now that the vision team is no longer involved. We had left it to vision for the last week or so but now that its dead we will pick it up again from here." Burton knew BDB had taken Vision's place in the transaction but intentionally failed to disclose that information.

217.    For the remainder of the evening on January 16, Fore and Burton exchanged text messages, culminating in Burton's message at 10:23PM saying "Talk in the am." At no time did Burton disclose to Fore that BDB was continuing their efforts to purchase the Loan.

218.    Articles of Organization for Warhorse were filed with the Nevada Secretary of State on January 17, 2013, the day after Towler's email saying Vision was no longer involved with Westport. The manager of Warhorse is Warhorse Acquisitions, LLC, another Nevada limited liability company, of which Dowers is the manager.

219.    At 8:55AM on January 17, 2013, Fore asked Burton, "Want to hook up today?" and Burton replied, "Sure. I am headed out right now but will check with you later." At 3:10PM Fore again asked if Burton wanted to connect, to which Burton asked about Korean restaurants and "Have you and

[36]

493

Pat [Turner] reconsidered?" Although Fore attempted to coordinate a dinner meeting with Burton, it never occurred.

220. At 11:17PM on January 17 Fore sent the following SMS message to Burton:

Rich, I am beginning to think something is fishy and we're being played. I sincerely hope I don't find out you are trying to buy Citi's note while allowing us to believe the deal is dead. *So there is no possible misunderstanding, you are not authorized to enter into any agreement with Citi without our consent.* I trust I'm overreaching, but if I'm not we will respond accordingly. (Emphasis added.)

221. Shortly before 11AM the next morning, Friday, January 18, 2013, Burton responded with an email to Fore in which he said the following:

This is in response to the initial text I received from you last night and which I have reread this morning. Your initial text last night stated as follows: "Rick, I am beginning to think something is fishy and we're being played. I sincerely hope I don't find out you are trying to buy Citi's note while allowing us to believe the deal is dead. So there is no possible misunderstanding, you are not authorized to enter into any agreement with Citi without our consent. I trust I'm overreaching [sic], but if I am not we will respond accordingly."

Tom, you are indeed overreaching [sic], and I resent the insulting tone, and self-aggrandizing and bullying statements in your text. Who are you to tell me who I can or can't do business with? I have not sought nor do I need to seek your authorization to deal with any person or entity, including but not limited to Citibank, Bank of America, Wells Fargo, Harrah's, the Baltimore Ravens, the City of Baltimore, Wal-Mart, Bo Brooks Restaurant or my aunt Ruth. Like you, I enjoy the freedom and privilege of doing business with whom I choose.

Have a good weekend and I wish you the best in your many endeavors.

Burton knew BDB was actively seeking to purchase the Loan but deliberately withheld that information despite Fore's clear request for confirmation of the facts.

222. At approximately 5:15PM on January 18, counsel for Counterclaim and Third Party Plaintiffs wrote the following email to Schwarz, Friedman and Levine:

I am writing to obtain clarification of the current situation regarding the status of efforts to buy the Citibank note secured by a deed of trust on the Westport

[37]

494

properties.  We had been led to believe the deal was dead, but based on recent communications from Richard Burton we now have reason to believe otherwise. I truly hope that is not the case.

Please advise me immediately of the status of this transaction.   If agreements have been reached or negotiations are ongoing, please give me a detailed summary of the terms and identify the parties.  If not, please advise me of the status of the transaction when it broke off and what you know about Citibank's plans.

This is a matter of the gravest concern to my clients.  Please respond immediately by phone or email.

223.   At approximately 6PM on January 18, in an email to counsel for Counterclaim and Third Party Plaintiffs with a copy to Bailey, but not Friedman or Levine, Schwarz said, "Vision is not pursuing any transaction related to Westport."  Schwarz and Bailey knew BDB was pursuing such a transaction pursuant to an agreement with Vision and their deliberate failure to disclose that information in response to a specific question was an omission of a material fact necessary to make his statement not misleading.  At 9:45PM Friedman wrote, "Please address all questions regarding Rick Burton or any affiliated entities to Mark Fields at fields@markfieldslaw.com."  Counsel to Counterclaim and Third Party Plaintiffs immediately responded by asking "Who does DLA represent in this matter?"  Friedman never replied.

224.  On January 23, 2013, counsel for Counterclaim and Third Party Plaintiffs wrote to Friedman and Levine, asking, "Last week I asked whom you are representing in this transaction.   I don't think I got an answer.  Can you please let me know?" Neither Friedman nor Levine ever replied.

225.  On January 24, 2013, counsel for Counterclaim and Third Party Plaintiffs again wrote to Friedman and Levine:

I'm a little perplexed by your silence regarding my question about who (sic), if anyone, you are representing in this transaction.  As I am sure you can

[38]

495

understand, the continued absence of any response to a seemingly simple question leads to—hopefully unnecessary—speculation and concern.

If for some reason you can't answer my question I'd appreciate an appropriate explanation.   Otherwise, especially since we referred the people with whom we were working on this project to you in the first place and provided materials to you on their behalf, I don't see anything improper in the question and hope you will respond.

Neither Friedman nor Levine ever replied.

226.   On January 24, 2013, Fore wrote the following in separate emails to Towler and Burton:  "…we were advised that your team is not pursuing Westport.  Since we never reached any agreement and have heard nothing further from you we assume that is still the case.  If anything changes please let me know.  Regards, Tom".  Towler replied, "Your statement is correct. VCP is not pursuing the Westport transaction."  Towler knew BDB was pursuing such a transaction pursuant to an agreement with Vision and his failure to disclose that information in response to a specific question was an omission of a material fact necessary to make his statement not misleading.  Burton never replied.

227.   Believing the deal with the Vision team, which included BDB as consultants, to be dead, beginning on January 16, 2013, Fore and Turner renewed conversations with several of the potential partners they had put on hold for the purchase of the Note and subsequent development agreements.  Several confirmed their willingness to participate and resumed their due diligence efforts.

228.   One potential investor familiar with the Property and the Project and who had completed his due diligence prior to mid-December expressed a desire to enter into such an arrangement. He preferred to finalize the terms of a transaction with Citibank before entering into an agreement with Westport.

[39]

496

229.   As time wore on Counterclaim and Third Party Plaintiffs became suspicious that Vision and/or BDB was still pursuing the transaction with Citibank and contacted Lewis to get the facts.  Lewis declined to provide any information.

230.   During the week of January 21, 2013, the investor said he was in contact with Citibank and Citibank was waiting for him to submit an offer.  On January 24, 2013, the potential investor said he planned to make an offer to Citibank the next day.

231.   Around mid-day on January 25, 2013, the potential investor confirmed  his submission of an initial offer to Citibank, and after one increase in the amount he was waiting for their response.  Citibank did not respond to him that day and apparently entered into an agreement  with BDB.

### The Contract to Purchase the Note

232.   At 3:53PM on January 25, 2013, Dowers sent and SMS message to Fore containing only his name and telephone number.  Fore then called Dowers, who told Fore "we" purchased the Note, and "we are your new lender."  Dowers provided no further information but said he wished to discuss the matter with Fore at a later time.

233.   On January 28, 2013, Fore, Burton and Dowers spoke on the telephone for approximately 30 minutes and Fore was told BDB jointly paid a $300,000 deposit to Citibank and signed a contract in the name of Warhorse to purchase the Loan for $7.5 million on January 25, 2013.  Dowers said Warhorse was formed specifically for this transaction.

234.   Burton and Dowers said the deadline for closing the purchase was 5:00PM, February 12, 2013.  Dowers described their actions as "opportunistic" and said they wanted to work with Westport and would submit another proposal for Westport's consideration.  They told Fore they were primarily seeking a transaction that would generate quick cash for the two of them since they were personally strapped for funds.  They said they preferred to work out a deal with someone other than Borden, since if

[40]

497

he supplied all the money they would not receive any cash in the short run. They were trying to structure a transaction that benefitted them, not Borden.

235. On January 29, 2013, Burton sent an email to Fore with a copy to Dowers but not Borden, attaching a letter dated January 29, 2013, from Warhorse to Fore, signed by Dowers as Manager. In that letter Warhorse proposed a transaction in which Fore would be required to make a non-refundable payment of $1.3 million to the "Current Ownership" of Warhorse by February 1, 2013, two days later. Current Ownership was not defined and neither Dowers nor Burton responded to Fore's request for specifics. The proposal further then obligated Fore to pay an additional $7.2 million to Warhorse by February 7, 2013, or forfeit his $1.3 million as liquidated damages.

236. In essence Warhorse proposed to close the purchase of the Loan—a transaction Fore and Turner negotiated—using Fore's money and then immediately foreclose on the Property at the sale scheduled for February 14, 2013. Warhorse only agreed to bid a maximum of $7.5 million at the sale. If the sales proceeds exceeded $7.5 million the Property would be sold to the highest bidder and the first $2 million of the proceeds would go to "Current Ownership". If the property did not bring more than $7.5 million Fore was nevertheless obligated to either pay "Current Ownership" $2 million in cash, or give them a $4 million first mortgage payable in one year. In either case Current Ownership would also get a 15% economic interest in the Project.

237. In other words, Fore was obligated to invest $8.5 million in cash within seven days—the full cost to purchase the Loan plus a $1 million profit. If the Property sold for $8 million, for example, Current Ownership would realize a $3.3 million profit while Fore would only recover $6 million of his $8.5 investment—a net loss of $2.5 million in two weeks—and the Property would be gone! If the property did not bring more than $7.5 million, for the privilege of allowing Warhorse to buy the Note with his money Fore would either have paid a $3.3 million cash premium, or a $1.3 million cash premium plus a $4 million one year mortgage on the Property and give up 15% of the Project.

[41]

498

238.   By this time it was obvious to Fore and Turner that Warhorse and Vision had conspired to conceal and facilitate Warhorse's acquisition of the Loan in a deliberate violation of the NDA but it was too late to prevent them from signing a contract with Citibank.  Fore attempted to ascertain as much of the true facts as possible and told Dowers and Burton he could not properly evaluate any transaction without confirming the existence of the contract with Citibank and reviewing its terms.  Dowers told Fore the contract contained a confidentiality provision and although he could not give a copy to Fore, his lawyers said he could show it to him via a Skype video conference.  Dowers repeatedly boasted that Warhorse would "crush" any opposition by Counterclaim and Third Party Plaintiffs to their purchase of the Loan.  He volunteered that BDB knew of the NDA prior to signing the contract with Citibank but said since they were not parties to the NDA it had no effect on them and they were free to sign the contract with Citibank.

239.   On February 1, 2013, Fore participated in a Skype video conference with Dowers and Burton, in which Dowers displayed the contract with Citibank on the screen for Fore to read.  During that conference Dowers reiterated that he and Burton knew about the NDA prior to signing the contract, and had no concerns of any kind about any claims Westport might assert.  On information and belief, Vision and BDB entered into an agreement regarding the assumption of the transaction by BDB, but neither that agreement nor the fact that Vision allowed BDB and Warhorse to take their place was ever disclosed to Counterclaim and Third Party Plaintiffs.

240.   On February 2, 2013, Turner sent an email to Burton, Dowers, Borden, Bailey, Towler and Schwarz, enclosing a letter.  In his letter Turner said despite efforts to disguise and conceal their intentions, it now appeared to him that one or more of the recipients of the letter entered into an unauthorized agreement with Citibank to purchase the Loan without Westport's consent. He went on to say:

> In the absence of our written consent, we regard any such agreement as having
> been made on our behalf and if you proceed further without our consent we will

[42]

hold you fully responsible for the substantial damages we will incur as a result. Furthermore, if you attempt to assign any portion of your interest in this transaction to a third party, such assignee will take subject to our claims. Failure to disclose our position to such third parties could subject you to additional liability for fraud.

241.  Warhorse continued to confirm their intention to close the sale.  They claimed to be negotiating with one or more third parties to resell or assign all or a portion of their interest. On information and belief their Contract with Citibank contains a representation that the Loan is not being acquired for resale, and no assignment is permitted without Citibank's express written consent.

242.  On February 14, 2013, Counterclaim and Third Party Plaintiffs learned Warhorse retained Kingbarn Realty Capital ("Kingbarn,") a Las Vegas real estate firm, who sent emails soliciting interest in the purchase of the Note to a number of recipients, including Project consultants introduced to Vision and BDB by Counterclaim and Third Party Plaintiffs. Kingbarn also distributed packages of information to prospective buyers, offering to sell the Loan for $10 million.  The packages contain confidential information provided to Vision and their consultant BDB during the January 8 and 9 visit to Baltimore and indicated that the note purchase agreement and value information are available for "confidential" review subject to Warhorse's approval.  Counterclaim and Third Party Plaintiffs provided two confidential appraisals to Vision and Kingbarn said two appraisals of the property were available.  These activities clearly violate the NDA, and on information and belief also constitute violations of Warhorse's contract with Citibank.

## Other Litigation

243.  On February 8, 2013, an involuntary chapter 7 bankruptcy petition was filed against IHW (the "IHW Bankruptcy").

[43]

500

244.  On February 19, 2013, IHW filed a motion to convert the IWH Bankruptcy to a chapter 11 case, and the motion was granted on March 4, 2013.

245.  On February 20, 2013, Turner, Fore and others filed an adversary case (the "Adversary Case") against Counterclaim Defendants and Third Party Defendants in the IHW Bankrputcy, alleging substantially similar facts and causes of action as set forth herein.

246.  On February 21, 2013, Warhorse, itself only formed approximately three weeks earlier, filed a Chapter 11 case in the United States Bankruptcy Court for the District of Nevada (the "Warhorse Bankruptcy").

247.  The Warhorse Bankruptcy was filed in bad faith as a litigation tactic to avoid resolution of the Adversary Case.

248.  As a result of filing the Warhorse Bankruptcy, Citibank was unwilling to enter into any transaction enabling Counterclaim and Third Party Plaintiffs to acquire the Note or to refinance the Project.

249.  Despite numerous requests that they do so, Counterclaim Defendants refused to assign the Contract to Counterclaim and Third Party Plaintiffs.

250.  Citibank moved to dismiss the Warhorse Bankruptcy as a bad faith filing, and on November 25, 2013, Judge Nakagawa agreed, dismissing the Warhorse Bankruptcy.  A copy of Judge Nakagawa's Memorandum and Order is attached hereto as Exhibit 3.

251.  Immediately following the dismissal of the Warhorse Bankruptcy, Citibank notified Warhorse the Contract was terminated, thereby making it impossible for Counterclaim and Third Party Plaintiffs to assume the Contract.

252.  The actions of Burton, Dowers and Warhorse, as knowingly aided and abetted by Vision, Towler, Bailey and Schwarz, are flagrant, intentional violations of Counterclaim and

[44]

501

Third Party Plaintiffs rights for the express purpose of enriching themselves to the detriment of Counterclaim and Third Party Plaintiffs, as a result of which Counterclaim and Third Party Plaintiffs have suffered considerable damage and Development may suffer the total loss of its Property.

## COUNTERCLAIM

### COUNT I
### INTENTIONAL MISREPRESENTATION; FRAUD

253.  The allegations contained in the Statement of Facts set forth in paragraphs 96 to 252 above are incorporated herein by reference.

254.  As set forth herein, on numerous occasions Towler, Schwarz, Bailey, Burton and Dowler made false statements and omitted to make statements of material facts with actual knowledge of their falsity and materiality, for the express purpose of deceiving Counterclaim and Third Party Plaintiffs and concealing their actions to allow Warhorse to enter into an agreement to purchase the Loan from Citibank, depriving Counterclaim and Third Party Plaintiffs and others acting on their behalf from purchasing the Loan, and subjecting Development to the possible loss of its property.

255.  Those statements were knowingly false when made and made by each individual with intent to deceive Counterclaim and Third Party Plaintiffs.

256.  Towler, Schwarz, Bailey, Burton and Dowler had actual knowledge of the NDA and had a duty to Counterclaim and Third Party Plaintiffs not to conceal their actions or enter into any agreement with Citibank.

257.  In reliance on those misrepresentations Plaintiffs took no action to prevent Warhorse and Defendants from acquiring the Loan, and proceeded to work with other investors

[45]

502

to purchase the Loan on Plaintiff's behalf. Had they known of Defendants' activities they would have informed Citibank that Warhorse had no authority to purchase the Loan without Plaintiffs' consent. Instead, Warhorse signed an agreement with Citibank thereby precluding Citibank from contracting with other prospective purchasers, and by virtue of its bad faith Nevada Bankruptcy deprived Counterclaim and Third-Party Plaintiffs of the opportunity to purchase the Loan.

**WHEREFORE**, Plaintiffs demand compensatory damages against Dale Dowers, Richard Burton, Michael Borden and Warhorse-Baltimore Realty, LLC for intentional misrepresentation in the amount of One Hundred Million Dollars.

### COUNT II
### INTERFERENCE WITH CONTRACT

258. The allegations contained in the Statement of Facts set forth in paragraphs 96 to 252 above are incorporated herein by reference.

259. Counterclaim and Third Party Plaintiffs negotiated the terms of the Contract long before Counterclaim Defendants had any knowledge of the Project or the Loan. Those terms were negotiated for the sole benefit of Counterclaim and Third Party Plaintiffs and both Citibank and Counterclaim and Third Party Plaintiffs believed the agreement was to be executed with Vision and/or Counterclaim and Third Party Plaintiffs for the benefit of Counterclaim and Third Party Plaintiffs.

260. Counterclaim Defendants knew Counterclaim and Third Party Plaintiffs had negotiated those terms and intended to enter into the Contract with Vision and Citibank.

261. As set forth herein, Towler, Schwarz, Bailey, Burton and Dowler made false statements and omitted to make statements of material facts with actual knowledge of their

[46]

503

falsity and materiality, deceiving Counterclaim and Third Party Plaintiffs and concealing their actions, with the express purpose of preventing Counterclaim and Third Party Plaintiffs or anyone acting on their behalf from entering into any agreement with Citibank to purchase the Loan, and instead entering into that agreement for the sole benefit of Counterclaim Defendants.

262.  Counterclaim Defendants allowed Citibank to believe they were acting with the knowledge and consent of Counterclaim and Third Party Plaintiffs, and thereby induced Citibank to enter into the Contract with them.

263.  Counterclaim Defendants misrepresented themselves to Counterclaim and Third Party Plaintiffs as agents or consultants to Vision, and had actual knowledge the as such they had no right to enter into the Contract.

264.  Counterclaim Defendants breached the Contract with Citibank.

265.  The actions of Counterclaim Defendants deprived Counterclaim and Third-Party Plaintiffs of the opportunity to purchase the Loan, and have subjected them to total loss of the Project and the Property.

**WHEREFORE**, Plaintiffs demand compensatory damages against Dale Dowers, Richard Burton, Michael Borden and Warhorse-Baltimore Realty, LLC for interference with contract in the amount of One Hundred Million Dollars ($100,000,000).

<div align="center">

**THIRD PARTY COMPLAINT**

**<u>THE PARTIES</u>**

</div>

The parties to the Third Party Complaint are the Third Party Plaintiffs, the Counterclaim Defendants and the following additional parties:

<div align="center">

[47]

</div>

266.  Third Party Defendant Vision Capital Partners, LLC ("Vision,") is a limited liability company with a principal place of business at 999 Murray Holladay Road, Suite 109, Salt Lake City, UT 84117.

267.  Third Party Defendant Douglas Towler ("Towler") is a resident of the state of Utah with an office address of 999 Murray Holladay Road, Suite 109, Salt Lake City, UT 84117

268.  Third Party Defendant Victor Schwarz ("Schwarz") is a resident of the state of Utah with an office address of 999 Murray Holladay Road, Suite 109, Salt Lake City, UT 84117

269.  Third Party Defendant Edward Bailey ("Bailey") is a resident of the state of Utah with an office address of 999 Murray Holladay Road, Suite 109, Salt Lake City, UT 84117

270.  The third party plaintiffs are citizens of Maryland and Limited Liability Company  under the laws of Maryland with its principal place of business in Maryland.  The third party defendants are citizens of Utah and  a Limited Liability Corporation under the laws of Utah with its principal place of business in Utah.  There is diversity of parties and the amount in controversy, without interest and costs, exceeds the sum or value specified by 28 U.S.C. § 1332(a)(1).

271.  Venue is proper under 28 USC § 1391 (b) (2) as this is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, and a substantial part of property that is the subject of the action is situated.

## COUNT I
## BREACH OF CONTRACT

272.  The allegations contained in the Statement of Facts set forth in paragraphs 96 to 252 above are incorporated herein by reference.

[48]

505

273.  Section 1(a) of the NDA expressly prohibits disclosure of Plaintiffs'
confidential information to any third party without Plaintiffs' prior written consent.  On
numerous occasions Towler, Schwarz, Burton, Dowers and Borden represented that Burton,
Dowers and Borden were merely "consultants" to Vision, in the sole capacity of reviewing
Vision's due diligence and providing a "litmus test" for Vision's investment in the Project.  At
**no** time did any representative of Vision ever advise Plaintiffs that Burton, Dowers or Borden
were functioning in any other capacity, although it is clear that Vision knew otherwise.

274.  At **no** time did Vision ever request or receive written permission to disclose any
information to Burton, Dowers or Burton, and at all times all defendants affirmatively
represented that they were agents and consultants of Vision's.

275.  Burton and Dowers admitted they had actual knowledge of the NDA prior to signing
the Citibank contract on January 25, 2013, and also knew they represented themselves as Vision's
consultants at all times when they received Plaintiffs' confidential information.

276.  Towler and Vision spent over two months of full-time, intensive investigation of the
Project and the Loan.  Warhorse signed the contract with Citibank only 10 days after Towler disappeared
from communications about the transaction.  A decision to make an investment totaling approximately
$8 million was obviously made in reliance on the due diligence conducted by Towler and the
confidential information supplied by Plaintiffs.

277.  Section 1(b) of the NDA expressly provides that for a period of one year neither Vision
nor "their partners, *consultants and agents* and any other person to whom they show the Project…" will
contact any person or entity introduced by Plaintiffs or circumvent Plaintiffs' position with respect to
"…an introduced party of opportunity."  That section goes on to say:

> …Vision further agrees they, or any of the other parties referred to herein, **will not enter
> into any agreement or relationship with any introduced party or opportunity** except
> through the efforts and approval of Westport ….  (Emphasis added.)
> [49]

506

278.  Vision represented BDB as their consultant and agent, and said they contacted them because they had previously done business together.  BDB expressly confirmed their capacity as Vision's consultant and agent on multiple occasions.

279.  With Vision's actual knowledge and consent, Vision's consultant and agent subsequently circumvented Plaintiffs, contacted persons to whom Vision was introduced by Plaintiffs and entered into an agreement with respect to an opportunity created and introduced by Plaintiffs in knowing disregard of the NDA and Plaintiffs' express notification of the necessity for their consent.

280.  By entering into the contract with Citibank, Defendants deprived Plaintiffs of the opportunity to pursue the transaction on behalf of the Debtor and others with an interest in preserving the Property and the Project.

281.  Warhorse is a single purpose entity formed on January 17, 2013, for the sole purpose of purchasing the Loan and acquiring the Property.  It is the alter ego of Burton, Dowers and Borden, and it would be inequitable to allow them to shield themselves from liability for their intentional wrongful acts.

**WHEREFORE**, Plaintiffs demand compensatory damages of Fifty Million Dollars ($50,000,000) for breach of contract against Vision Capital Partners, LLC, Dale Dowers, Richard Burton, Michael Borden and Warhorse-Baltimore Realty, LLC.

## COUNT II
## INTENTIONAL MISREPRESENTATION; FRAUD

282.  The allegations contained in the Statement of Facts set forth in paragraphs 96 to 257 above are incorporated herein by reference.

**WHEREFORE**, Plaintiffs demand compensatory damages against Vision Capital Partners, LLC, Douglas Towler, Victor Schwarz, and Edward Bailey for intentional misrepresentation in the amount of One Hundred Million Dollars.

[50]

## COUNT III
## CONSPIRACY; AIDING AND ABETTING; INTERFERENCE WITH CONTRACT

283. The allegations contained in the Statement of Facts set forth in paragraphs 96 to 265 above are incorporated herein by reference.

284. As set forth above, Counterclaim Defendants and Third Party Defendants made fraudulent misrepresentations in order to improperly and unlawfully misuse Plaintiffs' confidential information to permit Counterclaim Defendants to enter into agreement with Citibank to the detriment of Plaintiffs and without any right or authority to do so.

285. Towler, Schwarz, Bailey and Vision had actual knowledge of the activities of Burton, Dowler, Borden and Warhorse, and conspired with them and facilitated their fraud and interference with contract by providing access to Plaintiffs' confidential information in violation of the NDA, introducing Burton, Dowers, Borden and Warhorse to the opportunity to purchase the Loan and to the representatives of Citibank in violation of the NDA, and intentionally failed to make statements of material facts, the omission of which they knew or should have known were necessary to make their statements not misleading.

**WHEREFORE**, Plaintiffs demand compensatory damages against Vision Capital Partners, LLC, Douglas Towler, Victor Schwarz, and Edward Bailey, Dale Dowers, Richard Burton, Michael Borden and Warhorse-Baltimore Realty, LLC for aiding and abetting and interference with contract in the amount of One Hundred Million Dollars ($100,000,000).

Respectfully submitted,

/s/_____
Jeffrey M. Sirody, Bar #11715
Jeffrey M. Sirody & Associates
1777 Reisterstown Road, Suite 360 E
Baltimore, MD 21208
(410) 415-0445

[51]

508

Attorneys for Westport Development, LLC


/s/_____
Kenneth B. Frank, Bar #04883
1 South St.
23rd Floor
Baltimore, MD 21202
Phone: 443-691-3600
Attorney for Westport Partners, LLC and Thomas B. Fore



/s/_____
Patrick Turner


### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on December 12, 2013, a copy of the foregoing was served through this Court's electronic filing system on:

Mark C. Fields, Esquire
Law Office of Mark C. Fields
333 South Hope Street, 35th Floor
Los Angeles, CA 90071
(Attorney for Richard Burton, Dale Dowers & Michael Borden)

Joseph J. Bellinger
Offit Kurman, P.A.
300 East Lombard Street, Ste 2010
Baltimore MD 21202
(Attorney for Plaintiffs)


And caused to be sent via United States mail, postage fully pre-paid, addressed to the following:
Vision Capital Partners, LLC
999 Murray Holladay Road, Suite 109
Salt Lake City, UT 84117

Edward Bailey
999 Murray Holladay Road, Suite 109
Salt Lake City, UT 84117

[52]

509

Douglas Towler
999 Murray Holladay Road, Suite 109
Salt Lake City, UT 84117

Richard Burton
5920 S. Rainbow Blvd., Suite 11
Las Vegas, NV 89118

Dale Dowers
5920 S. Rainbow Blvd., Suite 11
Las Vegas, NV 89118

Michael Borden
5920 S. Rainbow Blvd., Suite 11
Las Vegas, NV 89118

/s/ Jeffrey M. Sirody
Jeffrey M. Sirody, Bar #11715

[53]

510

# EXHIBIT 16

**From:**  Kenneth B. Frank
**To:**  Pat Turner; Tom Fore
**Cc:**  prhodes@soradevelopment.com
**Subject:**  Email to Doug
**Date:**  January 10, 2013 9:26:57 PM

---

Here's my draft.  No matter what you send or discuss, do NOT make any further references to bankruptcy or any other course of action we might take.

Doug-- I'm sure you can understand that your proposal came as a bit of a surprise.  Until today we thought we were working around a framework of at least 2 years and more in the spirit of a JV.  We are trying to digest your proposal but need answers to some  questions to fully understand the implications of the deal.

Obviously no-one would agree to a transaction which is doomed to failure from the outset. We would prefer to fight the battle now--win or lose--rather than commit to an impossible deal.  I'm sure that's not what you intend but before we can respond we need answers to a couple of basic questions:

1. If a foreclosure is necessary (which we'd like to discuss) will you commit to buy the property in at the sale or agree, if a bid exceeds a predetermined price, to share the proceeds if you elect not to make a higher bid?

2.  What has changed to cause you to now require a 2x return in 1 year when you have always told us your target was a 2x return over 2 years?  Is the 1 year period rigid?

3. We thought you were going to include some operating funds. What happened to that?

4.  Are these terms driven at all by the need to bring in additional funds and does this proposal reflect the requirements of those new investors?  If so, you should tell us because we have investors who we put off because of what we believed our relationship with you was to be, but who may be willing to participate in the investment on more realistic terms than these.

Bottom line we need to know if you are willing to negotiate a deal that makes business sense and provides at least a realistic expectation of success.  Obviously you see the potential of this project.  We hope it is your intention to structure a deal that lets everyone to share in its success. =



**EXHIBIT 17**

| | |
|---|---|
| **From:** | Friedman, Mark </O=PIPER & MARBURY/OU=PM/CN=RECIPIENTS/CN=MJF> |
| **Sent:** | Saturday, January 19, 2013 2:43 AM |
| **To:** | 'Kenneth B. Frank' <kenny@kennyfrank.net> |
| **Subject:** | RE: Westport |

Kenny,Please address all questions regarding Rick Burton or any affiliated entities to Mark Fields at fields@markfieldslaw.com

Sent with Good (www.good.com)

-----Original Message-----
**From:** Kenneth B. Frank [kenny@kennyfrank.net]
**Sent:** Friday, January 18, 2013 05:14 PM Eastern Standard Time
**To:** Victor Schwarz; Levine, Richard E.; Friedman, Mark
**Subject:** Westport

Gentlemen:

I am writing to obtain clarification of the current situation regarding the status of efforts to buy the Citibank note secured by a deed of trust on the Westport properties.  We had been led to believe the deal was dead, but based on recent communications from Richard Burton we now have reason to believe otherwise. I truly hope that is not the case.

Please advise me immediately of the status of this transaction.   If agreements have been reached or negotiations are ongoing, please give me a detailed summary of the terms and identify the parties.  If not, please advise me of the status of the transaction when it broke off and what you know about Citibank's plans.

This is a matter of the gravest concern to my clients.  Please respond immediately by phone or email.

Thank you,

Kenneth Frank



DEPOSITION
EXHIBIT #
Ruther 21
2-11-15

PENGAD 800-631-6989

514

DLA0000037

# EXHIBIT 18

**From:**      Kenneth B. Frank
**To:**             Pat Turner
**Cc:**             tlewis@gejlaw.com
**Subject:**   Westport/Citibank
**Date:**        January 28, 2013 11:49:38 AM

Pat—

Tom Lewis requested confirmation from you that I am representing the borrower in the Citibank
loan for the Westport project.  I have asked him for information about the current status of the
transaction and before he is willing to discuss anything in detail he requested verification that I
represent the borrower.

Thank you,

Kenny



DEPOSITION
EXHIBIT #
Ruther   23
2-11-15
PENGAD 800-631-6989

516

IHW0001040

# EXHIBIT 19

| | |
|---|---|
| **From:** | Tom Lewis |
| **To:** | pat@turnerdevelopment.com; "Kenneth B. Frank" |
| **Cc:** | Matt Oakey; Martha L. Hylton |
| **Subject:** | RE: Westport/Citibank |
| **Date:** | January 28, 2013 2:56:10 PM |

Gentlemen—First, please specify in a signed letter which of the loan parties Ken is representing, and which parties he is not representing ( I assume Carlyle would be in that category, and the Citi equity affiliate, and CRP, etc. ). There is probably a process specified in the Loan Agreement for changing the notices given for a party; please just follow that process. Second, I have looked at the Loan Agreement and do not know of any notice or information that the Lender is required to provide to the Borrower at this time. The foreclosure sale has been duly filed and advertised. The auctioneer, A.J. Billig, can assist with details of the foreclosure bidding process. I am not in a position to discuss anything more. --Tom

Thomas B. Lewis
TEL: 410 347 1356 / FAX: 410 468 2786
218 N Charles Street, Suite 400, Baltimore, MD 21201
tlewis@gejlaw.com

**GALLAGHER EVELIUS & JONES LLP**

ATTORNEYS AT LAW

IRS CIRCULAR 230 NOTICE: Any U.S. tax advice contained in this communication (or in any attachment) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding federal tax penalties or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

This email transmission may contain CONFIDENTIAL and PRIVILEGED information. If you are not the intended recipient, please notify the sender by email, do not disseminate and delete immediately.

**From:** Pat Turner [mailto:pat@turnerdevelopment.com]
**Sent:** Monday, January 28, 2013 12:06 PM
**To:** 'Kenneth B. Frank'
**Cc:** Tom Lewis
**Subject:** RE: Westport/Citibank

Tom,

Yes Kenny is representing the partnership, thank you

Patrick Turner
President

Turner Development Group
1700 Beason Street
Baltimore, Maryland 21230
410 752-1241 Phone



DEPOSITION
EXHIBIT #
Ruther 24
2-11-15

518

IHW0001041

410 685-0226 Fax

www.Turnerdevelopment.com
www.Westportwaterfront.com

---

**From:** Kenneth B. Frank [mailto:kenny@kennyfrank.net]
**Sent:** Monday, January 28, 2013 11:50 AM
**To:** Pat Turner
**Cc:** tlewis@gejlaw.com
**Subject:** Westport/Citibank

Pat—

Tom Lewis requested confirmation from you that I am representing the borrower in the Citibank loan for the Westport project.  I have asked him for information about the current status of the transaction and before he is willing to discuss anything in detail he requested verification that I represent the borrower.

Thank you,

Kenny

519

IHW0001042

# EXHIBIT 20

| | |
|---|---|
| **From:** | Kenneth B. Frank |
| **To:** | Pat Turner |
| **Cc:** | Tom Fore |
| **Subject:** | RE: Cowboys |
| **Date:** | January 29, 2013 10:57:46 PM |

But if closing isn't until 2/12 we can freeze things as they are and claim the contract is ours.  The bankruptcy will stop the foreclosure and I'm thinking one of the things we may include in our suit against everyone will be damages if they fail to complete the sale and we are subject to a $30 million note.  That will get Vision and Mike's attention.

Also they didn't form Warhorse until January 17, long after they misrepresented their role.  So they will have a hard time hiding behind that shield.  They are digging a deep hole.

---

**From:** Pat Turner [mailto:pat@turnerdevelopment.com]
**Sent:** Tuesday, January 29, 2013 10:51 PM
**To:** Kenneth B. Frank
**Cc:** Tom Fore
**Subject:** Re: Cowboys

300k is a small deposit

Sent from my iPhone

On Jan 29, 2013, at 10:48 PM, "Kenneth B. Frank" <kenny@kennyfrank.net> wrote:

> So here is what we think we know:
>
> 1.   Deposit is $300k
> 2.   Price is $7.5 m
> 3.   Closing is 2/12
>
> They are really morons.

---

No virus found in this message.
Checked by AVG - www.avg.com
Version: 2014.0.4800 / Virus Database: 4257/9015 - Release Date: 01/28/15



521

# EXHIBIT 21

522

js

| From: | Rebecca and Jeff <jmslaw@aol.com> |
| Sent: | Thursday, January 31, 2013 9:52 AM |
| To: | kenny@kennyfrank.net |
| Subject: | Re: Ad |
| | |
| Flag Status: | Flagged |

Kenny,

The applicable Bankruptcy Code section is 303(b)(3)(A).

Jeff


-----Original Message-----
From: Kenneth B. Frank <kenny@kennyfrank.net>
To: jmslaw <jmslaw@aol.com>
Sent: Tue, Jan 29, 2013 4:11 pm
Subject: Ad

http://www.ajbillig.com/index.php?option=com_hotproperty&task=view&id=15404&Itemid=26



DEPOSITION
EXHIBIT #
Ruther 28
2-11-15

SIRODY000091 523

# EXHIBIT 22

**From:** Kenneth B. Frank
**To:** Pat Turner
**Subject:** RE: Cowboys
**Date:** January 29, 2013 10:58:23 PM

Neither Tom nor Pat seem to have the list of creditors.  Can you send it asap?

**From:** Pat Turner [mailto:pat@turnerdevelopment.com]
**Sent:** Tuesday, January 29, 2013 10:51 PM
**To:** Kenneth B. Frank
**Cc:** Tom Fore
**Subject:** Re: Cowboys

300k is a small deposit

Sent from my iPhone

On Jan 29, 2013, at 10:48 PM, "Kenneth B. Frank" <kenny@kennyfrank.net> wrote:

So here is what we think we know:

1.   Deposit is $300k
2.   Price is $7.5 m
3.   Closing is 2/12

They are really morons.

No virus found in this message.
Checked by AVG - www.avg.com
Version: 2014.0.4800 / Virus Database: 4257/9015 - Release Date: 01/28/15

DEPOSITION
EXHIBIT #
Ruther 26
2-11-15
PENGAD 800-631-6989

525

IHW0001059

# EXHIBIT 23

**From:**   Kenneth B. Frank
**To:**   pat@turnerdevelopment.com
**Cc:**   Tom Fore
**Subject:**   Re: Westport - expenses
**Date:**   January 30, 2013 11:59:01 AM

This is a little confusing. Can you send me a simple spreadsheet showing each creditor to whom we owe money and the amount currently owed?

On Jan 30, 2013, at 11:24 AM, "Pat Turner" <pat@turnerdevelopment.com> wrote:

Patrick Turner
President

Turner Development Group

1700 Beason Street
Baltimore, Maryland 21230
410 752-1241 Phone
410 685-0226 Fax

www.Turnerdevelopment.com
www.Westportwaterfront.com

**From:** Debbie Allen [mailto:dallen@westportwaterfront.com]
**Sent:** Wednesday, January 30, 2013 11:06 AM
**To:** pat@turnerdevelopment.com
**Subject:** Westport - expenses

<Expenses Jan 2013.xls>



527

IHW0001074

# EXHIBIT 24

| | |
|---|---|
| **From:** | Kenneth B. Frank |
| **To:** | pat@turnerdevelopment.com; Tom Fore; Patrick Rhodes |
| **Subject:** | Letter |
| **Date:** | February 1, 2013 1:02:08 PM |
| **Attachments:** | turner letter.docx |

Please review



529

February 1, 2013

Douglas Towler                     Richard Burton
Ed Bailey                          Dale Dowers
Victor Schwarz, Esq.               Mike Borden
Vision Capital Partners, LLC       Warhorse-Baltimore Real Estate, LLC
999 Murray Holladay Road           Warhorse Acquisitions, LLC
Suite 109                          5920 Rainbow Blvd., Suite 11
Salt Lake City, UT 84117           Las Vegas, NV 89118

*VIA ELECTRONIC AND OVERNIGHT DELIVERY*

RE: *Acquisition of Westport Promissory Note from Citibank*

Gentlemen:

Despite the apparent efforts of one or more of you to disguise and withhold information about your activities, I now have reason to believe you have entered into an agreement with Citibank to acquire the notes secured by the Westport real estate, and intend for Citibank to proceed with the scheduled foreclosure on your behalf.  I have advised you on more than one occasion that our written consent to those transactions is required.  It appears you intend to proceed notwithstanding the absence of such consent.

Please immediately provide me with a copy of any agreements with Citibank or any other party related to the Westport project and its financing.   In the absence of our written consent, we regard any such agreement as having been made on our behalf and if you proceed further without our consent we will hold you fully responsible for the substantial damages we will incur as a result.  Furthermore, if you attempt to assign any portion of your interest in this transaction to a third party, such assignee will take subject to our claims. Failure to disclose our position to such third parties could subject you to additional liability for fraud.

We hope these issues can be resolved and are open to discussions to reach a amicable conclusion.  In light of the limited timeframe, this matter must be addressed immediately.

Very truly yours,

Westport Development, LLC

By:  Patrick Turner

530

| | |
|---|---|
| **From:** | Kenneth B. Frank |
| **To:** | pat@turnerdevelopment.com; "Tom Fore" |
| **Subject:** | RE: Westport Project & The Ardent Cos. |
| **Date:** | February 1, 2013 6:36:21 PM |
| **Attachments:** | turner letter v2.docx |

See the attached revision to the letter.  I've made substantial changes.

Perhaps we should meet tomorrow morning to collect our thoughts and finalize the strategy for the next couple of days.

**From:** Pat Turner [mailto:pat@turnerdevelopment.com]
**Sent:** Friday, February 01, 2013 4:14 PM
**To:** Kenneth B. Frank; 'Tom Fore'
**Subject:** FW: Westport Project & The Ardent Cos.

See below
These guys came through a friend of mine Rod Hart that is the president of Lennar Homes. He spoke highly of them. I spoke to them today and they are very interested in Westport. They know the Baltimore market well they just sold a deal out in Belair MD

Patrick Turner
President

Turner Development Group
1700 Beason Street
Baltimore, Maryland 21230
410 752-1241 Phone
410 685-0226 Fax

www.Turnerdevelopment.com
www.Westportwaterfront.com

**From:** Todd Terwilliger [mailto:tterwilliger@theardentcompanies.com]
**Sent:** Friday, February 01, 2013 4:07 PM
**To:** pat@turnerdevelopment.com
**Cc:** Matt Shulman; Gregg Goldenberg; dmagill@att.net
**Subject:** Westport Project & The Ardent Cos.

Pat,

Thank you for the time this afternoon. Please forward an NDA for our signature.  Attached is a short deck of slides on our team. Page 16 and 17 are the bio's

Any additional project information, appraisals, and pro forma's would be helpful for us in order to put together a term sheet.

Thanks - TT



DEPOSITION
EXHIBIT #
Ruther 31
2-11-15

531

IHW0001259

**Todd Terwilliger**

Partner
tterwilliger@theardentcompanies.com
770-450-8737 direct
678-777-5577 mobile
6400 Powers Ferry Road, Suite 350
Atlanta, GA 30339

No virus found in this message.
Checked by AVG - www.avg.com
Version: 2014.0.4800 / Virus Database: 4257/9015 - Release Date: 01/28/15

IHW0001260



# WESTPORT
## WATERFRONT

February 1, 2013

Douglas Towler                     Richard Burton
Ed Bailey                          Dale Dowers
Victor Schwarz, Esq.               Mike Borden
Vision Capital Partners, LLC       Warhorse-Baltimore Real Estate, LLC
999 Murray Holladay Road           Warhorse Acquisitions, LLC
Suite 109                          5920 Rainbow Blvd., Suite 11
Salt Lake City, UT 84117           Las Vegas, NV 89118

### *VIA ELECTRONIC AND OVERNIGHT DELIVERY*

RE: *Acquisition of Westport Promissory Note from Citibank*

Gentlemen:

Despite deliberate efforts by one or more of you to disguise and withhold information about your activities, I am now advised you entered into an agreement with Citibank to acquire the note secured by the Westport real estate and intend to proceed with the foreclosure scheduled for February 14, 2013. On more than one occasion you were told our written consent was required for any transaction with Citibank and that consent was never provided.

Not only did you enter into such an agreement without our consent, your misrepresentations and unauthorized actions prevented us from concluding an agreement with Citibank on our own behalf. In the absence of a prompt resolution of this situation we will hold you collectively responsible for all consequential damages and other costs incurred by us. By itself a foreclosure sale will trigger substantial unnecessary expense and if the property is actually sold our irreparable damage is likely to exceed $100 million.

It has also been suggested to me that you are actively engaged in negotiations to assign all or a portion of your rights to purchase the Citibank note to third parties. We no more consent to an assignment than we do to your other actions and involvement of additional parties would further compound your liability to us. Furthermore, nondisclosure of our position to potential assignees could subject you to additional liability for fraud.

We sincerely hope these issues can be resolved amicably and are open to good faith discussions to reach a reasonable solution. In light of the limited

timeframe, however, this matter must be addressed immediately.  To that end we insist on full disclosure of all relevant facts, including copies of all agreements with Citibank or any other party related to the Westport project, its financing, and your acquisition of our note.  If your agreement with Citibank includes confidentiality provisions you believe precludes disclosure of any portion of this information, I strongly suggest you immediately seek a waiver as to us.  I sincerely doubt they would refuse.

We reserve the right to take any and all actions to protect our interests and our assets, and respond forcefully to what we regard as deceptive, improper and unlawful conduct.  A meaningful demonstration of a good faith effort to address these issues in an honest and straightforward manner would go a long way towards establishing an atmosphere conducive to a mutually satisfactory outcome.

Very truly yours,

Westport Development, LLC


By:  Patrick Turner

cc:  Thomas B. Fore

534

IHW0001262

# EXHIBIT 26

**Oxenford, Patti**

| | |
|---|---|
| **From:** | Kenneth B. Frank <kenny@kennyfrank.net> |
| **Sent:** | Thursday, February 07, 2013 2:14 PM |
| **To:** | Friedman, Mark; Mark Fields |
| **Subject:** | Westport |

Gentlemen:

This morning I received an email from Mark Fields asking me who I represent. That request was a little puzzling in light of the fact that I expressly provided that information to Mark Friedman at the meeting yesterday, and I believe that conversation occurred while Mark Fields was on the call via Skype.

Nevertheless, to reiterate what I said then, (a) I represent Tom Fore generally, and (b) at least for the time being I represent Pat Turner, Westport Development, LLC and Westport Partners, LLC solely in connection with the acquisition of the Citibank note, including matters arising out of the actions of Vision Capital, Warhorse-Baltimore Real Estate, Ed Bailey, Victor Schwarz, Doug Towler, Richard Burton, Dale Dowers and Michael Borden.

I trust this answers your questions.

1



DEPOSITION
EXHIBIT #
Ruther 33
2-11-15
PENGAD 800-631-6989

DLA0000048

536

# EXHIBIT 27

537



**js**

| | |
|---|---|
| **From:** | Rebecca and Jeff <jmslaw@aol.com> |
| **Sent:** | Thursday, February 07, 2013 2:07 PM |
| **To:** | Kenny@kennyfrank.net |
| **Subject:** | Mark Ominsky's contact info. |

**Flag Status:**          Flagged

Kenny,

Mark can be contacted at 240-620-9193

Thanks,

Jeff



SIRODY000090

538

# EXHIBIT 28

| | |
|---|---|
| **From:** | Cara Frye |
| **To:** | Kenneth B. Frank |
| **Cc:** | "Pat Turner" |
| **Subject:** | RE: Westport |
| **Date:** | February 8, 2013 2:45:36 PM |

Kenny,

Can you please complete relevant sections of the Affidavit.  Also, why is the Creditor Agreement unsigned?

Cara



CARA FRYE
C FRYE   PHONE 410.685.0250
          FACSIMILE 410.522.1192
          EMAIL CARA@CFRYEASSOCIATES.COM
1702 SEASON STREET • BALTIMORE, MARYLAND 21230

**From:** Kenneth B. Frank [mailto:kenny@kennyfrank.net]
**Sent:** Friday, February 08, 2013 11:05 AM
**To:** Cara Frye
**Subject:** Westport

Cara—see attached.  Can  you sign and send back?



DEPOSITION
EXHIBIT #
Ruther 34
2-11-15

PENGAD 800-631-6989

KBF-FRYE-000001

# EXHIBIT 29

Capital Reporting Company
Frye, Cara A. 12-16-2013

1

```
          IN THE UNITED STATES BANKRUPTCY COURT
             FOR THE DISTRICT OF MARYLAND
                  (Baltimore Division)


------------------------:
IN RE:                  :
                        :
INNER HARBOR WEST, LLC., : CASE NO. 13-12198-RAG
                        : CHAPTER 11
           DEBTOR.      :
                        :
                        :
------------------------:


                        Baltimore, Maryland
                  Monday, December 16, 2013
Deposition of:
                   CARA A. FRYE
called for oral examination by counsel, pursuant
to notice, at OFFIT KURMAN, P.A., 300 East Lombard
Street, Baltimore, Maryland, before Danielle
Kavanagh, RPR, of Capital Reporting, a Notary
Public in and for the State of Maryland, beginning
at approximately 10:15 a.m., when were present on
behalf of the respective parties:
```

Capital Reporting Company
Frye, Cara A. 12-16-2013

2

1                    A P P E A R A N C E S

2   On behalf of Dale Dowers, Mike Borden and Rick Burton:
          MARC C. FIELDS, ESQUIRE
3         LAW OFFICES OF MARK C. FIELDS, APC
          333 South Hope Street, 35th Floor
4         Los Angeles, CA 90071
          213.617.5225
5         fields@markfieldslaw.com

6   On behalf of Cara A. Frye:
          MARC A. OMINSKY, ESQUIRE
7         SHILLER, OMINSKY & SULIN, P.C.
          The Century Plaza Building, Suite 249
8         10632 Little Patuxent Parkway
          Columbia, MD 21046
9         443.393.3380
          marc@thesoslawgroup.com
10
    On behalf of Inner Harbor West, LLC:
11        GARY S. PORETSKY, ESQUIRE
          JEFFREY M. SIRODY & ASSOCIATES, P.A.
12        1777 Reisterstown Road, Suite 360E
          Baltimore, MD 21208
13        410.415.0445
          garyp@sirody.com
14
    On behalf of Citigroup Global Markets Realty Corp:
15        MATTHEW W. OAKEY, ESQUIRE
          GALLAGHER, EVELIUS & JONES, LLP
16        218 North Charles Street, Suite 400
          Baltimore, MD 21201
17        410.347.1359
          moakey@gejlaw.com
18
    On behalf of Dixie Construction:
19        ROBERT B. SCHULMAN, ESQUIRE
          SCHULMAN, HERSHFIELD & GILDEN, P.A.
20        The World Trade Center
          401 E. Pratt Street, Suite 1800
21        Baltimore, MD 21202
          410.659.0111
22        rbs@schulmantreem.com

(866) 448 - DEPO                    543
www.CapitalReportingCompany.com  © 2014

Capital Reporting Company
Frye, Cara A. 12-16-2013

8

1   location?

2        A.   Yes.

3        Q.   What location was that?

4        A.   20 North Patterson Park Avenue, Baltimore,

5   Maryland 21231.

6        Q.   And from when to when did C. Frye Associates

7   work out of that location?

8        A.   From its formation until the present.

9        Q.   Has it ever operated out of any other office?

10       A.   I don't understand what you mean by the word

11  "operated."  That is my address, that is where my

12  business is, that's where my corporation was formed, so

13  no.

14       Q.   There's documents that have been filed in

15  this case which indicate an address for your business

16  as 1700 Beason Street, Baltimore, Maryland 21230.

17            Have you ever operated out of that facility?

18       A.   That is the facility where Inner Harbor West

19  is operated out of.

20       Q.   It's listed in certain documents as the

21  address of you.

22       A.   Understood.

Capital Reporting Company
Frye, Cara A. 12-16-2013

9

1       Q.    Is that the address of you?

2       A.    No.

3       Q.    Do you know why that was listed as your

4   address --

5       A.    It was an error made by my attorney at the

6   time.

7       Q.    Your attorney being Marc Ominsky?

8       A.    My attorney at that time with whom I

9   communicated was Kenneth Frank.

10      Q.    What does C. Frye Associates, LLC do?

11      A.    It does land use and zoning law and project

12  management, primarily for real estate projects.

13      Q.    When did you start working for Inner Harbor

14  West or any entity affiliated with Inner Harbor West?

15      A.    2007.

16      Q.    How did you start working for them?  How did

17  that come about?

18      A.    When I was employed has a land use and zoning

19  associate at Rosenberg, Martin & Greenberg I worked

20  with a partner on some land use and zoning matters for

21  affiliates of that company, Inner Harbor West.

22      Q.    From 2007 to, say, 2010, because the invoice

Capital Reporting Company
Frye, Cara A. 12-16-2013

23

1   your definition of "primary counsel" is.  If there was

2   an environmental matter, they had environmental

3   counsel. If there was a contractual matter, they had

4   contractual counsel.

5        Q.    You viewed yourself as the in-house counsel?

6        A.    Yes.

7        Q.    Were you paid a salary?

8        A.    Yes, until I wasn't paid in 2011.  And I hope

9   that you say the word "salary" very broadly and not in

10  its technical sense.  I was not a W-2 employee, no.

11       Q.    Were you paid by the hour or were you paid a

12  set amount per month?

13       A.    I was paid a set amount based on a negotiated

14  fee per hour in a 40-hour workweek.

15       Q.    After Mr. Frank called you about possibly

16  joining in the involuntary, what was the next step in

17  that process?

18       A.    My recollection is that I received the

19  requisite documents that Mr. Frank advised me that I

20  needed to sign to further the petition.

21       Q.    Was Mr. Frank acting as your counsel at the

22  time?

Appeal: 15-1671    Doc: 25-2    Filed: 09/28/2015    Pg: 95 of 248

## Capital Reporting Company
### Frye, Cara A. 12-16-2013

24

```
1        A.    Yes.

2        Q.    Is Mr. Frank still your counsel?

3        A.    No.

4        Q.    When did Mr. Frank cease becoming your

5   counsel?

6        A.    When Mr. Ominsky became my counsel for

7   purposes of this involuntary petition and through

8   today.

9        Q.    What did Mr. Frank say to you as to why an

10  involuntary was being filed?

11       A.    Mr. Frank did not tell me why an involuntary

12  was being filed.  He told me that he was filing an

13  involuntary petition on behalf of Tom Fore who was a

14  creditor.

15       Q.    When Mr. Frank said that to you in that

16  conversation, what was your response?

17       A.    "Yes."

18       Q.    Did you discuss with anyone at the Westport

19  Group the fact that you would be filing an involuntary?

20       A.    No.

21       Q.    Did you make any efforts in 2012 to collect

22  any of your invoices?
```

Capital Reporting Company
Frye, Cara A. 12-16-2013

41

1      Q.    And did you notice that Mr. Fore was not a

2   petitioning creditor?

3      A.    Yes.

4      Q.    Do you know why Mr. Fore is not a petitioning

5   creditor?

6      A.    No.

7      Q.    Did you ever ask Mr. Frank why Mr. Fore was

8   not a petitioning creditor?

9      A.    No.

10     Q.    Did it surprise you that Mr. Fore was not a

11   petitioning creditor?

12     A.    No.

13     Q.    Have you ever spoken directly with Mr. Fore

14   in

15   2013?

16     A.    No.

17     Q.    When was the last time you spoke with Mr.

18   Fore?

19     A.    I don't recollect an exact date.  I would say

20   2011 or perhaps 2012.

21     Q.    When's the last time you spoke with Mr.

22   Turner?

Capital Reporting Company
Frye, Cara A. 12-16-2013

42

1        A.    Last month, November of 2013.

2        Q.    What was the substance of that discussion?

3              MR. OMINSKY:  Objection.  Again, this is

4  privileged if she was acting as counsel, giving advice

5  here and there.  They have had an attorney/client

6  relationship for many years.

7              BY MR. FIELDS:

8        Q.    When you spoke with Mr. Turner what was the

9  context of that discussion?  Were you acting as his

10 counsel?

11       A.    I am not sure what Mr. Turner's state of mind

12 was when he spoke to me and if he considered me his

13 counsel or not.  We've had an attorney/client

14 relationship since 2005 so I don't know how to answer

15 that question.

16       Q.    Let's go back to the filing of the

17 involuntary. How did you end up hiring Mr. Ominsky as

18 opposed to proceeding with Mr. Fore?

19       A.    I never proceeded with Mr. Fore.

20       Q.    I misspoke, Mr. Frank.

21       A.    How did I proceed with Mr. Ominsky rather

22 than Mr. Frank?

Appeal: 15-1671    Doc: 25-2    Filed: 09/28/2015    Pg: 98 of 248

Capital Reporting Company
Frye, Cara A. 12-16-2013

115

```
 1              (Whereupon, a discussion was held off the

 2              record.)

 3                   *  *  *  *  *

 4         MR. OAKEY:  I don't have any further

 5  questions.  I don't know if you have any follow-ups.

 6         MR. FIELDS:  I've got some documents from

 7  Dixie Construction that I'm going to ask you about so

 8  it's being copied.  Off the record.

 9                   *  *  *  *  *

10              (Whereupon, a break was taken at this time.)

11                   *  *  *  *  *

12              EXAMINATION

13                   *  *  *  *  *

14         BY MR. FIELDS:

15    Q.   I've got some documents from Dixie

16  Construction which I'm having copied.  They came in

17  while Mr. Oakey was examining you.  There's a retainer

18  letter that's been produced between Mr. Ominsky's firm

19  and Dixie Construction.

20              Have you seen that retainer letter before?

21    A.   I'd need to see a copy of it.  Not that I

22  recall, but I think it makes sense to wait.
```

Appeal: 15-1671    Doc: 25-2    Filed: 09/28/2015    Pg: 99 of 248

## Capital Reporting Company
### Frye, Cara A. 12-16-2013

116

```
 1       Q.   Let's wait.

 2            MR. FIELDS:  Off the record.

 3                 * * * * *

 4            (Whereupon, a break was taken at this time.)

 5                 * * * * *

 6            (Whereupon, Exhibit 5 was marked for

 7            identification.)

 8                 * * * * *

 9            BY MR. FIELDS:

10       Q.   Exhibit 5 are documents that were e-mailed to

11  me a few moments ago by Mr. Schulman and I put the

12  numbers on the bottom right side of each page.

13            Looking at page one --

14       A.   Can you give me a moment, if you would,

15  please.

16       Q.   Sure.

17       A.   Okay.

18       Q.   Have you seen page one before?

19       A.   No.

20       Q.   I understand you haven't seen it before, but

21  it's an e-mail from Mr. Schulman to Kenneth Frank, page

22  one
```

Appeal: 15-1671    Doc: 25-2    Filed: 09/28/2015    Pg: 100 of 248

Capital Reporting Company
Frye, Cara A. 12-16-2013

117

1         I'm talking about now, dated February 8 and

2    this says -- it starts off:  "Ken, this is to confirm

3    my understanding of our discussion that took place

4    today regarding your request that Dixie consider

5    allowing you to utilize its name in connection with a

6    filing of a petition for an involuntary bankruptcy,"

7    and I understand you weren't part of that conversation

8    and you haven't seen this document before but it seems

9    to indicate that Kenny Frank called or there was some

10   discussion on the day of the involuntary bankruptcy.

11        Does that refresh your recollection one way

12   or another as to whether you were approached by Mr.

13   Frank the day of the involuntary filing, or is it still

14   your recollection that you were approached about a week

15   prior to the involuntary filing?

16        A.   My answer was that I was approached within a

17   week of the filing.  I do not recall on what day.

18        Q.   Do you recall whether it was a weekday?

19        A.   No, I don't.

20        Q.   There is a statement in the next sentence:

21   "You indicated you had contacted three other creditors

22   and that you needed a fourth creditor to join in."

# EXHIBIT 30

**Robert B. Schulman**

| From: | Robert Schulman |
|---|---|
| Sent: | Friday, February 08, 2013 3:30 PM |
| To: | Kenneth B. Frank (kenny@kennyfrank.net) |
| Cc: | Shawn Pyle |
| Subject: | Dixie Construction Company |

Ken: this is to confirm my understanding of our discussion that took place today regarding your request that Dixie consider allowing you to utilize its name in connection with the filing of an Petition for Involuntary Bankruptcy relating to Inner Harbor West, LLC. You indicated that you had three other creditors and that you needed a 4th creditor to join in. Dixie agreed to join in and authorize the filing of the involuntary petition. In return for Dixie's willingness to participate, you agreed on your client's (Tom Fore) behalf, to execute documents that would do the following:

1. Your client will sign an indemnification and Hold harmless Agreement that would protect Dixie for all damages which arise as a result of Dixie's participation in the Bankruptcy; which results from Dixie's execution of the Petition for Involuntary Bankruptcy and any other matter, claim or cause of action relative to Dixie's involvement with your client or his assigns in connection with this matter.
2. Your client will pay any and all legal fees incurred in connection with this matter and will indemnify and hold Dixie harmless in the event that any attorney claims legal fees from Dixie regarding the filing of the Petition for Involuntary Bankruptcy.

In addition, your client will reaffirm that the Inner Harbor West, LLC has every intention under the bankruptcy rules to pay Dixie the current judgment in the amount of $101,225.62. In addition if the current development team, including Inner Harbor West, LLC and its officers, directors, affiliates, partners and your client proceeds with the development of the project it will agree to retain Dixie to do the site work as long as Dixie is competitive and the developer will affirm that it will make timely payment for the services performed going forward.

Please confirm the accuracy of the e mail and forward to me formal documents setting forth our understanding from today's discussion.



EXHIBIT
5
2/6/13



DEPOSITION
EXHIBIT #
Ruther 35
2-11-15

DIXIE(BR_2004) 0001554

# EXHIBIT 31

**Robert B. Schulman**

| | |
|---|---|
| **From:** | Kenneth B. Frank <kenny@kennyfrank.net> |
| **Sent:** | Friday, February 08, 2013 3:47 PM |
| **To:** | Robert Schulman |
| **Subject:** | RE: Dixie Construction Company |

This accurately reflects our understanding.

**From:** Robert Schulman [mailto:RBS@schulmantreem.com]
**Sent:** Friday, February 08, 2013 4:30 PM
**To:** Kenneth B. Frank
**Cc:** Shawn Pyle
**Subject:** Dixie Construction Company

Ken: this is to confirm my understanding of our discussion that took place today regarding your request that Dixie consider allowing you to utilize its name in connection with the filing of an Petition for Involuntary Bankruptcy relating to Inner Harbor West, LLC. You indicated that you had three other creditors and that you needed a 4th creditor to join in. Dixie agreed to join in and authorize the filing of the involuntary petition. In return for Dixie's willingness to participate, you agreed on your client's (Tom Fore) behalf, to execute documents that would do the following:

1. Your client will sign an Indemnification and Hold harmless Agreement that would protect Dixie for all damages which arise as a result of Dixie's participation in the Bankruptcy; which results from Dixie's execution of the Petition for Involuntary Bankruptcy and any other matter, claim or cause of action relative to Dixie's involvement with your client or his assigns in connection with this matter.

2. Your client will pay any and all legal fees incurred in connection with this matter and will indemnify and hold Dixie harmless in the event that any attorney claims legal fees from Dixie regarding the filing of the Petition for Involuntary Bankruptcy.

In addition, your client will reaffirm that the Inner Harbor West, LLC has every intention under the bankruptcy rules to pay Dixie the current judgment in the amount of $101,225.62. In addition if the current development team, including Inner Harbor West, LLC and its officers, directors, affiliates, partners and your client proceeds with the development of the project it will agree to retain Dixie to do the site work as long as Dixie is competitive and the developer will affirm that it will make timely payment for the services performed going forward.

Please confirm the accuracy of the e mail and forward to me formal documents setting forth our understanding from today's discussion.

1



DEPOSITION
EXHIBIT #
Ruther 38
2-11-15

DIXIE(BR_2004) 0007556

# EXHIBIT 32

FORM 5. INVOLUNTARY PETITION

B5 (Official Form 5) (12/07)

| United States Bankruptcy Court | INVOLUNTARY PETITION |
|---|---|
| District of Maryland | |

IN RE (Name of Debtor - If Individual: Last, First, Middle)

**Inner Harbor West, LLC**

ALL OTHER NAMES used by debtor in the last 8 years
(Include married, maiden, and trade names.)

Last four digits of Social-Security or other Individual's Tax-ID No./Complete EIN
(If more than one, state all.)

STREET ADDRESS OF DEBTOR (No. and street, city, state, and zip code)

**1700 Beason Street**
**Baltimore, MD 21230**

MAILING ADDRESS OF DEBTOR (If different from street address)

**Inner Harbor West, LLC**
**c/o Neil J. Ruther, Resident Agent**
**29 West Susquehanna Ave**
**Suite 610**
**Towson, MD 21204**

COUNTY OF RESIDENCE OR
PRINCIPAL PLACE OF BUSINESS

**Baltimore City**

LOCATION OF PRINCIPAL ASSETS OF BUSINESS DEBTOR (If different from previously listed addresses)

**1700 Beason Street, Baltimore, MD 21230**

CHAPTER OF BANKRUPTCY CODE UNDER WHICH PETITION IS FILED
■ Chapter 7    ☐ Chapter 11

### INFORMATION REGARDING DEBTOR (Check applicable boxes)

**Nature of Debts**
(Check one box)

Petitioners believe:
☐ Debts are primarily consumer debts
■ Debts are primarily business debts

**Type of Debtor**
(Form of Organization)

☐ Individual (Includes Joint Debtor)
☐ Corporation (Includes LLC and LLP)
☐ Partnership
■ Other (If debtor is not one of the above entities,
check this box and state type of entity below.)

**Limited Liability Company**

**Nature of Business** (Check one box)
☐ Health Care Business
■ Single Asset Real Estate as defined in
11 U.S.C. § 101(51)(B)
☐ Railroad
☐ Stockbroker
☐ Commodity Broker
☐ Clearing Bank
☐ Other

| VENUE | FILING FEE (Check one box) |
|---|---|
| ■ Debtor has been domiciled or has had a residence, principal place of business, or principal assets in the District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District. | ■ Full Filing Fee attached |
| ☐ A bankruptcy case concerning debtor's affiliate, general partner or partnership is pending in this District. | ☐ Petitioner is a child suport creditor or its representative, and the form specified in § 304(g) of the Bankruptcy Reform Act of 1994 is attached. *[If a child support creditor or its representative is a petitioner, and if the petitioner files the form specified in § 304(g) of the Bankruptcy Reform Act of 1994, no fee is required.]* |

### PENDING BANKRUPTCY CASE FILED BY OR AGAINST ANY PARTNER OR AFFILIATE OF THIS DEBTOR (Report information for any additional cases on attached sheets.)

| Name of Debtor | Case Number | Date |
|---|---|---|
| | | |
| Relationship | District | Judge |
| | | |

### ALLEGATIONS
(Check applicable boxes)

COURT USE ONLY

1.  ■ Petitioner(s) are eligible to file this petition pursuant to 11 U.S.C. § 303(b).
2.  ■ The debtor is a person against whom an order for relief may be entered under title 11 of the United States Code.
3.a. ■ The debtor is generally not paying such debtor's debts as they become due, unless such debts are the subject of a bona fide dispute as to liability or amount;

or

3.b. ☐ Within 120 days preceding the filing of this petition, a custodian, other than a trustee, receiver, or agent appointed or authorized to take charge of less than substantially all of the property of the debtor for the purpose of enforcing a lien against such property, was appointed or took possession.

DEPOSITION
EXHIBIT #
Ruther 39
2-11-15

PENGAD 800-631-6989

**558**

Name of Debtor  **Inner Harbor West, LLC**

B5 (Official Form 5) (12/07) - Page 2                                Case No.

---

### TRANSFER OF CLAIM

☐ Check this box if there has been a transfer of any claim against the debtor by or to any petitioner. Attach all documents evidencing the transfer and any statements that are required under Bankruptcy Rule 1003(a).

### REQUEST FOR RELIEF

Petitioner(s) request that an order for relief be entered against the debtor under the chapter of title 11, United States Code, specified in this petition. If any petitioner is a foreign representative appointed in a foreign proceeding, a certified copy of the order of the court granting recognition is attached.

Petitioner(s) declare under penalty of perjury that the foregoing is true and correct according to the best of their knowledge, information, and belief.

X **/s/ Cara A. Frye/ Principal**
   Signature of Petitioner or Representative (State title)

**C. Frye Associates, LLC**                     February  8, 2013
Name of Petitioner                                    Date Signed

Name & Mailing        **Cara A. Frye/ Principal**
Address of Individual  **1700 Beason Street**
Signing in Representative **Baltimore, MD 21230**
Capacity

---

X **/s/ Sean Pyle/ President**
   Signature of Petitioner or Representative (State title)

**Dixie Construction**                          February  8, 2013
Name of Petitioner                                    Date Signed

Name & Mailing        **Sean Pyle/ President**
Address of Individual
Signing in Representative **260 Hopewell Road**
Capacity                **Churchville, MD 21028**

---

X
   Signature of Petitioner or Representative (State title)

Name of Petitioner                                    Date Signed

Name & Mailing
Address of Individual
Signing in Representative
Capacity

---

X **/s/ Marc A. Ominsky, #13956**              February  8, 2013
   Signature of Attorney                              Date

**Marc A. Ominsky, #13956**
Name of Attorney Firm (If any)
**Shiller, Ominsky & Sulin, P.C.**
**The Century Plaza Building**
**Suite 249**
**Columbia, MD 21046**
Address
Telephone No.   **(443) 393-3380**

---

X **/s/ Marc A. Ominsky, #13956**              February  8, 2013
   Signature of Attorney                              Date

**Marc A. Ominsky, #13956**
Name of Attorney Firm (If any)
**Shiller, Ominsky & Sulin, P.C.**
**The Century Plaza Building**
**Suite 249**
**Columbia, MD 21046**
Address
Telephone No.   **(443) 393-3380**

---

X
   Signature of Attorney                              Date

Name of Attorney Firm (If any)

Address
Telephone No.

---

### PETITIONING CREDITORS

| Name and Address of Petitioner | Nature of Claim | Amount of Claim |
|---|---|---|
| C. Frye Associates, LLC<br>1700 Beason Street<br>Baltimore, MD 21230 | Contract | 112,450.00 |
| Dixie Construction<br>260 Hopewell Road<br>Churchville, MD 21028 | contract | 101,225.62 |
| Name and Address of Petitioner | Nature of Claim | Amount of Claim |
| | | **Total Amount of Petitioners' Claims**  213,675.62 |

Note:  If there are more than three petitioners, attach additional sheets with the statement under penalty of perjury, each petitioner's signature under the statement and the name of attorney and petitioning creditor information in the format above.

339

<u>0</u>   continuation sheets attached

# EXHIBIT 33

js

**From:** Kenneth B. Frank <kenny@kennyfrank.net>
**Sent:** Sunday, February 10, 2013 8:08 PM
**To:** Marc Ominsky
**Cc:** Jeff Sirody
**Subject:** Westport

**Flag Status:** Flagged

Marc-- today Jeff asked whether you had sent notices to the two members of Westport Development, LLC, the sole owner of Inner Harbor West, LLC. He was not sure of the precise notice requirement, but you should check it tonight and if notices are required I would suggest you generate them immediately.

Let me know.

Thanks



DEPOSITION EXHIBIT
Ruther 40
2-11-15
PENGAD 800-631-6989

SIRODY000089    561

# EXHIBIT 34

**From:** Kenneth B. Frank
**To:** pat@turnerdevelopment.com
**Subject:** FW: Inner Harbor West, LLC
**Date:** February 18, 2013 1:16:52 PM
**Attachments:** RETAINER AGREEMENT,Inner Harbor West,LLC.pdf

Please sign and email back to me asap....

**From:** Gerri Auchincloss [mailto:gerria@sfalaw.com]
**Sent:** Monday, February 11, 2013 10:53 AM
**To:** Kenneth B. Frank
**Cc:** Sandy Meyers
**Subject:** Inner Harbor West, LLC

Good Morning Mr. Frank:

At the request of Jeff Sirody, I have attached Sirody, Freiman & Associates' Retainer Agreement for your review and signature. Please contact Jeff directly if you have any questions.

Regards,
Gerri


Gerri C. Auchincloss, J.D., Law Clerk
Sirody, Freiman & Associates
1777 Reisterstown Road, Suite 360-E
Baltimore, MD 21208
Phone: 410-415-0445
Fax:    410-415-0744

No virus found in this message.
Checked by AVG - www.avg.com
Version: 2013.0.2899 / Virus Database: 2639/6087 - Release Date: 02/07/13
Internal Virus Database is out of date.

DEPOSITION
EXHIBIT #
Ruther #3
2-11-15

PENGAD 800-631-6989

563

## SIRODY FREIMAN & ASSOCIATES
### ATTORNEYS AT LAW

JEFFREY M. SIRODY — MD
ADAM M. FREIMAN— MD
D. PHILLIP ANDERSON - MD, IL
GARY S. PORETSKY - MD, DC
BENJAMIN J. BEATTY - MD

1777 REISTERSTOWN ROAD
SUITE 360
BALTIMORE, MARYLAND 21208
(410) 415-0445
(FAX) (410) 415-0744

### RETAINER AGREEMENT

I hereby retain Sirody, Freiman & Associates, hereinafter Attorney, to represent me, Inner Harbor West, LLC, hereinafter, Client, in a pending involuntary bankruptcy filing and proposed conversion thereof to a case under Chapter 11. Attorney agrees to prepare and file the petition and Schedules, Plan and other required documents and to appear at any necessary hearings.

I understand that court, deposition and other dates may involve the schedules of other attorneys. I authorize Mr. Sirody/Mr. Freiman to agree to requested adjournments of all such matters as a matter of professional courtesy at his discretion.

The agreed minimum fee for this representation, subject to Court approval is $20,000.00. This shall confirm that, to date, $20,000.00 has been paid.

Client agrees to pay all costs, including all telephone charges.

The current hourly rate charged by Sirody, Freiman & Associates attorneys is $350.00, billed by tenths of an hour. Any additional amounts owed will be determined by the Bankruptcy Court after filing of an attorney fee application, pursuant to Local Bankruptcy Rules and other applicable law. Time expended by paralegals will be billed at $150.00 per hour. Upon exhaustion of retainer funds, Attorneys will request additional retainers, and said retainer(s) must be replenished within 30 days or Attorney may seek withdrawal from further representation in this matter.

Client agrees to cooperate fully with Attorney in all respects, including, but not limited to the following:

A.    Appearing for office conferences when requested by Attorney;
B.    Promptly responding to all requests by Attorney, or by another party, for information, such as by way of Interrogatories, Depositions, Rule 2004 Exams;
C.    Complying with all other requests made by Attorney relating to furthering the Client's case.

Client agrees to obey all Court Orders, to avoid violation of any injunctions, and to refrain from unlawful conduct of any kind as it relates to this case.

564

Sirody, Freiman & Associates
RETAINER AGREEMENT
Page 2


CLIENT IS AWARE THAT ATTORNEY'S TIME IS LIMITED, AND THAT TIME FOR WHICH CLIENT WILL BE BILLED INCLUDES:

A.   All time spent on the case by Attorney;
B.   All time spent on the telephone by Attorney, with Client or anyone else regarding the case;
C.   All time spent by Attorney traveling between his office, and a Court, or any other place in connection with the case;
D.   All time spent writing legal documents, letters or anything else in connection with the case;
E.   All time spent by Attorney in Court, including time spent waiting for Client's case to be called.

Attorney makes no promises or representations as to the outcome of the case, but agrees to use his best efforts on behalf of Client and in his best interest. Client hereby acknowledges that Attorney has not made any promises or representations as to the ultimate outcome of this legal matter.

Under no circumstances shall Attorney be required under this Agreement to:

A.   Represent Client in an Appeal of any decision;
B.   Represent Client in a Motion for Reconsideration or Modification;
C.   Represent Client in any proceedings in any other lawsuits, actions or other proceedings arising out of his conduct in this case or any other case.

Pursuant to the United States Treasury Department Regulation 31 C.F.R. Part 10, Section 10.35, be advised, that, unless otherwise expressly indicated, any federal tax advice contained in this communication, including attachments, is not intended or written to be used, and may not be used, for the purpose of (i) avoiding penalties that may be imposed on the taxpayer and the Internal Revenue Code of 1986 as amended; or, (ii) promoting, marketing or recommending to another party, any tax related matter addressed herein.

Attorney has not shared, or agree to share, with any other entity, any compensation paid, or to be paid, by Client, except as follows:


565

IHW0001644

Sirody, Freiman & Associates
RETAINER AGREEMENT
Page 3


I acknowledge receiving a copy of the Agreement.  Client consents to Attorney disposing of his physical file, including all documents, five (5) years after the end of his representation.



Date:_____



Client: INNER HARBOR WEST, LLC


By:      _____



Attorney:_____
          Jeffrey M. Sirody, Esquire
          Adam M. Freiman, Esquire

          SIRODY, FREIMAN & ASSOCIATES
          1777 Reisterstown Road, Suite 360 E
          Baltimore, Maryland 21208

566

IHW0001645

# EXHIBIT 35

js

| | |
|---|---|
| **From:** | Rebecca and Jeff <jmslaw@aol.com> |
| **Sent:** | Tuesday, February 12, 2013 9:52 AM |
| **To:** | kenny@kennyfrank.net |
| **Subject:** | Re: Missed your call.. |
| **Flag Status:** | Flagged |

Kenny,

Please have Pat sign the retainer agreement and drop off the check or call me for wire instructions.

Thanks,

Jeff


-----Original Message-----
From: Kenneth B. Frank <kenny@kennyfrank.net>
To: Jeff Sirody <jmslaw@aol.com>
Sent: Mon, Feb 11, 2013 10:34 am
Subject: Missed your call..

Tried to call you back.  Call me.

DEPOSITION
EXHIBIT
PENGAD 800-631-6989
Luther 12
2-11-15

568

SIRODY000088

# EXHIBIT 36

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### (Baltimore Division)

In Re:  INNER HARBOR WEST, LLC,    \*    Case No. 13-12198
    \*
    Alleged Debtor.    \*    Chapter 7 (Involuntary)
    \*

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## DEBTOR'S CONSENT TO ORDER FOR RELIEF

Inner Harbor West, LLC , alleged Debtor, by Jeffrey M. Sirody and Sirody, Freiman, and

Associates, its attorneys, consents to the entry of an order for relief.


Dated: February 19, 2013        /s/ Jeffrey M. Sirody
        Jeffrey M. Sirody, Bar #11715
        SIRODY, FREIMAN & ASSOCIATES
        1777 Reisterstown Road, Suite 360 E
        Baltimore, MD 21208
        (410) 415-0445
        Attorneys for the alleged Debtor

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on **February 19, 2013**, a copy of the foregoing was mailed, first class, postage prepaid to:

C. Frye Associates, LLC
1700 Beason Street
Baltimore, Md 21230
(Petitioning Creditor)

Dixie Construction
260 Hopewell Road
Churchville, MD 21028
(Petitioning Creditor)

Marc A. Ominsky
The SOS Law Group
Century Plaza Building
10632 Little Patuxent Parkway
Suite 249
Columbia, MD 21046
(Attorney for Petitioning Creditors)

/s/ Jeffrey M. Sirody
Jeffrey M. Sirody, Bar #11715

# EXHIBIT 37

| | |
|---|---|
| **From:** | Kenneth B. Frank |
| **To:** | Pat Turner; TFore@soradevelopment.com; Patrick Rhodes |
| **Cc:** | jeanine@turnerdevelopment.com |
| **Subject:** | RE: Westport |
| **Date:** | February 27, 2013 8:09:34 PM |

I spoke with him briefly this evening, mostly off the record.  (I assume he's trustworthy.)  He said he'd do a quote check with me before he published.

The one quote I gave him was something to the effect that Citibank wants to see the project succeed, and our objective once the smoke clears is to make sure they get paid so we can move forward with project.

**From:** Pat Turner [mailto:pat@turnerdevelopment.com]
**Sent:** Wednesday, February 27, 2013 8:07 PM
**To:** Kenneth B. Frank; TFore@soradevelopment.com; Patrick Rhodes
**Cc:** jeanine@turnerdevelopment.com
**Subject:** Fwd: Westport


Sent from my iPhone

Begin forwarded message:

> **From:** "Kilar, Steve" <steve.kilar@baltsun.com>
> **Date:** February 27, 2013, 7:22:25 PM EST
> **To:** "pat@turnerdevelopment.com" <pat@turnerdevelopment.com>
> **Subject: Westport**
>
> Pat,
>
> I stopped by your office yesterday just to make sure I was still reaching you, since I hadn't heard back from phone messages for a few months (which I understand). I hope your assistant passed along my card.
>
> I'm writing a story for Sunday about the Westport bankruptcy. It would be helpful if you want to say something about what's going on with the case. But, if you don't want to talk about the case we could also just talk about what you want to have happen in the future at Westport. I'm sure there are plans in the works once the financing is squared.
>
> Since it's your project, it seems like you'd want to says something about it. You can call me -- or email me a statement if you prefer. I also understand if you're not comfortable talking on the record at this point.
>
> Best,
>
> Steve



DEPOSITION
EXHIBIT #
Ruther 99
8-11-15
PENGAD 800-631-6989

**Steve Kilar**
Reporter
The Baltimore Sun
410-332-6624 (o)
410-926-7974 (c)
410-332-6455 (f)
twitter.com/stevekilar

No virus found in this message.
Checked by AVG - www.avg.com
Version: 2013.0.2899 / Virus Database: 2641/6134 - Release Date: 02/26/13

574

IHW0001878

**From:** Kenneth B. Frank
**To:** Pat Turner
**Subject:** RE: sun paper comment
**Date:** March 1, 2013 11:46:46 AM

As you know from previous stories you have written, Westport is a dynamic and complicated project in the ongoing redevelopment of great Baltimore City neighborhoods. It has the potential to make an enormous contribution to Baltimore City.  When we started the project in 2005 most people in Baltimore never heard of Westport. We spent years assembling the real estate, developing a relationship with the community, the City and other stakeholders in the community.  We survived one of the most severe real estate collapses in US history and have invested great amounts time and money into the project. We are in the final states of re-capitalization of the project and would have completed that process except for the last minute interference described in the Complaint we filed last week.  We are confident the legal hurdles will quickly disappear so we can pay Citibank and finally put our shovels in the ground.  We have persevered through the worst of times and look forward to making Westport the success everyone knows it will be.

---

**From:** Pat Turner [mailto:pat@turnerdevelopment.com]
**Sent:** Thursday, February 28, 2013 2:56 PM
**To:** Kenneth B. Frank
**Subject:** sun paper comment

What do you think?

Steve,

I apologize for not having gotten back to you regarding Westport but it is going through a delicate on going legal process with many moving parts. As you know from previous stories you have written Westport is a dynamic and complicated project in the on going redevelopment of great Baltimore City neighborhoods. We started the project in 2005 when most people in Baltimore never heard of Westport unless they were from Connecticut. We spent years assembling the real estate and developing a relationship with the community and other stakeholders.  We endured and survived one of the worst recessions in US history and invested large amounts capital into the project. In the re-capitalization process we have crossed paths with a variety of financial institutions most legitimate some not. Currently we are dealing with a group that acted unethically and illegally in the refinancing process.

We are as committed to Westport now as we were 7 years ago. We will prevail in the current circumstances and Westport will move forward as planned. The project enjoys unprecedented support from the community, the City and the State.

Patrick Turner
President

Turner Development Group
1700 Beason Street
Baltimore, Maryland 21230
410 752-1241 Phone
410 685-0226 Fax

www.Turnerdevelopment.com
www.Westportwaterfront.com



DEPOSITION
EXHIBIT #
Ruther 45
2-11-15
PENGAD 800-631-6989

575

IHW0001917

# EXHIBIT 38

No virus found in this message.
Checked by AVG - www.avg.com
Version: 2013.0.2899 / Virus Database: 2641/6134 - Release Date: 02/26/13

IHW0001918

# EXHIBIT 39

THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

- - - - - - - - - - - - - - - - - - x
                            :
IN RE:                      :  Case No. 13-12198 RAG
                            :
INNER HARBOR WEST, LLC,   :  (Chapter 11)
                            :
          Debtor.       :
                            :
- - - - - - - - - - - - - - - - - - x  November 21, 2014

                                Baltimore, Maryland

**HEARING**

[70] Emergency Motion for Interim Relief Authorizing the
Debtor to Obtain Post-Petition, Secured, Super-Priority
Financing for the Purpose of Funding Expenses and Adequate
Protection Payments.

[75] Motion for Relief from Stay and Notice of Motion Re: 2841
Waterview Avenue, Baltimore, MD and 2201 Kloman Street,
Baltimore, MD, Filed by Citigroup Global Markets Realty Corp.

[86] Response on behalf of Citigroup Global Markets Realty
Corp. Filed by Matthew William Oakey.

[90] Motion to Convert Case from Chapter 11 to Chapter 7. FEE
EXEMPT, Motion to Dismiss Case for other reasons Filed by US
Trustee - Baltimore 11.

[92] Opposition on behalf of US Trustee - Baltimore 11 Filed
by Katherine A. (UST) Levin (related document(s)70 Motion for
Authority to Obtain Credit under Section 364 and Notice of
Motion).

[119] Line Concerning Debtor's Failure to File a Written
Objection to the Motion for Relief from Automatic Stay on
behalf of Westport Property Investments, LLC Filed by Matthew
G. Summers.

[123] Response on behalf of Inner Harbor West, LLC Filed by
Jeffrey M. Sirody (related document(s)75 Relief from Stay and
Notice of Motion).

Appeal: 15-1671   Doc: 25-2   Filed: 09/28/2015   Pg: 128 of 248
Case 1:14-cv-00557-JFM   Document 57-41   Filed 02/27/15   Page 3 of 8

lcj                                                                    9

1   have been doing my best to balance in my mind the parties'

2   positions as they appear at this time, and in the context of

3   the overall history of this almost 2-year-old case.

4          The case was filed on February 8, 2013, as an

5   involuntary case commenced by petitioning Creditors Dixie

6   Construction and C Frye and Associates, LLC.  And was then

7   converted to a case under Chapter 11 on March 4, 2013.  A

8   little less than 2 years may or may not be a long time with

9   respect to a particular Chapter 11.  That, of course, as we

10  all know, those of us who have been doing this for any

11  appreciable amount of time, it depends on the particular facts

12  and circumstances of each case.

13         But here at this point, I have concluded that the

14  record establishes that it is a long time, and that it is too

15  long under the circumstances as I see them, and I have decided

16  to do something about it.  And I am going to explain why in

17  this opinion.

18         This case now comes down to the struggle that has

19  arisen between the Debtor, aided by its quote unquote behind

20  the scenes hidden hand but now out in the open in the person

21  of Mr. Fore and his entity, TideRock, and his attorney,

22  Mr. Frank, and the new holder of the loan documents and lien,

23  Westport Property Investments, represented by Ballard Spahr

24  and Shapiro Sher, who appeared at the last hearing two weeks

25  ago, and I described as the backup law firm.

580

lcj                                                                          16

1    representation of the Debtor's affairs.

2              Save for the organizational chart that was attached

3    to them, that essentially confirmed that the Debtor's

4    background of ownership and management is a convoluted

5    patchwork.

6              An amended Schedule A was filed on April 9, 2013, at

7    Docket No. 22.  Now the value of the real estate was listed as

8    quote unquote, unknown.  Likewise on April 15, 2013, an

9    Amended Schedule B was filed at Docket No. 28, and the

10   adversary proceeding was added, also with an unknown value.

11             From the face of the Statement of Financial Affairs

12   and schedules, this appeared to be a stagnant, single-asset

13   real estate Debtor with no ongoing business and few if any

14   employees.  Nothing has happened since then to change that

15   perception.

16             In fact, everything that has happened since then has

17   only intensified that perception as consistent with the facts,

18   and has also confirmed that the unsecured, save perhaps for

19   Mr. Fore, could care less about the outcome of this case.  In

20   other words, this is a classic two-party dispute where the

21   stay is being used only to prevent the secured lender from

22   exercising its State law rights and in this instance anyway,

23   the Debtor has no leverage or plan.

24             On April 17, 2013, Warhorse, the Defendant in the

25   adversary proceeding, one of the Defendants in the adversary

                                                                        581

1    proceeding, filed a motion for 2004 examination, and that is

2    at Docket No. 29.  It was indicated that no payments had been

3    made on the debt to Citigroup since 2010.  And strongly

4    suggested that a, the filing of the involuntary was little

5    more than a sham transaction by parties aligned with the

6    Debtor's interests.  Perhaps to avoid a default provision in

7    the loan documents, specifically the guarantor agreement.

8            And that as for Mr. Fore and his entity, that his

9    debt may be more accurately characterized, and should be

10   characterized, as a capital investment.  In paragraph 12 of

11   the motion it was stated quote of that amount, talking about

12   the unsecured debt, $2,108,357.14, is held by Tom Fore/

13   TideRock Holdings, LLC, which is, according to the testimony

14   of Mr. Turner, who of course is the Debtor's principal.

15           At the Section 341 meeting with Creditors, evidence

16   by a quote Memorandum of Understanding that does not contain

17   payment terms nor does it require repayment of purported loan

18   unless and until the Debtor has sufficient funds to pay it.

19           Accordingly the purported loan by Mr. Fore will be

20   highly susceptible to recharacterization as a capital

21   contribution end quote.  These allegations are not facts but

22   if Mr. Fore's debt is taken from the equation of unsecured

23   claims, then what we are left with is an unsecured body of

24   Creditors amounting to no more than approximately $50,000,

25   again none of whom, as holders, have shown the slightest

582

lcj                                                                    18

1    inclination to be involved in this case.

2            Certainly Mr. Fore's stance in this case, in view of

3    the entire record, has appeared to be much more than the

4    stance of someone who is positioned as a stakeholder investor

5    in the Debtor as opposed to an arm's length unsecured

6    Creditor.

7            Needless to say, the motion was granted, the 2004

8    motion was granted by an order entered on May 9, 2013, and

9    that is at Docket No. 32.  And I will just point out here that

10   although Debtor's counsel did file a Rule 2016(b) disclosure

11   statement when the case was filed, counsel did not seek to

12   have itself employed formally until June 12, 2013.  That is at

13   Docket No. 34, about four months later.

14           That is not good, and it reflects a lack of

15   familiarity with the complex Chapter 11 process.  And that is

16   no knock on the Sirody firm whatsoever.  They generally do a

17   great job in the consumer area.  I am very familiar with them

18   and the wonderful job they do for their clients in that area

19   of this court's jurisdiction.

20           But seeking your own employment is generally not

21   something a firm has to do in a consumer case, and again

22   exhibits, the fact that it wasn't done here, exhibits -- for

23   four months -- exhibits a lack of familiarity with the much

24   more complex Chapter 11 process.

25           Nevertheless, my knowledge of their general

                                                                    583

Appeal: 15-1671    Doc: 25-2    Filed: 09/28/2015    Pg: 132 of 248
Case 1:14-cv-00557-JFM   Document 57-41   Filed 02/27/15   Page 7 of 8

lcj                                                                    19

1   expertise as compared with how this case has unfolded and

2   contrasted with recent events and filings, also has raised

3   serious questions in my mind as to what is really going on in

4   this case at this point.  To be blunt, whether to a certain

5   extent I am being sandbagged by a ghostwriter.  Note that the

6   Debtor did not file either a plan or disclosure statement by

7   the termination of exclusivity, did not file a motion to

8   extend the exclusive period.

9        That deadline is normally a signal to astute counsel

10  and a Debtor proceeding in good faith that if there has been

11  no significant reporting with regard to the status of the case

12  and prospects for rehabilitation before, the time has come.

13  But that didn't happen.

14       Moreover, the deadline is also a signal to -- I am

15  talking about the exclusivity deadline -- is also signal to

16  Creditors if the case is more than simply a struggle for

17  control, that the Debtor needs to be pushed.  That didn't

18  happen either.

19       I make that observation knowing that negotiations

20  have been ongoing since probably the beginning of the case and

21  that is a great thing.  No one is against that.  Certainly let

22  that be stated for the record.  But the absence of Creditor

23  concern at the passage of that milestone I think is also

24  telling as to how little the reorganization process has to do

25  with the real drama of this case, drama that I only see in

1   the complaint in the adversary proceeding, that the Debtor had

2   somehow, or parties aligned with the Debtor, had somehow been

3   crossed out of the transaction in an irretrievable way.

4           Well, the case has been pending for almost two years

5   now, and without a lot of action from anyone, including

6   Citigroup, and I assume negotiations have been going on.  That

7   is what I have been told all along.  And the Debtor still

8   hasn't been able to buy the note.

9           Indeed, the Debtor hasn't filed a plan or disclosure

10  statement, and there is no likelihood that will happen at any

11  point in the foreseeable future.  At least there is nothing in

12  the record before me that even suggests that.  In fact, no

13  response has been filed to the motion to convert and/or

14  dismiss.

15          And the further this drags on, the more convinced I

16  am that the process, and me, the jurist, have been sandbagged

17  by how the Debtor has handled this.  I don't believe the

18  Debtor's firm of record has been preparing most of the papers

19  filed in court.  I know Mr. Sirody's firm, and they are fine

20  at what they do.

21          But I also know their work product, and I dare say

22  many of the documents signed by their lawyers were not

23  prepared by their lawyers.  And I am not going to deal with a

24  shadowy situation like that in a Chapter 11.  I am just not

25  going to do it.  Moreover, it is just another reflection of

585

## THE UNITED STATES DISRICT COURT
## FOR THE DISTRICT OF MARYLAND

WESTPORT PROPERTY INVESTORS, LLC   *

               **Case No.: 1:14-cv-557-JFM**

       **v.**                 *

PATRICK TURNER, *et al.*         *

*    *    *    *    *    *    *    *    *    *    *    *    *

### AFFIDAVIT OF KENNETH B. FRANK

I, Kenneth B. Frank, state as follows:

1.      I am over the age of 18 and am competent to testify as to the matters set forth herein, of which I have personal knowledge.

2.      I am a member in good standing of the bar of the state of Maryland and of this Court, and have been such for over 40 years.

3.      I first undertook representation of Thomas B. Fore ("Fore,") in 2011, in connection with a real estate development project in Glassboro, NJ.

4.      In August, 2011, Mr. Fore told me he loaned funds as forbearance payments and other operating expenses for a project in Baltimore, known as Westport, for which he was responsible for arranging a refinancing of a defaulted $30 million loan from Citibank.  He asked me to review documents on his behalf related to a transaction he negotiated to provide the initial capital for that refinancing, which was scheduled to close within 30-45 days.  Westport was represented by Cara Frye, Esq. ("Frye,") and Steven L. Hawtof, Esq., of Abramoff, Neuberger and Linder, LLP, and over the course of the next 30-45 days I reviewed documents and negotiated revisions on Fore's behalf with Westport's counsel.  The lender failed to fund that

586

transaction, however, the transaction was apparently nothing more than an elaborate scam in which the lender fraudulently absconded with over $100,000 in commitment fees paid by Fore. I had no further involvement with any matters related to Westport for approximately one year thereafter.

5.      Fore was actively seeking potential investors and lenders for Westport, and had preliminary discussions with many people and entities. From time to time I was asked to prepare non-disclosure agreements for many of those prospects.

6.      In November, 2012, Citibank docketed a foreclosure action but made no effort to proceed with a sale of the property. In fact, Citibank confirmed in writing it was still willing to sell its note at a substantial discount to Westport or someone acting on its behalf.

7.      Also in November, 2012, I was asked to participate in a conference call among Patrick Rhodes ("Rhodes,") one of Fore's employees, and representatives of Vision Capital, a potential lender or investor in Westport based in Salt Lake City, Utah. I subsequently reviewed a Non-Disclosure and Non-Circumvention Agreement (the "NDA,") among Vision on one hand, and Fore, Westport Partners, LLC, an entity owned by Fore, Turner, and Westport Development, LLC, on the other. The NDA was signed on November 27, 2012.

8.      Westport Development was the parent company of Inner Harbor West, LLC ("IHW,") and Inner Harbor West 2, LLC ("IHW2,") the two entities who collectively owned the Westport real estate. IHW is the entity on whose behalf the bankruptcy at issue in this case was filed.

9.      Sometime thereafter, I attended a presentation about the Westport Project at the office of Patrick Turner ("Turner,") who I was told was the developer of the Westport Project.

587

Although I had met Turner socially on several prior occasions, and believe he may have participated in some conversations in my review of documents related to the abortive 2011 financing described in paragraph 4 hereof, this was my first meeting with him in a business context.

10.     From time to time between November, 2012, and early January, 2013, at Fore or Rhodes' request, I participated in conference calls and/or reviewed documents and emails related to Vision's due diligence.  Because he had answers to many of Vision's questions, Turner was included in most of the email exchanges, and I reviewed, and where necessary edited, all written responses by everyone to ensure they were correct.

11.     By late December or early January, Vision indicated it intended to make a proposal to Citibank, and I was asked to introduce them to Thomas Lewis, Esq. ("Lewis,") Citibank's local counsel, with whom I had been in contact advising him of the possibility of a proposal.  I called Lewis and arranged for a representative of Vision to contact him directly.

12.     Vision's initial offer was not acceptable to Citibank, and I contacted Lewis again to inquire as to whether Citibank would be receptive to a revised offer.  He said they might, and I reported back to Fore, Rhodes and Turner, and communicated that information to Vision.

13.     In the second week of January a representative of Vision came to Baltimore and brought Richard Burton ("Burton,") and Dale Dowers ("Dowers,") with him, representing them to be "consultants" to give final validation to their due diligence.  A meeting was scheduled which Fore asked me to attend.  When I arrived, I was asked to leave, because no other lawyers were present.

588

3

14.     Within the next several days Vision substantially changed their proposed deal and it became apparent that Burton and Dowers, and their partner Michael Borden ("Borden,") were not consultants as represented, but were actually dictating the terms of the transaction and perhaps taking Vision's place altogether.  If that were true, it would be a violation of the NDA, and was a matter of great concern.

15.     Understanding what was taking place and determining what to do about it became a matter of the highest priority for me, Fore, Rhodes and Turner.  As a result, I coordinated a series of emails and text messages, primarily between Burton and Fore, along with several communications by Turner and myself, intended to put Burton on notice that he was not permitted to enter into any agreement with Citibank without the consent of the parties to the NDA, and elicit written confirmation of their actions to provide evidence for possible future litigation.  I had input into all of the emails and texts, and wrote or edited many of them myself.

16.     On January 24, 2013, Citibank published the first advertisement for a foreclosure sale of the Westport real estate, scheduled for February ___ .  On January 25, 2013, Burton informed Fore that he and his partners had entered into an agreement with Citibank to acquire the loan, were Westport's new lender, and intended to proceed with the foreclosure.   Burton refused to disclose any of the terms of the transaction, and Fore and Turner asked me to contact Lewis to try to ascertain the facts.  Fore, Turner, Rhodes and I also had discussions about possible courses of action in response to those developments.

17.     When I contacted Lewis, he refused to speak to me unless he was provided confirmation that I was representing the borrower.  Since I had been the person who previously handled those communications, and Turner did not have other counsel, I asked Turner to provide

589

4

that confirmation so I could try to find out what was going on.  He did so, but even then, Lewis was unwilling to provide any substantive information.

18.     At that time it appeared the only effective action to prevent loss of the Westport real estate, the only source of repayment of Fore's loan, was a bankruptcy.  I am not a bankruptcy lawyer, and on January 28, 2013, I contacted Jeffrey Sirody, Esq., a person I knew from the golf club we both belonged to, and who practices bankruptcy law.  I asked him if Turner chose to file a chapter 11 whether he would be interested in representing the debtor, and asked a few general questions.  On January 29, 2013, I sent him a link to the advertisement for the foreclosure sale. That day I also asked Turner to send me a list of Westport's creditors.  Rhodes maintained a summary of Westport's obligations for purposes of creating pro-forma projections for prospective investors and lenders, and I wanted to make sure his list was complete.

19.     Turner told me Carlyle Partners, was the owner of a 40% interest in Westport, and its consent was required for major decisions, including the filing of a bankruptcy.  Because the property would likely be lost if the foreclosure proceeded, Turner said he was confident they would give their approval.

20.     In a conference call on January 30, 2013, Carlyle informed Turner that as a public real estate investment business, it never wanted any of its properties associated with a bankruptcy and refused to allow Turner to file a Chapter 11.

21.     The next day Turner informed me that he spoke to Neil Ruther ("Ruther,") after the Carlyle call and told Ruther for the first time about his desire to file a Chapter 11, but Carlyle refused to consent.  Ruther told Turner that had he filed a bankruptcy, it would have triggered their personal guarantee, something until then Turner had not realized.  Turner then told Fore and

590

5

me, for those reasons he could not and would not participate in a bankruptcy. I subsequently

obtained a copy of the guaranty agreement from Rhodes, who maintained copies of all Westport

documents in a password protected "drop box" for distribution to potential investors.

22.    On January 31, 2013, I discussed the situation with Sirody, who told me creditors

could file an involuntary bankruptcy against IHW or IHW2. Sirody emailed me a reference to

the appropriate section of the Bankruptcy Code.

23.    I explained what I learned to Fore, who said he needed to do whatever was

necessary to avoid a loss of the more than $2 million he was owed. He said he would discuss it

with Turner.

24.    Fore later told me Turner asked him not to file a bankruptcy, and was very upset

when Fore said he was going to do it anyway, and there was nothing Turner could do to prevent

it. From reading the guaranty, neither Fore nor I believed Turner could be held responsible

anyway if third parties filed an involuntary bankruptcy.

25.    Initially I believed three creditors were required to file an involuntary bankruptcy.

I contacted Robert Schulman, Esq. ("Schulman,") counsel to Dixie Construction, the holder of a

recorded judgment against IHW, and Cara Frye ("Frye,") an attorney and real estate consultant,

who was owed more than $100,000 on a contract with IHW. I explained that their claims would

be extinguished by a foreclosure, and asked them if they would be petitioning creditors in an

involuntary bankruptcy if Fore paid the legal fees and other costs.

26.    Frye agreed to be a petitioning creditor, and Schulman, expressly acknowledging

that I represented Fore, requested confirmation that his client would be paid what was owed,

would be considered for future work, and would be reimbursed for its costs.

591

27.     The Memorandum of Understanding pursuant to which Fore lent funds to the Westport entities, provided that upon acquisition of the Citibank Note, Fore would have a first lien on the Westport real estate and so long as his loan remained unpaid, he had approval rights over any decisions regarding the project.  I told Fore of Schulman's requests, and Fore told me it was his intention to do the things requested by Schulman.  Accordingly, I told Schulman those conditions were acceptable.

28.     I had several conversations with Frye, and she asked questions about the bankruptcy process.  I understand she has taken the position that I was providing legal advice to her and therefore our communications are privileged.  I also understand that whether an attorney-client relationship exists is partially determined by the facts and circumstances, and the belief of the "client" that such a relationship existed.

29.     I then learned that because the total number of creditors of IHW was below a certain threshold, only one creditor was needed to file the bankruptcy.  Because Fore is a real estate developer often involved in public-private partnerships, he wanted to avoid the publicity filing a bankruptcy would inevitably generate.  If he was not required to be among the petitioning creditors, although he was willing to pay the legal expenses, he preferred the other creditors initiate the bankruptcy.  He also wanted to reserve the right to possibly file an involuntary bankruptcy against IHW2 if that became necessary.

30.     On February 7, 2013, I asked Sirody for a recommendation of an attorney to serve as counsel to the petitioning creditors in the involuntary bankruptcy.  He recommended Marc Ominsky, who I subsequently contacted and engaged on behalf of Fore to represent the petitioning creditors and file the involuntary bankruptcy case.

592

31.     On February 8, 2013, Ominsky filed the involuntary Chapter 7 bankruptcy case.

32.     In subsequent conversations with Sirody, he expressed the view that as managing member of an LLC with a 60% interest in the Westport real estate, composed of numerous third-party investors, Turner had a fiduciary obligation to those investors to convert the involuntary bankruptcy Chapter 7 case to a Chapter 11, and would have substantial potential liability if he failed to do so. Sirody further expressed the view that such an action would not violate the guaranty. I communicated this information to Fore and Turner, and Turner subsequently decided to proceed with the conversion of the case to a Chapter 11.

33.     Fore agreed to pay the costs of the Chapter 11, with the understanding that such expenses would be added to the outstanding principal balance of his loan. Sirody sent me a retainer agreement for Turner to sign, which I forwarded to him. I also coordinated the payment of Sirody's retainer by Fore.

34.     Fore was my client at all relevant times.

35.     At no time have I ever represented IHW or IHW 2. Until shortly before the filing of the involuntary bankruptcy, I did not even know of their existence. At no time did I ever represent Turner or any of the Westport Entities in connection with the filing of any bankruptcy case.

36.     To the extent I ever represented Turner or any Westport entity, I did not do so before late January, 2013, and my services were limited to (a) negotiations with Citibank and/or potential capital sources regarding transactions intended to acquire the Citibank loan and provide capital for development of the project, and (b) responses to the actions of Vision, Burton, Dowers and Borden in violation of the NDA, to which both Fore and Turner and their respective entities

593

were parties.  In those matters the interests of Fore and Turner were completely aligned, and they were the only persons to whom I provided advice or legal services.  When suit was ultimately filed against Vision and the other parties, I represented Fore, Westport Partners, LLC, an entity owned by Fore, and Turner.  Sirody represented Westport Development.

37.     Prior to January 30, 2013, Turner believed he was free to file a Chapter 11 bankruptcy case, and that possibility was discussed by Fore, Rhodes, Turner and me.  No decisions were made and no any steps were taken in furtherance of any course of action, however, and all of those discussions stopped immediately upon learning that Carlyle refused to consent to a bankruptcy, and Turner's potential liability under the guaranty precluded any direct or indirect participation by him.

38.     Between January 30-31, 2013, when I learned Turner was not permitted to file a bankruptcy and such a filing might trigger his liability under the guaranty, and February 8, 2013, when the involuntary Chapter 7 bankruptcy was filed, I made every effort to restrict my communications with Turner to matters related to the matters described in paragraph 36 hereof.

39.     Once the bankruptcy was converted to a Chapter 11, because the interests of Fore and Turner were once again aligned, and also to limit the legal fees Sirody's office might charge Fore, I assisted Sirody's office where appropriate by writing or editing documents to be filed in the Bankruptcy, and also participated in the formulation of litigation strategy.  I was also designated by Fore and Turner as their spokesperson in any negotiations, subject to their direction and only so long as they pursued an agreed upon course of action.  I was assured by Sirody such assistance was entirely proper, and violated no ethical or legal restrictions.  The fact

594

that Judge Gordon may have sensed that Sirody's office did not write all of the documents filed

in that case, does not mean my participation was improper in any way.

40.    At no time during any relevant period did I have any communications with Neil

Ruther of any kind.  I did not know Mr. Ruther, and the first time I had any contact with him was

approximately six months later, at a meeting at Turner's office convened to attempt to resolve

another disagreement between Fore and Turner.  I represented Fore at that meeting, and Mr.

Ruther represented Turner.

I HEREBY DELARE under penalties of perjury, that the foregoing is true and correct.

Kenneth B. Frank

**10**                                                                    595

## THE UNITED STATES DISRICT COURT
## FOR THE DISTRICT OF MARYLAND

WESTPORT PROPERTY INVESTORS, LLC    *

                                                    **Case No.: 1:14-cv-557-JFM**

            **v.**                           *

PATRICK TURNER, *et al.*                *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

### AFFIDAVIT OF PATRICK TURNER

1. I am over the age of 18 years and have personal knowledge of the matters and facts set forth herein.

2. At all times relevant to this action I was the managing member of the controlling entities of Inner Harbor West (IHW) and Inner Harbor West 2 (IHW 2).

3. IHW and IHW 2 were owned by Westport Development LLC.  In turn a sixty percent (60%) interest in Westport Development LLC was owned by Westport Property Holdings LLC (hereinafter "WPH,") and CRP Westport Holdings LLC (hereinafter "CRP") owned forty percent (40%) (hereinafter collectively the "Development Entities").

4. CRP was owned and controlled by the Carlyle Group, a venture capital firm. Carlyle's representative to WPH was George Ruhlen, an attorney.

5. The operating agreements through which CRP held its interest provided in part that certain major decisions could not be made without CRP's consent. Among those was the filing of a bankruptcy on behalf of IHW or IHW 2.

6. In 2011, on behalf of IHW, IHW 2, and Westport Development, I entered into a Memorandum of Understanding with entities owned and controlled by Thomas Fore. Put simply,

596

Fore agreed to lend money to make forbearance payments to Citibank, to pay current operating expenses of the development entities to avoid foreclosure, and to find financing with which to recapitalize the Westport project.

7.  Mr. Fore subsequently indicated attorney Kenneth Frank would represent him in connection with his attempts to arrange financing for Westport.  Although Mr. Frank represented Mr. Fore's interests. because we were jointly seeking financing for the project, I communicated with Mr. Frank, met with him, received copies of documents he prepared and permitted him to represent to third parties that he spoke for the Development Entities the purposes of  seeking financing.

8.  In January and February, 2013, IHW was unable to pay its creditors.

9.  At that time, a group of investors who indicated that they would provide the capital necessary to fund the Project going forward (Vision Capital) breached a non disclosure agreement by promoting three other individuals who, in violation of the NDA, reached an agreement with the Mortgagee, CitiGroup Global Markets Realty Corp. (hereinafter CitiGroup) to acquire the Note.  This was an event which completely changed the focus of both Mr. Fore's companies and the Development Entities, as potential investors now became adversaries to the project.

10.  Mr. Fore's interests and the interests of the Development Entities were aligned for these limited purposes, and I authorized him to speak directly with CitiGroup on our behalf in order to determine our position with respect to Vision and the group which claimed to have purchased the Note.  At no time did Mr. Frank represent IHW, IHW 2, or Westport Development for any other purpose.

2

597

11. In late January, 2013, I discussed with Mr. Fore and Mr. Frank the possibility of filing a petition for bankruptcy reorganization of IHW and IHW 2, as our efforts to raise additional capital had not yet succeeded but showed potential for success.

12.   To facilitate the evaluation of such a course, Mr. Frank asked for a list of the creditors of the development entities. I instructed my assistant to send such a list to him. This action was taken prior to the events of January 30, 2013 described below, and was solely in anticipation of the possible filing or a bankruptcy reorganization which I later determined could not be pursued.

13.   Faced with an imminent foreclosure sale, on January 30, 2013, I participated in a conference call with Mr. Ruhlen, in which I sought his approval for the the filing of a bankruptcy to protect the assets of IHW.

14. During that conference call Mr. Ruhlen advised me that under no circumstances would CRP or any Carlyle Group entity consent to or permit the filing of a bankruptcy proceeding on behalf of any of the Development Entities, including IHW.  He further stated that such a filing would be viewed negatively by other Carlyle Investors.

15. Shortly after that conversation, I spoke with Neil J Ruther, an attorney, and part owner of WPH. Mr. Ruther advised me that the loan documents executed by us in favor of CitiGroup, contained a provision which would trigger personal liability for the indebtedness to the Mortgagee if IHW or IHW 2 filed for bankruptcy protection or consented to such filing.

16.   Following that conversation, I spoke with Mr. Fore, who had by this time loaned over $2 Million in support of the Project and was therefore a creditor of the Development Entities.  I advised him that IHW could not and would not file a bankruptcy and that I strongly objected to any effort by him or his companies to do so.

3

598

17. Mr. Fore stated that he was not bound by an agreement with CitiGroup and he intended to protect his investment by filing an involuntary bankruptcy petition against IHW.

18. I repeated my position opposing such a filing, but Mr. Fore said he was going to proceed with an Involuntary Bankruptcy.

19. Following the filing of the Involuntary Bankruptcy I knew the Development Entities would need counsel. Since I did not know any bankruptcy lawyers, I asked Mr. Frank for a recommendation. He introduced me to Mr. Sirody and facilitated the retention of his firm to represent the Development Entities.

20. I met with Mr. Sirody who advised me that as the managing member of the Development Entities I had a fiduciary obligation to protect their assets. He advised me that converting the Chapter 7 claim to a reorganizing bankruptcy under Chapter 11 was not only necessary, but would in no way violate the covenant of the loan documents triggering personal liability.

21. At the time Mr. Fore filed an Involuntary Bankruptcy Petition against IHW 2 in March, 2014, I was the only person with management authority in the Development Entities other than the approval rights held by Mr. Ruhlen.

22. Neither I nor any other official of IHW 2 counseled, encouraged or consented to the filing of the Involuntary Bankruptcy Petition against IHW 2.

23. At no time did Mr. Frank represent IHW or IHW 2 for purposes of filing a bankruptcy or any purpose other than described in Paragraph 10, nor did I or any other official of IHW or IHW 2 instruct, encourage or permit him or Mr. Fore to pursue the filing of an involuntary bankruptcy by any creditor of IHW or IHW 2.

4

599

24. Cara Frye, the principal of Cara Frye and Associates, is a lawyer who provided real estate planning and legal services to the Development Entities pursuant to a written agreement, totally unrelated to the efforts to recapitalize the project. The Development Entities were not able to pay her firm's fees, and as a result she stopped providing services in _2011_.

25. She performed no work for the Development Entities since that time, and has not provided legal advice to any such entity since then. Her firm was owed in excess of One Hundred Thousand Dollars. I had no ability to prevent her from taking any action to collect her firm's fees.

26. I told Ms. Frye she would be contacted by Mr. Frank, but she was not instructed or encouraged by me to participate in the filing of any bankruptcy proceeding for the Development Entities.

27. The property which is the subject of this litigation was recently sold at foreclosure auction for Six Million Dollars ($6,000,000.00).

I HEREBY DECLARE and affirm under the penalties of perjury that the foregoing statements are true and correct.

_____
Patrick Turner

600

1

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF MARYLAND

3

4    CITIGROUP GLOBAL MARKETS

5    REALTY CORPORATION

6              Plaintiff

7    vs.                        Case No. 1:14cv00557

8    PATRICK TURNER, et al

9              Defendants

10   _____/

11

12

13          The deposition of THOMAS BUTLER FORE was held

14   on Tuesday, February 17, 2015, commencing at 11:10 a.m.,

15   at the Law Offices of Ballard Spahr, LLP, 300 East

16   Lombard Street, 18th Floor, Baltimore, Maryland  21202,

17   before R. Dwayne Harrison, Notary Public.

18

19

20

21   REPORTED BY:  R. Dwayne Harrison

Appeal: 15-1671    Doc: 25-2    Filed: 09/28/2015    Pg: 150 of 248

Citigroup Global Markets - BOES7 JFM ation 61-3    Filed 04/15/15    Page 2 of 95    Thomas Butler Fore - Vol. 1
Patrick Turner, et al                                                               February 17, 2015

Page 2

```
 1  APPEARANCES:
 2       ON BEHALF OF THE PLAINTIFFS:
 3       TIMOTHY F. MCCORMACK, ESQUIRE
 4       MICHELLE M. MCGEOGH, ESQUIRE
 5          Ballard Spahr, LLP
 6          300 East Lombard Street, 18th Floor
 7          Baltimore, Maryland, 2102
 8          Telephone:  410-528-5600
 9          Facsimile:  410-528-5650
10          Email:  mccormackt@ballardsphar.com
11
12       ON BEHALF OF THE DEPONENT, THOMAS BUTLER FORE:
13       KENNETH B. FRANK, ESQUIRE
14          Murphy, Falcon & Murphy
15          One South Street, 23rd Floor
16          Baltimore, Maryland 21202
17          Telephone:  410-539-6500
18          Facsimile:  410-539-6599
19          Email:  kenneth.frank@mfmrk.com
20
21  APPEARANCES (Continued on the next page.)
```

Page 3

```
 1  APPEARANCES CONTINUED:
 2
 3       ON BEHALF OF HIMSELF:
 4       NEIL J. RUTHER, ESQUIRE
 5          Law Offices of Neil J. Ruther
 6          29 West Susquehanna Avenue, Suite 500
 7          Towson, Maryland 21204
 8          Telephone:  410-337-6888
 9          Facsimile:  410-337-0636
10          Email:  nruther@rutherlaw.net
11
12
13
14
15
16
17
18
19
20
21
```

Page 4

```
 1                    INDEX
 2       Deposition of THOMAS BUTLER FORE
 3              February 17, 2015
 4
 5  Examination by:                          Page
 6  Mr. McCormack                    5, 256, 271
 7  Mr. Frank                          206, 270
 8
 9  Exhibit No.                            Marked
10  Exhibit 1 Subpoena: 12-29-14 (Fore)         29
11  Exhibit 2 Subpoena: 12-29-14 (Tiderock Capital)  29
12  Exhibit 3 Subpoena: 12-29-14(Tiderock Holdings)  29
13  Exhibit 4 Check: $7,500                    166
14
15
16
17
18
19
20
21
```

Page 5

```
 1     PROCEEDINGS
 2  Whereupon,
 3     THOMAS BUTLER FORE,
 4  called as a witness, having been first duly sworn to
 5  tell the truth, the whole truth, and nothing but the
 6  truth, was examined and testified as follows:
 7     EXAMINATION BY MR. MCCORMACK:
 8  Q.  Could you state your full name for the
 9  record?
10  A.  It's Thomas Butler Fore, F-O-R-E.
11  Q.  What is your home address?
12  A.  4300 Rugby Road, Baltimore 21210.
13  Q.  And your current business address?
14  A.  1122 Kenilworth Drive.  That's suite 100 in
15  Towson, Maryland 21204.
16  Q.  Mr. Fore, my name is Timothy McCormack.
17  Seated to my left is Michelle McGeogh.  We represent
18  Westport Property Investments LLC which is the
19  Plaintiff in this lawsuit against Patrick Turner and
20  Neil Ruther.
21     And I'm going to ask you a series of
```

602

Appeal: 15-1671    Doc: 25-2    Filed: 09/28/2015    Pg: 151 of 248

Citigroup Global Markets Holdings, Inc. v.    Case 1:13-cv-00657-JFM    Document 61-3    Filed 04/15/15    Page 3 of 95    Thomas Butler Fore - Vol. 1
Patrick Turner, et al                                                                                        February 17, 2015

Page 6

1  questions today and the first one is:  Have you ever
2  had your deposition taken before?
3  A.  Yes.
4  Q.  On how many occasions?
5  A.  I was a police officer, so I've been
6  deposed many times.
7  Q.  Okay.  What types of cases were you deposed
8  in as a police officer?
9  A.  Civil cases, criminal cases.
10  Q.  Okay.  In those civil cases, were you ever
11  a defendant?
12  A.  No.
13  Q.  Okay.  What types of -- were you a witness
14  of the events or was that the circumstance under which
15  you were deposed?
16  A.  Yeah.  Generally, I was a witness, or if I
17  was a -- you know, prosecuting on the part of the team
18  of the prosecution.
19  Q.  And how -- well, first, what police
20  departments were you employed by?
21  A.  Baltimore City.

Page 7

1  Q.  And how long?
2  A.  Eight years.
3  Q.  During what period of time?
4  A.  1992 to 2000.
5  Q.  And what were the circumstances of your
6  leaving the Baltimore police in 2000?
7  A.  I retired.
8  Q.  After eight years?
9  A.  Yup.
10  Q.  Other than those instances when you were
11  deposed when you were a police officer, have you ever
12  had your deposition taken?
13  A.  Yes.
14  Q.  What types of cases?
15  A.  I had a civil case and probably four years
16  ago, for -- up in New Jersey for a lawsuit that was
17  settled where I was deposed.
18  Q.  Okay.  Were you a party to that lawsuit?
19  A.  Yes.
20  Q.  And were you plaintiff or defendant?
21  A.  I was a defendant.

Page 8

1  Q.  Okay.  And what were you sued for?
2  A.  A -- I don't remember all the specifics,
3  but a gentleman sued claiming that he was entitled to
4  an equity percentage in a project.
5  Q.  And who was the -- what was the gentleman's
6  name?
7  A.  Joe Getz.  I think it's G-E-T-Z.
8  Q.  And he claimed he was entitled to equity in
9  a project in which you were involved?
10  A.  Yes.
11  Q.  Okay.  What was the project?
12  A.  Rowan Boulevard.
13  Q.  Okay.  And what were you doing -- was that
14  an LLC or is that a partnership?
15  A.  It was various LLCs, but it a mixed use
16  redevelopment project in New Jersey.
17  Q.  Okay.  You say you settled that with
18  Mr. Getz?
19  A.  Yes.
20  Q.  What did Mr. Getz get as a settlement?
21  A.  I don't recall, but I don't think he got

Page 9

1  any money or anything.  I think he just -- we
2  countersued them and he walked away.
3  Q.  Other than the Getz case, have you ever
4  been deposed?
5  A.  I'm thinking.  I don't recall any other
6  times.
7  Q.  Okay.  When was it that the deposition was
8  taken in the case by Mr. Getz?
9  A.  I believe in 2012.
10  Q.  Do you know what court that was in?
11  A.  It was in New Jersey.  I don't recall.
12  Q.  Federal court?  State court?
13  A.  I think it was state court.
14  Q.  All right.  Well, let's go over the ground
15  rules, although you're not completely new to this
16  process.  But I'm going to ask you a series of
17  questions today.  The court reporter is taking down
18  each of my questions.  He's going to take down each of
19  your answers.  He's going to, at the end of day,
20  produce a transcript which will have Q followed by the
21  question and A followed by the answer.

603

Appeal: 15-1671    Doc: 25-2    Filed: 09/28/2015    Pg: 152 of 248

Citigroup Global Markets Realty Corp vs.    Thomas Butler Fore - Vol. 1
Patrick Turner, et al                                    February 17, 2015

Case 1:13-cv-00657-JFM Document 61-3   Filed 04/15/15   Page 4 of 95

Page 10

1    Your lawyer and Mr. Ruther, who is
2  representing himself and Mr. Turner, have rights to
3  interpose objections.  For the most part, those
4  objections are going to be technical.  They are not
5  going to interfere with your answering of the
6  questions.
7    Because we're only going to produce a
8  transcript at the end of this deposition, there are
9  some ground rules we have to follow.  The first is only
10  one of us can speak at a time.  So if I'm asking you a
11  question, please wait until I finish before you begin
12  to answer.  I will also always try to wait until you've
13  completed your answer to ask my next question.  If I
14  should mistake a pause in your testimony for the end of
15  an answer, please let know and I'll give you a chance
16  to finish your answer.
17    We're looking for the facts of this case
18  and so it's important that you understand the
19  questions.  If there's something you don't understand,
20  please let me know so I can either repeat the question
21  or maybe ask a different question or expand on it.  If

Page 11

1  you answer a question that I have asked and you don't
2  indicate that you're having any trouble with the
3  question, we're going to assume that you understood it
4  and you're giving truthful testimony.
5    You need to answer orally.  The court
6  reporter cannot take down nods or shakes of the head.
7  You need to say yes or no.  Uh-huh or uh-uh sound very
8  similar and will appear very similar in a transcript.
9  We are looking for facts.
10    This isn't an endurance contest.  We will
11  take breaks throughout the day.  If at any point you
12  feel the need to take a break, just let me know and I'm
13  happy to take a break.  You don't even have to tell me
14  why.  The only exception to that is going to be that if
15  I have a question pending I'll want you to answer it
16  and then we can take our breaks.
17  A.  Okay.
18  Q.  Now, last week Mr. Ruther, in his
19  deposition, described how he and Patrick Turner had
20  aggregated the parcel of property which eventually
21  would come -- parcels of property that would eventually

Page 12

1  become to be owned by Inner Harbor West and Inner
2  Harbor West II LLC and he did not -- as he talked about
3  those early stages, he didn't mention your involvement.
4  Q.  Can you tell me when you first became
5  involved in this development?
6    MR. FRANK: Objection.
7  Q.  You may answer.
8  A.  I believe it was in December of 2011.
9  Q.  Okay.  And how is it that you became
10  involved?
11  A.  I was introduced to the project by Skanska
12  USA.
13  Q.  You say introduced to the project by
14  Skanska USA.  Who at Skanska?
15  A.  I'm trying to think of his name.  I don't
16  recall his name.  It was the area president for
17  Skanska.
18  Q.  Okay.  What is the business of Skanska?
19  A.  They're a construction company.
20  Q.  All right.  And how did you -- did you have
21  a preexisting relationship with Skanska?

Page 13

1  A.  We were working on another project with
2  them in Prince George's County that we were exploring
3  and, during the course of that discussion, they
4  mentioned that they were trying to assist with
5  Westport.
6  Q.  Who is "we"?
7  A.  Rob Hobson who is a gentleman that was
8  working for me at the time.
9  Q.  Okay.  Were you doing this through a
10  business?
11  A.  That is my business.
12  Q.  Okay.  But were you doing it through a
13  limited liability company or a corporation or some
14  other entity?
15  A.  Which -- I'm not sure I understand.
16  Q.  Prince George's.  You said you and Rob
17  Hobson were working with Skanska on a project in Prince
18  George's County.
19  A.  Okay.  So as -- my company is called Sora
20  Development.  So at the time we were just exploring a
21  request for a development of an arena with Skanska.

604

Page 14

1  Q.   Okay.  And what was to be Skanska's role in
2  the development of the arena?
3  A.   They were considering it as a development
4  or a construction project.  It was not a fully fledged
5  project.  It was an exploration.
6  Q.   All right.  Was the arena ever belt?
7  A.   No.
8  Q.   Now, you say Skanska -- then the area vice
9  president for Skanska told you about the Westport
10  project.
11     What did he -- was it a he or a she?
12  A.   He.
13  Q.   What did he tell you?
14  A.   He indicated that they were working with
15  the ownership group of Westport to underwrite the
16  horizontal construction because they were contemplating
17  a financing relationship.
18  Q.   Who was contemplating a financing
19  relationship?
20  A.   The area president for Skanska at the time
21  was contemplating doing a loan to -- advancing a loan

Page 15

1  to Westport for the horizontal construction.
2  Q.   Okay.  What do you mean by horizontal
3  construction?
4  A.   The dirt work.  The civil engineering, you
5  know, putting in the roads, water and sewer.
6  Q.   Okay.  Now you say he introduced you to the
7  project.
8     I mean, do you mean he did more than just
9  say, hey, I'm considering advancing money to this
10  project and investing in it?
11     MR. FRANK: Objection.
12  A.   He was -- they were interested in doing
13  a -- working on the project and thought it was a good
14  project.
15     So they were trying to introduce me to the
16  ownership group to see if I would have any interest in
17  helping.
18  Q.   Okay.  So did the area vice president
19  introduce you to the ownership group?
20  A.   Yes.
21  Q.   Who specifically did he introduce you to?

Page 16

1  A.   Pat Turner.
2  Q.   Okay.  When was that?
3  A.   Like I said, I'm a little fuzzy on that,
4  but I believe it was in the fall of 2011.
5  Q.   Okay.  And where did you first -- well, how
6  did you first meet Pat?
7     Did you meet him in person?  Did you meet
8  him over the telephone?
9  A.   I think we met at Pat's office with the
10  Skanska rep.
11  Q.   And who is "we"?
12  A.   Rob Hobson.
13  Q.   You, Rob Hobson and Pat?
14  A.   And Pat Turner and -- I can't believe I
15  can't remember his name.
16  Q.   Okay.  And the Skanska rep?
17  A.   Yeah.
18  Q.   All right.  What was discussed at that
19  meeting?
20  A.   Pat told us about the status of the
21  project.  We saw the PowerPoint presentation and I

Page 17

1  believe that's when we learned that he was working on a
2  structure for a refinance with the project and, I mean,
3  various other details about the project.
4  Q.   What did he tell you was the status of the
5  project?
6  A.   You know, that it had full PUD approval,
7  planned unit development, and that he was in
8  negotiations with the bank to buy the note.
9  Q.   Did he say who the bank was?
10  A.   Citibank.
11  Q.   Now, by the fall of 2011, end of -- well,
12  the fourth quarter 2011, we were fairly deep into the
13  recession.
14     Was any active development going on on the
15  property?
16     MR. FRANK: Objection.
17  A.   I don't recall.
18  Q.   You don't remember Pat telling you whether
19  or not anything was going on at the site or if it was
20  just a big, vacant site at that point?
21  A.   I don't recall.

605

Page 18

1  Q.   Did you go visit the sight after that first
2  meeting?
3  A.   Yes, I did go to the site.
4  Q.   Okay.  What did you find there?
5  A.   At the time, I believe the Cirque de
6  Soleil -- I don't remember if Cirque de Soleil had
7  started at the time, but there was some work being done
8  at the -- there was some -- some of the work being done
9  on the waterfront and I believe the Cirque de Soleil
10  work was in place at the time.
11  Q.   What was the Cirque de Soleil work?
12  A.   It was the -- they had rented the site to
13  put the Cirque de Soleil -- the event on.  So they had
14  done some site work.
15  Q.   Okay.  Other than some work being done on
16  the waterfront and whatever Cirque de Soleil was doing,
17  for its productions, did you see any other work going
18  on on the development -- on the site?
19  A.   I don't recall, but I don't think so.
20  Q.   Okay.  You say that Mr. Turner was in
21  negotiations to refinance or purchase the note that was

Page 20

1  A.   $8.5 million.
2  Q.   So Citi was willing to sell its $30 million
3  dollar loan for eight and a half million dollars.
4     Is that your understanding?
5     MR. FRANK: Objection.
6  A.   That's correct.
7  Q.   So did you -- what was the next step?  You
8  had the first meeting.  You looked at the property.
9     Tell me how your discussions with
10  Mr. Turner developed.
11  A.   I believe we had a couple of additional
12  meetings.  I think he came to my office.  And at the
13  time he was trying to secure capital to do his
14  forbearance payments with Citibank.
15  Q.   And do you know how much those were?
16  A.   I believe at the time they were about
17  $50,000 a week.
18  Q.   Was he current on those forbearance
19  payments when you first met Mr. Turner?
20  A.   I don't believe so.
21  Q.   Do you know how far in arrears he was?

Page 19

1  secured by the property?
2  A.   That was my understanding.
3  Q.   And did he talk to you at all about --
4  well, first, did he tell you how much the outstanding
5  balance was on that note?
6  A.   I don't -- I don't remember if he said it
7  at that meeting.
8  Q.   Did you come to learn how much that balance
9  was?
10  A.   Yes.
11  Q.   How much?
12  A.   I believe at the time it was $30 million.
13  Q.   And did Mr. Turner, in that first meeting,
14  disclose to you the terms on which he was discussing
15  purchasing that note from Citi?
16  A.   I don't recall.
17  Q.   Did you ever come to learn the terms on
18  which Mr. Turner and Citi were discussing his sale of
19  the note?
20  A.   Yes.
21  Q.   And how much was Citi looking for?

Page 21

1  A.   I don't remember.
2  Q.   What was Mr. Turner seeking from you, that
3  capital?
4  A.   He was seeking a -- some sort of
5  arrangement to borrow the money to pay the Citibank
6  payments.
7  Q.   What was he offering you in exchange for a
8  loan or the money necessary to pay the Citibank
9  forbearance payments?
10  A.   Ultimately -- you know, I don't really
11  remember what he offered me.  Ultimately, what we
12  agreed to was that I would lend the money to do the
13  forbearance payments and I would assist with the
14  refinance of the project.
15  Q.   All right.  How much specifically did you
16  agree to lend?
17  A.   Initially, it was, I think, in total, about
18  $600,000.
19  Q.   And when did you make that first loan?
20  A.   I don't remember the dates.  It was in
21  early 2012, I believe was the first time I did it.

606

Citigroup Global Markets Realty Corp. vs.    Thomas Butler Fore - Vol. 1
Patrick Turner, et al                                                        February 17, 2015

Case 1:12-cv-00657-JFM Document 61-3   Filed 04/15/15   Page 7 of 95

Page 22

1  Q.   Okay.  Now, you say initially it was
2  $600,000.
3      Did you eventually advance more money than
4  that $600,000?
5  A.   Yes.
6  Q.   How much -- well, what was the next
7  advance, if you remember?
8  A.   Well, it was -- so the advances were sort
9  of made as they were needed under the agreement and I
10  don't recall.  Just a lot of money went to Citibank.
11  Q.   Okay.  How much was the total that you
12  contributed?
13  A.   If it's -- if it was -- I mean, you're
14  talking about from today or from that time?
15  Q.   Yeah, I'm saying up until today.
16  A.   I think it's -- if it's just cash, it's
17  somewhere around $2.1, $2.2 million.
18  Q.   Okay.  Now, what else would there be
19  besides cash?
20  A.   We contributed a lot of time, you know, a
21  lot of my personnel time to -- so that cost me money.

Page 23

1  Q.   Okay.  And tell me what your personnel --
2  what you and your personnel were doing in this time
3  that you contributed.
4  A.   Just working on securing financing.
5  Q.   Okay.  What specifically were you doing to
6  secure financing?
7  A.   Meeting with the principals of Westport,
8  meeting with prospective lenders.
9  Q.   Okay.  Tell me who some of those
10  prospective lenders were.
11  A.   There were a lot of them.  There was
12  Vision Capital.
13  Q.   Okay.
14  A.   We met with -- I believe it's called CWG.
15  It's a fund.
16  Q.   Okay.
17  A.   We met with Comstock.  We met with a
18  company called Ardent, A-R-D-E-N-T.  We met with -- I
19  think it's called Stein Investment Group out of
20  Atlanta.  We met with Related out of California.  We --
21  I don't remember who else we talked to.  I mean, I'm

Page 24

1  sure if I sat here all day I could come up with a long
2  list.
3  Q.   All right.  Did any of those prospective
4  lenders ever agree to contribute or advance money or
5  finance a transaction for Westport Development or Inner
6  Harbor West LLC or Inner Harbor West II LLC?
7      MR. FRANK: Objection.
8  A.   Now, when you say did they agree to
9  advance, I think if you could be more specific because
10  there's lots of ways to agree to finance.  I mean, we
11  got term sheets from some people.  We didn't get term
12  sheets from others.
13  Q.   Okay.  Who did you get term sheets from?
14  A.   CWG we got a term sheet from.
15  Q.   Okay.
16  A.   Jeff Stein -- from the Stein Investment
17  Group we got a term sheet from.  We actually made an
18  offer to Citibank.
19  Q.   Okay.
20  A.   Kennedy Funding we got a term sheet from.
21  Q.   Okay.

Page 25

1  A.   Vision Capital we -- I don't think we got a
2  term sheet from them, but we had an agreement for them
3  to fund it.
4      MR. MCCORMACK: We'll go off record.
5      (There was a recess taken at 11:35 and the
6  deposition resumed at 11:39 a.m.)
7      BY MR. MCCORMACK:
8  Q.   So you told me you got -- you received term
9  sheets from CWG, you remember, Stein Investment,
10  Kennedy Funding and that you had agreement with Vision
11  Capital.
12      Was there anybody else you got a term sheet
13  from other than those first three?
14      MR. FRANK: If you remember.
15      MR. MCCORMACK: It's always if he
16  remembers.
17  A.   Yeah.  I don't recall.  I really don't.  I
18  mean, it's been a long road.
19  Q.   All right.  You said you had an agreement
20  with Vision.
21      Did you reach an agreement with anyone else

607

Appeal: 15-1671    Doc: 25-2    Filed: 09/28/2015    Pg: 156 of 248

Citigroup Global Markets Realty Corp vs.
Patrick Turner, et al
Case 1:13-cv-00887-JFM Document 61-3   Filed 04/15/15   Page 8 of 95

Thomas Butler Fore -  Vol. 1
February 17, 2015

1  that gave you a term sheet?
2  A.  No.
3  Q.  What is it that -- well, before we get to
4  that --
5  A.  With the exception of Stein, I mean, we --
6  with the Stein Investment Group.
7  Q.  What with the Stein Investment Group?  You
8  had an agreement?
9  A.  We had an agreement with them.
10  Q.  Now, you've told me that you contributed
11  initially in the neighborhood of $600,000 in early
12  2012, that, over the years, that amount grew to $2.1
13  million and that you contributed your time and
14  personnel time of your employees to try to find new
15  financing.  So that's what Inner Harbor West and Inner
16  Harbor West II and Westport Development received.
17      What did you receive as part of this
18  arrangement with Mr. Turner?
19  A.  Wow.  That's a really good question.
20      MR. FRANK: I'm going to object.  What did
21  he get or what was he promised to get?

1      MR. MCCORMACK: You know, why don't we let
2  him answer the question?  If he has a problem with it,
3  he can ask.
4      MR. FRANK: I'm going to object to this.
5      BY MR. MCCORMACK:
6  Q.  Go ahead.
7  A.  Probably the biggest thing I received was a
8  lot of lost time and brain damage.  But I didn't -- I
9  mean, I didn't receive anything.
10  Q.  Okay.  How did you document your agreement
11  with Mr. Turner?
12  A.  I signed an agreement with him.
13  Q.  Who drafted that agreement?
14  A.  Jim Deveney.
15  Q.  And where was Mr. Deveney practicing at
16  that time?
17  A.  He was in -- I mean, he was in our offices
18  in Baltimore.  He's an independent attorney.
19  Q.  Okay.
20  A.  We just shared an office.
21  Q.  And whose counsel was Mr. Deveney's, yours

1  or Mr. Turner's?
2  A.  Mine.
3  Q.  Okay.  And did Mr. Turner have counsel as
4  you developed the agreement that you signed with him?
5  A.  I do recall he had counsel.
6  Q.  Who was that?
7  A.  At the time it was -- I mean, he was
8  represented by Ballard Spahr and he was represented by
9  somebody from Abramoff.  What is the guy's name?
10  Steve -- I can't remember his last name.  I should, but
11  I don't.
12  Q.  Okay.  So your testimony under oath is that
13  someone from Ballard Spahr was involved in representing
14  Mr. Turner in the negotiation of your Memorandum of
15  Understanding?
16      MR. FRANK: Objection.
17  A.  No, no.  You asked who his lawyer was.
18  Q.  I asked who his lawyer was in connection
19  with the negotiation of your agreement with him.
20  A.  Oh, I don't -- I don't remember.  I think
21  it was Abramoff, somebody from Abramoff.  I don't

1  recall.
2  Q.  Okay.
3      (Fore Exhibits 1, 2 & 3 were marked for
4  purposes of identification.)
5      THE REPORTER: Exhibits 1, 2 and 3.
6      BY MR. MCCORMACK:
7  Q.  Okay.  Mr. Fore, I have placed in front of
8  you what we've marked as Exhibits 1, 2 and 3 which are
9  a subpoena dated December 29, 2014 to you as Exhibit 1,
10  a subpoena dated the same date to Tiderock Capital LLC
11  as Exhibit 2 and a subpoena dated the same date to
12  Tiderock Holdings as Exhibit 3.
13      Do you recall receiving these?
14  A.  Yes.
15  Q.  Okay.  Could you tell me what you did to
16  assemble documents responsive to these subpoenas?
17  A.  I researched the documents related to the
18  subpoenas and turned them in.
19  Q.  Okay.  When you say researched, what did
20  you do to research?  Where did you look?
21  A.  We looked through our files and through our

608

Citigroup Global Markets Holdings Inc. v.    Thomas Butler Fore - Vol. 1
Patrick Turner, et al    February 17, 2015
Case No. 8:08-cv-06957-JFM    Document 61-3    Filed 04/15/15    Page 9 of 95

Page 30

1  emails.
2  Q.  Okay.  What files specifically?
3  A.  I have a couple of files in my office that
4  have stuff related to this and that's where we got them
5  from.
6  Q.  Okay.  How big are those files?
7      Are they big as this Redwell folder or are
8  they as skinny as this manila folder or something in
9  between?
10  A.  They're small.
11  Q.  They're small?  Okay.
12      How many documents did you find responsive
13  to the subpoena?
14      MR. FRANK: Objection.
15  A.  I don't remember.  Whatever we found.  So I
16  don't remember the total count.
17  Q.  Okay.  Well, do you remember, were there
18  ten documents?
19      MR. FRANK: Objection.
20  A.  I don't recall.  I mean, we submitted
21  everything that we found.

Page 31

1  Q.  Okay.  But I'm trying to understand.
2      You don't have any recollection of -- what
3  was it, 20 documents?
4      MR. FRANK: Objection.  Asked and answered.
5  Q.  Go ahead.  You can answer.
6  A.  It's all -- all that we found, we turned
7  in.  So I don't remember what the total was.
8  Q.  Okay.  So sitting here today on
9  February 17th, you have no ability to tell me how many
10  documents you, quote, turned in?
11      MR. FRANK: Objection.
12  A.  I don't remember the exact number.
13  Q.  Okay.  Approximate number?
14      MR. FRANK: Objection.
15  A.  I don't -- I don't remember.
16  Q.  Okay.  Now, when did you do this search
17  first of the -- of your files for documents?
18  A.  It was during the term -- after we received
19  the subpoenas and we amalgamated the documents that we
20  turned in.
21  Q.  Okay.  When specifically?

Page 32

1      MR. FRANK: Objection.
2  A.  It was, you know, over the last 30, 45 days
3  from this period.  It was January -- what was it, the
4  16th?  So it was the last month, you know, in January
5  and February.
6  Q.  Okay.  Now, you're sort of all over the
7  board.
8      I want to know -- did you start looking
9  before January 16th?
10      MR. FRANK: Objection.
11  A.  I don't remember the dates.  This hasn't
12  been a big issue for me.  So we did what we were asked
13  to do.
14  Q.  I'm just trying to --
15  A.  Go ahead.
16  Q.  I'm trying to understand when you did it.
17      Did you do it after January 16th?
18      MR. FRANK: Objection.
19  A.  I don't remember the dates.  I really
20  don't.
21  Q.  Okay.  Did anybody help you with this

Page 33

1  project?
2  A.  You mean in terms of pulling the documents
3  together?
4  Q.  Yes.
5  A.  My assistant.
6  Q.  What is your assistant's name?
7  A.  Jessica Angelini.
8  Q.  Is it possible Jessica Angelini will have a
9  better recollection as to, for example, how many
10  documents you located?
11      MR. FRANK: Objection.
12  A.  I have no idea.  Perhaps.
13  Q.  Okay.  Now you said you also looked for
14  emails.
15      Tell me, what emails accounts did you
16  search?
17  A.  At the time, I searched my Sora Holdings
18  email and my Sora Development email.
19  Q.  Now, do you have separate email accounts in
20  the name of Tiderock Capital?
21  A.  No.

609

Page 34

1  Q.  Do you have a separate email account in the
2  name of Tiderock Holdings?
3  A.  No.
4  Q.  Do you have a personal email account that
5  you use for personal emails as opposed -- as
6  distinguished from the Sora email accounts?
7  A.  I do.  I didn't -- wouldn't have used it.
8  I'm sure that we looked in it, but I do have a personal
9  email.
10  Q.  Okay.  Can you tell me what search terms
11  you used to review the Sora Holdings email account?
12     MR. FRANK: Objection.
13  A.  I mean, we searched through everything that
14  was related to -- I mean, we searched Tiderock,
15  Tiderock Holdings, Tiderock Capital, Westport, Pat
16  Turner, you know, any of the -- any of the other --
17  anything else related to that.
18  Q.  And did you find emails responsive to the
19  subpoena in the Sora Holdings email account?
20     MR. FRANK: Objection.
21  A.  I believe we did.

Page 35

1  Q.  Okay.  Now, did you use -- what search
2  terms did you use for the Sora Development email
3  account search?
4  A.  Sora Development and Sora Holdings are in
5  one email file.  They're combined into one archive.  So
6  one search would have done it all.
7  Q.  Okay.  And you found -- and from that
8  search, that one search, with those search terms, you
9  found emails that were responsive to the subpoenas?
10     MR. FRANK: Objection.
11  Q.  Correct?
12  A.  I believe so.
13  Q.  Now, what did you do with the documents
14  that you and Jessica Angelini located that were
15  responsive to the subpoena?
16  A.  I'm not sure I understand the question.
17  Q.  Well, did you give them to somebody to
18  transmit to us?
19  A.  Yes, I gave them to Kenny.
20  Q.  Okay.  Kenny being Kenneth --
21  A.  Frank, my lawyer.

Page 36

1  Q.  Your lawyer sitting next to you?
2  A.  Yeah.
3  Q.  Okay.  Now, what did you do with the emails
4  you found that were responsive to the subpoena?
5     Did you give those to Mr. Frank as well?
6  A.  Yes.
7  Q.  And did you give those to Mr. Frank with
8  the instruction to forward them as responsive to the
9  subpoena?
10     MR. FRANK: Objection.  Don't answer about
11  what you've told me or didn't tell me.
12  Q.  What did you understand -- oh, yeah.  How
13  did you convey the emails?
14     Did you send them electronically to
15  Mr. Frank or did you send them in paper copy?
16     MR. FRANK: Objection.
17  A.  I don't remember.  I think we did both.
18  Q.  Now, you understood that the subpoena was a
19  court order that required you to produce these
20  documents, yes?
21     MR. FRANK: Objection.

Page 37

1  A.  Yes.
2  Q.  Okay.  And how did you understand they were
3  going to get to us after you did the searches and
4  located the documents?
5  A.  The lawyer.
6  Q.  Mr. Frank?
7  A.  Yes.
8  Q.  Mr. Frank was to send the responsive
9  documents and emails to us, correct?
10  A.  Correct.
11  Q.  Okay.  So if you located things -- well,
12  you, in good faith, identified everything that you
13  thought was responsive to the subpoena, correct?
14     MR. FRANK: Objection.
15  A.  Yes.
16  Q.  And you, in good faith, gave all of that to
17  Mr. Frank, correct?
18  A.  Yes.
19  Q.  And it was your understanding Mr. Frank was
20  then going to forward those materials to us in response
21  to the subpoena, correct?

610

Citigroup Global Markets, Inc. vs.
Patrick Turner, et al

Thomas Butler Fore - Vol. 1
February 17, 2015

---

Page 38

1    MR. FRANK: Objection.
2  A.   Yes.
3  Q.   Okay.  Anybody ever tell you that none of
4  those emails you identified made their way to us?
5    MR. FRANK: Objection.
6  A.   Can you repeat that question?
7  Q.   Has anybody ever told you that none of the
8  emails that you identified and gave to Mr. Frank to
9  forward to us made it to us?
10    MR. FRANK: Objection.
11 A.   No.
12    MR. FRANK: That's simply not true.  And if
13 it is so, you never notified me.  I told you that the
14 emails were being sent to you.
15    MR. MCCORMACK: Where is the written
16 response?  Mr. Frank, you know full well --
17    MR. FRANK: I take it back.  I take it
18 back.
19    MR. MCCORMACK: Thank you.  I thought we
20 could get there.
21 BY MR. MCCORMACK;

---

Page 39

1  Q.   I'm going to hand you what we previously
2  marked in the earlier deposition as Ruther Exhibit
3  Number 12 and this is the original.  I'll give you the
4  one with the original sticker.
5    Mr. Fore, I'd like you to take a moment and
6  review, if you would, Ruther Exhibit 12.
7  A.   (Witness complied.)
8  Q.   Is Ruther Exhibit 12 the agreement that you
9  entered into with Mr. Turner that resulted from the
10 discussions we've been talking about today?
11 A.   Yes.
12 Q.   Okay.  This is the one document -- this is
13 the only document we have received in response to the
14 three subpoenas that we've marked as Fore Exhibits 1,
15 2 and 3.
16    And you'll see at the bottom lower
17 right-hand corner -- you see the words Fore-claim and
18 then 000001?
19 A.   Yes.
20 Q.   Your lawyer put those there.
21    Now, seeing this, do you have any other --

---

Page 40

1  any recollection that there was anything else you might
2  have given Mr. Frank to relay to us in the way of
3  documents?
4    MR. FRANK: Objection.
5  A.   Yeah.  I mean, this is the loan document.
6  But, again, any other correspondence, any other emails
7  were turned in.
8  Q.   Okay.  Now, let's see if we can explore a
9  little bit what you got for your investment and if it
10 was maybe a little more than -- what did you say --
11 lost time and --
12 A.   Brain damage.
13 Q.   Brain damage?  All right.  Okay.  It always
14 helps to have a score card to know who the players are.
15 I'm handing you also what has been marked as Ruther
16 Exhibit 1.
17    Have you ever seen Ruther Exhibit 1 or
18 something like it?
19 A.   Yeah.
20 Q.   Okay.  So looking at Ruther 12, it says it
21 is an agreement among Westport Development LLC and

---

Page 41

1  would you agree with me that that appears on Ruther 1
2  to be the 100 percent managing member -- hundred
3  percent owner and managing member of each of Inner
4  Harbor West LLC and Inner Harbor West II LLC?
5    MR. FRANK: Objection.
6  A.   In accordance with the word chart, you're
7  talking about the lower tier?
8  Q.   Yes.
9  A.   Yes.
10    MR. FRANK: Are you asking him for what he
11 think it means?
12    MR. MCCORMACK: He understood the question.
13 He's already answered it, Mr. Frank.
14    MR. FRANK: Well, I didn't understand the
15 question.  So can you tell me what it was?
16    MR. MCCORMACK: You'll get a transcript at
17 the end.  He and I had no problem.  You can read his
18 answer.
19    MR. FRANK: So you're not going to tell me
20 what the question was you meant to ask.
21    BY MR. MCCORMACK:

611

Page 42

1  Q.   Westport -- the next entity is Westport
2  Property Holdings LLC on Ruther 12.
3      Do you see that?
4  A.   Yes.
5  Q.   And would you agree with me that that
6  corresponds to the entity that is the owner of
7  60 percent of the common interest in Westport
8  Development LLC and there's a notation as the managing
9  member, correct?
10     MR. FRANK: I'm going to object.  Are you
11 asking if that's what the document says?
12 Q.   Do you understand the question?  Mr. Fore,
13 it's only your understanding.
14 A.   If you're asking that the Westport Property
15 Holdings LLC and the Westport Property Holdings LLC on
16 the chart and on the document are connected or --
17 Q.   It's the same.
18 A.   -- appear to be the same entity.
19 Q.   Okay, good.  Now, Middle Branch doesn't
20 show up on the organization chart, does it?
21     MR. FRANK: Objection.  If you're asking if

Page 43

1  Middle Branch is on this word chart, I don't see it.
2  Q.   Okay.  Do you know what Middle Branch
3  Development LLC was?
4  A.   I believe Middle Branch Development LLC is
5  the borrowing entity on the Westport obligations.
6  Q.   Okay.  And is it your understanding that
7  Middle Branch was what's sometimes called a special
8  purpose entity set up just to be the borrower?
9      MR. FRANK: Objection.
10 A.   I don't know.
11 Q.   Okay.  Was it your understanding that the
12 structure of the loan transaction involved the
13 Indemnity Deed of Trust during IDOT?
14     MR. FRANK: Objection.
15 A.   For whom?  I guess you need to rephrase the
16 question.
17 Q.   Okay.  If Middle Branch was the borrower,
18 how did you understand that Inner Harbor West -- the
19 property owned by Inner Harbor West LLC and Inner
20 Harbor West II LLC was pledged as collateral?
21     MR. FRANK: Objection.

Page 44

1  A.   I have no idea.
2  Q.   So you don't know how that structure works
3  at all?
4  A.   I mean, I can -- I don't know what the
5  benefit of me guessing what the structure is.
6  Q.   No, I'm just trying to understand what your
7  understanding was.  You were -- eventually you put $2.1
8  million dollars into this transaction.  I'm just trying
9  to understand to what degree you understood who was the
10 borrower, who was the guarantor, what was pledged.  I'm
11 just trying to learn your understanding.
12 A.   It's easy enough to understand that the
13 Inner Harbor West I and II were the entities that owned
14 the land.
15 Q.   Okay.  And that they put a mortgage on that
16 land with Citi, correct?
17     MR. FRANK: Objection.
18 A.   I presume that's correct.
19 Q.   Now, once we get through the two Inner
20 Harbor West entities on Ruther 12, the next entitle is
21 Tiderock Holdings.

Page 45

1      That's one of your entities, correct?
2      MR. FRANK: Objection.
3  A.   Yes.
4  Q.   What -- did Tiderock Holdings have any
5  business other than associated with this development?
6  A.   No.
7  Q.   And then there's an entity called Tiderock
8  Capital.
9      Is that also one of your entities?
10 A.   Yes.
11 Q.   Did Tiderock Capital have any business
12 other than in connection with this transaction?
13 A.   No.
14 Q.   Now, who formed Tiderock Holdings for you?
15 A.   I believe Jim Deveney did.
16 Q.   Okay.  And who formed Tiderock Capital for
17 you?
18 A.   I believe he did.
19 Q.   All right.  Now, if you turn to page 3,
20 paragraph 2, do you see that?
21 A.   The one that begins "and Capital shall?"

612

Citigroup Global Markets Realty Corp vs Document 61-3    Filed 04/15/15    Page 18 of 95    Thomas Butler Fore - Vol. 1
Patrick Turner, et al
February 17, 2015

Page 46

1  Q.  Yes.
2  A.  Uh-huh.
3  Q.  All right.  Now, that's the first reference
4  to you contributing money to this venture.  I've read
5  through this agreement and I don't see any provision or
6  any terms of repayment of the money that you were
7  advancing.
8     Were there terms of repayment?
9  A.  The -- yeah.  I mean, our expectation is we
10  get repaid from the -- you know, from our closing.
11  Q.  From a closing?
12  A.  Uh-huh.
13  Q.  Okay.  And where -- so you understood this
14  to be a loan to be repaid on closing.
15     Closing of what?
16  A.  A refinance.
17  Q.  Okay.  And is there an interest rate that
18  you were entitled to on the money that you were
19  contributing?
20     MR. FRANK: Objection.
21  A.  I don't recall.  I don't -- I'm not sure.

Page 47

1  Q.  Okay.  Do you recall that -- you say
2  refinance.
3     Were you agreeing here to find a new lender
4  or were you agreeing that, in fact, Tiderock Capital
5  would purchase the note held by Citi?
6  A.  We were -- we were trying to find a lender
7  to do the project.  So at the time we would have -- we
8  would have secured that on our own or -- I mean, I
9  think there was a variety of ways it could have come
10  together.
11  Q.  Well, look at paragraph 3 of Ruther 12.
12  A.  Uh-huh.
13  Q.  The one that begins:  "Capital shall
14  provide funds for Capital's acquisition of the note and
15  loan documents."
16  A.  Uh-huh.
17  Q.  Do you see that?
18  A.  Uh-huh.
19     THE REPORTER: Yes?
20  A.  Yes.  I'm sorry.
21  Q.  It's all right.  So one of the undertakings

Page 48

1  you made was to purchase the note and the loan
2  documents from Citi, correct?
3  A.  Correct.
4  Q.  And was some of the financing you were
5  looking for financing to allow Tiderock Capital to go
6  ahead and purchase the note?
7  A.  Yes.
8  Q.  Why did Tiderock Capital never purchase the
9  note and loan documents on or before the purchase
10  deadline in accordance with the provisions of the Citi
11  agreement and the CRP agreement for the sum of
12  $8,500,000?
13     MR. FRANK: Objection.
14  A.  I think a lot of misfortune.
15  Q.  Was some of that misfortune you just didn't
16  have the money?
17     MR. FRANK: Objection.
18  A.  Tiderock Capital was trying to secure a
19  loan to refinance the project to do it.
20  Q.  But Tiderock Capital did not have
21  $8,500,000 prior to the purchase deadline date,

Page 49

1  correct?
2  A.  That's correct.
3  Q.  Okay.
4     THE WITNESS: Can I use the restroom?
5     MR. MCCORMACK: Oh, sure.  Why don't we
6  take ten minutes?  I'll show you.
7     (There was a recess taken at 12:08 and the
8  deposition resumed at 12:14 a.m.)
9  BY MR. MCCORMACK:
10  Q.  All right.  Still looking at Ruther 12,
11  paragraph 3.  One of the things that Capital was going
12  to try to provide funds for was Capital's acquisition
13  of the note and the loan documents for eight and a half
14  million dollars.
15     Now, if you would look down -- incredibly,
16  it's only the third sentence of this paragraph, but it
17  begins with "Capital and WPH."
18     MR. FRANK: Can you show us where we're
19  talking about?
20  Q.  Right on the left -- the right-hand side,
21  the sentence that begins right there, "Capital and."

613

Appeal: 15-1671    Doc: 25-2    Filed: 09/28/2015    Pg: 162 of 248

Citigroup Global Markets - Thomas Butler Fore - Vol. 1
Patrick Turner, et al
Case 1:14-cv-00587-JFM Document 61-3    Filed 04/15/15    Page 14 of 95
February 17, 2015

---

Page 50

1    Did you find it, Mr. Frank?

2    MR. FRANK: Uh-huh.

3    MR. MCCORMACK: Good.

4    BY MCCORMACK:

5    Q.    "Capital and WPH shall mutually agree on

6    the terms and conditions of any -- of any and all

7    matters respecting the enforcement, collection,

8    transfer or disposition of the Westport note."

9        Do you see that?

10   A.   Yes.

11   Q.   Okay.  Now, WPH is Westport Property

12   Holdings LLC.

13       So you agree that your company and the

14   entity that was controlled by Mr. Turner and owned by

15   Mr. Turner, Mr. Ruther and others were going to

16   mutually agree on the terms and conditions respecting

17   the enforcement or collection or transfer or other

18   disposition of the promissory note that would then be

19   owed to Tidewater Capital by Mr. Turner's entities,

20   correct?

21       MR. FRANK: Objection, objection.

---

Page 51

1        Are you testifying or are you asking a

2    question?

3        MR. MCCORMACK: I asked a question.

4    Q.   Isn't that correct?

5        MR. FRANK: I object.

6    A.   I'm saying, based on what the document

7    says, it appears that there would have to be mutual

8    approval of, you know, any modification to that -- you

9    know, paying off that note or refinancing that loan.

10   Q.   Okay.  Or collecting that note because

11   collection is in there, right?

12   A.   I see the word "collection" there.  I don't

13   know how it's relative given the fact that we didn't

14   own the note.

15   Q.   Well, it was talking about what was going

16   to happen when and if you owed the note.  So if you had

17   bought the note, you could only take collection action

18   with the agreement of Mr. Turner's entity?

19       MR. FRANK: Objection.

20   Q.   Correct?

21       MR. FRANK: Objection.  It calls for a

---

Page 52

1    legal conclusion.  The documents speaks for itself.

2    Q.   What's your understanding?

3    A.   I mean, my presumption would have been that

4    there would be other agreements in place that would --

5    that this was -- this only identifies potential

6    outcomes and that there would have been a legal

7    agreement in place before the note would have been

8    purchased that would have -- this would not have been

9    the agreement based on which that would have happened.

10   Q.   Now, have you ever been owed money by

11   anybody else?

12   A.   Yes.

13   Q.   Have you ever had a promissory note or

14   document from somebody saying I'll repay you?

15   A.   Yes.

16   Q.   Have you, in any of those instances in

17   which you were owed money, agreed with the person that

18   owed you the money, "but I won't take any action unless

19   it's okay with you?"

20       MR. FRANK: Objection.

21   A.   I guess you'll have to restate that

---

Page 53

1    question.

2    Q.   Well, give me an example of somebody that

3    owed you money and gave you a promissory note.

4    A.   I have an employee that owed me money --

5    two of them that owed me money and gave me a promissory

6    note.

7    Q.   Okay.  What is the employee's first name?

8    A.   One was Bill.

9    Q.   We'll start with Bill.

10       Now, was your deal with Bill that he was

11   going to -- he was going to pay you back on certain

12   terms, right?

13   A.   Yes.

14   Q.   The terms are put in the promissory note,

15   correct?

16   A.   Yes.

17   Q.   Now, did you agree with Bill, "but I won't

18   take any collection action unless you agree to it,

19   Bill, and it's okay with you?"

20   A.   I did do that.  I mean --

21   Q.   You had that agreement with him?

614

Page 54

1 A. He's -- it's not in the agreement, but he's
2 owed me that money for two years and hasn't repaid me.
3 Q. But it's not in the agreement that you
4 can't take any action without his consent, is it?
5 A. It's not in the agreement, but this --
6 again, this is not a loan agreement. This is the basis
7 of a future deal. This is...
8 Q. Okay. I think I understand the
9 distinction.
10    Now, can you turn to page 4 of Ruther 12,
11 specifically paragraph 6 refers to a development
12 operating agreement.
13    Do you know what that's referring to?
14    MR. FRANK: Objection.
15 A. Well, the idea in this would have been that
16 in the event that we had funded $14 million or more
17 that we would have had -- and Carlyle Group would have
18 agreed to it, we would have had the right to acquire or
19 own Carlisle's interest.
20 Q. Okay. And then you were going to share
21 that between Westport Property Holdings and Tiderock

Page 55

1 Holdings, correct?
2    MR. FRANK: Objection.
3 A. If that would have happened, that was
4 potentially there, yes.
5 Q. Okay. Now, can you turn to page 6
6 paragraph 6.7 specifically?
7 A. (Witness complied.) Yes.
8 Q. All right. And there you and Mr. Turner
9 agreed that Westport Property Holdings, his company,
10 and Tiderock Holdings, your company, will each have
11 approval of all major decisions affecting the project,
12 including but not limited to budgets, marketing,
13 financing, sale and leasing decisions as well as any
14 related party contracts affecting the project or the
15 sale of any interest in the project, correct?
16    MR. FRANK: Objection.
17 Q. That's what it provides, correct?
18    MR. FRANK: Objection.
19 A. You're asking me if that's what it says?
20 Q. Yes.
21 A. That's how I read it.

Page 56

1 Q. Okay. And what did you understand that
2 provision to mean?
3 A. Again, in the event that we had funded this
4 amount of money and, you know, those things would have
5 fallen in place and if Carlyle had agreed to allow us
6 to take their interest, then we would have -- this
7 hypothecated with a future where we had entered into
8 the project, which never happened.
9 Q. And if you could, turn to page 8 of Ruther
10 12.
11 A. (Witness complied.)
12 Q. Specifically paragraph 17.
13 A. Yes.
14 Q. Okay. And what did you understand
15 paragraph 17 to mean?
16 A. Just that there was an exclusivity period
17 for this agreement.
18 Q. So in exchange for your
19 investment --
20    MR. FRANK: Objection.
21    MR. MCCORMACK: What is your objection?

Page 57

1    MR. FRANK: Go ahead. Finish the question.
2    MR. MCCORMACK: Okay. Thank you.
3    BY MR. MCCORMACK:
4 Q. So in exchange for your investment, you got
5 an exclusivity period, correct?
6    MR. FRANK: Objection.
7 A. I don't know if it's an exchange -- it
8 was -- the money was clearly a loan, number 1. Number
9 2, I wouldn't say it was an exchange for it. It was
10 just part of the conditions of the agreement that there
11 was an exclusivity period.
12 Q. All right. Now, you're saying the money
13 was clearly a loan. I have not seen a promissory note.
14    Is there a promissory note that evidences
15 that loan?
16    MR. FRANK: Objection.
17 A. All I can tell you is what my intention was
18 and what the document says right down there, that it
19 was a loan.
20 Q. Okay. So you're holding up Ruther
21 Exhibit 12.

615

Page 58

1  A.  Yes.
2  Q.  So that's the document under which you made
3  the, you called it, loan, okay?
4  A.  And it's even stated in there as a loan.
5  Q.  So in exchange for the loan, you received
6  exclusive rights to enter into any agreement with
7  Westport Property Holdings for a period of time,
8  correct?
9      MR. FRANK: Objection.  The document speaks
10  for itself.  You're asking him to characterize it.
11  A.  Yeah, that's what the document says.
12     MR. MCCORMACK: Now, Mr. Frank, if you keep
13  making speaking objections --
14     MR. FRANK: It's not --
15     MR. MCCORMACK: No, it's a speaking
16  objection.
17     MR. FRANK: If you wish to ask him
18  questions that are improper, I'm going to instruct him
19  not to answer.  So I suggest --
20     MR. MCCORMACK: If you do that, we will
21  test whether Judge Motz stays home on snow days or

Page 59

1  comes in.
2      MR. FRANK: I would welcome such a test.
3      MR. MCCORMACK: Because the only basis on
4  which you may instruct him is privilege.
5      MR. FRANK: That is not correct.  Continue
6  with your question --
7      MR. MCCORMACK: That is Walston Purina.
8  That has been the law in this circuit --
9      MR. FRANK: Continue with your questions,
10  Mr --
11     MR. MCCORMACK: -- since before you and
12  I --
13     MR. FRANK: Mr. McCormack, continue your
14  questions, please.
15     MR. MCCORMACK: So if you instruct him, we
16  will call and we'll find the judge.
17     MR. FRANK: Mr. McCormack, continue your
18  questions.
19     BY MR. MCCORMACK:
20  Q.  Now, again, in exchange for the loan, you
21  got an exclusive right to be involved in any

Page 60

1  transaction with Westport Property Holdings for a
2  period of time, correct?
3      MR. FRANK: Objection.
4  A.  Again, I think it speaks for itself.
5  Q.  Is that your understanding?
6      You had an exclusive right in exchange for
7  your loan, correct?
8      MR. FRANK: Objection.
9  A.  I believe that the document, you know,
10  describes the exclusive period.
11  Q.  Okay.  And the document provides that you
12  had approval together with Mr. Turner's company for all
13  major decisions, correct?
14  A.  No.
15  Q.  Look at page 6, please.
16  A.  Which section was it?
17  Q.  6.7.
18  A.  Again, that -- what I believe that relates
19  to is that is a -- going forward in the future, that
20  would be an indication of how a deal would be
21  structured after I had entered into a partnership.

Page 61

1  Q.  Now, this agreement is dated February 23,
2  2011.
3      Do you see that?
4  A.  Yes, I saw that.
5  Q.  And does that refresh your recollection as
6  to when you were being introduced to Mr. Turner by
7  Shanska?
8  A.  Yes, Skanska.  So I was a year off.
9  Q.  Okay.
10  A.  So I would have been introduced to it
11  probably in December of 2010 and so I was just a year
12  off on the chronology.
13  Q.  All right.  Now, when did Mr. Frank first
14  get involved in representing parties in this Westport
15  transaction?
16     MR. FRANK: Objection.
17  A.  I believe I got Kenny involved in 2012.
18  Q.  Okay.  And what were the circumstances -- I
19  don't want to hear any communications, but just what
20  were the circumstances that you got Mr. Frank involved?
21  A.  I wanted to get his assistance with helping

616

Appeal: 15-1671    Doc: 25-2    Filed: 09/28/2015    Pg: 165 of 248

Citigroup Global Markets Realty Corp v
Patrick Turner, et al

Case 1:14-cv-00587-JFM Document 61-3    Filed 04/15/15    Page 17 of 95

Thomas Butler Fore - Vol. 1
February 17, 2015

Page 62

1  me on the refinance portion of it.
2  Q.  All right.  Were you dealing with anybody
3  specifically when you got Mr. Frank involved?
4  A.  I don't remember.  I believe, at the time,
5  we were working with Vision Capital out of Utah.
6  Q.  And what was it that you asked Mr. Frank to
7  do in connection with Vision Capital?
8  A.  I believe to assist me with the -- with
9  working with them with helping me to secure financing
10  for the project.
11  Q.  Okay.  Let me hand you what's been marked
12  as Ruther Exhibit 13.  All right.  You said earlier
13  that you had an agreement with Vision Capital.
14     Were you referring to Ruther Exhibit 13 or
15  is there some additional agreement that you had with
16  Vision?
17  A.  This is the only agreement I know that
18  we've executed with them.
19  Q.  And this is entitled Mutual Confidentiality
20  and Nondisclosure Agreement, correct?
21  A.  Yes.

Page 63

1  Q.  Now, this is not -- would you agree with me
2  that this is not agreement by Vision Capital to make
3  any level of investment in Inner Harbor West LLC or
4  Inner Harbor West II LLC?
5  A.  Yes.
6  Q.  It's just an agreement that says -- well,
7  what it claims to say, that there will be certain
8  confidentiality maintained and there's a
9  non-circumvention covenant; isn't that right?
10  A.  Yes.
11  Q.  Okay.  Now, one of the parties to this is
12  something called Westport Partners LLC.
13     What is Westport Partners LLC?
14  A.  Westport Partners was an entity that we
15  created so that Rob Hobson could eventually have a
16  piece of the project.
17  Q.  Who are the members of Westport Partners
18  LLC?
19  A.  There really -- there is no operating
20  agreement for it.
21  Q.  Okay.  All right.  Who created Westport

Page 64

1  Partners?
2  A.  I don't remember.  I may have done it or
3  Deveney may have done it.
4  Q.  Okay.  Now, this is an agreement among
5  Vision Capital Partners LLC, Westport Partners LLC and
6  it says in the first paragraph Westport Development
7  LLC, Patrick Turner and Thomas B. Fore.
8     Do you see that?
9  A.  Okay.  Yeah, yes.
10  Q.  But if you turn to page 2, there's a
11  signature line for Vision Capital.
12     Do you see that?
13  A.  Yes.
14  Q.  Signed by Ed Balley, manager, correct?
15  A.  Yes.
16  Q.  And there's a signature line for Westport
17  Partners LLC.
18     Do you see that?
19  A.  Yes.
20  Q.  Signed by Thomas B. Fore, member, correct?
21  A.  Yes.

Page 65

1  Q.  That would be you?
2  A.  Correct.
3  Q.  Then there's a signature line that says
4  Patrick Turner.
5     Do you see that?
6  A.  Yes.
7  Q.  Do you recognize the handwritten signature
8  underneath Mr. Turner's typed name?
9  A.  Yes.
10  Q.  Is that Pat Turner's signature?
11  A.  Do I recognize his?
12  Q.  Yeah.
13  A.  I have no idea.
14  Q.  Okay.  Then there's a signature line that
15  says Thomas B. Fore.
16  A.  Yes.
17  Q.  And you've signed -- that's your signature
18  underneath that one?
19  A.  Yeah.
20  Q.  But there's no signature line at all for
21  Westport Development LLC, is there?

617

Appeal: 15-1671    Doc: 25-2    Filed: 09/28/2015    Pg: 166 of 248

Citigroup Global Markets Realty Corp. vs.    Document 61-3    Filed 04/15/15    Page 166 of 195    Thomas Butler Fore - Vol. 1
Patrick Turner, et al                                                                     February 17, 2015

Page 66

1  A.  No.
2  Q.  Now, what was it that Vision Capital was
3  being asked to consider doing?
4     MR. FRANK: Objection.
5  A.  To finance the acquisition of the note.
6  Q.  Okay.  Finance the acquisition of the note.
7  The acquisition pursuant to Ruther
8  Exhibit 12, the Memorandum of Understanding?
9  A.  The eight and a half million.
10  Q.  Which was the eight and a half million that
11  Tiderock Capital had committed to spend if it could
12  raise it, correct?
13  A.  Yes.
14     MR. FRANK: Objection.
15  Q.  So Vision was being asked to consider
16  providing financing to Tiderock Capital so that it
17  could exercise the purchase agreement with Citi and
18  then you would have to the rights that were set out in
19  this Memorandum of Understanding, correct?
20     MR. FRANK: Objection.
21  A.  I don't know if that would have been the

Page 67

1  case.  I can't -- I don't know what would have
2  happened.
3  Q.  Well, what was Vision being asked to do?
4  A.  Vision was being asked to fund the
5  acquisition of the note so -- we had not negotiated
6  that out fully.  So I don't know what would have
7  happened.  You know, that would have -- I guess that
8  would have had to work itself out.
9  Q.  So Vision could finance that acquisition by
10  itself?
11     MR. FRANK: Objection.
12  A.  No.
13  Q.  Why not?
14  A.  Because we had an NDA.
15  Q.  By NDA, you mean Ruther Exhibit 13?
16  A.  Yes.
17  Q.  Could Vision Capital advance the money to
18  Patrick Turner and he purchase the note and cut you out
19  of the deal?
20     MR. FRANK: Objection.
21  A.  Not based on this NDA.

Page 68

1  Q.  Or Ruther 12?
2  A.  I believe that Ruther 12 was expired by
3  then.
4  Q.  So your understanding is that by November
5  of 2012 Mr. Turner -- the only thing that restrained
6  Mr. Turner from cutting you out of any deal is the
7  Ruther 13, what you referred to as the NDA?
8     MR. FRANK: Objection.
9  A.  It would have prevented Vision Capital from
10  taking any action.  Well, I guess that's not true
11  because they did, but...
12  Q.  Okay.
13  A.  But that's clearly why it was designed to
14  do that.
15  Q.  Now, what confidential -- well, what
16  secret, confidential, unique or valuable information
17  developed by Westport did you or Mr. Turner or any of
18  your entities provide to Vision Capital?
19     MR. FRANK: Objection.
20  A.  I don't -- I don't really recall, all
21  the -- you know, what was secret and what was not.

Page 69

1  Q.  Well, can you recall what you told them and
2  maybe we can -- once we've figured out what it was you
3  conveyed to them we'll figure out which of it would
4  have been secret.
5  A.  I don't know how we would do that.  But I
6  think, primarily, that the issue there was that -- I
7  mean, Vision did get some environmental information,
8  some information on appraisal that were confidential
9  and Vision did get direct access to negotiate with
10  Citibank which would have fallen under that
11  confidentiality.
12  Q.  Okay.  Now, let's break this down for a
13  little bit.
14     What environment information was provided
15  to Vision?
16     MR. FRANK: Objection.  What relevance does
17  this have to this case?
18  Q.  Go ahead.  You may answer.
19  A.  It's -- well, it's confidential.  I'm
20  kidding.
21     All right.  So there was an environmental

618

Appeal: 15-1671    Doc: 25-2    Filed: 09/28/2015    Pg: 167 of 248

Citigroup Global Markets Realty Corp. v.    Document 61-3    Filed 04/15/15    Page 19 of 95    Thomas Butler Fore - Vol. 1
Patrick Turner, et al                                                                                        February 17, 2015

Page 70

1  summary and all the details about the environmental
2  status of the project.
3  Q.  Okay.  And do you know how much of that was
4  public knowledge?
5  A.  No.
6  Q.  Do you know if there is an environmental
7  covenant between the owners of the property and
8  benefiting the Maryland Department of the Environment
9  that is of public record relating to this property?
10      MR. FRANK: Objection.
11 A.  I presume so.  I don't know.
12 Q.  All right.  Okay.  So you said you provided
13 appraisals that someone on your side had commissioned
14 to Vision.
15      Who had those appraisals done?
16 A.  I don't recall.  I don't remember who
17 commissioned the appraisals.
18 Q.  Were they in existence before you got
19 involved or was the property appraised after you got
20 involved with Mr. Turner?
21 A.  There were appraisals that existed before

Page 71

1  and appraisals that existed after.
2  Q.  And you said that Vision got the
3  opportunity to deal directly with Citigroup, correct?
4  A.  Correct.
5  Q.  Okay.  Now, why couldn't Vision, without
6  entering into an agreement with you and Mr. Turner,
7  just call up Citigroup and say, hey, I'd like to buy
8  the mortgage?
9  A.  I suppose they could have.
10 Q.  Okay.
11 A.  I think many people tried.
12 Q.  Now, I think we've established -- well, let
13 me ask.
14      Did Vision Capital ever agree to advance
15 the $8.5 million dollars to purchase the promissory
16 note and related loan documents from Citigroup?
17 A.  Did they verbally agree or --
18 Q.  Well, let's --
19 A.  Does that count?
20 Q.  I'm happy to make it -- we'll let that
21 count.

Page 72

1      First, did they orally agree?
2  A.  I believe they did.
3  Q.  Okay.  And to whom did they make that oral
4  agreement?
5  A.  I believe to Turner.
6  Q.  Okay.  Were you there?
7  A.  No.
8  Q.  Who told you about it?
9  A.  I believe -- I'm going back a long way, but
10 I believe Turner told me and I believe that -- what was
11 his name -- Doug, the guy from Vision Capital, the
12 representative, I may have heard it from him as well.
13 Q.  Okay.  Now, was that oral agreement ever
14 reduced to writing?
15 A.  No.
16 Q.  Did Vision Capital, in fact, ever advance
17 or provide the $8.5 million dollars?
18 A.  No.
19 Q.  Did you -- let's start with you.
20      Did you ever bring litigation against
21 Vision Capital on that oral agreement?

Page 73

1  A.  Yes.
2  Q.  Okay.  When did you sue Vision Capital?
3  A.  I believe we sued in 2013 and I want to say
4  it was probably March of 2013, I believe.
5  Q.  All right.  And who were the -- who all
6  were the plaintiffs?
7  A.  I believe it was Vision Capital, its
8  principals.
9      MR. RUTHER: He didn't understand your
10 question.
11 Q.  Did they sue you or did you sue them?
12     MR. FRANK: He asked who the plaintiffs
13 were.
14 A.  Oh.  I don't remember.  I honestly don't
15 remember.
16 Q.  Do you recall who represented you in that
17 lawsuit?
18 A.  Mr. Frank.
19 Q.  Okay.  Do you recall what court it was
20 filed in?
21 A.  I believe the initial suit was filed in

619

Page 74

1  federal court. I think so.
2  Q. Okay. Bankruptcy court or U.S. District
3  Court?
4  A. I believe it was in the bankruptcy court.
5  Q. And how was the first lawsuit resolved?
6     MR. FRANK: Objection.
7  A. I believe the first lawsuit was -- they
8  moved -- it was moved out of Bankruptcy Court.
9  Q. It was dismissed by Judge Gordon, correct?
10     MR. FRANK: Objection.
11  Q. Is that right?
12  A. That sounds right.
13  Q. Okay. Then was there a second lawsuit?
14  A. Yes, and then I believe that the defendants
15  in that lawsuit then sued us.
16  Q. Where was that second lawsuit filed?
17  A. I believe it was in federal court in
18  Maryland.
19  Q. Now, first, Exhibit 13, the mutuality,
20  confidentiality and nondisclosure agreement.
21     Do you know why Middle Branch Development

Page 75

1  LLC was not a party to that agreement?
2     MR. FRANK: Objection.
3  A. I do not know. In fact, I don't even know
4  who drafted this document.
5  Q. Do you know why Inner Harbor West LLC is
6  not a party?
7     MR. FRANK: Objection.
8  A. I have no idea.
9  Q. Do you know why Inner Harbor West II LLC is
10  not a party?
11     MR. FRANK: Objection.
12  A. I don't know.
13  Q. Do you know why Neil Ruther is not a party?
14     MR. FRANK: Objection.
15  A. Neil had never been involved in any of
16  these discussions that I know of.
17  Q. Were you aware at the time that the mutual
18  confidentiality and nondisclosure agreement was signed
19  that Mr. Ruther and Mr. Turner had personally
20  guaranteed the debt under certain circumstances?
21     MR. FRANK: You just mean when the NDA was

Page 76

1  signed?
2     MR. MCCORMACK: When Exhibit 13 was signed.
3  A. Let me see. I don't believe so.
4  Q. When did you first learn that Mr. Ruther
5  and Mr. Turner had guaranteed the debt under certain
6  circumstances?
7     MR. FRANK: Objection.
8  A. I want to say in mid to late January of
9  2013.
10  Q. Okay. And who told you for the first time?
11  A. Pat.
12  Q. And Pat you mean Pat Turner?
13  A. Turner.
14  Q. And what did -- did Mr. Turner tell you
15  what the circumstances were, what any of the
16  circumstances were under -- in which he and Mr. Ruther
17  had agreed to guarantee the debt?
18  A. No.
19  Q. What did he tell you about the guarantee?
20  A. Just that there was -- that there was a
21  guarantee related to -- I think it was related to the

Page 77

1  forbearance agreements is what I thought, but I don't
2  know.
3  Q. Did he tell you anything else about it?
4  A. Not that I recall.
5  Q. Now, you said that the parties in the U.S.
6  District Court, the defendants there that you sued,
7  sued back.
8     And who specifically was it that sued you
9  in that U.S. District Court proceeding?
10     MR. FRANK: Objection.
11  A. I don't recall. I believe it was Warhorse
12  Properties LLC, whatever their entity was, that they
13  contracted with Citibank for the note and it may have
14  been them individually.
15  Q. And what was Warhorse?
16     MR. FRANK: Objection.
17  A. I don't know what Warhorse was. I only
18  know that my belief is that Warhorse was a single
19  purpose entity set up by them to contract for the
20  Citibank note.
21  Q. Set up by whom?

620

Page 78

1  A.  By three gentlemen that we referred to as
2  the cowboys.
3  Q.  Okay.
4  A.  Dale Dowers, Rick Burton and Mike -- I
5  think his name is Mike Borden.
6  Q.  Dale Dowers, Rick --
7  A.  Burton, B-U-R-T-O-N.
8  Q.  Richard Burton?
9  A.  Yeah.
10  Q.  Now, were any of Mr. Dowers, Mr. Burton or
11  Mr. Borden involved in Vision Capital?
12      MR. FRANK: Objection.
13  A.  Are you asking me if they were partners in
14  Vision Capital?
15  Q.  Yes.
16  A.  I have no idea.
17  Q.  Okay.  Did you sign a mutual
18  confidentiality and nondisclosure agreement on the same
19  terms or similar terms as that of Ruther Exhibit 13
20  with Warhorse Baltimore?
21      MR. FRANK: Objection.

Page 79

1  A.  No, I don't believe so.
2  Q.  Okay.  Do you have any personal knowledge
3  as to the relationships, if any, between Warhorse
4  Baltimore and Vision Capital?
5      MR. FRANK: Objection.
6  A.  I'm still unclear as to that relationship.
7  Q.  Okay.  Now, what was the basis, then, for
8  Mr. Frank bringing a lawsuit on your behalf and on
9  behalf of others against Warhorse Baltimore if you
10  didn't have a contract with Warhorse Baltimore and you
11  can't -- you're not aware or don't have any knowledge
12  of any relationship between it and Vision Capital?
13      MR. FRANK: Objection.  If you're asking
14  what my basis for bringing the lawsuit is, that's
15  privileged and don't answer that.
16      MR. MCCORMACK: I'm not asking -- I am not
17  deposing you.  I'm asking him.
18  Q.  What is your understanding as to the
19  basis --
20      MR. FRANK: I'm instructing him not to
21  answer to the extent that it involves communications

Page 80

1  from me.
2  A.  To make it simple, the Vision Capital
3  players, Trojan Horse, they brought the Warhorse
4  parties in and gave them -- under our NDA with them,
5  gave them all of our information and access to
6  Citibank.
7      In other words, they tricked Citibank and
8  tricked us into introducing these guys in to negotiate
9  our deal with Citibank and they stole our contract.
10  Q.  Okay.  Now, so I can understand why that
11  would make you think you could sue Vision Capital
12  because that would have been maybe a violation of
13  Ruther Exhibit 13, right?
14      MR. FRANK: Objection.
15  A.  I don't even understand what you're saying.
16  Q.  What you just described -- you just told
17  me, if I understood you correctly, that you felt that
18  in violation of Ruther Exhibit 13, the mutual
19  confidentiality and nondisclosure agreement, Vision
20  took the information that you shared with them and gave
21  it to Warhorse Baltimore, correct?

Page 81

1      MR. FRANK: Objection.
2  A.  That is correct.
3  Q.  Okay.  So I understand that that would
4  be -- that's one of the reasons you sued Vision,
5  because they violated their promise to keep the secret
6  secret, correct?
7      MR. FRANK: Objection.
8  A.  That is correct.
9  Q.  Okay.  What I don't understand -- Warhorse
10  Baltimore never promised to do or not do anything.
11      How is it you were suing Warhorse
12  Baltimore?
13      MR. FRANK: Objection.
14  A.  How do you know what Warhorse Baltimore
15  promised to do or didn't do?
16  Q.  Okay.  You tell me what Warhorse Baltimore
17  promised to you or Patrick Turner or Westport Partners
18  or Westport Development.
19      MR. FRANK: Objection.  What possible
20  relevance does this have?
21  A.  I don't understand that either.  I can tell

621

Page 82

1  you that our belief is that there was a conspiracy to
2  do this between Vision and the cowboys.  The cowboys
3  were aware of our NDA and they also lied to us in order
4  to gain entry into this.
5      And we filed a suit that we believe was
6  there and we'll continue to pursue that and I'm
7  confident in my counsel's ability to do that, and I
8  believe that the Warhorse parties take it very
9  seriously as well, so...
10 Q.  But let's back up just a second.
11     So it's not that you're saying that you
12 had -- that any of you had agreement with Warhorse
13 Baltimore, but the theory was that there was a
14 conspiracy between Warhorse Baltimore and
15 Vision Capital, correct?
16     MR. FRANK: Objection.
17 A.  I also believe that Warhorse Baltimore was
18 bound under this agreement by virtue of their
19 relationship with them and, when we met them, they
20 assured us that they were covered under this agreement
21 as consultants to Vision Capital.

Page 83

1  Q.  Okay.  So who -- well, first of all, tell
2  me about that relationship between Warhorse Baltimore
3  and Vision Capital that leads you to believe that
4  Warhorse Baltimore was covered by the mutual
5  confidentiality and nondisclosure agreement that is
6  Ruther 13.
7      MR. FRANK: Objection.
8  A.  The fact is that they were introduced as
9  the consultants to Vision Capital and, ultimately, they
10 even affirmed that they were covered as a consultant to
11 Vision Capital.
12 Q.  Who specifically confirmed that to whom?
13     MR. FRANK: Objection.
14 A.  This is -- was confirmed in a meeting
15 between all the parties in early January of 2013.
16 Q.  And who on the Warhorse Baltimore side said
17 that they were bound by the agreement?
18     MR. FRANK: Objection.
19 A.  I don't recall.
20 Q.  Okay.  Did you hear it?
21 A.  We talked about it with -- I guess his name

Page 84

1  is Doug Trauner and I don't recall, really, who said
2  it.
3      I get them mixed up -- there's different
4  guys in different groups.  There's a Troller and a
5  Trauner.
6  Q.  Now, you say that Warhorse Baltimore takes
7  the litigation seriously; is that correct?
8  A.  Yes.
9  Q.  And by seriously, do you mean this was a
10 piece of litigation that they would settle in exchange
11 for paying $35,000 into Mr. Frank's escrow account and
12 everybody walking away --
13     MR. FRANK: Objection.
14 Q.  -- or is there something more to the
15 seriousness?
16 A.  You're talking about the Warhorse people,
17 not the Vision Capital.
18 Q.  All right.  So who is paying the $35,000?
19     MR. FRANK: Objection.
20 Q.  Who is going to pay the $35,000, just
21 Vision?

Page 85

1  A.  Just Vision.
2  Q.  Okay.  Have they paid it?
3  A.  I don't --
4      MR. FRANK: Objection.
5  A.  I don't know.
6  Q.  When is it due?
7  A.  I don't recall.  I mean, I really don't
8  know.  I'm not --
9  Q.  Who would know?
10 A.  Mr. Frank would know.
11 Q.  Okay.  And what is going to be done with
12 the $35,000?
13 A.  It's going to come to me.
14 Q.  Have you received it yet?
15 A.  No.
16 Q.  Why is it coming to you and no portion
17 going to Mr. Turner?
18 A.  Because the project owes me a lot of money.
19 I mean, I'm owed a lot of money.
20 Q.  Okay.  Now, you said that there were
21 meetings with the Warhorse Baltimore people where they

622

Appeal: 15-1671    Doc: 25-2    Filed: 09/28/2015    Pg: 171 of 248

Case 1:14-cv-00857-QFM Document 61-3    Filed 04/15/15    Page 23 of 95
Citigroup Global Markets Realty Corp. v.                                    Thomas Butler Fore - Vol. 1
Patrick Turner, et al                                                           February 17, 2015

Page 86

1  affirmed that they were -- well, have you settled with
2  Warhorse or is that still ongoing?
3      MR. FRANK: Objection.
4  A.  I don't know if it's settled yet.
5  Q.  Okay.  Is somebody talking about
6  settlement?
7  A.  We are in discussions about that.
8  Q.  And who is handling the discussions from
9  your side?
10 A.  Mr. Frank.
11 Q.  You don't know if there's been an agreement
12 in principal reached yet?
13     MR. FRANK: Objection.
14 A.  I don't know if it's been -- I don't know
15 if it's been completed.
16 Q.  Has there been an offer that's been
17 accepted?
18     MR. FRANK: Objection.
19 A.  I think we've reached mutual understanding.
20 I just don't know if it's been done.
21 Q.  What are the terms -- your best

Page 87

1  recollection of the terms of that mutual understanding?
2      MR. FRANK: Objection.
3  A.  Just that -- that we're going to -- you
4  know, we're going to sign mutual waivers and releases
5  and be done with it.
6  Q.  Any money going to change hands at all?
7      MR. FRANK: Objection.
8  A.  I don't believe so, no.
9  Q.  Was Mr. Frank ever given or promised an
10 equity interest in any of these developments?
11     MR. FRANK: Objection.
12 A.  No.
13 Q.  Did he ever ask for one?
14 A.  No.  We -- we talked about a variety of
15 different things related to his work with my company.
16 Q.  And was one of those that he would be given
17 a percentage in equity interest in the eventual entity
18 that would develop Westport?
19     MR. FRANK: Objection.
20 A.  No.
21     MR. RUTHER: Can we take 30 minutes to get

Page 88

1  something to eat?
2      MR. MCCORMACK: Sure.
3      (There was a lunch recess taken at 12:57
4  and the deposition resumed at 1:33 p.m.)
5      BY MR. MCCORMACK:
6  Q.  Where did the $2.1 million dollars in total
7  that you've invested in the project come from?
8      MR. FRANK: Objection.
9  A.  It came out of my company and out of my
10 money.  I mean, it came from a variety of places.
11 Q.  All right.  So it was actually your cash.
12 It's not money that you borrowed?
13 A.  Well, a portion of it came from my partner.
14 Q.  Okay.  Isn't that Mr. Haskins or somebody
15 else?
16 A.  No, no.  A guy named Anthony Decaris,
17 D-E-C-A-R-I-S.
18 Q.  And did you borrow it from Mr. Decaris?
19 A.  No.
20 Q.  Do you have any kind of written agreement
21 with Mr. Decaris?

Page 89

1  A.  Yes.
2  Q.  And what are the terms, if any -- what are
3  the terms of the agreement?
4      Are there payment terms?
5  A.  No.  He's a principal in Tiderock.  So it
6  went in as capital under Tiderock.
7  Q.  And so if you were able to ever effectuate
8  a transaction with Mr. Turner, then Mr. Decaris would
9  recover his investment as an equity holder in Tiderock
10 Capital?
11 A.  Again, the idea is always that the money
12 would go and get paid back as a loan and then the --
13 you know, from whatever formation of whatever deal got
14 the thing refinanced.
15 Q.  Okay.  Do you know who Doug Towle is?
16 A.  Doug Towler.
17     MR. FRANK: Could you spell it, please?
18     MR. MCCORMACK: This email says T-O-W-L-E,
19 but perhaps it should have been Towler.
20 A.  Again, I get these two guys confused.
21 There's a Trauner and a Towler.  So I don't know if

623

Appeal: 15-1671    Doc: 25-2    Filed: 09/28/2015    Pg: 172 of 248

Citigroup Global Markets v... Joseph Butler Fore - Vol. 1
Case 1:14-cv-00587-JFM Document 61-3 Filed 04/15/15 Page 24 of 95
Patrick Turner, et al
February 17, 2015

Page 90

1  Doug Towler is the guy from Vision Capital, but I think
2  so.
3  Q.  Okay.  Now, you said you brought Mr. Frank
4  in to advise you in connection with the transaction.
5      Did there --
6      MR. FRANK: Objection.  That's not what he
7  said.
8  Q.  You said that you brought Mr. Frank in
9  to -- in connection with the -- your efforts to find
10  financing.
11      Did there come a time when Mr. Frank was
12  providing legal advice to you?
13  A.  Yes.
14  Q.  And legal advice to Patrick Turner?
15  A.  I know there was cases where he -- I mean,
16  he was always representing me.  I know there was cases
17  when he was able to provide, I guess, some sort of
18  advice to Pat, but...
19  Q.  Did you have a written engagement letter
20  with Mr. Frank?
21  A.  Yes, I believe I did.

Page 91

1  Q.  When was that signed?
2  A.  Oh, gosh.  I want to say in -- I don't
3  know.  I don't remember.  I want to say in 2011, maybe.
4  Q.  Okay.  Were you ever asked to sign a letter
5  waiving any conflicts between Mr. Frank's simultaneous
6  representation of you and his representation of
7  Mr. Turner?
8  A.  No.  Again, because I don't think he --
9  there was -- he technically represented Turner.  I
10  think that the case is where we -- you know, where
11  there's an alignment.
12      If we were talking to an investor or in the
13  case of the litigation with the cowboys it was, you
14  know, fairly simple.
15  Q.  All right.  But you knew that there were
16  occasions when Mr. Frank was corresponding with
17  Mr. Turner and not including you?
18  A.  I'm sure.
19  Q.  I show you what was marked as Ruther
20  Exhibit 16.  Ruther Exhibit 16 is an email exchange and
21  if you look -- see the lower right-hand corner where it

Page 92

1  says IHW?
2  A.  Yes.
3  Q.  And then it's followed by 0000590.  Do you
4  see that?
5  A.  Yes.
6  Q.  That IHW means that this was an email that
7  was produced to us by Inner Harbor West in response to
8  a subpoena that we issued at the same time we issued
9  those subpoenas to you.  In fact, Mr. Ruther produced
10  it as attorney of counsel for Inner Harbor West.
11      So if you read from the bottom up, we've
12  got an email exchange beginning with Mr. Frank writing
13  to Mr. Turner and he says:  "Doug" -- and it says
14  Towle, T-O-W-L-E.  You think that was probably supposed
15  to be Towler?
16  A.  Yes.
17  Q.  Okay.  "Asked me for a copy of the latest
18  Citi agreement.  That's a good sign."
19      Now, do you have any recollection today
20  what the discussions were with Mr. Towler or
21  Vision Capital at or around December 7th of 2012?

Page 93

1  A.  No.  I mean, my expectation is that this is
2  when they were doing their due diligence.
3  Q.  They being Vision Capital?
4  A.  Yes.
5  Q.  Now, what was Citigroup doing as of
6  December 2012?
7      MR. FRANK: Objection.
8  A.  The loan was in default, correct?
9  A.  Yes.
10  Q.  And were you still paying $50,000 a week to
11  get extensions of the forbearance agreement?
12  A.  No, not at that time.
13  Q.  And had Citigroup given you or Mr. Turner
14  or all of you any indication as to what it intended to
15  do?
16  A.  Citibank was not corresponding with me
17  about this.  So I don't know what was going on at the
18  time.
19  Q.  Okay.  Were they corresponding with
20  Mr. Turner?
21  A.  I mean, I presume so.  I don't know what

624

Citigroup Global Markets, et al v. Document 61-3    Filed 04/15/15    Page 2 of 95 Thomas Butler Fore - Vol. 1
Case 1:14-cv-00557-JFM    Document
Patrick Turner, et al                                                                February 17, 2015

Page 94

1   was going on then.
2   Q.   Did you, on occasion, have conference
3   telephone calls with Mr. Turner?
4   A.   Yes.
5   Q.   Did you ever have face-to-face meetings
6   with Mr. Turner?
7   A.   Yes.
8   Q.   Do you remember him, in December of 2012,
9   saying anything about what he understood to be
10  Citigroup's intentions?
11  A.   No.
12  Q.   Did Mr. Frank participate in some of those
13  telephone conversations?
14  A.   With?
15  Q.   You and Mr. Turner.
16  A.   I believe so.  I don't remember.
17  Q.   Okay.  Did you ever meet face with face
18  with Mr. Turner with Mr. Frank present?
19  A.   I believe we -- we definitely did.  I don't
20  know about it related to this timeframe.
21  Q.   Do you ever remember Mr. Turner having

Page 95

1   separate, independent counsel present at any of those
2   meetings?
3   A.   I don't recall.
4   Q.   Do you recall Mr. Turner ever having
5   another --
6       MR. FRANK: Is there a timeframe you're
7   talking about here?
8       MR. MCCORMACK: I'm talking about the ones
9   that he told me that he remembers having meetings with
10  you and Mr. Turner.
11      MR. FRANK: But what timeframe are you
12  asking about?
13      MR. MCCORMACK: I'm asking about -- he's
14  already identified the conversations.
15      MR. FRANK: I'm asking now what timeframes
16  are you talking about.
17      MR. MCCORMACK: I'm asking him about the
18  ones he's already identified.
19      MR. FRANK: Well, you didn't identify a
20  timeframe.
21      MR. MCCORMACK: Okay.  Then it's whichever

Page 96

1   ones he remembers.
2       MR. FRANK: Okay.
3       BY MR. MCCORMACK:
4   Q.   The conference calls that you had with
5   Mr. Turner and Mr. Frank on the phone, do you ever
6   remember Mr. Turner having another lawyer on any of
7   those calls?
8   A.   I don't remember.
9   Q.   Okay.  So your best recollection is that
10  you were there, Turner was on the call and Frank was on
11  the call and you don't remember anybody else being on
12  the call?
13      MR. FRANK: Objection.
14  A.   I just don't remember.
15  Q.   Okay.  Now, at the top of Ruther
16  Exhibit 16, do you see Mr. Frank's final direction to
17  Mr. Turner?
18  A.   Yes.
19  Q.   What did he tell Mr. Turner?
20  A.   You want me to read what it says?
21  Q.   Yeah, read it aloud.

Page 97

1   A.   "But just copy me.  It enables me to know
2   what they're thinking."
3   Q.   Okay.  At some point -- you've alluded a
4   couple of times to the fact that Vision Capital brought
5   Warhorse Baltimore in, as you say, an adviser and then
6   at some point Warhorse Baltimore had some direct
7   discussions with Citigroup.
8       Tell me about the circumstances of the
9   relationship between your side and Vision Capital
10  breaking down.
11      MR. FRANK: Objection.
12  A.   You know, I don't know how to describe
13  that.  I think that, you know, they were --
14  Vision Capital was obviously in negotiations with
15  Citibank.  Vision Capital, we don't know when they
16  started having those discussions with Warhorse or
17  really what the full amount or what those discussions
18  constituted.  We don't know.  I don't know.
19  Q.   And when did you first become aware of the
20  fact that Warhorse was having conversations with
21  Citigroup?

625

Citigroup Global Markets Realty Corp. v.          Thomas Butler Fore - Vol. 1
Case 1:14-cv-00557-QFM Document 61-3   Filed 04/15/15   Page 26 of 95
Patrick Turner, et al                                    February 17, 2015

Page 98

1  A.  When did I become aware for a fact that
2  they had a conversation with Citigroup?  I believe the
3  first time I knew it was a fact was on probably the
4  25th of January of 2013.
5  Q.  Had it been suspected before that?
6  A.  Had it been suspected?  I believe it was
7  perhaps suspected, you know, in the weeks preceding
8  that 25th confirmation.
9  Q.  Okay.  Were there conversations among you,
10  Mr. Turner and Mr. Frank about the possibility of some
11  or all of the entities having to file for relief under
12  the bankruptcy code as early as January 10, 2013?
13  A.  No.
14  Q.  What makes you certain that that was not
15  the case?
16  A.  Well, I mean, again, my memory, I just -- I
17  don't think that there would have been any reason for
18  that at the time.
19  Q.  I'm going to hand you what was previously
20  marked as Ruther Exhibit 17 and ask you to take a
21  moment to review it.

Page 99

1  A.  Okay.
2  Q.  Ruther Exhibit 17 is an email from
3  Mr. Frank to Mr. Turner and you, correct?
4  A.  That is what it appears to be.
5  Q.  This is another document -- you see in the
6  lower right-hand corner, it's another one that
7  Mr. Ruther produced to us on behalf of Inner Harbor
8  West.
9  A.  Okay.
10  Q.  Now, there's a carbon copy of the email to
11  a P. Rhodes, R-H-O-D-E-S, at SoraDevelopment.com.
12      Who is that?
13  A.  That's Patrick Rhodes.  He basically
14  oversees my development company.  He is one of my key
15  people.
16  Q.  Okay.  Now, the subject is email to Doug.
17      Am I correct that that would have been Doug
18  Towler?
19  A.  I believe so, yes.
20  Q.  And it begins:  "Here is my draft."
21      So Mr. Frank has provided draft of a text

Page 100

1  of an email to go to Mr. Towler.
2      Who was to send that email?
3      MR. FRANK: Objection.
4  A.  I don't recall.
5  Q.  Were you?
6  A.  I don't recall.  I really don't.
7  Q.  Did you -- did you ever send an email like
8  this to Mr. Towler?
9  A.  I don't -- I don't -- I don't believe so.
10  Q.  Do you know if Mr. Turner ever sent an
11  email like this to Mr. Towler?
12  A.  I don't know.
13  Q.  Mr. Frank begins his email to Mr. Towler
14  saying:  "I'm sure you can understand that your
15  proposal came as a bit of a surprise."
16      What was the proposal from Mr. Towler that
17  came as a bit of a surprise?
18  A.  The -- my recollection is that the previous
19  terms under which they would have done the deal would
20  have been a -- I'm just trying to remember.
21      It would have been a hundred percent return

Page 101

1  over a two or three-year period and I believe that this
2  date on January 10th follows the date that they had a
3  meeting in Baltimore in which these other terms were
4  proposed.
5  Q.  And what were the other terms?
6  A.  I believe it's reflected in this.  Two
7  times return in one year.
8  Q.  How much were they proposing to invest?
9  A.  I believe at this time it was the $8.5
10  million dollars.
11  Q.  And you thought, before January 10th, that
12  they wanted to receive back $17 million, a hundred
13  percent return over what period of time?
14      MR. FRANK: Objection.
15  A.  I believe it was in two years.
16  Q.  And then the change as of January 10 was
17  that they, in fact, wanted $25.5 million back for their
18  eight and a half million dollar investment and they
19  wanted it in one year; is that correct?
20      MR. FRANK: Objection.
21  A.  I think that -- oh.  Yeah, I don't recall

626

Page 102

1  it being that.  I don't know.  I mean, I thought it was
2  that they wanted a hundred percent return in 12 months,
3  not a 200 percent return.
4  Q.  And how did they convey this change in
5  position?
6  A.  My understanding is it was at a meeting.
7  Q.  Were you there?
8  A.  No.
9  Q.  Who was at the meeting?
10  A.  I believe it was Pat -- I don't know who
11  all was there.  I only know that Pat Turner was there
12  and I believe that Pat Rhodes went since I couldn't go.
13  Q.  Was Mr. Frank there?
14  A.  No, I don't believe so.  I don't know who
15  else was there.  It was at a law firm.
16  Q.  What law firm?
17  A.  I don't know.
18  Q.  DLA Piper?
19  A.  Perhaps.  I don't remember.  I was not
20  there, so...
21  Q.  Who would be able to tell me?  I guess

Page 103

1  Mr. Turner could tell me who was there.  Mr. Rhodes.
2  Anybody else you can think of that could
3  tell me who was at that meeting?
4  A.  I'm sure that Doug Towler or any of the
5  cowboys could tell you.
6  Q.  But I just want to keep them straight.
7  Doug wasn't a cowboy.  He was a Vision Quest person,
8  right?
9  A.  That's correct.  I mean -- that's correct.
10  Q.  Now do you see at the top of the page
11  Mr. Frank's second sentence before he gets to Doug?
12  A.  Yes.
13  Q.  Could you read that aloud?
14  A.  It says:  "Here is my draft.  No matter
15  what you send or discuss, do NOT make any further
16  references to bankruptcy or any other course of action
17  we might take."
18  Q.  Okay.  Now, it says:  "Do NOT make" -- and
19  "not" is in all capitals -- "any further references to
20  bankruptcy."
21  Does that refresh your recollection as to

Page 104

1  whether somebody was making references to a possible
2  bankruptcy?
3  A.  No, I really don't remember.
4  Q.  Okay.  But you weren't at that meeting, so
5  it's possible Mr. Frank brought up bankruptcy on
6  January 10th when he met with the Vision Quest --
7  MR. FRANK: Objection.
8  Q.  -- people and the cowboys?
9  MR. FRANK: Objection.
10  A.  I guess anybody could have made a reference
11  to the bankruptcy.  I don't know who did it.
12  Q.  Okay.  But you understood from this email
13  that Mr. Frank was telling you and Mr. Turner, whatever
14  you do, don't make any further references to
15  bankruptcy?
16  MR. FRANK: Objection.
17  A.  It's clear that's what that says to me, I
18  mean, from reading it.
19  Q.  Now, after January 10th, were there some
20  further conversations among you, Mr. Turner and the
21  Warhorse Baltimore and Vision Capital people?

Page 105

1  A.  Yes, I'm sure there were.
2  Q.  Okay.  Now, Dale Dowers, he's a cowboy,
3  right?
4  A.  Yes.
5  Q.  Okay.  And did there come a time when Dale
6  Dowers made an oral proposal to Pat Turner and you
7  concerning the Westport project?
8  A.  Yes, I believe so.
9  Q.  What were the terms of that oral --
10  A.  I honestly don't remember.
11  Q.  Really?  Anything at all you remember about
12  it?
13  A.  No, just that I think that his -- if I'm
14  trying to recall, his proposal was that, you know, if
15  he took it through -- if they bought it and he went
16  through foreclosure, that he would still give Pat an
17  opportunity to buy the note back or -- you know, but if
18  it sold for too much money that he wouldn't.  It was
19  all over the place.
20  Q.  And do you recall learning at some point
21  that Dale Dowers' oral proposal to you and Pat was

627

Page 106

1  being withdrawn or terminated?
2  A.  Yeah, I think I remember it almost
3  happening on the same day that he gave -- he said that
4  you have a certain number of hours to respond.
5  Q.  And you didn't accept it, whatever he'd
6  offered orally?
7  A.  Well, I mean, it wasn't accepted.
8  Q.  Right.  What was the relationship between
9  Burton and Dowers?
10  A.  I have no idea.
11  Q.  I show you what is marked as Ruther 18.
12     Do you recall receiving Ruther 18 when
13  Mr. Burton sent it?
14  A.  I mean, I don't -- I don't recall it
15  necessarily, but I remember there being an email that
16  terminated this, but it looks fine.
17  Q.  Okay.  I show you what we've marked
18  previously as Ruther 19.
19     MR. RUTHER: Off the record.
20     (A brief discussion was held off the
21  record.)

Page 107

1  A.  Okay.
2  Q.  Now, this is again -- Ruther 19 is another
3  document produced by Inner Harbor West.  And do you
4  see -- we start at the bottom of the page.
5     At the very first message beneath the word
6  "begin forwarded message," is that same email we were
7  just looking at as Ruther 18?
8  A.  Okay.
9  Q.  Yes?
10  A.  Yes.
11  Q.  Okay.  Now, what's interesting is the next
12  thing that happens is Patrick Turner sends it by his
13  iPhone to Kenny Frank, correct?
14     MR. FRANK: Objection.
15  A.  I mean, I'm reading what you're reading.  I
16  see that it's a -- that it appears to be a forwarded
17  transmittal.
18  Q.  Forwarded from Turner --
19  A.  From Pat Turner.
20  Q.  -- to Kenneth Frank, correct?
21  A.  Yes.

Page 108

1  Q.  Okay.  And then Kenneth Frank responds back
2  to Pat Turner: "Saw the text.  Trying to pry out of
3  him whether they're doing it without us."
4     Do you see that?
5  A.  Yes.
6  Q.  And you're not copied on either of those
7  second two exchanges, are you?
8  A.  No.
9  Q.  So, again, we have Mr. Turner and Mr. Frank
10  corresponding about the transaction and the agreements
11  and the negotiations with the cowboys, but you're not
12  included.
13     They're dealing directly, correct?
14  A.  Yes.
15  Q.  I show you what has been marked as Ruther
16  Exhibit 20.
17  A.  (Witness reviewing.)
18  Q.  All right.  You've had a chance to read
19  through it.  Again, it's a document produced by Inner
20  Harbor West.
21     Can you tell me the date of the email?

Page 109

1  A.  It looks like January 18th, 2013.
2  Q.  Who is it from?
3  A.  It is from Kenny Frank to me and Pat
4  Turner.
5  Q.  Okay.  Now, he says: "Proposed email to
6  Victor and Rich Levine."
7     Would Victor be Victor Schwarz?
8     MR. FRANK: Objection.
9  A.  I don't know.
10  Q.  Do you know another Victor involved in this
11  transaction as of January 2013 other than Victor
12  Schwarz who was a principal in Vision Capital Partners?
13  A.  No.
14  Q.  Okay.  And do you know who Rich Levine is?
15  A.  I believe he's one of the people from
16  Vision as well.
17  Q.  Okay.  Could he be an attorney partner at
18  the DLA Piper?
19     MR. FRANK: Objection.
20  A.  Perhaps.
21  Q.  Now, what can you tell me about what was

628

Citigroup Global Markets Realty Corp v                          Thomas Butler Fore - Vol. 1
Patrick Turner, et al                                                        February 17, 2015

Page 110

1  going on as of January 18th, 2013 when Mr. Frank
2  drafted this proposed email to Victor and Rich Levine
3  writing to obtain clarification, the current situation
4  regarding the status of any efforts to buy the Citibank
5  note?
6      What do you understand was happening?
7  A.  If my memory serves me, we were -- we just
8  weren't getting clear messages from any of them about
9  what really was going on, who was doing what as it
10 related to this transaction.
11 Q.  Okay.  And we being you and Mr. Turner?
12 A.  And Kenny.  I mean any of us.
13 Q.  And Mr. Frank?
14 A.  Yeah.
15 Q.  Okay.  Now, do you recall if Mr. Turner --
16 I'm sorry -- if Mr. Frank sent that email to Victor and
17 Rich Levine?
18     MR. FRANK: Objection.
19 A.  I have no idea.
20 Q.  Well, let's see if we can help you.  I'm
21 handing you what's been marked as Ruther Exhibit 21.

Page 111

1  Now, Ruther Exhibit 21 you'll see in the lower
2  right-hand corner has a different notation.
3      Do you see that?
4  A.  Yes.
5  Q.  DLA000037.  Do you see that?
6  A.  Yes.
7  Q.  That stands for DLA Piper.
8      MR. FRANK: Objection.  Are you testifying?
9      MR. MCCORMACK: I'm explaining to your
10 client.
11     MR. FRANK: How do you know?
12     MR. MCCORMACK: How do I know?  Because we
13 served a subpoena on them and DLA Piper -- I think it's
14 technically DLA Piper US -- produced documents in
15 response to the subpoena.
16     MR. FRANK: Well, thank you for explaining.
17     MR. MCCORMACK: Yeah.  Interestingly, they
18 don't correspond with what you sent us but I'm sure
19 there's a reasonable explanation as to why we only got
20 half of it.
21     BY MR. MCCORMACK:

Page 112

1  Q.  All right.  So now, do you see the first
2  message at the bottom of the page?  It begins "original
3  message"?
4  A.  Yes.
5  Q.  Okay.  Now, does that answer our question
6  as to who Victor was?
7      MR. FRANK: Objection.
8  A.  It appears to, yes.
9  Q.  And who is Victor?
10 A.  Victor Schwarz.
11 Q.  All right.  And does it answer our question
12 as to who -- well, at least it says Rich Levine as
13 Richard E. Levine, and we have the text that Mr. Frank
14 had circulated as a draft in Exhibit Number 20,
15 correct?
16 A.  Yes.
17 Q.  Okay.  And the response to Mr. Frank is
18 from Mark Friedman, another DLA Piper partner.  And he
19 says: "Kenny, please address all questions regarding
20 Rick Burton or any affiliated entities to Mark Fields
21 at Fields@Markfieldslaw.com."

Page 113

1      My first question is:  Do you know who Mark
2  Fields is?
3  A.  Yes.
4  Q.  Who is he?
5  A.  He is an attorney for the Westport -- I
6  mean the Warhorse parties.
7  Q.  Okay.  And did you have an understanding as
8  to who DLA Piper was representing as of January 18th
9  and 19th, 2013?
10 A.  I believe that they were representing the
11 Warhorse people as well.
12 Q.  When you say "as well," you mean also
13 Vision Capital?
14 A.  Yeah.  I mean the group.
15 Q.  Yet Mr. Friedman is directing Mr. Frank
16 that if there's a question about one of the cowboys, go
17 to Mr. Fields rather than him, correct?
18 A.  That's what it says.
19 Q.  Okay.  Now, there came a time when
20 Citigroup stopped waiting and they began advertising a
21 foreclosure sale of the property owned by Inner Harbor

629

Page 114

West LLC and Inner Harbor II LLC; is that correct?
MR. FRANK: Objection.
A. I believe there was the foreclosure proceedings or notice or something in that year.
Q. How did you first learn about the foreclosure?
A. I don't remember.
Q. Okay. I show you what was marked as Ruther Exhibit 22.
Does this refresh your recollection as to when you learned or how you learned that Citigroup had begun advertising the property for sale at public auction foreclosure?
A. It appears to.
Q. And what does this Ruther Exhibit 22 tell you about that?
A. It just says in response to -- I think Sherman was a lender, another lender that we were talking to, and it just says, in response to who the contact person was at Citi, that Pat appears to send me an auction advertisement.

Page 115

Q. Now, he got the advertisement in turn -- the bottom of the page -- from Glen Charlow sending him from a link from the A.J. Billig auction house website.
What was Mr. Charlow's relationship to this project?
A. I don't even know who that is.
Q. Okay. So Mr. Charlow, at 3:02 in the afternoon, sends Mr. Turner the advertisement and then Mr. Turner, 14 minutes later, forwards it to you and then you respond asking for information, contact information at Citi for Mr. Sherman, correct?
A. That's what it says, yes.
Q. And who was Mr. Sherman with?
A. I don't remember. We dealt with a lot of people. So I think he was just an investor. I don't even remember who it was.
Q. Now, what, if anything -- what did you and Mr. Turner do next once you learned of the foreclosure?
A. I don't recall.
Q. Did you and Mr. Turner ask Mr. Frank to contact the lender to try to negotiate with them?

Page 116

MR. FRANK: Objection.
A. No, I don't believe so. I don't remember.
Q. So you don't remember your doing it or you don't remember ever hearing that Pat Turner had asked them to do it?
A. I don't remember any of that.
Q. Did Mr. Frank, on his own, undertake to negotiate with Tom Lewis over at the lender's law firm?
MR. FRANK: Objection.
A. I have no idea.
Q. I show you what's been marked as Ruther Exhibit 23. Ruther 23 is an email from Mr. Frank to Mr. Turner with a copy to T. Lewis at GEJlaw.com -- I think that's Gallagher Evelius Jones -- dated January 28, 2013.
Have you ever seen this email before?
A. I don't believe so.
Q. You were not copied on this email?
A. No.
Q. And can you read just the first sentence aloud for me?

Page 117

MR. FRANK: Objection.
A. "Pat, Tom Lewis requested confirmation from you that I'm representing the bar in the Citibank loan for the Westport project."
Q. Okay. Now, you told me earlier today that you knew that the borrower for this project was Middle Branch Development LLC, correct?
A. Correct.
MR. FRANK: Objection.
Q. So Mr. Frank is asking Mr. Turner to confirm to Mr. Lewis that Mr. Frank represents Middle Branch Development LLC, correct?
MR. FRANK: Objection.
A. I can't infer that.
Q. Really? Well, then, who do you think Mr. Frank means when he says: "I am representing the borrower in the Citibank loan to the Westport project?"
MR. FRANK: Objection.
A. Only he would know what he meant when he said that. I don't know what that -- I mean, there's a variety of parties. So it could have been Pat Turner

630

Citigroup Global Markets USA v. QFM Document 61-3   Filed 04/15/15   Page 31 of 95
Patrick Turner, et al
Thomas Butler Fore - Vol. 1
February 17, 2015

**Page 118**

1 saying that it was fine for him to talk to him. I'm
2 sure that's what he meant.
3 Q. Well, no, no.
4    I'm not asking what -- I mean, so your
5 understanding is that when he says -- when he asks him
6 to confirm that "I am representing the borrower in the
7 Citibank loan for the Westport project," what do you
8 understand that to mean?
9    MR. FRANK: Objection.
10 A. Again, I don't know what Kenny means when
11 he wrote that.
12 Q. Do you know, did Mr. Turner provide
13 Mr. Lewis with the confirmation he was asking for?
14 A. I don't know.
15 Q. I show you what is marked as Ruther
16 Exhibit Number 24.
17 A. Okay.
18 Q. And specifically -- well, if you turn to
19 the second page which is IHW0001042, we see the
20 original Kenneth Frank to Pat Turner email. "Tom Lewis
21 requested confirmation from you that I am representing

**Page 119**

1 the borrower in the Citibank loan for the Westport
2 project."
3    Correct?
4 A. Yes.
5 Q. If you turn over a page to 1041, the bottom
6 of the page we have a response from Pat Turner to
7 Kenneth Frank and Tom Lewis. "Tom, yes, Kenny is
8 representing the partnership. Thank you."
9    Is that correct?
10 A. Yes, that's how I read it.
11 Q. And that comports with your understanding
12 as of January the 28th that Mr. Frank was representing
13 all of you in efforts to resolve or avoid a foreclosure
14 sale and to refinance the property, correct?
15    MR. FRANK: Objection.
16 A. Again, my position was that he was granted
17 some leeway to communicate with these people, but...
18 Q. And he was communicating as an attorney for
19 you and Mr. Turner and your related entities, right?
20    MR. FRANK: Objection.
21 A. Again, I think that, from my standpoint, he

**Page 120**

1 was not representing all of these parties, but
2 obviously I wasn't copied on all these emails.
3 Q. And, in fact, this is an exchange that you
4 weren't copied on.
5    MR. FRANK: Objection.
6 A. Yes.
7 Q. Now, I show you next what's been marked as
8 Ruther Exhibit Number 25.
9 A. (Witness reviews).
10 Q. Ruther Exhibit 25, it's another document
11 produced to us by Inner Harbor West LLC. It's an email
12 exchange. Reading up from the bottom, we begin on
13 January 29, 2013 at 10:48 in the morning from Kenneth
14 B. Frank.
15    Do you see that?
16 A. Yes.
17 Q. Now, he says: "So here is what we think we
18 know. One, deposit is $300K. Two, price is $7.5M.
19 Three, closing is 2/12."
20    Do you know what he's referring to? What
21 deposit is he referring to?

**Page 121**

1 A. I believe that is the deposit that the
2 Warhorse parties put up to Citibank for their contract.
3 Q. Okay. And when it says price, is that the
4 purchase price Warhorse was going to pay?
5 A. I believe that's consistent with what I
6 heard.
7 Q. And the closing was to occur -- when it
8 says 2/12, that's February the 12th?
9 A. I believe so.
10 Q. And that is of 2013? Was that your
11 understanding?
12 A. Yes.
13 Q. Then he says: "They are really morons."
14    Who are they?
15 A. I believe he's talking about Warhorse but I
16 don't know.
17 Q. All right. Mr. Turner responds to you and
18 Mr. Frank: "300K is a small deposit."
19    Do you see that?
20 A. Yes.
21 Q. Now, Mr. Frank then responds to both

631

Page 122

1  Mr. Turner and you.
2     Do you see that?
3  A.  Yes.
4  Q.  And he says:  "But if closing isn't until
5  2/12, we can freeze things as they are and claim the
6  contract as ours."
7     What contract do you understand him to be
8  talking about?
9  A.  I believe the contract between the Warhorse
10  parties and Citibank.
11  Q.  Okay.  And do you know how it was he
12  proposed you were going to be able to claim the
13  contract between the Warhorse parties and Citigroup
14  yours and not Warhorse's?
15  A.  Can you repeat that question?
16  Q.  Well, he says:  "We can claim the contract
17  as ours."
18     If the contract was between Warhorse
19  Baltimore and Citigroup, how was it that Mr. Frank was
20  suggesting that you could claim it was your contract?
21     MR. FRANK:  Objection.  I'm going to

Page 123

1  instruct you not to answer to the extent that it
2  involves communications from me to you, if your
3  understanding is based on communications between you
4  and me.
5  A.  Okay.  Then I can't answer.
6     MR. MCCORMACK:  No.  You can instruct him
7  not to tell me what you communicated, not what he came
8  to conclude.
9     MR. FRANK:  I understand.
10     BY MR. MCCORMACK:
11  Q.  All right.  What did you conclude after
12  talking with Mr. Frank about the basis for claiming
13  that the contract between Warhorse Baltimore and
14  Citigroup Global Markets belonged to you and Mr. Turner
15  and not to Warhorse?
16  A.  The violation of the NDA and a lawsuit to
17  stop it.
18  Q.  Okay.  And so you concluded that, because
19  Vision Capital had violated its nondisclosure agreement
20  with you, that you and Mr. Turner could claim that
21  Warhorse's contract was yours?

Page 124

1     MR. FRANK:  Objection.  That calls for a
2  legal conclusion.
3     MR. MCCORMACK:  I'm asking for his
4  understanding.
5  A.  My belief was that, at the time, that they
6  conspired to steal the note and the opportunity from
7  us.
8  Q.  Now, Mr. Frank goes on and he says:  "The
9  bankruptcy will stop the foreclosure."
10     Do you see that?
11  A.  Yes.
12  Q.  What bankruptcy is he talking about?
13  A.  At the time we -- or at least I was
14  convinced that one way or the other the getting a
15  Chapter 7 in place would be an effective recourse for
16  me as a lender.
17  Q.  Okay.  And it would stop the foreclosure?
18  A.  Yes.
19  Q.  Did you communicate your belief that filing
20  an involuntary bankruptcy case or the filing of a
21  Chapter 7 bankruptcy case was an effective course of

Page 125

1  action for you?
2     Did you relay that to Mr. Turner?
3  A.  I don't remember the date of when that
4  happened, but I do know that Turner was not supportive
5  of us filing a bankruptcy.
6  Q.  Really?  Did he do anything to help support
7  it?
8  A.  I'm not sure of your question.
9  Q.  What part of the question don't you
10  understand?
11  A.  Did he do anything to help support it?
12  Q.  Yeah.
13  A.  He originally had inquired with the Carlyle
14  Group to see if he could file an involuntary bankruptcy
15  and they wouldn't let him.
16  Q.  Okay.  So he asked Carlyle -- he suggested
17  the strategy to Carlyle and Carlyle said no.
18     My question is:  When you and Mr. Frank and
19  Mr. Ominsky and Mr. Sirody all began moving forward on
20  an involuntary, did Mr. Turner do anything to help?
21     MR. FRANK:  Objection.  None of that is in

632

Page 126

1  evidence.
2      MR. MCCORMACK: That is -- I'm not going to
3  comment. Go ahead.
4  A.  I believe, at the time, Pat was opposed to
5  the bankruptcy, to us filing a Chapter 7 because he was
6  concerned about his liability under the loan, you know.
7  Q.  But that's not my question.
8      My question is:  Did he, at some point,
9  take steps to help you file the involuntary?
10 A.  No.
11 Q.  Did he provide a list of his creditors to
12 Mr. Frank for Mr. Frank to provide to Mr. Sirody and
13 Mr. Ominsky?
14     MR. FRANK: Objection.
15 A.  We knew who the creditors were, but I think
16 he just -- he may have provided contact information for
17 them, but...
18 Q.  So he provided contact information.
19 A.  I believe so.
20 Q.  And he was aware that you were going
21 forward with this proposed bankruptcy?

Page 127

1  A.  I believe so, yes.
2  Q.  And did he allow his sometime attorney,
3  Mr. Frank, to go out and find bankruptcy counsel?
4      MR. FRANK: Objection.
5  A.  Not to my knowledge.
6  Q.  Okay.  So if I show you emails where
7  Mr. Frank is communicating with bankruptcy lawyers and
8  setting up the bankruptcy filing, it's going to come as
9  a surprise to you?
10     MR. FRANK: Objection.
11 A.  No, that would not be a surprise.
12 Q.  Okay.  Now, you say you don't think
13 Mr. Turner was in favor of this.
14     At the time that the bankruptcy was getting
15 organized, who was Mr. Frank representing, in your
16 view?
17     MR. FRANK: Objection.  You want to specify
18 a time?
19 Q.  Oh, I'd love to.  How about we'll say from
20 January 1 through, I don't know, let's say
21 February 28th of 2013.

Page 128

1      MR. FRANK: And what is the question?
2  Q.  Who did he understand you were representing
3  with regard to the bankruptcy at that time?
4  A.  I mean, my feeling is that Kenny has always
5  represented me and my interest.  As I said, I think
6  that in some cases where there's a need to have him
7  communicate with other people, you know, whether it was
8  under this scenario or related to the Vision and the
9  loan and that stuff, you know, that he represented
10 Pat's and my interest in very specific incidences.
11 Q.  Okay.  Now, when you brought the
12 involuntary, are you trying to -- well, first of all,
13 you didn't actually bring the involuntary, did you?
14     MR. FRANK: Objection.
15 A.  No, but, I -- I mean, I qualified for it
16 and, you know, I felt that I qualified for it so we
17 allowed these other people to do it because they were
18 also creditors to that entity.
19 Q.  Wait a second.  I don't understand.  You've
20 lost me there.
21     First of all, who is "we" who let the other

Page 129

1  creditors --
2  A.  Kenny and I utilized Dixie Construction and
3  Cara Frye as relationship as a creditor.  I was also a
4  creditor, so...
5  Q.  But you didn't join in the involuntary?
6  A.  No.
7  Q.  So let me make sure I understand.
8      So you had a claim, you're telling me,
9  against Inner Harbor West LLC?
10 A.  Yes.
11 Q.  And that was under your Memorandum of
12 Understanding, correct?
13 A.  Correct.
14 Q.  And then Mr. Frank -- and Mr. Frank was, in
15 November and December and January, representing you and
16 Mr. Turner in discussions with Vision Capital and
17 Warhorse Baltimore, correct?
18     MR. FRANK: Objection.
19 A.  I mean, based on -- again, I don't know all
20 the ins and out of those discussions, but based on what
21 you -- you know, the documentation, it appears that

633

Appeal: 15-1671    Doc: 25-2    Filed: 09/28/2015    Pg: 182 of 248

Citigroup Global Markets Realty Corp. v.    Document 61-3    Filed 04/15/15    Page 3 of 95
Patrick Turner, et al
Thomas Butler Fore - Vol. 1
February 17, 2015

Page 130

1  way.
2  Q.  Okay.  And you at some point decided --
3  what you're telling me today is that you, as a
4  creditor, were going to pursue your remedies against
5  Inner Harbor West over the objections of Pat Turner,
6  correct?
7  A.  Correct.
8  Q.  My first question is:  Did anybody ever
9  suggest to you you ought to get a new lawyer that isn't
10  simultaneously representing Mr. Turner and his
11  companies and you if you're now going to pursue your
12  claims against Inner Harbor West?
13      MR. FRANK: Objection.
14  A.  No.  But, again, I didn't feel like as if
15  Kenny was Pat's -- Westport's lawyer or anybody else's
16  lawyer, so I don't think it was related.
17  Q.  My question was nobody said to you, hey,
18  you really got to get independent counsel, Mr. Frank
19  can't be on both sides of the dispute?
20      MR. FRANK: Objection.
21  A.  No.

Page 131

1  Q.  Did anybody give you a letter to sign
2  saying you had no objection to Mr. Frank being on both
3  sides of the dispute?
4      MR. FRANK: Objection.
5  A.  I don't recall.
6  Q.  Did you ever discuss with Mr. Turner the
7  fact that, hey, isn't this a little weird, Kenny is our
8  lawyer and now he's helping me sue you?
9      MR. FRANK: Objection.
10  A.  No, because, again, I never felt that Kenny
11  was Pat's lawyer.
12  Q.  Does Turner ever say to you, boy, this is a
13  strange situation?
14  A.  No.  I just -- as I said, Pat was -- you
15  know, he was initially upset about the fact that I was
16  going to proceed with the pursuant to Chapter 7 to
17  protect my money.
18  Q.  Okay.  Did he tell you to stop?
19  A.  He told us he didn't want us to do it.
20  Q.  Did he tell you to stop?
21  A.  I don't recall.

Page 132

1  Q.  Did he tell you if you do this you will
2  have no more part of this investment?
3  A.  He had already told me that, that I'd have
4  no more part of the investment.
5  Q.  Did he, in fact, cut you out after you
6  filed the involuntary?  Well, you didn't do it.  After
7  Dixie filed it.
8  A.  I don't recall.  We filed a lot.
9  Q.  Did Mr. Turner bring any legal action
10  against you to try to stop you from arranging an
11  involuntary?
12  A.  I don't believe so, no.
13  Q.  Now, so the lawyer that you saw as your
14  lawyer, Mr. Frank, went out and he asked people, other
15  people to file the involuntary instead of you, correct?
16  A.  Correct.
17  Q.  Do you know why he asked other people and
18  left your name off of it?
19  A.  I mean, part of it was, you know, because
20  of nature of my work, I don't want to be in the middle
21  of the crosshairs of this kind of stuff, but also I

Page 133

1  wanted to reserve the right to file the Chapter 7 on
2  the other entity.
3  Q.  Did somebody tell you that you could only
4  file on one entity and not two?
5      MR. FRANK: Objection.
6  A.  I believe that was the case.
7  Q.  Now, did the fact that you had an agreement
8  with Mr. Turner that gave you a right to have a -- to
9  have equity in any reorganized entity, did that play
10  any part in your decision to keep your name off of the
11  first involuntary petition?
12      MR. FRANK: Objection.
13  A.  Absolutely not.
14  Q.  Did the fact that you had approval rights
15  over any major action by Westport Development LLC or
16  any of its affiliates, did that impact on your decision
17  to keep your name off of the involuntary?
18      MR. FRANK: Objection.
19  A.  That's not even accurate because those -- I
20  didn't have approval rights.
21  Q.  And did the fact that you had some

634

Page 134

1  exclusive rights to negotiate with Westport Property
2  Development, Westport Property Holdings, did that
3  impact on your decision to keep your name off of the
4  involuntary petition?
5      MR. FRANK: Objection.
6  A.  Those exclusive rights had expired two
7  years before this time.
8  Q.  You say that Mr. Turner was objecting to
9  your filing this involuntary.
10     Did he do so in writing in any emails?
11 A.  I don't know.  I don't recall, but I don't
12 think so.
13 Q.  I show you what's been marked as Exhibit
14 26, Ruther 26.  Ruther 26 is an email from Mr. Frank to
15 Mr. Turner dated January 29, 2013.  "Neither Tom nor
16 Pat seem to have a list of creditors.  Can you send one
17 ASAP."
18     Do you see that?
19 A.  Yes.
20 Q.  Do you understand Pat to be Pat Rhodes?
21 A.  I'm sure.

Page 135

1  Q.  Mr. Frank is asking for the list of
2  creditors because he's getting ready to file the
3  bankruptcy, correct?
4      MR. FRANK: Objection.
5  A.  I don't know what he was doing.
6  Q.  Okay.  Can you think of any other reason,
7  on January 29, 2013, Mr. Frank might be asking for a
8  list of creditors of Inner Harbor West LLC?
9      MR. FRANK: Objection.
10 A.  No.
11 Q.  Okay.?
12     MR. RUTHER: Can we take five minutes?
13     MR. MCCORMACK: Sure.
14     (There was a recess taken at 2:31 and the
15 deposition resumed at 2:37 p.m.)
16     BY MR. MCCORMACK:
17 Q.  I hand you what's been marked as Ruther
18 Exhibit 27.
19 A.  Okay.
20 Q.  All right.  Bottom of the page we have
21 Debbie Allen from Westportwaterfront.com sending Pat

Page 136

1  Turner an Excel spreadsheet that say expenses,
2  January 2013.
3      Do you see that?
4  A.  Yes.
5  Q.  Then we have Mr. Turner forwarding that at
6  11:24 the same morning.  And then we have Mr. Frank
7  complaining:  "This is a little confusing.  Can you
8  send me a simple spreadsheet showing each creditor to
9  whom we owe money and the amount currently owed."
10     Who do you understand him to mean when he
11 says "we owe money?"
12 A.  I have no idea.
13 Q.  Really?  Do you think he and Pat have some
14 joint debts with somebody?
15 A.  They may have.
16 Q.  Okay.  You don't those are maybe the debts
17 of Inner Harbor West LLC?
18 A.  It could be.  I mean, again, I wasn't the
19 one that wrote the email.
20 Q.  No, but you were copied on it.
21 A.  I got'em.

Page 137

1  Q.  Did you see what it was Debbie Allen had
2  forwarded?
3  A.  I'm sure I did.
4  Q.  Were they joint debts of Kenny Frank and
5  Pat Turner?
6      MR. FRANK: Objection.
7  A.  No.  It's clearly the expenses for
8  Westport.
9  Q.  Okay.  There we go.
10     Now, do you think sending at least two,
11 maybe more, variations on the list was helpful to
12 preparing -- for finding creditors to file the
13 involuntary?
14     MR. FRANK: Objection.
15 A.  I have no idea.
16 Q.  Do you know who Jeff Sirody is?
17 A.  Yes.
18 Q.  Who is Jeff Sirody?
19 A.  He's a bankruptcy attorney.
20 Q.  And how do you know his name?
21 A.  He was a bankruptcy attorney for, I guess,

635

---

Page 138

1 Inner Harbor West I.
2 Q.   He was the bankruptcy attorney for Inner
3 Harbor West LLC and he filed the consent after the
4 involuntary was filed, correct?
5      MR. FRANK: Objection.
6 A.   I believe so.  I don't have the document.
7 Q.   And he represented Inner Harbor West LLC
8 all the way through its Chapter 11 until Judge Gordon
9 dismissed the case, correct?
10      MR. FRANK: Objection.
11 A.   I believe so.
12 Q.   Were you there the day that Judge Gordon
13 dismissed the case?
14 A.   No.
15 Q.   Have you ever read the transcript?
16 A.   Nope.
17 Q.   You should.
18      Do you know who hired or located Mr. Sirody
19 to represent Inner Harbor West LLC in connection with
20 the bankruptcy case?
21 A.   No.

---

Page 139

1 Q.   Would it surprise you if I told you it was
2 Kenneth Frank?
3 A.   It wouldn't either way.
4 Q.   I handed you what's been marked as Ruther
5 Exhibit 28.  It's an email exchange over -- from the
6 29th of January to the 31st of January 2013.  The first
7 email is from Mr. Frank to Mr. Sirody.  Subject:  Ad.
8 And there is a link to an advertisement on the A.J.
9 Billig Auctioneers website.
10      Were you aware of Mr. Frank sending
11 Mr. Sirody copies of the foreclosure advertisement for
12 the Inner Harbor West property on January 29th?
13 A.   I don't recall.
14 Q.   Okay.  Now, there's a response from
15 Mr. Sirody to Mr. Frank providing -- it says the
16 applicable bankruptcy code section is 303(b)(3)(a).
17      Do you see that?
18 A.   Yes.
19 Q.   I'm going to tell you section 303 of the
20 bankruptcy code deals with involuntary petitions.
21      Were you aware that Mr. Sirody, who would

---

Page 140

1 later be bankruptcy counsel for Inner Harbor West, was
2 providing Mr. Frank with references to the bankruptcy
3 code as early as January 31, 2013?
4 A.   I don't recall.
5 Q.   Okay.  Now, at the time that these
6 communications are going on, Mr. Frank is still
7 representing Mr. Turner for purposes, right?
8      MR. FRANK: Objection.
9 A.   Again, it's not my opinion that he was
10 representing Mr. Turner, so...
11 Q.   Okay.  What kind of activity would, in your
12 view, have amounted to representing Mr. Turner?
13 A.   Well --
14      MR. RUTHER: Objection.  Go ahead and
15 answer if you can.
16 A.   So, you know, again, I think it's a
17 situation where you have all of these parties involved.
18 But in a case where we were -- you know, where we were
19 suing the cowboys or dealing with the cowboys dispute,
20 you know, that's a case where I would have been
21 comfortable with him representing Pat individually or

---

Page 141

1 whatever.  But, you know, in a case where we were
2 trying to negotiate with a party, if he was there, he
3 could negotiate on -- you know, from a standpoint of
4 when everybody's interests were aligned or whatever.
5 But, you know, I never viewed Kennedy as Pat's lawyer
6 or Westport's lawyer or whatever.
7 Q.   If Kenny Frank was ghostwriting letters for
8 Pat Turner to the cowboys or the Vision Capital people,
9 would that be activity that you would consider to be
10 representing Pat Turner?
11      MR. RUTHER: Same objection.
12      MR. FRANK: I object as well.
13 A.   Yeah.  I mean, again, I don't know how --
14 legally what defines representing somebody and doesn't.
15 So --
16 Q.   Okay.
17 A.   -- you know, I don't know how to deal with
18 where you draw the line.
19 Q.   Okay.  But you knew, at the same time that
20 Mr. Frank was assembling a list of creditors, talking
21 to bankruptcy lawyers, he was performing legal services

636

Case 1:14-cv-00857-QFM Document 61-3   Filed 04/15/15   Page 37 of 95
Citigroup Global Markets, Inc. v.                                   Thomas Butler Fore - Vol. 1
Patrick Turner, et al                                                          February 17, 2015

Page 142

1  for Mr. Turner, correct?
2      MR. FRANK: Objection.
3  A.  Again, I don't know what that means in
4  terms of performing legal services or whether he
5  legally represented who.  He's always been my attorney.
6  Q.  Let me give you a clear example.  You knew
7  at the time that Mr. Frank was collecting the list of
8  creditors to identify the creditors of Inner Harbor
9  West and speaking with Mr. Sirody, a bankruptcy lawyer,
10  about possible involuntary bankruptcy cases and
11  exchanging -- receiving citations from Mr. Sirody to
12  the bankruptcy code provisions on involuntary petitions
13  Mr. Frank was ghostwriting letters for Mr. Turner to
14  Vision Capital and Warhorse Baltimore?
15      MR. FRANK: Objection.
16      MR. MCCORMACK: What's the basis for that
17  objection?
18      MR. FRANK: I'm allowed to object.  You're
19  assuming that evidence --
20      MR. MCCORMACK: I just want to make sure
21  it's not form.

Page 143

1      MR. FRANK: No.  It's relevance to begin
2  with, as I've objected many times before.  Second of
3  all, you're asking him to state a legal conclusion.
4  You're asking him to assume or asking him to tell you
5  whether or not that was providing legal services,
6  whether I was providing legal services to Mr. Turner.
7      MR. MCCORMACK: No.  I'll rephrase the
8  question.
9      MR. FRANK: Okay.
10      BY MR. MCCORMACK:
11  Q.  As of the time period when Mr. Frank was
12  asking Mr. Turner for a list of the creditors so he
13  could identify creditors for an involuntary petition --
14      MR. FRANK: Objection.
15  Q.  -- and at the time that Mr. Frank was
16  communicating with the bankruptcy lawyer, Mr. Sirody,
17  about, among other things, the foreclosure sale and
18  involuntary petitions, Mr. Frank was also writing
19  letters, ghostwriting letters for Mr. Turner to
20  Vision Capital and Warhorse Baltimore, correct?
21      MR. FRANK: And I object.  The basis for my

Page 144

1  objection is the fact that you are misstating facts
2  that are not in evidence.  You are conflating periods
3  of time that do not relate to one another and what
4  you've asked him is not an accurate statement of
5  anything that's in this record.
6      MR. MCCORMACK: Thank you.
7      BY MR. MCCORMACK:
8  Q.  You knew that, right?
9  A.  No, I did not.  I don't know what you are
10  saying he was ghostwriting.
11  Q.  Let's see if I can help.  Let me give you
12  Ruther Exhibit 30.
13  A.  Okay.
14  Q.  Exhibit Ruther Exhibit 30 is two-page
15  exhibit, first page an email from Kenneth Frank.
16      Do you see that?
17  A.  Yes.
18  Q.  What's the date?
19  A.  February 1st, 2013.
20  Q.  So that would have been -- well, that's the
21  day after we saw Mr. Sirody, the last of the exchange

Page 145

1  with Mr. Sirody in Exhibit 28 about the bankruptcy
2  code, correct?
3  A.  Yes.
4  Q.  Okay.  Now, who does Mr. Frank write to on
5  February 1st?
6  A.  It's to Pat Turner, cc'd to -- or to me and
7  to Pat Rhodes.
8  Q.  So to Pat Turner, you and to Patrick Rhodes
9  and it says:  "Attachment turner letter.docX.
10      Do you see that?
11  A.  Yes.
12  Q.  And Mr. Frank says "Please review,"
13  correct, in his email?
14      MR. FRANK: Objection.
15  A.  Yes.
16  Q.  And then attached to it as IHW0001257 is
17  the text of the attachment and that is a letter to be
18  signed by whom?
19      MR. FRANK: Objection.
20  A.  At the bottom of the letter it has a
21  signature line for Patrick Turner.

637

Citigroup Global Markets Realty Corp vs.    Document 61-3    Filed 04/15/15    Page 38 of 95    Thomas Butler Fore - Vol. 1
Case 1:14-cv-00587-JFM
Patrick Turner, et al                                                                                                              February 17, 2015

Page 146

1  Q.   Okay.  And who is -- the letter that
2  Mr. Frank has drafted and sent to you and Mr. Turner to
3  review, who is it addressed to?
4  A.   Doug Towler, Ed Balley, Victor Schwarz,
5  Vision Capital, Rick Burton, Dale Dowers and Mike
6  Borden and Warhorse Baltimore Real Estate and Warhorse
7  Acquisitions.
8  Q.   Okay.  So at the time -- well, first of
9  all, you did know about this because you got the email,
10  right?
11  A.   Yeah, I just don't remember it.
12  Q.   Right.  You just had forgotten.  But now
13  seeing this now you know that -- you are aware that at
14  the time that Mr. Frank was asking Mr. Turner for a
15  list of creditors for the involuntary --
16       MR. FRANK: Objection.
17  Q.   -- he was still ghostwriting letters for
18  Mr. Turner to send to Vision Capital and Warhorse
19  Baltimore, right?
20       MR. FRANK: Objection.
21  A.   I mean, it appears that way.

Page 147

1  Q.   And the day after Mr. Sirody, the
2  bankruptcy lawyer, was communicating with Mr. Frank and
3  sharing with Mr. Frank the bankruptcy code reference
4  for involuntary petitions, Mr. Frank was ghostwriting
5  letters for Mr. Turner to Vision Capital and Warhorse
6  Baltimore, right?
7       MR. FRANK: Objection.
8  A.   Again, it appears that way.
9  Q.   Okay.  I hand you what's been marked as
10  Luther Exhibit 31.
11  A.   Okay.
12  Q.   All right.  So Ruther Exhibit 31, top of
13  the page on IHW0001259, we have another email from
14  Kenneth Frank, this time just to you and Pat Turner,
15  correct?
16  A.   Yes.
17       MR. FRANK: Objection.
18  Q.   He's dropped Patrick Rhodes off, correct?
19  A.   Yes.
20  Q.   The date, though, is still February 1,
21  2013, correct?

Page 148

1  A.   Yes.
2  Q.   Now, this one is dated at 6:36 and 21
3  seconds p.m., correct?
4  A.   Correct.
5  Q.   And that's about five and a half hours
6  after Ruther Exhibit 30, correct?
7       MR. FRANK: Objection.
8  A.   Yes.
9  Q.   And Mr. Turner says:  "See attached
10  revision to the letter.  I've made substantial
11  changes."
12       Correct?
13  A.   Okay.
14  Q.   And then he says:  "Perhaps we should meet
15  tomorrow morning to collect our thoughts and finalize
16  the strategy for the next couple of days."
17       Correct?
18  A.   Yes.
19  Q.   All right.  If you turn -- starting at the
20  third page of Luther Exhibit 31, which is page 1261, we
21  now have an expanded letter to the same persons at

Page 149

1  Vision Capital Partners, Warhorse Baltimore Real Estate
2  LLC and Warhorse Acquisitions LLC, correct?
3  A.   Yes.
4  Q.   And it's still to be signed by Patrick
5  Turner?
6  A.   Yes.
7  Q.   But it's just a longer letter?
8  A.   Yes.
9       MR. FRANK: Objection.
10  Q.   Now, did you meet with Mr. Turner and
11  Mr. Frank the next day on February 2nd, 2013?
12  A.   I don't recall.
13  Q.   Do you recall any meeting during that first
14  week of February to collect your thoughts with
15  Mr. Frank, Mr. Turner and finalize the strategy for the
16  next couple of days?
17       MR. RUTHER: Excuse me.  Who is Mr. Frey or
18  did I mishear?
19       MR. MCCORMACK: Mr. Frank.
20       MR. RUTHER: Oh, Frank?  Apologies.
21       MR. MCCORMACK: Kenneth B. Frank.

638

Citigroup Global Markets v.    Thomas Butler Fore - Vol. 1
Patrick Turner, et al    February 17, 2015

Page 150

1    MR. RUTHER: I thought you said Frey.
2    MR. MCCORMACK: No.
3    THE WITNESS: I don't recall.
4    MR. MCCORMACK: The sponsor of our party.
5    MR. RUTHER: Yes.
6    BY MR. MCCORMACK:
7  Q.  You don't recall the meeting?
8  A.  No.
9  Q.  Okay.  When you met with these gentlemen,
10  did you routinely keep notes?
11  A.  No.
12  Q.  Okay.  Have you ever been admonished by
13  Mr. Frank in the course of this entire Westport
14  Development discussions not to write things down?
15  A.  No.
16  Q.  Were you communicating ever by text message
17  with Mr. Turner?
18  A.  Sure, occasionally.
19  Q.  With Mr. Frank?
20  A.  Occasionally.
21  Q.  Did you make any effort to search your text

Page 151

1  messages for responsive messages?
2  A.  No.  My -- I lost my phones.  I broke one
3  and the other one in the last -- I've replaced my
4  phones in the last couple of years.
5  Q.  Who is your carrier?
6  A.  AT&T.
7  Q.  How long has AT&T been your carrier?
8  A.  I don't know, five years.
9  Q.  So during the period of time that we're
10  discussing here, you probably had an account with AT&T?
11  A.  Perhaps, yes.
12  Q.  This has been marked as Ruther 33.
13    Have you ever seen Ruther Exhibit 33
14  before?
15  A.  I don't know.
16  Q.  Okay.  Were you aware of the fact that on
17  February 7th, 2013 Mr. Frank sent an email to
18  Mark Friedman at DLA Piper and to attorney Mark Fields
19  stating that he represented you generally and "at least
20  for the time being, I represent Pat Turner, Westport
21  Development LLC and Westport Partners LLC?"

Page 152

1    MR. FRANK: Would you finish reading the
2  sentence, please?
3    MR. MCCORMACK: No.  You can read it when
4  you get a chance to examine him if you want to.
5    MR. FRANK: I object to the question.
6    BY MR. MCCORMACK:
7  Q.  Were you aware of making that
8  representation?
9    MR. FRANK: Object to the question.  That's
10  an improper question.
11  A.  I don't recall.
12  Q.  Okay.
13    MR. FRANK: That's an improper question,
14  Mr. McCormack.
15  Q.  I show you what's been marked as Ruther
16  Exhibit 29.
17    Do you know who Cara Frye is?
18  A.  Yes.
19  Q.  Who is Cara Frye?
20  A.  She was a consultant/project manager for
21  Westport for a time.

Page 153

1  Q.  She's also an attorney; is that correct?
2  A.  Yeah, I believe I just learned that.
3  Q.  Okay.  Who was she project
4  manager/consultant for?
5  A.  I believe she was assisting with Westport,
6  helping Pat.
7  Q.  Okay.  And helping you?
8  A.  No.  She didn't work for me.
9  Q.  Were you involved at the time she was
10  helping Pat?
11  A.  I think for a short time that I was there.
12  I mean, I don't remember when she quit, but I remember
13  her being there for maybe the first six to twelve
14  months that I was trying to help.
15  Q.  Okay.  Have you ever heard the name
16  Marc Ominsky?
17  A.  Yes.
18  Q.  Who is Marc Ominsky?
19  A.  He's the attorney for the Chapter 7
20  bankruptcy creditors.
21  Q.  He filed the involuntary, correct?

639

Page 154

1   A.  Correct.

2   Q.  Now, were you aware that the attorney for

3 Inner Harbor West LLC recommended Mr. Ominsky to

4 Mr. Frank?

5     MR. FRANK: Objection.

6   A.  No.

7   Q.  I show you what's been marked as Luther

8 Exhibit 32.  Now, if you look in the lower right-hand

9 corner you're going to see Ruther 32 has a notation,

10 Sirody 000090.

11     Do you see that?

12   A.  Yes.

13   Q.  That's just an indication that was put

14 there by Jeffrey M. Sirody & Associates when they made

15 their production in response to a subpoena.

16     MR. FRANK: Objection.  Are you testifying

17 or are you asking questions?

18     MR. MCCORMACK: I'm explaining to him where

19 that came from so he would understand.

20     MR. FRANK: Do you have knowledge of who

21 put that Bates stamp on there?

Page 155

1     MR. MCCORMACK: Yeah.

2     MR. FRANK: You do?

3     MR. MCCORMACK: Yeah.  It came that way.

4 It came stamped.

5     MR. FRANK: Do you know who put the Bates

6 stamp on it?

7     MR. MCCORMACK: Yeah, Jeffrey M. Sirody &

8 Associates.

9     MR. FRANK: You know that?  You have

10 personal knowledge of that?

11     MR. MCCORMACK: I have personal knowledge

12 of that, yeah.

13     MR. FRANK: Okay, good.

14     MR. MCCORMACK: And I know that Mr. -- we

15 put the IHW, but Mr. Ruther gave us, I don't know,

16 about 8,000 pages and we know yours have got all

17 different types and some of yours came un-Bates stamped

18 at all and we numbered those.

19     And we know the Mr. Fore's one document

20 came marked for claim with numbers by you and we know

21 DLA Piper's came with DLA because they came in the mail

Page 156

1 and they said here's are our documents marked DLA.

2     BY MR. MCCORMACK:

3   Q.  Were you -- so you say you weren't aware of

4 Jeff Sirody providing Kenny Frank with Mark Ominsky's

5 telephone number on February 7, 2013?

6     MR. FRANK: Objection.

7   A.  I don't recall.

8   Q.  Do you have any knowledge as to who

9 communicated with Cara Frank to ask her to join in the

10 involuntary bankruptcy case?

11     MR. FRANK: I think you mean Cara Frye.

12   Q.  Cara Frye.  I'm sorry.

13   A.  I believe it was Kenny.

14   Q.  Okay.  What leads to you believe it was

15 Kenny?

16   A.  That's what I believe.  I don't really

17 remember.

18   Q.  I hand you what's been marked as Ruther

19 Exhibit 34.

20   A.  Okay.

21   Q.  Now, Exhibit 34, you see down in the lower

Page 157

1 right-hand corner it says KBF-Frye-000001.

2     Do you see that?

3   A.  Yes.

4   Q.  That's stands for Kenneth B. Frank and then

5 Frye because he grouped them by who he was

6 communicating with.  So we got this from Mr. Frank and

7 it's an email exchange on February 8th, 2013 and it

8 begins with Mr. Frank to Ms. Frye.  "Cara, see

9 attached.  Can you sign and send back?"

10     Do you see that?

11   A.  Yes.

12   Q.  And then Ms. Frye writes back and asks

13 Mr. Frank: "Kenny, can you please complete the

14 relevant sections of the affidavit.  Also, why is the

15 creditor agreement unsigned?  Cara."

16     Do you see that?

17   A.  Yes.

18   Q.  Who does Ms. Frye copy on her message to

19 Mr. Frank as she's writing him back about the affidavit

20 that's going to go to the attorney who files the

21 involuntary?

640

Page 158

1    MR. FRANK: Objection.
2  A.  It looks like Pat Turner.
3  Q.  But you're not copied?
4  A.  No.
5  Q.  No, just Pat.
6    Do you know how Mr. Frank settled on
7  Ms. Frye and Dixie Construction to be the two
8  petitioning creditors?
9  A.  No.
10 Q.  Did you authorize Mr. Frank to provide
11 inducements to any of the creditors to join in the
12 involuntary?
13   MR. FRANK: Objection.  Don't say anything
14 that you communicated with me.
15   THE WITNESS: Okay.
16 Q.  Do you know if Mr. Frank was authorized to
17 provide inducements to creditors to get them to join in
18 the involuntary?
19   MR. FRANK: Objection.
20 A.  I -- I believe that -- I'm not really clear
21 on what you mean by "inducements."

Page 159

1  Q.  Okay.  Are you aware of the fact that
2  Mr. Frank promised Dixie Construction that if it joined
3  in the involuntary and you went forward with the
4  development, Dixie Construction would be engaged to do
5  the excavating work so long as its prices were
6  competitive?
7    MR. FRANK: Objection.
8  A.  I don't recall.
9  Q.  You don't recall what, whether you knew
10 that?
11 A.  Whether I knew that.
12 Q.  You haven't ever heard that until just now?
13 A.  I don't recall.  I mean, I heard about it,
14 you know, maybe within the last month or so, I guess,
15 but --
16 Q.  Okay.  So that was the first time you heard
17 about it.
18   MR. FRANK: Objection.
19 A.  I may have heard about it before then.  I
20 just don't remember.
21 Q.  Were you -- do you recall being in any

Page 160

1  discussions in which it was proposed that creditors be
2  offered inducements?
3    MR. FRANK: Objection.
4  A.  No.
5  Q.  Is it possible that Mr. Turner authorized
6  Mr. Frank to give those kind of inducements without
7  your knowledge?
8    MR. FRANK: Objection.
9  A.  Is it possible?
10 Q.  Yeah.
11 A.  I suppose anything is possible, but I
12 wouldn't -- I don't know -- I have no way of knowing
13 that.
14 Q.  Okay.  Is it possible that, without any
15 authority at all, Mr. Frank undertook to offer
16 inducements to creditors without consulting with you
17 and Mr. Turner?
18   MR. FRANK: Objection.
19   MR. RUTHER: Same objection.
20 A.  I mean, I suspect that I would have -- that
21 he would have said something to me, but I don't recall.

Page 161

1  Q.  When were you asked to pay for the attorney
2  for the creditors that were going to file the petition?
3    MR. FRANK: Objection.
4  A.  I don't remember.
5  Q.  Did you ever tell anyone that you would
6  hold petitioning creditors harmless from any claim
7  they'd acted improperly in filing the involuntary
8  bankruptcy case?
9  A.  Can you repeat that?
10 Q.  Did you ever tell anyone that you would
11 hold petitioning creditors harmless from any claim for
12 damages if it was alleged they'd acted improperly in
13 filing the involuntary?
14 A.  I don't recall.
15 Q.  You don't recall doing it --
16 A.  No.
17 Q.  -- or you don't recall one way or the
18 other?
19 A.  I don't remember.
20 Q.  Let me show you what has been marked as
21 Exhibit 35.

641

Citigroup Global Markets, et al v.                                Thomas Butler Fore - Vol. 1
Patrick Turner, et al                                                    February 17, 2015

---

Page 162

1    When was the first time that you saw what's
2  been marked as Ruther Exhibit 35?
3  A.  I don't really remember.
4  Q.  Was it -- did you see it back in
5  February 8th when Mr. Schulman wrote to Mr. Frank?
6  A.  I don't recall.
7  Q.  Was it sometime in 2014?
8  A.  I honestly don't remember.  I don't
9  remember this document.
10  Q.  Okay.  I'm going to show you Exhibit --
11  Ruther Exhibit 38, one of Mr. Frank's responses.
12    And same question:  Do you remember ever
13  seeing this?
14  A.  This is the same email.  I don't recall.
15  Q.  So the involuntary was filed just by
16  Cara Frye and Dixie Construction and not by you or any
17  of your companies, correct?
18    MR. FRANK: Objection.
19  A.  Correct.
20  Q.  And as of February 8th, was Mr. Turner in
21  agreement that this was the only way to stop the

Page 163

1  foreclosure sale?
2  A.  I don't recall.
3    MR. FRANK: Objection.
4  Q.  I'm going to show you what's been marked as
5  Ruther Exhibit 41.
6    Do you recall what the advertisement was on
7  the A.J. Billig website that was sent on February 11th
8  to you, Mr. Turner and Mr. Rhodes?
9  A.  No.
10  Q.  Being sent by Mr. Frank.  Is he back now
11  representing all three of you --
12    MR. FRANK: Objection.
13  Q.  -- or both of you, rather, you and
14  Mr. Turner?
15  A.  I have no idea.
16  Q.  Okay.  Did you ever have any conversations
17  with Marc Ominsky?
18  A.  I don't recall.
19  Q.  Did you ever have any meetings with
20  Mr. Ominsky?
21  A.  No.

Page 164

1  Q.  Did you pay the bill of Cara Frye and
2  Dixie Construction for the involuntary?
3  A.  Did I pay Cara Frye's bill?
4  Q.  Yes, the bill to Marc Ominsky.
5  A.  I'm confused by the question.
6  Q.  Okay.  Let me break it down.  I show you
7  Ruther Exhibit 39.
8    All right.  Ruther 39 is the involuntary
9  petition, correct?
10    MR. FRANK: Objection.
11  A.  It's a -- it's a form, yes.
12  Q.  All right.  It says, upper right-hand
13  corner:  "Involuntary petition."
14  A.  Okay, yes.
15  Q.  If you turn the page, do you see the box
16  near the top of the page says "Request for relief"?
17  A.  Yes.
18  Q.  And on the left-hand side for name of
19  petitioner, Cara Frye Associates LLC.
20    Do you see that?
21  A.  Yes.

Page 165

1  Q.  And directly to the right is the name of an
2  attorney.
3    Do you see that?
4  A.  Yes.
5  Q.  Attorney is Marc A. Ominsky, correct?
6  A.  Yes.
7  Q.  And then the next box is -- the next thing
8  on the left-hand side, name of petitioner,
9  Dixie Construction and immediately to the right of
10  that, name of attorney, Marc A. Ominsky, correct?
11  A.  Yes.
12  Q.  Did you pay the attorney's fees to
13  Mr. Ominsky for the services he performed to Cara Frye
14  Associates LLC and Dixie Construction?
15  A.  I believe so.
16  Q.  And why did you pay the attorney's fees of
17  other parties to file the involuntary?
18  A.  Because, again, as a creditor, I thought I
19  had the right to do that.
20  Q.  To pay somebody else's attorneys fees for
21  their lawyer?

642

Appeal: 15-1671    Doc: 25-2    Filed: 09/28/2015    Pg: 191 of 248

Citigroup Global Markets, QFM v.    Document 61-3    Filed 04/15/15    Page 43 of 95    Thomas Butler Fore - Vol. 1
Patrick Turner, et al                                                                              February 17, 2015

Page 166

1  A.  Yes.
2  Q.  I understand you have a right to pay
3  somebody else's attorney's fees, but why did you choose
4  to pay someone else's attorney's fees?
5  A.  Because I wanted to get the involuntary
6  filed.
7      MR. MCCORMACK: Okay.  Let's take five
8  minutes.
9      (There was a recess taken at 3:17 and the
10  deposition resumed at 3:35 p.m.)
11      MR. MCCORMACK: Can we mark this as the
12  next exhibit?
13      (Fore Exhibit 4 was marked for purposes of
14  identification.)
15      THE REPORTER: Exhibit 4.
16      BY MR. MCCORMACK:
17  Q.  I'm showing you what's been marked as
18  Exhibit 4 to your deposition.  It is a check in the
19  amount of $7,500 to Schiller, Ominsky, Sullivan --
20  Soland (phonetic) maybe?  I can't read your
21  handwriting.

Page 167

1      Can you read your handwriting?
2  A.  Are you asking me?
3  Q.  Yeah.
4  A.  That's not my handwriting.
5  Q.  All right.  Do you know whose handwriting
6  it is?
7  A.  Potentially my CFO.
8  Q.  Can you read your CFO's handwriting?
9  A.  I can try.  It says Schiller, Ominsky,
10  Soland, PC is what it looks like.
11  Q.  All right.  And this is the check in
12  payment of Mr. Ominsky's fees for filing a Chapter 7
13  bankruptcy for people other than your company, correct?
14      MR. FRANK: Objection.
15  A.  I presume.
16  Q.  Okay.  Any other circumstances you can
17  remember in your business career where you've paid
18  somebody else's legal fees to file a suit that you
19  weren't a party to?
20  A.  Yes.
21  Q.  Okay.  Tell me other cases when you've done

Page 168

1  that.
2  A.  I had a partner in a project that I had who
3  was getting sued by another company and I paid his
4  legal bills to defend him in that case.  I've done it
5  for other people as well.
6  Q.  All right.
7      Have you ever paid to have somebody file a
8  suit and be a plaintiff and sue somebody when you
9  weren't going to be a party to the lawsuit?
10      MR. FRANK: Objection.
11  A.  I don't recall.
12  Q.  Okay.  Who told you how much you had to pay
13  Mr. Ominsky?
14  A.  I don't recall.
15  Q.  Did you get a bill from Mr. Ominsky?
16  A.  I don't recall.
17  Q.  Have you ever spoken with Cara Frye about
18  the involuntary bankruptcy?
19  A.  I don't remember.
20  Q.  Have you ever spoken with
21  Dixie Construction Company about the bankruptcy?

Page 169

1  A.  I don't recall.
2  Q.  Did you attend the meeting of creditors
3  held under the bankruptcy code?
4  A.  No, I didn't attend any of those.
5  Q.  Why not?
6  A.  I was really busy with a lot of other
7  stuff, so...
8  Q.  When was the first time that you spoke with
9  Pat Turner after the involuntary bankruptcy was filed?
10  A.  I don't remember.
11  Q.  Did you talk to him on February 8th?
12  A.  I don't remember.
13  Q.  Do you know if it was the week of the
14  bankruptcy?
15  A.  I have no idea.
16  Q.  Was it soon after the bankruptcy?
17  A.  I don't remember.  I honestly don't.
18  Q.  I show you what's been marked as Ruther
19  Exhibit 42.
20      Now, were you aware that beginning as early
21  as the Monday after the Friday bankruptcy filing
                                                    643

Citigroup Global Markets, v. Document 61-3   Filed 04/15/15   Page 42 of 95  Thomas Butler Fore - Vol. 1
Patrick Turner, et al
February 17, 2015

Page 170

1  Mr. Frank was again communicating with Mr. Turner and
2  handling Mr. Turner's affairs?
3      MR. FRANK: Objection.
4  A.  I don't remember.
5  Q.  This is an email exchange between
6  Mr. Sirody, who would become the Chapter 11 bankruptcy
7  attorney for Inner Harbor West and Mr. Frank, dated
8  February 12th, 2013.
9      Do you see the message at the top of the
10  page from Mr. Sirody?
11      MR. FRANK: Objection.
12  A.  Yes.
13  Q.  And what does Mr. Sirody say to Mr. Frank?
14  A.  In the subject?
15  Q.  No, in the text after Kenny.
16  A.  "Kenny, please have Pat sign the retainer
17  agreement, drop off the check or call me for wiring
18  instructions.  Thanks, Jeff."
19  Q.  Do you understand Pat in that context to be
20  Patrick Turner?
21      MR. FRANK: Objection.

Page 171

1  A.  I don't know.
2  Q.  Do you find it strange that the attorney
3  who organized the involuntary is now the conduit for
4  the retainer agreement for the attorney that's going to
5  represent the alleged debtor?
6      MR. FRANK: Objection.
7  A.  I don't know what I find it.
8  Q.  Okay.  I'm going to show you what's been
9  marked as Ruther 43.  All right.
10      Now, Ruther Exhibit 43, first page we have
11  email exchange first from Jerry Auchincloss to
12  Mr. Frank.  "Good morning, Mr. Frank.  At the request
13  of Jeff Sirody, I have attached Sirody, Frieman &
14  Associates retainer agreement for your review and
15  signature.  Please contact Jeff directly if you have
16  any questions."
17      Do you see that?
18  A.  Yes.
19  Q.  And then right above that, what does
20  Mr. Frank do with the retainer agreement?
21  A.  It appears that it was forwarded tow Pat

Page 172

1  Turner.
2  Q.  Okay.  Now, you're not copied on that?
3  A.  No.
4  Q.  So Mr. Frank is communicating just with
5  Mr. Turner and he's forwarding Mr. Sirody's retention
6  agreement, correct?
7  A.  That's what it appears.
8  Q.  Okay.  And then if we look at the second,
9  third and fourth pages of Ruther Exhibit 43, what do we
10  find?
11      MR. FRANK: Objection.
12  A.  It appears like a retainer agreement.
13  Q.  And do you see the third paragraph of the
14  retainer agreement?
15  A.  Third paragraph.
16  Q.  The agreed minimum fee.
17  A.  Yes.
18  Q.  Its says:  "The agreed minimum fee for this
19  representation subject to court approval is $20,000.
20  This shall confirm that, to date, $20,000 has been
21  paid."

Page 173

1      Do you know who paid the $20,000 retainer
2  to Sirody, Frieman & Associates?
3      MR. FRANK: Objection.  This is not signed.
4  So it doesn't speak as to any date.
5  A.  I don't know.
6  Q.  Did you pay the $20,000?
7  A.  I probably did.
8  Q.  Did you pay any other monies to Sirody
9  after the initial $20,000?
10  A.  I'm sure we paid some money to him.
11  Q.  And, in fact, you and your companies were
12  the only source of monies for this development during
13  this entire period of time, correct?
14      MR. FRANK: Objection.
15  A.  I don't know the answer to that.  I know we
16  were a source.
17  Q.  Did Inner Harbor West LLC have any ongoing
18  business operations?
19  A.  I have idea.
20  Q.  Did you know of it owning anything other
21  than vacant parcels of property in Westport?

644

---

Page 174

1  A.  I have no way of knowing where -- you know,
2  where Pat or anybody else was getting money from.
3  Q.  Okay.
4  A.  All I know when I was asked to provide
5  money or had to provide money.
6  Q.  Is it your understanding that some of that
7  $2.1 million you put in went to pay attorneys?
8  A.  I believe so.
9  Q.  Were you aware of the fact that Kenneth
10  Frank was advising Patrick Turner on media relations
11  after the bankruptcy was filed?
12  A.  I don't recall.  Kenny is very talented,
13  though.
14  Q.  That he is.  Let's see if we can help.
15  Ruther 44.
16  A.  Okay.
17  Q.  All right.  Ruther Exhibit 44, another
18  document produced by Inner Harbor West, email exchange.
19  Beginning at the bottom of the first page we have an
20  email from Steve Kilar, K-I-L-A-R.  It says
21  @BaltSun.com.

Page 175

1      Does it to look to you, as it does to me,
2  like Steve Kilar is a reporter?
3      MR. FRANK: Objection.
4  A.  I can only assume that.  I don't know.
5  Q.  You're not a recipient of that email from
6  Mr. Kilar, are you?
7  A.  No.
8  Q.  Just to Patrick Turner?
9  A.  Yes.
10  Q.  What does Pat Turner do with it in the
11  middle of the page?
12  A.  It looks like he forwarded it to Kenny and
13  me and Pat Rhodes and Jeanine.
14  Q.  Jeanine being his wife?
15  A.  I presume.
16  Q.  And Mr. Frank then responds to Pat Turner,
17  you, Mr. Rhodes and Jeanine, correct?
18  A.  Yes.
19  Q.  And what does Mr. Frank say in the first
20  sentence?
21      MR. FRANK: Objection.

Page 176

1  A.  "I spoke with him briefly this evening
2  mostly off the record. (I assume he's trustworthy.)  He
3  said he'd do a quote check with me before he
4  published."
5  Q.  Did you understand or do you understand now
6  from this that Mr. Frank was speaking to the reporter
7  at the Baltimore Sun about the Westport project?
8      MR. FRANK: Objection.
9  A.  It seems to say that.
10  Q.  Were you okay, as of February 27th of 2013,
11  with Mr. Frank speaking off the record to the media?
12  A.  It's not for me to control what Kenny does
13  or doesn't do or anybody else.
14  Q.  Is that more of a Pat issue because it's
15  Pat's project?
16      MR. FRANK: Objection.
17  A.  I mean, I guess it depends on, you know,
18  what the -- what it was relative to.  I don't know what
19  the question was.  It could have been a question about
20  me.
21  Q.  I'm going to show you what's been marked as

Page 177

1  Ruther Exhibit 45.
2  A.  Okay.
3  Q.  All right.  Ruther Exhibit 45 is another
4  email exchange produced by Inner Harbor West.
5      At the bottom of the page, do you see we
6  have an email from Pat Turner to Kenneth Frank, subject
7  Sunpaper comment.
8      Do you see that?
9  A.  Yes.
10  Q.  Then the text says:  "What do you think?"
11  And it's followed by Mr. Turner's proposed email to
12  someone named Steve.
13  A.  Yes.
14  Q.  And you're not copied on Mr. Turner's email
15  to Mr. Frank?
16  A.  Apparently not.
17  Q.  So this is just an issue between
18  Mr. Turner, Mr. Frank where Mr. Turner asks Mr. Frank
19  what does he think about Mr. Turner's proposed comment?
20  A.  Okay.  Yes.
21  Q.  Okay.  And then Mr. Frank responds to

645

Page 178

1  Mr. Turner with some changes, correct?
2     MR. FRANK: Objection.
3  A.  It appears so.
4  Q.  I mean, it's -- you know, I guess maybe
5  that objection is well founded.
6     With a significant rewrite of the proposed
7  statement to go from Patrick Turner to the Sunpapers,
8  correct?
9     MR. FRANK: Objection.
10 A.  I mean, again, it appears to be a rewrite.
11 Q.  Okay.  And again, you're not copied?
12 A.  No.
13 Q.  So this is just between Mr. Frank and
14 Mr. Turner where Mr. Frank is giving Mr. Turner his
15 advice on media relations, correct?
16 A.  I mean, I don't know what the intent was,
17 but it appears so.
18 Q.  Now, what was happening in February and
19 March 2013 with regard to the cowboys?
20    MR. FRANK: With regard to what?
21    MR. MCCORMACK: The cowboys.  The Warhorse

Page 179

1  Baltimore people.
2  A.  I honestly don't remember.
3  Q.  Let's see if this will refresh your
4  recollection.  I hand you what's marked as Ruther 47.
5  A.  Okay.
6  Q.  All right.  Ruther 47 is another email
7  exchange.  First is an email from Mark Fields addressed
8  to Matt Oakey at Gallagher Evelius & Jones to
9  Mr. Frank, someone at KG law.  And it says:  I'm
10 sending this email to the three of you in your
11 capacities as counsel for Citi, Westport/Turner/Fore
12 and Vision Capital and its principals.  I represent
13 Dale Dowers, Rick Burton and Michael Borden, three
14 members of Warhorse Acquisitions which is the parent
15 LLC of Warhorse Baltimore."
16    Mr. Frank responds:  "FYI, playing out as
17 hoped, we will tell them to fuck themselves."
18    Do you know what he means by that?
19 A.  Well, I don't know that --
20    MR. FRANK: Which word don't you
21 understand?

Page 180

1  A.  I don't know that you can actually if you
2  can yourself, but -- yeah, I don't know.  I mean, I
3  think, at the time, that's when we were very frustrated
4  with negotiations with these guys.
5  Q.  All right.
6  A.  So that is probably well expressed in his
7  little sentences there.
8  Q.  All right.  So now, of the attorneys, Oakey
9  represented Citi, correct?
10    MR. FRANK: Objection.
11 A.  I believe so.
12 Q.  And the attorney -- I don't know the first
13 name, but Gollogly represented Vision, correct?
14 A.  I don't know.
15 Q.  Is it your understanding that, when
16 Mr. Fields says he's writing to counsel for
17 Westport/Turner/Fore, he means Mr. Frank?
18    MR. FRANK: Objection.
19 A.  Again, this was one of those cases where we
20 had Kenny quarterbacking this discussion.  I mean, Pat
21 didn't really have money for an attorney and this is

Page 181

1  the litigation which is something that Kenny is really
2  good at.
3  Q.  Okay.  I show you what's been marked as
4  Ruther Exhibit 50.  Ruther Exhibit 50 is letter from
5  Jeffrey M. Sirody & Associates PA to Inner Harbor West
6  LLC, attention Patrick Turner and Kenneth Frank and
7  it's dated February 4th, 2014.
8     Have you seen this before?
9  A.  I don't remember.
10 Q.  Were you aware of Jeffrey M. Sirody &
11 Associates complaining in February of 2014 that they
12 were -- that their May bill was over $40,000 and they
13 billed additional time since then?
14 A.  Yes.
15 Q.  Were you aware that they were threatening
16 to withdraw?
17 A.  Yes.
18 Q.  Now, the bankruptcy court record doesn't
19 show them ever withdrawing.
20    Were they paid additional money?
21 A.  I'm sure they were.

646

Appeal: 15-1671    Doc: 25-2    Filed: 09/28/2015    Pg: 195 of 248

Citigroup Global Markets Realty Corp. vs    Case 1:14-cv-03587-QFM    Document 61-3    Filed 04/15/15    Page 47 of 95    Thomas Butler Fore - Vol. 1
Patrick Turner, et al                                                                                                    February 17, 2015

Page 182

1    Q.   Who paid them that additional money?

2    A.   I'm sure I did.

3    Q.   Now, the bankruptcy record docket also does

4    not show them ever having applied for or obtained an

5    order authorizing them to take money from Inner Harbor

6    West.

7         Did anybody ever tell you that Jeffrey M.

8    Sirody & Associates were not entitled to be paid until

9    they applied to the Bankruptcy Court and got an order

10   authorizing them to be paid?

11        MR. FRANK: Objection.

12   A.   No.

13   Q.   Would you have liked to know before you had

14   written them all these checks?

15        MR. FRANK: Objection.

16   A.   I mean, I think any time you have more

17   information, you know, at the beginning than the end,

18   that's better.

19   Q.   Okay.

20        THE WITNESS: That's why I shaved mine off.

21   I had a goatee for 15 years and I had to get rid of it.

Page 183

1    It always itched.

2         THE REPORTER: I'm sorry, I didn't know I

3    was digging so much.

4    Q.   Did there come a time when you and

5    Mr. Frank had a disagreement over Mr. Frank's fee?

6         MR. RUTHER: Which time?

7    A.   I mean, I think Kenny and I have know each

8    other for a long time.  We're both spirited people.  So

9    I think there's lot of times where we've had

10   disagreements.

11   Q.   I show you what's been marked as Ruther

12   Exhibit 54.

13   A.   Okay.

14   Q.   All right.  Exhibit -- Ruther Exhibit 54

15   dated October 23rd, 2014, is that one of the times you

16   were having a disagreement with Mr. Frank?

17   A.   Yes.  Mr. Turner or Mr. Frank?

18   Q.   Mr. Frank.

19   A.   Yeah, this looks like a very mild one, but

20   yes.

21   Q.   Now, does this refresh your recollection

Page 184

1    that Mr. Frank was looking for equity in the project?

2         MR. FRANK: Objection.

3    A.   This was -- so it was something that we --

4    given the fact that we had an uncertain litigation and

5    we were trying come up with creative ways to mitigate

6    the cost, it was something that was tossed out, but I

7    don't even remember.  I may have been the one that

8    suggested it as a solution if we were able to get

9    there.

10   Q.   Now, at the time that Mr. -- well,

11   Mr. Frank here is saying he wants $10,000 per month at

12   a minimum.

13        Did you agree to pay him $10,000 a month?

14        MR. FRANK: Objection.

15   Q.   You may answer.

16   A.   We absolutely settled on our situation.  So

17   that $10,000 a month was fine.

18   Q.   Okay.  So you did agree to do that?

19   A.   Yes.

20   Q.   He talks about a -- he said there's some

21   talk about a success fee in the amount of approximately

Page 185

1    $125,000.

2         What was going to be the measure of

3    success?

4    A.   Well, one part of it would have been the

5    litigation against the cowboys.  The other part would

6    have been potentially closing the Westport transaction.

7    Q.   Okay.  Has he earned that success for you

8    yet?

9    A.   We did not agree on that, I'm sure.  But,

10   you know, we obviously have not succeeded in closing

11   the Westport transaction because I saw you at the

12   auction.

13   Q.   At the time that this email was written on

14   October 23rd, was Mr. Frank refusing to file papers or

15   deliver a draft of papers to Mr. Sirody to file in the

16   bankruptcy court?

17        MR. FRANK: Objection.

18   A.   No, I don't recall any discussion about

19   anything related to the bankruptcy in that.

20   Q.   As of October 23rd, 27th, were you

21   considering replacing counsel -- replacing Mr. Frank?

647

Case 1:14-cv-00587-JFM Document 61-3   Filed 04/15/15   Page 48 of 95
Citigroup Global Markets, Inc. vs.                                    Thomas Butler Fore - Vol. 1
Patrick Turner, et al                                                 February 17, 2015

Page 186

1   A.   This is October of this year?
2   Q.   October of 2014.
3   A.   '14.
4   Q.   Yeah.
5   A.   I believe so.
6   Q.   Okay.  Had you spoken with other counsel?
7   A.   I did, yes.
8   Q.   But, ultimately, took Mr. Ruther's advice
9   that you didn't have time and you came to terms with
10  Mr. Frank?
11      MR. FRANK: Objection.
12  A.   Again, you know, this is a longstanding
13  relationship.  So sometimes when your blood boils -- I
14  think I quit smoking that week.  But, yes, we resolved
15  it.
16  Q.   Okay.  So it was your craving for nicotine
17  that made you say Kenny is out of control?
18  A.   Yeah, it was a fairly good battle.
19  Q.   Now, did Mr. Frank draft the papers seeking
20  to disqualify Ballard Spahr from representing Westport
21  Property Investments LLC?

Page 187

1      MR. FRANK: Objection.
2   A.   I don't recall.
3   Q.   Do you believe you have any claims against
4   Westport Property Investments LLC?
5      MR. FRANK: Objection.  And to the extent
6   that involves revealing any legal strategy or any
7   conversations with counsel, I instruct you not to
8   answer.
9   A.   I don't -- I don't know what my plans or my
10  strategy is.
11  Q.   I'm not asking for your plans or your
12  strategies.
13      I'm asking you:  As a matter of fact,
14  sitting here today, do you believe that you have any
15  claims against Westport Property Investments LLC?
16  A.   I don't know.
17  Q.   Okay.  So, today, you're not asserting any
18  claims against Westport Property Investments LLC?
19      MR. FRANK: Objection.  This is totally
20  irrelevant.  It's got nothing to do with this lawsuit
21  and this is not an appropriate forum to assert claims

Page 188

1   against Westport Property Investments.
2   A.   How about I can answer it this way.  I
3   have -- I don't know who the principals of Westport
4   Properties LLC are.  Therefore, I do not know whether I
5   have claims against them or not.
6   Q.   Okay.  Let's see if we can put a little
7   meat on those bones.
8      What difference would it make who the
9   principals of Westport Property Investments are?
10      MR. FRANK: I'm going to object and I'm
11  going to instruct you not to answer to the extent that
12  it reveals any legal strategy or attorney product.
13      MR. MCCORMACK: You can object to a
14  question.  You can't --
15      MR. FRANK: On the basis of the privilege.
16      MR. MCCORMACK: You can't coach him.  You
17  can object.
18      MR. FRANK: I'm not coaching him.
19      MR. MCCORMACK: You can either instruct him
20  not to answer or not.
21      MR. FRANK: I'm telling him what he can

Page 189

1   answer and what he can't.  But I told him not to answer
2   to the extent that it reveals --
3      MR. MCCORMACK: No.
4      MR. FRANK: -- legal strategy, attorney
5   work product or communications with his counsel.
6      MR. MCCORMACK: Mr. Frank, you can't --
7      MR. FRANK: I can and I did.
8      MR. MCCORMACK: -- give him a qualified
9   instruction.  You've either got to instruct him or not
10  instruct him.
11      Would you read the question back?
12      THE REPORTER: "Okay.  Let's see if we can
13  put a little meat on those bones.
14      What difference would it make who the
15  principals of Westport Property Investments are?"
16      THE WITNESS: It would make a difference
17  because I have had various relationships with people
18  and some of those people, if they were Westport
19  Property Investments, would have potentially put me in
20  violation of agreements that I have with them.  I mean,
21  that could be anybody.

648

Page 190

1    BY MR. MCCORMACK:
2  Q.  Okay.  What --
3  A.  What if it was -- what if it was my lawyer,
4  my last lawyer, okay, who tried to steal the project
5  from me?
6     What if it was him -- or he, I should say?
7  I should think that I would have a rightful complaint
8  against him.
9  Q.  So is there anybody else whom you -- who
10  might give rise to a complaint --
11     MR. FRANK: Objection.
12  Q.  -- by being a principal of Westport
13  Property Investments LLC other than your most recent
14  lawyer?
15     MR. FRANK: Objection.
16  A.  I mean, there's a number of people.  I
17  wouldn't even be able to restrict that to a list, so...
18  Q.  Okay.  So sitting here today, you cannot
19  identify any claim you have against Westport property
20  Investments LLC?
21     MR. FRANK: Objection.  This is completely

Page 191

1  irrelevant to this lawsuit.  It involves legal
2  strategy.  It involves attorney work product and I'm
3  instructing you not to answer.
4  Q.  Are you accepting that instruction?
5     Would you read the question back so we're
6  very clear as to what the question is that Mr. Frank is
7  instructing this witness not to answer.
8     THE REPORTER: "Okay.  So sitting here
9  today, you cannot identify any claim you have against
10  Westport property Investments LLC?"
11  A.  I -- without the knowledge of who the
12  principals are and Westport Properties LLC, it puts me
13  at a disadvantage to qualify and answer that question.
14  Q.  Have you authorized anyone to make a threat
15  against Westport Property Investments LLC of
16  litigation?
17     MR. FRANK: Objection.
18  A.  Have I authorized anybody to make a threat?
19  Not that I know of.
20     MR. MCCORMACK: Okay.  Take five.
21     (There was a recess taken at 4:00 and the

Page 192

1  deposition resumed at 4:13 p.m.)
2     BY MR. MCCORMACK:
3  Q.  All right.  Let me just be sure I
4  understand this.  You would only -- you believe you
5  would only have a claim if the principal of Westport
6  Property Investments LLC was somebody that you had a
7  prior relationship with?
8     MR. FRANK: Objection.  Instruct the
9  witness not to answer.  Any answer would be based upon
10  attorney work product and legal strategy.
11     MR. MCCORMACK: I'm not asking what your
12  advice is and your strategy is not.
13     BY MR. MCCORMACK:
14  Q.  Are you going to accept that instruction?
15  A.  I do specifically accept that instruction,
16  but I will try to rephrase my answer one more time.
17  Q.  Sure.
18  A.  Okay.  Without knowing who the principals
19  of the project are -- of Westport Properties LLC are, I
20  have no way of articulating to you the nature of my
21  feelings about anything else.

Page 193

1     So unless we're going to discuss who those
2  people are, there's no point in me trying to answer the
3  question.
4  Q.  All right.  But could you imagine or, as a
5  hypothetical, suggest someone whose position as
6  principal would give rise to a claim against --
7     MR. FRANK: Objection.
8  Q.  -- Westport Property Investments?
9     MR. FRANK: Objection.
10     MR. RUTHER: That, I object too as well.
11  A.  No, I do not want to hypothecate who --
12  various situations or whatever.  So since we don't
13  know, my answer is I don't know.
14  Q.  Okay.  So just so we're clear, if, for
15  example -- let's assume, hypothetically, Swirnow
16  Building Contractors is the principal of Westport
17  Property Investments LLC.
18     Would that give rise to a claim --
19     MR. FRANK: Objection.
20  Q.  -- in your view?
21     MR. FRANK: Objection.  Calls for a legal

649

Page 194

conclusion. It's totally irrelevant to this case.
A. I don't know.
Q. Okay. Assume, hypothetically, John Paterakis were the principal of Westport Property Investments LLC.
MR. FRANK: Objection.
Q. Would you then believe that you have a claim?
MR. FRANK: Objection. Mr. Fore is not an expert. He is not prepared to answer hypothetical questions.
A. I don't know.
Q. Okay. Assume -- do you know who Scott Plank is?
MR. FRANK: Objection.
A. Yes, I know who he is.
Q. Assume, hypothetically, Scott Plank was the principal of Westport Property Investments LLC.
Do you then think you'd have a claim?
A. I don't know.
MR. FRANK: Objection. I would instruct

Page 195

you not to answer to the extent that it would reveal any legal strategy or attorney work product or communications with your attorney.
Q. Suppose -- assume, hypothetically, Glen Charlow were the principal of Westport Property Investments LLC.
Do you then --
MR. FRANK: Same objection.
Q. Please let me ask the question.
Do you then believe you would have to claim?
MR. FRANK: Same objection. Same instruction.
A. I don't know.
Q. Assuming hypothetically Tom Daschle, former senator and senate majority leader were the principal of Westport Property Investments LLC.
Would you believe that you have a claim?
MR. FRANK: Same objection. Same instruction.
A. And I don't know.

Page 196

Q. So you're not aware of any claim --
MR. FRANK: Objection.
Q. -- that would be based on Tom Daschle being the principal of Westport Property Investments?
MR. FRANK: Objection. Instruct the witness not to answer. These are ridiculous questions and it's totally irrelevant to this case.
Q. Okay. If we assume, hypothetically, that the former governor of New York, George Pataki, were a principal of Westport Property Investments LLC, do you think that would give rise to a claim?
MR. FRANK: Same objection. Same instruction.
A. I don't know.
Q. You're not aware of any claim, though --
MR. FRANK: Objection.
Q. -- that could be based on George Pataki being a principal?
MR. FRANK: Objection. Instruct you not to answer.
A. I don't know the answer.

Page 197

Q. What about Mary Peters, former United States Secretary of Transportation?
Are you aware of any claim that would arise from Ms. Peters being a principal of Westport Property Investments LLC?
MR. FRANK: Same objection. Same instruction.
Q. Would it change -- are you going to answer?
A. I don't know.
Q. Would it change your answer at all if I told you Senator Daschle and Governor Pataki and Secretary Peters all are on an advisory board of the Northeast Maglev?
Does that change your answer?
MR. FRANK: Same instruction and same objection.
A. I don't know.
Q. You don't know. Why don't you know?
MR. FRANK: Objection.
Q. You're not aware of any claim? I don't understand what "I don't know" means.

A. I don't know how to answer your question.
Q. Well, you said there might be circumstances, depending on who the principal was, that you would have a claim.
So I'm asking you if any one of these three members of the advisory board of the Northeast Maglev were the principal of Westport Property Investments LLC, do you believe that you would have any claim against Westport Property Investments LLC?
MR. FRANK: Same objection. Instruct you not to answer the question.
THE WITNESS: Okay.
MR. MCCORMACK: But what's your basis --
MR. FRANK: I already recited my basis.
MR. MCCORMACK: Why don't you recite it again so the record is clear?
MR. FRANK: My basis is any potential claims based on hypothetical situations -- you want me to answer you or are you going to --
MR. MCCORMACK: We're listening. I'm just shaking my head.

MR. FRANK: You were about to speak.
MR. MCCORMACK: No, I wasn't. I was shaking my head.
MR. FRANK: Any question about --
MR. MCCORMACK: You're hearing my thoughts.
MR. FRANK: -- the potential hypothetical claims requires an analysis of the legal issues which reflect attorney work product, legal strategy, communications with his counsel and they're totally irrelevant to this case --
MR. MCCORMACK: Okay.
MR. FRANK: -- and not calculated to lead to admissible evidence in this case.
BY MR. MCCORMACK:
Q. Do you know of, today, any claim that you would hold against Westport Property Investments LLC if any of its principals were members of the advisory board of the Northeast Maglev?
MR. FRANK: Same objection.
MR. MCCORMACK: I'm not asking for your advice, Mr. Frank.

MR. FRANK: I instruct you not to answer.
MR. MCCORMACK: I'm not asking for your advice, Mr. Frank.
MR. FRANK: I understand that.
MR. MCCORMACK: I'm asking if he's aware of any claim?
MR. FRANK: Same instruction. Same objection.
THE WITNESS: I'm not going to answer it.
MR. MCCORMACK: Well, again, he's not -- obviously, the existence of the claim isn't privileged. He believes that there's a claim. But if you're going to give him the instruction --
BY MR. MCCORMACK:
Q. You're accepting his instruction?
A. Yes.
Q. Okay. I'd ask the same question about another member of the Northeast Maglev Advisory Board. Kevin Plank --
MR. FRANK: Same objection.
Q. -- founder and CEO of Under Armour.

Would his presence as a principal of Westport Property Investments in any way give rise to a claim?
MR. FRANK: Same objection. Same instruction. Instruct you not to answer.
Q. Are you accepting that instruction?
A. Yes.
Q. How about Edward Rendell, former governor of Pennsylvania, another member of the Northeast Maglev Advisory Board?
If he were a principal of Westport Property Investments, would that give rise to a claim, in your opinion?
MR. FRANK: Same objection. Same instruction. Instruct you not to answer.
Q. Are you accepting that instruction?
A. Yes.
Q. Okay. If Rodney Slater, former United States Secretary of Transportation, were a principal of Westport Property Investments LLC, do you believe that would give rise to a claim against the limited

Citigroup Global Markets Inc. v. Document 61-3    Filed 04/15/15    Page 52 of 95
Patrick Turner, et al                                                    Thomas Butler Fore - Vol. 1
                                                                         February 17, 2015

Page 202

1  liability company?
2      MR. FRANK: Same objection.  Same
3  instruction.  Instruct you not to answer.
4      Mr. McCormack, would you care to tell us
5  how these questions could possibly lead to admissible
6  evidence in this case?
7  Q.  Are you accepting the instruction not to
8  answer?
9  A.  Yes.
10 Q.  How about a Douglas Steenland, former
11 president and CEO of Northwest Airlines and a member of
12 the Northeast Maglev Advisory Board?
13     If he were a principal of Westport Property
14 Investments LLC, would that give rise to a claim?
15     MR. FRANK: Same objection.  Same
16 instruction.  Instruct you not to answer.
17     You're telling me you won't explain how
18 these could possibly be relevant or designed to elicit
19 admissible evidence in this case?  You're not prepared
20 to tell me that?  Is that right, Mr. McCormack?
21     MR. MCCORMACK: I'm not answering your

Page 203

1  questions.  You want to give him an --
2      MR. FRANK: Right.  So that means you're
3  not answering my question.
4      MR. MCCORMACK: I am not answering your
5  question.  If you want to give him an instruction, give
6  him an instruction.
7      MR. FRANK: I already gave him the
8  instruction and I asked you a question that you won't
9  answer.
10     BY MR. MCCORMACK:
11 Q.  Are you accepting the instruction?
12     MR. RUTHER: Can we go off the record for a
13 moment, please?
14     MR. MCCORMACK: Not yet.
15 Q.  Are you going to accept the instruction?
16 A.  Yes.
17 Q.  What about if Christine Todd Whitman,
18 former governor of New Jersey, and member of the
19 Northeast Maglev Advisory Board were a principal of
20 Westport Property Investments LLC?
21     Would that, in your opinion, give rise to a

Page 204

1  claim?
2      MR. FRANK: Same objection.  Same
3  instruction.  Instruct you not to answer.
4  Q.  Are you accepting that instruction?
5  A.  Yes.
6      MR. MCCORMACK: I have no further questions
7  of this witness.
8      MR. FRANK: Did you want to go off the
9  record a moment?
10     MR. RUTHER: It's now irrelevant.  My
11 93-year-old dad's in the hospital.  I would like to see
12 him before the end of the day.  That's the only reason
13 I was going to suggest it.  You made your point and you
14 made your point and belaboring it would have been of no
15 further use.  But since the discussion is over, I don't
16 have a need to do that.
17     MR. MCCORMACK: I want you to see your
18 father.  My problem is when we get in front of
19 Judge Motz and he starts ordering him to answer, I want
20 to make sure all of the questions --
21     MR. RUTHER: I understand.  But it's a moot

Page 205

1  point now, isn't it?
2      MR. MCCORMACK: All right.  Do you have any
3  questions?
4      MR. RUTHER: I do not.  I just want to make
5  one statement for the record.  And Mr. Frank has
6  questions.  I'll defer until that time.  Just putting a
7  minor point on the record.  You want me to do it now?
8  Okay.
9      We're aware -- I represent Patrick Turner
10 as well.  We are aware of Judge Motz's ruling that
11 these depositions could go forward without his
12 presence.
13     I just want the record to reflect that
14 Mr. Turner wanted to be here and has not waived his
15 right to be present at these depositions.  We
16 respectfully disagree with Judge Motz's ruling.  That's
17 all I have.  I have nothing else.
18     MR. FRANK: Mr. Fore, I have a few
19 questions for you.
20     MR. MCCORMACK: You're not counsel to a
21 party.  You're going to cross-examine?

                                            652

Citigroup Global Markets Realty Corp vs    Thomas Butler Fore - Vol. 1
Case 1:14-cv-00587-JFM Document 61-3   Filed 04/15/15   Page 53 of 95
Patrick Turner, et al                                              February 17, 2015

Page 206

1      MR. FRANK: I'm counsel for Mr. Fore and
2  I'm entitled to ask questions. If you don't want me
3  to, you can object. But I intend to ask him questions.
4      MR. MCCORMACK: I don't think that you're
5  entitled to. You're not a party.
6      MR. FRANK: Well, that's your opinion.
7      MR. MCCORMACK: You've been here you
8  defended your witness.
9      MR. FRANK: That's your opinion. I'm
10 entitled to ask questions and I intend to do that.
11     EXAMINATION BY MR. FRANK:
12 Q.  Now, Mr. Fore, Mr. McCormack read to you
13 and had you read to him excerpts from what was marked
14 as Ruther 13, the -- I'm sorry -- Ruther 12, a
15 Memorandum of Understanding, and he asked you whether
16 you'd ever had a loan where the borrower had the right
17 to tell you when and how to enforce the loan.
18     I direct your attention to paragraph 3 of
19 Exhibit Number 12, and ask you whether or not your loan
20 was subject to any approval or restrictions in favor of
21 Mr. Turner or anyone else.

Page 207

1      In particular, I direct your attention to
2  paragraph 3-1 where -- or paragraph 3 where it
3  describes the terms on which Citibank would agree to
4  sell the loan to you and how the loan would be
5  structured after that. I direct your attention in
6  particular --
7      MR. MCCORMACK: Mr. Frank, can we get a
8  question? Just ask one. Mr. Ruther here wants to
9  leave. He wants go to the hospital.
10     MR. FRANK: Stop it, stop it, Mr.
11 McCormack.
12     MR. MCCORMACK: Ask the question.
13     MR. FRANK: You're taking the time now.
14     BY MR. FRANK:
15 Q.  So starting with little Roman numeral ii,
16 the next complete sentence, what does it say beginning
17 with the word "immediately"?
18 A.  Immediately prior to the purchase of -- the
19 purchase by Capital of the Citi equity to the --
20 Q.  I'm sorry.
21     MR. MCCORMACK: Wait, wait, wait. I see at

Page 208

1  least three Roman number ii's.
2  Q.  1, 2, 3, 4, 5, 6, 7 8, 9, 10, 11 -- the
3  12th -- 13th line down in paragraph 3 beginning with
4  "Immediately prior to the purchase."
5  A.  Okay. "Immediately prior to the purchase
6  by Capital of the note and the loan documents, Capital
7  shall request that Citi split the note into a
8  promissory note with the principal amount due under the
9  note less the amount of the Tiderock note and the
10 Westport note."
11 Q.  And that's defined as the Westport note?
12 A.  Yes.
13 Q.  Okay. And so --
14 A.  "The Tiderock shall be secured by all the
15 collateral including -- all the collateral securing the
16 note and the Westport note shall be unsecured."
17 Q.  Okay. And let's continue in the next
18 sentence. Capital?
19     MR. MCCORMACK: What's the question?
20     MR. FRANK: Keep going.
21     MR. MCCORMACK: No, no. Wait a minute.

Page 209

1  You're asking him a question?
2      MR. FRANK: Keep going, sir.
3      MR. MCCORMACK: Are you asking him a
4  question? What's the question?
5      MR. FRANK: Are you interrupting me?
6      MS. MCGEOGH: Yes.
7      MR. MCCORMACK: Yes. I'm trying to
8  understand. Is there a question or not?
9      BY MR. FRANK:
10 Q.  Would you read the next sentence, please?
11     MR. MCCORMACK: Okay, there we go.
12 A.  "Capital and WPH shall mutually agree on
13 the terms and conditions of any and all matters with
14 respect to the enforcement collection, transfer or
15 disposition of the Westport note."
16 Q.  So the rights that Capital and WPH -- to
17 mutually agree on those conditions, does that apply to
18 the Tiderock note?
19     MR. MCCORMACK: Objection to form. You may
20 answer.
21 A.  No.

653

Appeal: 15-1671     Doc: 25-2     Filed: 09/28/2015     Pg: 202 of 248

Citigroup Global Markets Realty Corp vs     Thomas Butler Fore - Vol. 1
Case 1:14-cv-00587-JFM Document 61-3   Filed 04/15/15   Page 54 of 95
Patrick Turner, et al                                                    February 17, 2015

---

Page 210

1  Q.  So, in fact, is it not correct that the
2  Tiderock note would secure any money that you had
3  advanced pursuant to this agreement?
4      MR. MCCORMACK: Objection to form.
5  Leading.  You may answer.
6  A.  I believe so.
7  Q.  And what does this document provide as to
8  the collateral that you would have for the Tiderock
9  note?
10      MR. MCCORMACK: Objection to form.  You may
11  answer.
12  A.  The -- I believe it was rolled up -- the
13  property and the entire asset.
14  Q.  So is it correct to say that the Tiderock
15  note was secured by the real estate -- would be secured
16  by the real estate?
17      MR. MCCORMACK: Objection to form.
18  A.  If we were able to buy the loan documents.
19  Q.  And is it also not correct that you have
20  sole discretion as to how to enforce that note?
21      MR. MCCORMACK: Objection to form.  You may

---

Page 211

1  answer.
2  A.  I mean, that was the intention.
3  Q.  Now, section 17, which Mr. McCormack asked
4  you to read, is that the provision that provided
5  exclusivity to you?
6  A.  It appears so, yes.
7  Q.  And how long did that exclusivity last?
8  A.  60 days.
9  Q.  Actually, is it 60 days or is it an
10  alternative calculation?
11      MR. MCCORMACK: Objection.  Asked and
12  answered.
13  A.  Let's see.  The maturity date on the Citi
14  agreement or the day -- 60 days following thereof.
15  Q.  And is that the earlier or later of the two
16  to occur?
17  A.  I guess earlier.
18  Q.  Do you know what the maturity date on the
19  Citi agreement was?
20  A.  No.
21  Q.  I think it's recited in the document here.

---

Page 212

1  Let's just take a look at what the defined term is.
2  The defined term we're looking for is maturity date and
3  maturity date is defined in paragraph D on page 2.
4      And would you tell -- would you read that
5  section and tell us what that maturity date is?
6  A.  "The Citi agreement has been amended, among
7  other matters, and extended the deadline to purchase
8  the note and the loan documents to March 16, 2011."
9  Q.  So the maturity date was March 16th, 2011?
10  A.  Right.
11      MR. MCCORMACK: Objection to form.
12  Q.  And the date of this agreement is?
13  A.  It's the 23rd of February 2011.
14  Q.  So based on that, how long did the
15  exclusivity period last?
16  A.  It was 30 days.
17  Q.  What was the beginning of the date?
18  A.  March -- I mean February 25th to
19  March 11th, so...
20  Q.  To March?
21  A.  16th, sorry.

---

Page 213

1  Q.  How many days was that, approximately?
2  A.  25 days.
3      MR. MCCORMACK: Objection.  Asked and
4  answered.
5  Q.  Now, when this agreement was signed, do you
6  know how much money you had advanced or what you were
7  agreeing to advance in exchange for the exclusivity?
8  A.  As of the date of that agreement, I think
9  $50,000 was advanced on the date that we did the
10  agreement and then, during the course of that next
11  month, it would have been probably 200, $250,000.
12  Q.  And the circumstances under which you might
13  have a participation interest in the development of
14  Westport presupposed what things to occur?
15  A.  We would have had to succeeded in the
16  refinance and the acquisition of the note.  We would
17  have had to succeed in the negotiations of an agreement
18  with the Carlyle Group.  We would have had to succeed
19  in and negotiate some agreement with Turner and the
20  entire Westport parties.  It would have -- I mean, it
21  would have been a lot of things to accomplish to get

654

Appeal: 15-1671    Doc: 25-2    Filed: 09/28/2015    Pg: 203 of 248

Case 1:14-cv-00857-TFM    Document 61-3    Filed 04/15/15    Page 53 of 95

Citigroup Global Markets Realty Corp v.
Patrick Turner, et al

Thomas Butler Fore - Vol. 1
February 17, 2015

Page 214

1   there.
2   Q.   And none of those things took place, did
3   they?
4   A.   No.
5        MR. MCCORMACK: Objection to form.
6   Q.   Now, Mr. Fore, you were asked by -- or you
7   were shown a document by Mr. McCormack that referred to
8   a reference -- that contained a reference to a
9   bankruptcy on January the 10th of 2013.
10       Were there discussions about potential
11  bankruptcies prior to January 25th?
12  A.   Yes, but the -- you know, all predicated
13  on, you know, exploring whether or not a bankruptcy was
14  even possible.
15  Q.   And what was the type of bankruptcy that
16  was contemplated initially?
17       MR. MCCORMACK: Could we establish who's
18  in these conversations?  Because you were instructing
19  quite a bit --
20       MR. FRANK: I'm asking the questions.
21       MR. MCCORMACK: All right.

Page 215

1        BY MR. FRANK:
2   Q.   In those conversations, the references that
3   you made that there were discussions, what type of
4   bankruptcy was contemplated?
5   A.   Initially a Chapter 11, I believe.
6   Q.   And do you know if there came a time when
7   you learned that a Chapter 11 was not possible?
8   A.   Yes.
9   Q.   And when was that?
10  A.   In January of 2013.  I don't remember the
11  exact date.
12  Q.   And what did you learn that led you to
13  believe that Chapter 11 was not possible?
14  A.   Initially, it was that Carlyle would not
15  support a Chapter 11 filing and subsequently that, you
16  know, Turner couldn't do it.
17  Q.   Well, when you said Carlyle wouldn't
18  support a Chapter 11, what do you mean by that?
19  A.   That they would -- that he needed a -- I
20  guess he needed their approval to file a Chapter 11 and
21  he couldn't...

Page 216

1   Q.   And did they refuse to give that to him?
2   A.   Yes.
3   Q.   Do you know when that occurred?
4   A.   I don't remember.  In January.
5   Q.   Do you know what the event was in which
6   Mr. Turner was told that Carlyle refused to permit him
7   to file a Chapter 11?
8   A.   I don't recall.  I believe he talked to
9   them.
10  Q.   And -- but you don't know when that took
11  place?
12  A.   I don't remember.
13  Q.   When that took -- after you were told --
14  well, did Mr. Turner tell you that he couldn't file a
15  Chapter 11?
16  A.   Yes.
17  Q.   And what was your response?
18  A.   I mean, my response was that I was going to
19  do it regardless.
20  Q.   When you say you were going to do it
21  regardless, what --

Page 217

1   A.   As a creditor, I was going to file a
2   Chapter 7 to protect my investment, my loan.
3   Q.   And what was Mr. Turner's response to that?
4   A.   He was upset.
5   Q.   And do you know why he was upset?
6   A.   He was upset because he was concerned that
7   a bankruptcy filing would affect some of his
8   obligations under the loan documents, I think.
9   Q.   And do you know when he learned that or
10  became aware of that?
11  A.   I don't remember.
12  Q.   Was he aware of that at the time that he
13  requested Carlyle to permit him to file a Chapter 11?
14  A.   I don't believe so.
15  Q.   So is it your testimony that after he spoke
16  to Carlyle, that he learned that he was subject to a
17  guarantee that would be triggered by filing of a
18  bankruptcy?
19       MR. MCCORMACK: Objection to form.
20  A.   Yeah, I believe -- I mean, I believe that
21  it was after that.

655

Page 218

1  Q.   Do you know how he found out about the
2  guarantee or what caused him -- what reminded him of
3  the guarantee?
4  A.   I don't remember.
5  Q.   Did he tell you who told him about it?
6  A.   I don't remember.
7  Q.   When you told him that you were then going
8  to file a Chapter 11, what was his response?
9       You already mentioned that he was not
10 happy, but what was his response?
11      MR. MCCORMACK: Objection.  Asked and
12 answered.
13 A.   He didn't want us to do it.
14 Q.   And what did you tell him?
15 A.   That I was going do it anyway.
16 Q.   And was that a source of disagreement
17 between you and Mr. Turner?
18 A.   Yes.
19 Q.   Did there come a time when Mr. Turner was
20 advised by anyone that a filing of involuntary
21 bankruptcy by you would not trigger the liability in

Page 219

1  his guarantee agreement?
2       MR. MCCORMACK: Objection to form.
3  A.   I don't remember.  I don't recall.
4  Q.   Did there ever come a time when Mr. Turner
5  told you that someone told him that and that he was
6  less upset about you filing the bankruptcy?
7       MR. MCCORMACK: Objection to form.
8  A.   Yes, I do remember that discussion, but I
9  don't remember when it was.
10 Q.   Now, the email that Mr. McCormack showed
11 you in which -- and I'll tell you which one it was.
12 The list of creditors, which I believe was -- let me
13 see if I can find where that was.  There were several
14 of them.  Ruther 26 and Ruther 27.  I'll show you.
15      What is the date of those -- of Ruther 26,
16 what is the date of that email?
17 A.   January 29th.
18 Q.   Do you know whether that was before or
19 after the conversation with Carlyle?
20 A.   I believe it was after.
21 Q.   Do you know?

Page 220

1  A.   I know it was after.
2  Q.   Do you know whether it was before or after?
3  A.   It was after.
4       MR. MCCORMACK: He's answered the question.
5  Now, will you ask him --
6  Q.   I'm asking you if you're sure.
7  A.   Yeah.
8       MR. MCCORMACK: Oh, come on.  Come on.
9  Mr. Frank, you're making a face because you don't like
10 his answer.
11      MR. FRANK: No.
12      MR. MCCORMACK: You're trying to coach him.
13      MS. MCGEOGH: You've asked him three times.
14      MR. MCCORMACK: You've asked him three
15 times and he told answered you repeatedly.
16      BY MR. FRANK:
17 Q.   I'm asking are you certain.
18      On what basis do you say that it was after
19 Carlyle -- what is your basis for saying that?
20      MR. MCCORMACK: Objection.  Looking over
21 your glasses now, giving him every verbal --

Page 221

1       MR. FRANK: Hold on.
2       MR. MCCORMACK: -- clue you can to change
3  his answer.
4       MR. FRANK: Stop.
5       MR. MCCORMACK: It's ridiculous.
6       BY MR. FRANK:
7  Q.   What is your factual basis for that answer?
8  A.   I mean, I don't know.  I don't know what
9  the -- I don't, related to that date, if it was before
10 or after.
11 Q.   I mean, I asked you before whether you knew
12 when the conversation with Carlyle took place and I
13 thought your answer was you didn't know.
14 A.   Yeah, I thought it was in -- I thought it
15 was in January, but I don't remember.
16 Q.   Well, what is the date of this email?
17 A.   January.  I don't remember.  I don't.
18 Q.   Do you know whether this request was in
19 connection with the potential filing of a Chapter 11 or
20 an involuntary bankruptcy?
21      MR. MCCORMACK: Objection to form.

656

Page 222

1  A.  I don't remember.  I don't know.
2  Q.  And the email which is Ruther 25, if this
3  email was prior to the --
4      MR. MCCORMACK: Wait a minute.  Are you
5  showing him with notes on it?  Is there writing on
6  that?
7      MS. MCGEOGH: Yeah.
8      MR. MCCORMACK: Come on.
9      MR. FRANK: There's nothing of any
10  consequence.
11      MR. MCCORMACK: There's writing all over
12  it.
13      MR. FRANK: There's nothing of any
14  consequence.
15      MR. MCCORMACK: Okay.  Hand it across the
16  table.
17      MR. FRANK: Mr. McCormack, we'll use an
18  unmarked one.
19      BY MR. FRANK:
20  Q.  Ruther 25.  What's the date on those
21  emails?

Page 223

1  A.  January 29th.
2  Q.  If these emails as well as Ruther 26
3  predated the conversation with Carlyle, was there any
4  discussion prior to the conversation with Carlyle of
5  involuntary bankruptcy?
6      MR. MCCORMACK: Objection to form.  You may
7  answer.
8  A.  There was discussion prior to the
9  conversation with Carlyle about an involuntary.
10  Q.  And what was that discussion?
11  A.  Just that it might be an opportunity that
12  Pat should look into.
13  Q.  That Pat should look into?
14  A.  Pat Turner, yes.  But I don't remember the
15  date of the discussion.
16  Q.  I asked you about an involuntary
17  bankruptcy.
18      MS. MCGEOGH: Perhaps we should give him a
19  shovel.
20  Q.  Involuntary bankruptcy --
21  A.  Oh, oh, sorry.

Page 224

1  Q.  Let me ask the question again.
2      Prior to the conversations with Carlyle,
3  was there ever any discussion of an involuntary
4  bankruptcy filed by creditors?
5      MR. MCCORMACK: Objection to form.
6  A.  I don't believe so.
7  Q.  Now, in January of 2013, what was going on
8  with respect to Vision and the cowboys?
9  A.  We were in negotiations with them trying to
10  resolve -- in late January we were working on them to
11  try to get the deal financed and then we were trying to
12  resolve a deal with them.
13  Q.  And when you were told -- did there come a
14  time when you were told by a representative of
15  Vision Capital that they were no longer in the deal?
16  A.  Yes.
17  Q.  And, at that point, did you suspect that
18  the cowboys were seeking to circumvent you and acquire
19  a Citibank note on their own?
20      MR. MCCORMACK: Objection to form.
21  A.  Yes.

Page 225

1  Q.  And did that become a matter of -- did that
2  occupy much of your time?
3  A.  It occupied a hundred percent of my time.
4  It was very disconcerting.
5  Q.  And did it occupy much of anyone else's
6  time during that period?
7      What period of time are we talking about?
8  A.  January -- I mean, this would have been for
9  January, February, you know, end of -- I mean, really
10  that period of -- I think it was January 25th when Dale
11  Dowers called me and told me he bought the note.
12  Q.  But you suspected it prior to that?
13  A.  Yes.
14  Q.  Did that occupy a substantial portion of my
15  time?
16  A.  Yes.
17  Q.  Did that occupy a substantial portion of
18  Mr. Turner's time?
19  A.  Yes.
20      MR. MCCORMACK: Objection to form.
21  Q.  Did it occupy a substantial portion of

657

Citigroup Global Markets Inc. v. Document 61-3    Filed 04/15/15    Page 58 of 95
Case 1:14-cv-00557-JFM
Patrick Turner, et al

Thomas Butler Fore - Vol. 1
February 17, 2015

Page 226

1   Mr. Rhodes' time?
2       MR. MCCORMACK: Objection to form.
3   A.   Yes.
4   Q.   Would you say that that -- that dealing
5   with that subject was a matter that we discussed and
6   worked on almost full time during that period?
7       MR. MCCORMACK: Objection to form.
8   A.   Yes.
9   Q.   And who was involved in the efforts to
10  understand what went on and to deal with it?
11  A.   As it relates to the cowboys?
12  Q.   Yes.
13  A.   I mean, it was you, primarily, and me,
14  Pat -- working with Pat Turner and Pat Rhodes.
15  Q.   And did we speak on the telephone?
16  A.   Yes.
17  Q.   How often did we speak on the telephone?
18  A.   I don't recall the quantity.  A lot.
19  Q.   Multiple times a day?
20  A.   Yes.
21  Q.   And who were the signatories to the NDA

Page 227

1   with Vision Capital?
2   A.   We went through that.  That was Westport --
3   that was Westport Partners, Pat Turner individually, me
4   individually, and I can't remember if there was anybody
5   else.
6   Q.   But you and Mr. Turner were both individual
7   parties to that contract, were you not?
8   A.   Correct.
9   Q.   Were your interests in any way different
10  with respect to enforcement of it?
11  A.   No.  I mean, if we were all parties to it,
12  I assume that any of us had the right to enforce it.
13  Q.   And what was I being asked to do with
14  respect to that matter?
15      MR. MCCORMACK: Excuse me.  By whom?
16      MR. FRANK: By anyone.
17      MR. MCCORMACK: Thank you.
18  A.   To -- basically to police the cowboys and
19  advise on what the appropriate strategy was for dealing
20  with that and trying to help resolve the negotiations
21  with them so we didn't end up where we are now.

Page 228

1   Q.   And other than negotiations with Vision
2   Capital and/or the Warhorse group and -- was I asked to
3   do anything else during that period of time?
4       MR. MCCORMACK: By whom?
5   Q.   By you or Mr. Turner, to your knowledge.
6   A.   I don't recall there being anything else to
7   work on.
8   Q.   And when -- was I asked to contact Citibank
9   at any point in time?
10  A.   I don't remember.
11  Q.   I draw your attention to email -- it's
12  Ruther 44, 45 and 46.
13  A.   My pile got messed up.
14  Q.   And actually 35.
15  A.   There's 43.  There's 44, 45, 47.
16  Q.   Yes, and also number 35.
17  A.   All right.  Hold on.  47.  I don't know if
18  you need 46.  I didn't see that one.  I don't know if
19  there was a 46.  35?
20  Q.   Uh-huh.
21  A.   Here it is.

Page 229

1   Q.   Excuse me a second.  It's 23.
2   A.   That one, I might have.
3   Q.   I have it here, but it has writing on it.
4   Okay.
5       And do you know what the purpose for my
6   communications with Mr. Lewis was or what information I
7   was trying to get from him?
8       MR. MCCORMACK: Objection.
9   A.   Yes.  You were trying to find out if they
10  negotiated a deal with the cowboys.
11  Q.   And Ruther 29 in which Cara Frye
12  transmitted an appraisal, do you know if appraisals --
13  strike that.
14      Were you ever asked to provide appraisals
15  to third parties in connection with your negotiations
16  with potential investors or partners?
17  A.   Yes.
18  Q.   And do you recall whether or not you needed
19  to obtain an appraisal for any negotiations you were
20  engaged in?
21  A.   Yes.

658

Appeal: 15-1671    Doc: 25-2    Filed: 09/28/2015    Pg: 207 of 248

Citigroup Global Markets v. Patrick Turner, et al    Case 1:14-cv-00587-QFM Document 61-3  Filed 04/15/15  Page 59 of 95    Thomas Butler Fore - Vol. 1
February 17, 2015

Page 230

1    MR. MCCORMACK: Objection. Form.
2 Q. And do you know whether -- do you know the
3 purpose for which Cara sent that appraisal on February
4 the 7th, 2013? If you know.
5 A. No, no. I was trying to think. I thought
6 I saw a -- something that was related to Ardent
7 Financial, but I don't remember. Presumably for a --
8 Q. Don't guess.
9 A. I don't know. I mean, I don't know the
10 answer.
11 Q. But you had been -- had you been asked for
12 an appraisal by a potential investor?
13 A. Oh, yes. And this -- this makes sense.
14 The -- I think that she sent the appraisal to Greg
15 Jones because he was the appraiser who was doing a new
16 appraisal and he wanted the old appraisal to look at is
17 what I believe happened.
18 Q. All right. Actually, I think --
19    MR. MCCORMACK: Oh, come on.
20    MS. MCGEOGH: Seriously?
21 A. That's 2011. I don't recall.

Page 231

1 Q. Okay. What was Mr. Rhodes' responsibility
2 with respect to the Westport project?
3    MR. MCCORMACK: Object. It's beyond the
4 scope of the direct examination.
5    MR. FRANK: You asked about Mr. Rhodes.
6 A. He had no direct responsibility. He was
7 only providing support in terms of organizing materials
8 for investors.
9 Q. And did he prepare the financial analyses
10 for investors?
11    MR. MCCORMACK: Objection. Leading.
12 A. Yes.
13 Q. And did he prepare projections of cash
14 flows?
15    MR. MCCORMACK: Objection to form. You may
16 answer.
17 A. Yes.
18 Q. Did those projections include costs and
19 expenses?
20    MR. MCCORMACK: Objection to form. You may
21 answer.

Page 232

1 A. Yes.
2 Q. And did those projections include analysis
3 of various scenarios for particular lenders given their
4 approach to the transactions?
5    MR. MCCORMACK: Objection to form. Beyond
6 the scope of direct. You may answer.
7 A. Yes.
8 Q. And did that require sources and uses of
9 funds?
10    MR. MCCORMACK: Objection to form. You may
11 answer.
12 A. Yes.
13 Q. Among the uses of funds, what did
14 Mr. Rhodes include?
15    MR. MCCORMACK: Objection to form. You may
16 answer.
17 A. It would have been, you know, acquisition
18 of the -- paying off the note, repaying my loan,
19 repaying any other relative expenses related to the
20 closing. And then it would have -- it depends. Some
21 of those could have included future operating capital

Page 233

1 if it were contemplated in the lender's package.
2 Q. When you said paying off what was owed to
3 you, did it also include other creditors as well?
4 A. Yes.
5    MR. MCCORMACK: Objection to form.
6 A. It included all the unsecured creditors.
7 Q. During the period of time beginning
8 approximately January 10th and running through the
9 first week in February, is that the period of time when
10 activity was at its height with respect to Vision and
11 the Warhorse group?
12    MR. MCCORMACK: Objection to form.
13 A. Yes. That was a fairly intense time.
14 Q. And among the conversations that you had
15 with the people involved in those activities, did there
16 come times when it required one or another of us to
17 prepare something in writing?
18    MR. MCCORMACK: I'm sorry. I don't
19 understand your question.
20 Q. My question was --
21    MR. MCCORMACK: There were too many

659

Appeal: 15-1671     Doc: 25-2        Filed: 09/28/2015      Pg: 208 of 248

Citigroup Global Markets Realty Corp. v. Document 61-3   Filed 04/15/15   Page 60 of 95  Thomas Butler Fore - Vol. 1
Patrick Turner, et al                                                                   February 17, 2015

Page 234

1  pronouns.
2  Q.   -- those activities, did they require from
3  time to time the preparation of written material?
4  A.   Yes.
5      MR. MCCORMACK: What activities?
6      MR. FRANK: He understood the question.
7      BY MR. FRANK:
8  Q.   And was some of that written material
9  prepared by me?
10 A.   Yes.
11 Q.   And was some of it prepared by other
12 people?
13 A.   Yes.
14 Q.   And was most of the written material
15 discussed as to what it would say prior to its being
16 provided to a third party?
17 A.   I don't recall.  I mean, I know in a lot of
18 circumstances things were discussed.
19 Q.   I mean, would you characterize the
20 activities as a collaborative effort?
21 A.   Yes.

Page 235

1  Q.   Solely directed at the Vision-Warhorse
2  issue; is that correct?
3      MR. MCCORMACK: Objection to form.
4  A.   Yes.
5  Q.   To the best of your knowledge, am I a
6  bankruptcy lawyer?
7      MR. MCCORMACK: Objection.
8  A.   No.
9  Q.   Did I ever undertake to provide services
10 with respect to a bankruptcy for you?
11     MR. MCCORMACK: Objection.
12 A.   No.
13 Q.   To the best of your knowledge, did I ever
14 undertake to provide services with respect to a
15 bankruptcy to any other person in connection with this
16 Westport project?
17     MR. MCCORMACK: Objection.
18 A.   No.
19 Q.   Did there come a time when Mr. Turner was
20 advised by -- obtained advice that he was actually free
21 to convert the Chapter 11 to -- excuse me -- the

Page 236

1  Chapter 7 to a Chapter 11?
2  A.   Yes.
3  Q.   Do you know the source of that advice?
4  A.   I don't remember.
5  Q.   Do you know whether that advice was given
6  by me?
7  A.   No, I don't know.
8  Q.   At that time -- prior to that time and
9  following the following of the involuntary bankruptcy,
10 until sometime in the second week of February, did you
11 know whether Mr. Turner was going to file an
12 involuntary bankruptcy -- excuse me -- was going to
13 convert it to a Chapter 11 or not?
14 A.   No.  I mean, I don't know.  I didn't know
15 until it was done.
16 Q.   And, in fact, do you know when Mr. Turner
17 actually retained counsel to represent the debtor in
18 the bankruptcy?
19     MR. MCCORMACK: I think we have that
20 exhibit.
21     THE WITNESS: Yeah, that's an exhibit.

Page 237

1      MR. MCCORMACK: February 11th.  There
2  was -- the email from you to Mr. Turner setting
3  Sirody's retainer.
4      MR. FRANK: But we don't know when that was
5  signed, do we?  We know that it was not sent until
6  February the 16th.
7      MR. MCCORMACK: February 16th you sent it
8  to Mr. Turner.
9      BY MR. FRANK:
10 Q.   Right.  But you don't know when Mr. Turner
11 retained Mr. Sirody?
12 A.   No, I have no idea.
13 Q.   But it had to be February 16th or later; is
14 that correct?
15 A.   I suppose.
16 Q.   So prior to -- between the time that you
17 filed or caused to be filed the involuntary bankruptcy
18 and February 16th, did Mr. Turner tell you at any time
19 that -- what he was going to do on behalf of the
20 debtor?
21 A.   I don't recall.  I just don't remember.

660

Citigroup Global Markets, Inc. v.
Patrick Turner, et al

Page 238

1 Q.  If you had not been able to get other
2 creditors to agree to file the involuntary bankruptcy,
3 what were you going to do?
4 A.  I would have filed it myself.
5 Q.  And did you tell Mr. Turner that?
6 A.  Yes.
7 Q.  Do you know whether Mr. Ruther had
8 knowledge of any of the activities with respect to
9 filing the bankruptcy?
10 A.  No.
11 Q.  Did you ever speak to Mr. Ruther about it?
12 A.  I don't recall.  I don't even remember when
13 I first met Neil.  I don't think I really had spoken to
14 him very often, if ever, prior to that.
15 Q.  So, to the best of your knowledge, was
16 there anything that Mr. Turner could have done to have
17 stopped you from either filing the involuntary
18 bankruptcy or causing other people to file it?
19 A.  Paid us $2.8 million dollars.
20 Q.  Did he ever express concern that he might
21 be subjected to a judgment if you went ahead and did

Page 239

1 that?
2 A.  I don't remember the timing of it, but
3 he -- that's what he was upset about.
4 Q.  And what did you tell him?
5 A.  I mean, I told him what I would say now is
6 that my concern is to protect my money and get my money
7 back.  I can't protect him and do that.
8 Q.  Once Mr. Turner had determined to convert
9 the bankruptcy to a Chapter 11, did you and Mr. Turner
10 work together to attempt to accomplish a reorganization
11 of the debtor?
12    MR. MCCORMACK: Objection.  You may answer.
13 A.  Yes.
14 Q.  And what did you do -- what did those
15 efforts -- what did they consist of?
16 A.  Trying to secure the loan terms and
17 investment from a party to do the project, to
18 restructure their debt.
19 Q.  And were there times when you acted
20 together to negotiate with potential investors or
21 partners?

Page 240

1    MR. MCCORMACK: Objection to form.
2 A.  Yes.
3 Q.  And did you designate someone to speak on
4 your collective behalves when negotiations were
5 necessary?
6 A.  Yes.
7 Q.  And who did you designate?
8 A.  You.
9 Q.  And what was your reason for designating me
10 to do that?
11 A.  To, number one, protect my interest and,
12 number two, you know, in a case where Pat can afford to
13 have an attorney anyway and, you know, if our interests
14 were completely aligned as in getting a refinance, then
15 it would be helpful or in the case of the cowboys'
16 lawsuit.
17 Q.  At any time that I was engaged or asked to
18 speak on your collective behalves, was I told what
19 limits I was authorized -- what the limitations of my
20 authorization were?
21    MR. MCCORMACK: Objection.

Page 241

1 A.  I think there's cases where you were and,
2 you now, but I don't recall every situation, how it was
3 articulated, but Pat was always adamant that he was the
4 only person that can make decisions for Westport
5 because we are not partners in Westport and we have no
6 say.
7 Q.  And were there times that you and Pat
8 disagreed?
9 A.  Absolutely.
10 Q.  And were there times that you allowed
11 Mr. Turner to dictate what I was to do even though you
12 didn't agree with it?
13 A.  There's one incidence I can think of.
14 Q.  When did that occur?
15 A.  In, I want to say, November of this year --
16 of this past year, of 2014.
17 Q.  And do you recall what that situation was?
18 A.  It was when we were -- when there was a
19 negotiation over the settlement or discussion over the
20 settlement after the note had been purchased by
21 Westport Properties LLC and it was a very, very strong

661

Page 242

1  fight internally.

2  Q.   And what was the result of that?

3  A.   Pat insisted on quoting that the value of

4  his -- of our contributions under Westport was $20

5  million dollars and we all strongly disagreed with that

6  because I just wanted to get my money back.

7  Q.   Was there another time when you and

8  Mr. Turner disagreed when I represented you and he was

9  represented by other counsel?

10 A.   Yes.

11     MR. MCCORMACK: Objection to form.

12 Q.   And when was that?

13 A.   I want to say it was in 2014, maybe.

14 Sometime in 2014.

15 Q.   And what was that occasion?

16 A.   We had a meeting when he had negotiated the

17 deal with, I believe it was, Comstock that -- and that

18 we had no rights on the property other than as a

19 lender, which we knew, but that we were going to get

20 our money back whenever we did and we had to have a

21 very tense negotiation over where my loan was going to

Page 243

1  fall on the capital side.

2  Q.   And what did Mr. Turner tell you about your

3  agreement with him?

4      MR. MCCORMACK: Objection.

5  A.   That it had expired two years prior and

6  that, you know, he would make sure that I got my money

7  back at some point.

8  Q.   And did Mr. Turner have counsel at that

9  meeting?

10 A.   Yes.

11 Q.   Who was that counsel?

12 A.   Neil.

13 Q.   Was that the first time you met Mr. Ruther?

14 A.   I believe so. But I may have met him once

15 before, but I believe that was it.

16 Q.   In your original Memorandum of

17 Understanding, in addition to getting paid your loan

18 back, were there other fees or payments that you would

19 have been entitled to had you arranged the financing?

20 A.   Yeah, we had it in there for an assignment

21 fee of -- or success fee on the financing.

Page 244

1  Potentially, construction management fees and other

2  things that would have come further down the road if

3  we'd have gotten a deal done.

4  Q.   I direct your attention to Ruther Number 45

5  which I --

6  A.   Hold on. That's where my stack gets a

7  little messy, but I think I can find it. I think I

8  gave you 45, Kenny.

9  Q.   I direct your attention to the third to

10 last sentence that begins "We are in the final stages"

11 and ask you to read that.

12     MR. MCCORMACK: Wait. 45?

13     THE WITNESS: Third to last from where?

14     MR. MCCORMACK: Yeah, from where, which

15 version?

16     MR. FRANK: Third to last from the bottom.

17     MR. MCCORMACK: Third from...

18     MR. FRANK: Third from last in the sentence

19 in this paragraph.

20     MR. MCCORMACK: In your version of the

21 statement of the Sun press?

Page 245

1      THE WITNESS: It says: "We are competent" --

2      MR. MCCORMACK: 45. It's two versions of

3  the statement --

4      MR. FRANK: I'm talking about the first

5  paragraph, third to last --

6      MR. MCCORMACK: Right. So your version --

7      MR. FRANK: Third to last paragraph --

8  sentence in the first paragraph.

9      MR. MCCORMACK: Which is your version --

10     MR. FRANK: Mr -- I'm asking the questions.

11     MR. MCCORMACK: I'm trying to figure out

12 where we are.

13     MR. FRANK: Well, you just look at it. You

14 have it your in hand.

15     MR. MCCORMACK: I can't figure it out.

16     MR. FRANK: The first paragraph.

17     MR. MCCORMACK: First paragraph of which

18 version, yours or Pat's?

19     MR. FRANK: Exhibit 45. The first

20 paragraph on the page.

21     MR. MCCORMACK: There's two emails on it.

662

Citigroup Global Markets Realty Corp. vs.
Patrick Turner, et al

Case 1:14-cv-00557-QFM Document 61-3   Filed 04/15/15   Page 63 of 95

Thomas Butler Fore - Vol. 1
February 17, 2015

Page 246

1    THE WITNESS: I'll start reading it.
2    MR. FRANK: Mr. McCormack, stop. It's the
3  first paragraph on the page.
4    MR. MCCORMACK: So you're talking about
5  your version of the statement?
6    MR. FRANK: Please. First paragraph on the
7  page.
8    MR. MCCORMACK: Which is your version of
9  the statement.
10    MR. FRANK: Mr. McCormack, where it starts
11  with "we are in the final stages." Right here.
12    THE WITNESS: Okay. I see it.
13    MR. MCCORMACK: We're in the final states.
14    THE WITNESS: I think it's a misspell. "We
15  are in the final states of recapitalization of the
16  project and would have completed that process except
17  for the last minute interference described by the
18  Complaint that we filed last week."
19    BY MR. FRANK:
20  Q.   Does that refresh your recollection as to
21  what that statement was in reaction to?

Page 247

1    MR. MCCORMACK: Objection. I don't think --
2  A.   No. It was in reaction to the lawsuit that
3  we filed.
4  Q.   Against?
5  A.   The cowboys and Vision.
6    Kenny, please just don't roll in a bunch of
7  Redwells.
8  Q.   Okay. Ruther 33.
9    MR. RUTHER: Can I have 45, please?
10  A.   45 he wants?
11  Q.   33.
12  A.   Neil wanted 45.
13    MR. MCCORMACK: Make sure he's got the
14  copy. Keep the originals in front of you.
15  A.   You said 33?
16  Q.   I did.
17  A.   There it is.
18  Q.   And I'm now going to direct your attention
19  to the next to last paragraph that begins with
20  "Nevertheless."
21    MR. MCCORMACK: Hold on. I don't have it.

Page 248

1  I've got to have it in front of me. Which one?
2    THE WITNESS: 33. Starting with
3  "Nevertheless?"
4  BY MR. FRANK;
5  Q.   Yes. I'd like you to read the entire
6  paragraph because Mr. McCormack only read part.
7  A.   All right. So starting: "Gentlemen, this
8  morning" --
9  Q.   Starting with "Nevertheless."
10  A.   Okay. So: "Nevertheless, to reiterate
11  what I said then, I" -- let me just start over because
12  I got to do this the right way.
13    "Nevertheless, to reiterate what I said
14  then, (a) I represent Tom Fore generally, and (b) at
15  least for the time being I represent Pat Turner,
16  Westport Development LLC, and Westport Partners LLC
17  solely in connection with the acquisition of the
18  Citibank note including matters arising out of actions
19  of Vision Capital, Warhorse Baltimore Real Estate, Ed
20  Balley, Victor Schwarz, Doug Towler, Richard Burton,
21  Dale Dowers and Michael Borden. I trust this answers

Page 249

1  your question."
2  Q.   Now, does what you just read accurately
3  reflect your understanding of who I represented?
4    MR. MCCORMACK: Objection.
5  A.   Yes.
6  Q.   I direct your attention to Ruther 35.
7  A.   For some reason I had that right at the top
8  of my pile.
9    MR. MCCORMACK: Hold on. I don't have it
10  at the top of mine.
11  Q.   And who is this email from?
12  A.   Robert Schulman.
13  Q.   And if you would read the last sentence in
14  the first paragraph, please.
15  A.   "In return?" That one?
16  Q.   Uh-huh.
17  A.   "In return for Dixie's willingness to
18  participate, you agree that your clients, Tom Fore" --
19  okay, behalf, on my behalf --
20  Q.   Excuse me a second. Why don't you read
21  whole thing so that the reporter can get it correct

663

Appeal: 15-1671    Doc: 25-2    Filed: 09/28/2015    Pg: 212 of 248

Citigroup Global Markets OSB7 QFM Inc.ment 61-3   Filed 04/15/15   Page 6 2hoofn 9Butler Fore - Vol. 1
Patrick Turner, et al                                                                         February 17, 2015

Page 250

1  including the parens.
2  A.  Okay, sorry.  Let try it again.  "In return
3  for Dixie's willingness to participate, you agreed on
4  your client's (Tom Fore) behalf to execute documents
5  that would be -- that would do the following."
6  Q.  Okay.
7      MR. MCCORMACK: Keep going.  The sentence
8  doesn't end.
9  Q.  That's enough.  That's all I'm interested
10  in reading.  If you would like to have him read the
11  rest, you may when it's your turn.
12      You were asked whether you got an agreement
13  from a lender to finance the project.  Did Kennedy
14  Funding agree to finance the project?
15  A.  Yes.
16  Q.  And what happened then?
17  A.  They claim that their partnership broke up
18  and one of the brothers started a new company and took
19  the file with them and it was an absolute mess.
20  Q.  Did you lose money on that transaction?
21  A.  Yes.

Page 251

1  Q.  Had you paid a commitment fee?
2  A.  Yes.
3  Q.  Did you ultimately determine that was a scam?
4  A.  Yes.
5  Q.  Do you know approximately how many emails
6  you have in your in-box?
7      MR. MCCORMACK: Objection.
8  A.  You mean in my work in-box?
9  Q.  Yes.
10  A.  I don't know.  180,000?
11  Q.  Take a look at Ruther 22.  This is just as
12  an example, but this is -- when it says --
13      MR. MCCORMACK: Wait.  Are you showing him
14  the one with notes again?
15      MR. FRANK: No.  I'm not showing him the
16  one -- he's got it in his hand.
17      MR. MCCORMACK: You were turning -- you
18  were showing him the one --
19      MR. FRANK: Well, I'm going to ask him.
20      BY MR. FRANK:
21  Q.  You see where it says Turner Development

Page 252

1  Group?
2      MS. MCGEOGH: Oh, God.
3  A.  (No response.)
4  Q.  Do you see it says Turner Development Group?
5  A.  Yes.
6  Q.  Is that the signature and the
7  identification that Pat customarily puts on his emails?
8      MR. MCCORMACK: Objection.
9  A.  I believe so, yes.
10  Q.  And how is it signed?  Patrick Turner,
11  president.  President of?
12  A.  Turner Development Group.
13  Q.  Is Turner Development Group, does that have
14  any interest in Westport whatsoever?
15  A.  No.
16  Q.  Is that shown on the organization chart
17  anywhere?
18  A.  No.
19  Q.  And is that the same signature, for
20  example, that Mr. Turner used on Ruther 45 and on
21  Ruther 47?

Page 253

1      MR. MCCORMACK: Yeah, 45, it's the same.
2  It's exactly the same.
3  A.  Could I see it?  That way I can answer it.
4  (Pause.)  Yes.
5      MR. MCCORMACK: It's exactly the same.
6      What was the other one you wanted to ask
7  about?
8  Q.  In fact, to the best of your knowledge,
9  whenever Mr. Turner -- same as on Ruther 24.  Same on
10  Ruther 24.
11  A.  You know what?  Ruther 24 was the
12  dubious -- yes, it is.
13  Q.  To the best of your knowledge, is that
14  Mr. Turner's customary signature block?
15  A.  Yes.
16      MR. MCCORMACK: Objection.  How would he
17  possibly know that?
18  Q.  In the emails that you have seen, is that
19  the one that appears most the time?
20  A.  I am very familiar with that and that's, I
21  think, all I've ever seen on the signature block other

664

Appeal: 15-1671    Doc: 25-2    Filed: 09/28/2015    Pg: 213 of 248

Citigroup Global Markets Realty Corp v.
Patrick Turner, et al

Case 1:14-cv-00587-JFM   Document 61-3   Filed 04/15/15   Page 65 of 95

Thomas Butler Fore - Vol. 1
February 17, 2015

Page 254

1 than the text or something. That's the only time --
2 I've always seen all of Pat's emails have that
3 signature block.
4 Q. Ruther 27.
5    MR. MCCORMACK: Is there a question in there?
6 Q. Yes. Is that the same?
7 A. Yes.
8 Q. So is there any indication on, for example,
9 Ruther 27 that Mr. Turner was writing that email in any
10 capacity other than as president of Turner Development
11 Corporation?
12    MR. MCCORMACK: Objection. Wait a minute.
13 You're asking him now the capacity in which --
14    MR. FRANK: I'm asking if there is any
15 indication, on the face of this email, that Mr. Turner
16 was writing this in any other capacity than as
17 president of Turner Development Group.
18    MR. MCCORMACK: Other than the fact it was
19 produced by Inner Harbor West in response to a subpoena
20 to them asking for Inner Harbor West documents?
21    MR. FRANK: I'm not asking you the

Page 255

1 question, Mr. McCormack. I'm asking Mr. Fore.
2    MR. MCCORMACK: Okay. Objection to form.
3 A. It doesn't appear to be, no.
4    MR. RUTHER: May I just comment as to your
5 last discussion? What you asked for were all documents
6 relating to the project in the possession of Inner
7 Harbor West and that is what I tried to produce.
8    MR. FRANK: I think that's all I have.
9    MR. MCCORMACK: Can I have the originals,
10 Mr. --
11    MR. RUTHER: I do not have any questions.
12    MR. MCCORMACK: I do, but I'm not
13 insensitive to the fact that you just said you have a
14 parent in the hospital.
15    MR. RUTHER: My sister has texted me. I'm
16 all right.
17    MR. MCCORMACK: Okay.
18    THE WITNESS: Hold on. I'm going to try to
19 give you the originals.
20    MR. MCCORMACK: Give me all the originals.
21    THE WITNESS: That's original. That's

Page 256

1 original. Now the blue is fading to black.
2    (A brief discussion was held off the record.)
3    EXAMINATION BY MR. MCCORMACK:
4 Q. A few questions prompted by Mr. Frank's
5 lengthy examination.
6    The first is I believe you told me the
7 beginning of the day that you advanced monies to extend
8 the time period for the forbearance and the loan
9 purchase agreement with Citi; is that correct?
10 A. Yes.
11 Q. And you advanced some money and some of
12 those fees were paid after the date that you executed
13 the memorandum of understanding, correct?
14 A. Correct.
15 Q. Okay. So the deadline on that loan
16 purchase agreement was eventually extended beyond
17 March 16, 2011, right?
18 A. The deadline on the deal, not the
19 exclusivity? I'm not sure which one you're talking about.
20 Q. The deadline on the Citigroup agreement,
21 which you were entitled, under the Memorandum of

Page 257

1 Understanding, to exercise the purchase option, you
2 extended that deadline beyond March 16, 2011, correct?
3    MR. FRANK: Objection. That's not what it
4 was. It had nothing do with extending the purchase
5 option.
6 A. I believe -- to answer your question, I
7 believe that the forbearance -- if what you're talking
8 about related to the forbearance agreement and all of
9 that stuff, I believe it was extended a few times, but
10 I don't remember the dates.
11    MR. MCCORMACK: I don't have the original.
12    MR. FRANK: I don't think you gave me a copy.
13    MS. MCGEOGH: Yes, we did.
14    MR. FRANK: I don't have a copy of the MOU.
15    BY MR. MCCORMACK:
16 Q. I'm going to place in front of you Ruther
17 Exhibit 12. If you'd look at paragraph 2...
18    MR. FRANK: Paragraph 2 on what page?
19    MR. MCCORMACK: I've opened it to page 2,
20 paragraph 2.
21    MR. FRANK: Paragraph number 2 or the

665

Page 258

1  second paragraph?
2     MR. MCCORMACK: Paragraph number 2.
3     MR. FRANK: On the second page?  I only see
4  paragraph number 1.
5     MR. MCCORMACK: I'm sorry.  Page 3.  Open
6  it to paragraph number 2.
7     MR. FRANK: Excuse me.  This has -- mine
8  has notes on it.
9     MS. MCGEOGH: Well, see, I was just going
10 through this.  These exhibits are a mess.
11    MR. FRANK: Somebody handed me the
12 original.  I made notes on the original.
13    So why don't we agree that -- let's take a
14 copy and we'll agree that it's a copy of it and you can
15 substitute it.
16    MR. MCCORMACK: Do you have a problem with
17 that?
18    MR. RUTHER: I do not.
19    MR. FRANK: You want to show him an
20 unmarked copy?
21    THE WITNESS: Okay.

Page 259

1     BY MR. MCCORMACK:
2  Q.  All right.  Paragraph number 2.
3  A.  Yes.
4  Q.  Little Roman numeral ii.  Do you see
5  purchase deadline date?
6  A.  Yeah.  I see where it says March 16, 2011.
7  Q.  That date was extended, correct?
8  A.  I believe so.  I don't have the -- all the
9  chronology.  But, I mean, obviously, I spent a
10 million-six in extension fees, so...
11 Q.  So you didn't give Pat Turner and Citigroup
12 a million-six in extension fees just to get an
13 exclusive right to purchase that loan for three weeks
14 from February 23rd to March 16, 2011, did you?
15 A.  Some of the payments came after that date.
16 Q.  All right.  Because you kept pushing that
17 deadline out?
18 A.  Kept pushing it out.
19 Q.  All right.  Now, you said that there were
20 discussions regarding bankruptcy in a Chapter 11 prior
21 to the decision being made to file the involuntary.

Page 260

1     Who were those discussions among?
2  A.  I don't remember who -- all the parties
3  that were involved, but I just -- I just remember that
4  there was a discussion -- I don't remember the exact
5  dates, but there was a discussion prior to that about
6  Turner, you know, exploring a Chapter 11 through the
7  company.
8  Q.  Was Mr. Frank present for those discussions?
9  A.  I don't remember.  I don't recall.
10 Q.  But you were present?
11 A.  I was -- I mean, I was not present for all
12 the discussions, but I know that wasn't a topic that
13 had come up.
14 Q.  Well, now, how -- if you weren't present,
15 how do you know it was a topic that came up?
16 A.  I don't know who Pat talked to or who
17 else -- I didn't communicate with Carlyle Group or any
18 of that stuff.  I just know that at that time, prior to
19 that time there was a discussion about him potentially
20 doing a Chapter 11.
21 Q.  And how do you know that?

Page 261

1  A.  Because he told me.
2  Q.  Who told you?
3  A.  Pat Turner.
4  Q.  What did Pat tell you exactly?
5  A.  Just that -- you know, that that was a
6  possibility and that he was going to talk to Carlyle
7  Group.
8  Q.  Okay.  Was Kenny Frank present when he told
9  you that?
10    MR. FRANK: Objection.
11 A.  I don't recall.
12 Q.  Now, you said that Pat Turner was opposed
13 your filing the involuntary, correct?
14 A.  Yes.
15 Q.  Nevertheless, Pat Turner provided Mr. Frank
16 with a list of creditors, correct?
17    MR. FRANK: Objection.
18 A.  I don't know.  It appears that that was sent.
19 Q.  And then when Mr. Frank said he needed more
20 information, Mr. Turner had another of his employees
21 send another Excel spreadsheet, correct?

666

Page 262

1      MR. FRANK: Objection.
2  A.  I believe so based on the documents.
3  Q.  So even though he was opposed, he was still
4  providing information to facilitate Mr. Frank finding
5  creditors to file the involuntary, right?
6      MR. FRANK: Objection.
7  A.  Well, again, he was the opposed to it up
8  until the point that he realized that there was a -- it
9  was going to happen regardless and he didn't believe
10  that it triggered any personal liability, so..
11  Q.  And at that point he wasn't opposed anymore?
12  A.  Well, I don't know if he was opposed or not
13  opposed.  I think he was resigned to it.
14  Q.  Okay, and he cooperated?
15      MR. FRANK: Objection.
16  A.  A few calls, given a list of creditor
17  information, cooperating -- I don't know that I would
18  consider that cooperating.  He was not involved in it.
19  Q.  He didn't communicate with, for example,
20  Cara Frye, his former in-house counsel and his attorney
21  and tell her don't you participate, did he?

Page 263

1      MR. FRANK: Objection.
2  A.  I'm not aware of his communications with her.
3  Q.  Are you aware of him communicating, say,
4  with Robert Schulman who represented Dixie Construction
5  and saying don't do this?
6      MR. FRANK: Objection.
7  A.  I'm not aware.
8  Q.  Now, you said that Mr. Turner received
9  advice from somebody that he could consent to
10  converting the case to Chapter 11 without triggering
11  his guarantee.
12      Who gave him that advice?
13  A.  I don't know.
14  Q.  How do you know he got that advice?
15  A.  I don't really remember the details of it.
16  I just remember that that was a topic that came up.
17  Q.  Now, Mr. Frank asked you what you had asked
18  Mr. Frank to do with regard to Vision Capital and
19  Warhorse Baltimore, correct?
20  A.  I didn't even follow what you said.
21  Q.  In Mr. Frank's examination, he asked you

Page 264

1  what had you instructed Mr. Frank to do with regard to
2  Vision Capital and Warhorse Baltimore.
3      Do you remember that conversation a few
4  minutes ago?
5  A.  I recall the conversation.
6  Q.  Okay.  What is it that you told us that you
7  told Mr. Frank -- you instructed Mr. Frank to do?
8  A.  I wanted him to pursue a resolution with
9  the cowboys if it included litigation, but also try to
10  find out what was going on.
11  Q.  Now, one key to buying the promissory note
12  from Citigroup was to avoid the foreclosure sale
13  scheduled for February 2013, correct?
14      MR. FRANK: Objection.
15  A.  At that point, I don't know that -- if that
16  was really a key element to it.
17  Q.  Did you have an understanding as to whether
18  or not that note still have value the day after the
19  property was sold at public auction sale?
20      MR. FRANK: Objection.
21  A.  I don't follow your question.

Page 265

1  Q.  Once the property was sold and the property
2  was gone, there was no purpose served in buying the
3  note anymore, was it?
4      MR. FRANK: Objection.
5  A.  Yeah, I don't know how to -- I don't know
6  if there was -- would have been a purpose then.
7  Q.  Okay.  Let me see if put a little meat on
8  these bones.
9      If they'd held their foreclosure sale in
10  February 2013 and Westport Property Investments had
11  came to the courthouse and been the high bidder and
12  bought the real estate, were you still going to be
13  willing to be paying $8.5 million dollars to Citigroup
14  to buy the note?
15      MR. FRANK: Objection.
16  A.  I believe I would have.
17  Q.  Why would you buy a note if the real estate
18  was gone?
19      MR. FRANK: Objection.
20  A.  I mean, I would have bought the note and
21  the real estate.  I would have bought the whole asset.

667

Appeal: 15-1671    Doc: 25-2    Filed: 09/28/2015    Pg: 216 of 248

Citigroup Global Markets Realty Corp. v.    Document 61-3    Filed 04/15/15    Page 68 of 95    Thomas Butler Fore - Vol. 1
Patrick Turner, et al                                                                 February 17, 2015

Page 266

1 Q. Okay. But once the foreclosure sale was
2 conducted and the asset is gone, were you still going
3 to buy the note?
4     MR. FRANK: Objection.
5 A. That would never happen, so I don't know.
6 Q. Right. So it was important to stop that
7 foreclosure sale so that there was still a viable
8 plan -- property would still be owned by Inner Harbor
9 West and Inner Harbor West II and you could develop it,
10 correct?
11 A. Yeah. I think that to be able to
12 reorganize the sale or take control over the sale as
13 creditors, that would have been the smart thing to do.
14 Q. Okay. Now, did you also instruct Kenneth
15 Frank to round up creditors to file the involuntary
16 case?
17 A. We discussed the strategy for filing the
18 Chapter 7.
19     MR. FRANK: But don't reveal what we
20 discussed.
21     THE WITNESS: Right.

Page 267

1     MR. MCCORMACK: Wait, wait. You asked him
2 about what you discussed already. You've opened the
3 door on this.
4     MR. FRANK: No, I asked him what he asked
5 me -- what I was instructed to do.
6     MR. MCCORMACK: That's a conversation.
7     MR. FRANK: By him and by Mr. Turner.
8     MR. MCCORMACK: That's a conversation.
9     MR. FRANK: No, but it's not about -- it is
10 not a privileged communication.
11     MR. MCCORMACK: You asked him what
12 instructions he gave you.
13     BY MR. MCCORMACK:
14 Q. Did you instruct Kenneth Frank to round up
15 creditors for the involuntary?
16     MR. FRANK: Objection.
17 A. Well...
18     MR. FRANK: Just to be clear, what I asked
19 him about was related to the Warhorse matter and
20 Vision. That's all I asked him about.
21     MR. MCCORMACK: You asked him about --

Page 268

1     MR. FRANK: What my instructions were with
2 respect to that, what I was asked to do. I did not
3 specify whether it was by him or anyone else. I asked
4 what I was asked to do. I mentioned nothing about the
5 involuntary bankruptcy.
6     MR. MCCORMACK: And I believe that you
7 opened the door to what instructions you were given.
8     MR. FRANK: I'm not going to allow him to
9 answer what he told me, but if you want to ask what
10 happened --
11     MR. MCCORMACK: No.
12     MR. FRANK: -- you can ask that. I'm not
13 going to allow him to answer what he told me.
14     MR. MCCORMACK: All right. Then let me ask
15 the question so we can make our record.
16     BY MR. MCCORMACK:
17 Q. Did you ask Mr. Frank to round up creditors
18 to file an involuntary?
19     MR. FRANK: Objection. Don't answer what
20 you told me.
21 A. Yes.

Page 269

1 Q. Did you ask Mr. Frank to locate -- did
2 you -- was Mr. Turner aware of your asking Mr. Frank to
3 identify creditors to file the involuntary?
4     MR. FRANK: Objection.
5 A. I don't believe so.
6 Q. Did you ask Mr. Frank to find bankruptcy
7 counsel for Inner Harbor West?
8     MR. FRANK: Objection.
9 A. No.
10 Q. Did Mr. Turner ask Mr. Frank to find
11 bankruptcy counsel for Inner Harbor West?
12 A. I don't know.
13 Q. Do you have any explanation as to why
14 Mr. Sirody sent his engagement letter to Mr. Frank to
15 be forwarded to Mr. Turner?
16 A. I don't know.
17 Q. Did you ask Mr. Frank to locate counsel to
18 file the involuntary?
19     MR. FRANK: Objection.
20 A. I don't recall.
21 Q. Did you ask Mr. Frank to just take whatever

668

Appeal: 15-1671    Doc: 25-2    Filed: 09/28/2015    Pg: 217 of 248

Citigroup Global Markets, et al vs.
Patrick Turner, et al
Case 1:14-cv-00557-QFM Document 61-3    Filed 04/15/15    Page 69 of 95

Thomas Butler Fore - Vol. 1
February 17, 2015

Page 270

1 steps were necessary to stop that foreclosure sale?
2    MR. FRANK: Objection. And don't answer
3 that question.
4    MR. MCCORMACK: Nothing further.
5    MR. FRANK: Two quick things. Paragraph 17--
6    THE WITNESS: I feel like I'm in a
7 ping-pong match.
8    MR. MCCORMACK: I'm going to object again.
9    MR. FRANK: That's fine.
10    MR. MCCORMACK: I don't think that you've
11 really got a right to examine him.
12    EXAMINATION BY MR. FRANK:
13 Q.   Paragraph 17 of Ruther 12 is the
14 exclusivity period. I direct your attention to the
15 last sentence.
16    Can you read exactly when the period ends,
17 please?
18 A.   "Period ending on the earlier to occur of
19 the maturity date on the Citibank agreement or the date
20 which is 60 days following the date hereof."
21 Q.   So even if the Citibank date were extended,

Page 271

1 when would this expire?
2 A.   60 days from whatever date this was, 23rd
3 of February 2011.
4 Q.   Mr. Fore, Mr. McCormack asked you whether
5 you thought, by providing a list of creditors for the
6 involuntary bankruptcy, Mr. Turner was assisting.
7    Do you know of your own personal knowledge
8 whether the list of creditors was provided in
9 connection with the potential Chapter 11 or an
10 involuntary bankruptcy?
11 A.   I don't recall. I don't know. I mean,
12 it -- it could have been for a lender too.
13    MR. FRANK: I have nothing further.
14    EXAMINATION BY MR. MCCORMACK:
15 Q.   Mr. Fore, you extended that 60-day deadline
16 as you gave more money and more money and more money to
17 Mr. Turner, right?
18    MR. FRANK: Objection. The document speaks
19 for itself.
20 Q.   Isn't that right?
21 A.   I don't -- I mean, I don't even think we

Page 272

1 have any extensions for this.
2 Q.   That's not my question.
3    You and Mr. Turner agreed to extend that
4 deadline as you contributed more money and more money
5 and more money to the project.
6    MR. FRANK: Are you referring to a written
7 agreement or an oral agreement?
8    Are asking him -- what are you asking him?
9 Is there a written agreement?
10    MR. MCCORMACK: He understands the questions.
11    BY MR. MCCORMACK:
12 Q.   You and Mr. Turner agreed to extend that
13 deadline as you contributed more money and more money
14 and more money, right?
15 A.   We did extend the -- we did extend the
16 mechanism. I don't know -- you know, there weren't,
17 like, specific extensions of the date.
18 Q.   There weren't any documents, but you
19 wouldn't have kept putting money in to the point where
20 you had $2.1 million dollars in there if you didn't
21 have his agreement to extend, as you say, the mechanism

Page 273

1 of the Memorandum of Understanding, right?
2 A.   I don't know. I mean, I felt like I was
3 just chasing my money to -- you know, from one
4 emergency to the next. So I don't know that I was
5 making very good judgments at the time.
6 Q.   But the agreement with Mr. Turner was
7 whatever the deal was in the Memorandum of
8 Understanding, it got pushed out each time you ponied
9 up more money for him?
10    MR. FRANK: Objection.
11 Q.   Correct?
12 A.   I don't believe that's correct.
13 Q.   Okay. Then why, in heavens name, did you
14 keep writing checks to Mr. Turner?
15 A.   That's a question everybody has asked me.
16    MR. FRANK: I'd like to know the answer to
17 that too.
18    MR. MCCORMACK: Nothing further.
19    (Deposition concluded at 5:42 p.m.)
20
21

669

Page 274

1    CERTIFICATE OF DEPONENT

2

3    I hereby certify that I have read and

4    examined the foregoing transcript, and the same is a

5    true and accurate record of the testimony given by me.

6

7    Any additions or corrections that I feel

8    are necessary will be made on the Errata Sheet.

9

10

11

12    _____

13    THOMAS BUTLER FORE

14

15

16

17

18

19

20

21

---

Page 275

1                    ERRATA SHEET

2    Case: Citigroup Global v. Turner

3    Witness: THOMAS BUTLER FORE          Date: 2-17-15

4    PAGE/LINE        SHOULD READ        REASON FOR CHANGE

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

---

Page 276

1    State of Maryland

2    City of Baltimore, to wit:

3         I, R. Dwayne Harrison, a Notary Public of

4    the State of Maryland, Baltimore City, do hereby

5    certify that the within-named witness personally

6    appeared before me at the time and place herein set

7    out, and after having been duly sworn by me, according

8    to law, was examined by counsel.

9         I further certify that the examination was

10   recorded stenographically by me and this transcript is

11   a true record of the proceedings.

12        I further certify that I am not of counsel

13   to any of the parties, nor in any way interested in the

14   outcome of this action.

15        As witness my hand this 23rd of February,

16   2015.

17        ___R. Dwayne Harrison___

18        R. Dwayne Harrison

19        Notary Public

20   My Commission Expires:

21   September 15, 2017

670

## $

**$10,000 (3)**
184:11,13,17
**$125,000 (1)**
185:1
**$14 (1)**
54:16
**$17 (1)**
101:12
**$2.1 (6)**
22:17;26:12;44:7;88:6;
174:7;272:20
**$2.2 (1)**
22:17
**$2.8 (1)**
238:19
**$20 (1)**
242:4
**$20,000 (5)**
172:19,20;173:1,6,9
**$25.5 (1)**
101:17
**$250,000 (1)**
213:11
**$30 (2)**
19:12;20:2
**$300K (1)**
120:18
**$35,000 (4)**
84:11,18,20;85:12
**$40,000 (1)**
181:12
**$50,000 (3)**
20:17;93:10;213:9
**$600,000 (4)**
21:18;22:2,4;26:11
**$7,500 (1)**
166:19
**$7.5M (1)**
120:18
**$8,500,000 (2)**
48:12,21
**$8.5 (5)**
20:1;71:15;72:17;101:9;
265:13

## @

**@BaltSuncom (1)**
174:21

## A

**ability (2)**
31:9;82:7
**able (9)**
89:7;90:17;102:21;122:12;
184:8;190:17;210:18;238:1;
266:11
**above (1)**
171:19

**Abramoff (3)**
28:9,21,21
**absolute (1)**
250:19
**Absolutely (3)**
133:13;184:16;241:9
**accept (4)**
106:5;192:14,15;203:15
**accepted (2)**
86:17;106:7
**accepting (7)**
191:4;200:15;201:6,16;
202:7;203:11;204:4
**access (2)**
69:9;80:5
**accomplish (2)**
213:21;239:10
**accordance (2)**
41:6;48:10
**account (7)**
34:1,4,11,19;35:3;84:11;
151:10
**accounts (3)**
33:15,19;34:6
**accurate (3)**
133:19;144:4;274:5
**accurately (1)**
249:2
**acquire (2)**
54:18;224:18
**acquisition (10)**
47:14;49:12;66:5,6,7;67:5,
9;213:16;232:17;248:17
**Acquisitions (3)**
146:7;149:2;179:14
**across (1)**
222:15
**acted (3)**
161:7,12;239:19
**action (9)**
51:17;52:18;53:18;54:4;
68:10;103:16;125:1;132:9;
133:15
**actions (1)**
248:18
**active (1)**
17:14
**activities (5)**
233:15;234:2,5,20;238:8
**activity (3)**
140:11;141:9;233:10
**actually (9)**
24:17;88:11;128:13;180:1;
211:9;228:14;230:18;235:20;
236:17
**Ad (1)**
139:7
**adamant (1)**
241:3
**addition (1)**
243:17
**additional (5)**
20:11;62:15;181:13,20;

**182:1**
**additions (1)**
274:7
**address (3)**
5:11,13;112:19
**addressed (2)**
146:3;179:7
**admissible (3)**
199:13;202:5,19
**admonished (1)**
150:12
**advance (8)**
22:3,7;24:4,9;67:17;71:14;
72:16;213:7
**advanced (5)**
210:3;213:6,9;256:7,11
**advances (1)**
22:8
**advancing (3)**
14:21;15:9;46:7
**advertisement (6)**
114:21;115:1,8;139:8,11;
163:6
**advertising (2)**
113:20;114:12
**advice (14)**
90:12,14,18;178:15;186:8;
192:12;199:21;200:3;235:20;
236:3,5;263:9,12,14
**advise (2)**
90:4;227:19
**advised (2)**
218:20;235:20
**adviser (1)**
97:5
**advising (1)**
174:10
**advisory (7)**
197:12;198:6;199:17;
200:18;201:10;202:12;203:19
**affairs (1)**
170:2
**affect (1)**
217:7
**affecting (2)**
55:11,14
**affidavit (2)**
157:14,19
**affiliated (1)**
112:20
**affiliates (1)**
133:16
**affirmed (2)**
83:10;86:1
**afford (1)**
240:12
**afternoon (1)**
115:8
**again (38)**
40:6;54:6;56:3;59:20;60:4,
18;89:11,20;91:8;98:16;
107:2;108:9,19;118:10;
119:16,21;129:19;130:14;

**131:10;136:18;140:9,16;
141:13;142:3;147:8;165:18;
170:1;178:10,11;180:19;
186:12;198:16;200:10;224:1;
250:2;251:14;262:7;270:8
**against (22)**
5:19;72:20;79:9;129:9;
130:4,12;132:10;185:5;187:3,
15,18;188:1,5;190:8,19;
191:9,15;193:6;198:9;199:16;
201:21;247:4
**aggregated (1)**
11:20
**ago (2)**
7:16;264:4
**agree (27)**
21:16;24:4,8,10;41:1;42:5;
50:5,13,16;53:17,18;63:1;
71:14,17;72:1;184:13,18;
185:9;207:3;209:12,17;238:2;
241:12;249:18;250:14;
258:13,14
**agreed (11)**
21:12;52:17;54:18;55:9;
56:5;76:17;172:16,18;250:3;
272:3,12
**agreeing (3)**
47:3,4;213:7
**agreement (92)**
22:9;25:2,10,19,21;26:8,9;
27:10,12,13;28:4,19;39:8;
40:21;46:5;48:11,11;51:18;
52:7,9;53:21;54:1,3,5,6,12;
56:17;57:10;58:6;61:1;62:13,
15,17,20;63:2,6,20;64:4;
66:17;71:6;72:4,13,21;74:20;
75:1,18;78:18;80:19;82:12,
18,20;83:5,17;86:11;88:20;
89:3;92:18;93:11;123:19;
133:7;157:15;162:21;170:17;
171:4,14,20;172:6,12,14;
210:3;211:14,19;212:6,12;
213:5,8,10,17,19;219:1;
243:3;250:12;256:9,16,20;
257:8;270:19;272:7,7,9,21;
273:6
**agreements (4)**
52:4;77:1;108:10;189:20
**ahead (9)**
27:6;31:5;32:15;48:6;57:1;
69:18;126:3;140:14;238:21
**Airlines (1)**
202:11
**AJ (3)**
115:3;139:8;163:7
**aligned (1)**
141:4;240:14
**alignment (1)**
91:11
**alleged (2)**
161:12;171:5
**Allen (2)**
135:21;137:1

Appeal: 15-1671     Doc: 25-2     Filed: 09/28/2015     Pg: 220 of 248

Citigroup Global Markets Realty Corp., v     Document 61-3     Filed 04/15/15     Page 72 of 95     Thomas Butler Fore - Vol. 1
Patrick Turner, et al                                                                                              February 17, 2015

allow (5)
    48:5;56:5;127:2;268:8,13
allowed (3)
    128:17;142:18;241:10
alluded (1)
    97:3
almost (2)
    106:2;226:6
aloud (3)
    96:21;103:13;116:21
alternative (1)
    211:10
although (1)
    9:15
always (10)
    10:12;25:15;40:13;89:11;
    90:16;128:4;142:5;183:1;
    241:3;254:2
amalgamated (1)
    31:19
amended (1)
    212:6
among (9)
    40:21;64:4;98:9;104:20;
    143:17;212:6;232:13;233:14;
    260:1
amount (8)
    26:12;56:4;97:17;136:9;
    166:19;184:21;208:8,9
amounted (1)
    140:12
analyses (1)
    231:9
analysis (2)
    199:7;232:2
and/or (1)
    228:2
Angelini (3)
    33:7,8;35:14
answered (7)
    31:4;41:13;211:12;213:4;
    218:12;220:4,15
Anthony (1)
    88:16
anymore (2)
    262:11;265:3
Apologies (1)
    149:20
Apparently (1)
    177:16
appear (3)
    11:8;42:18;255:3
appears (19)
    41:1;51:7;99:4;107:16;
    112:8;114:14,20;129:21;
    146:21;147:8;171:21;172:7,
    12;178:3,10,17;211:6;253:19;
    261:18
applicable (1)
    139:16
applied (2)
    182:4,9
apply (1)

209:17
appraisal (8)
    69:8;229:12,19;230:3,12,
    14,16,16
appraisals (7)
    70:13,15,17,21;71:1;
    229:12,14
appraised (1)
    70:19
appraiser (1)
    230:15
approach (1)
    232:4
appropriate (2)
    187:21;227:19
approval (9)
    17:6;51:8;55:11;60:12;
    133:14,20;172:19;206:20;
    215:20
Approximate (1)
    31:13
approximately (4)
    184:21;213:1;233:8;251:5
archive (1)
    35:5
Ardent (2)
    23:18;230:6
A-R-D-E-N-T (1)
    23:18
area (6)
    12:16;14:8,20;15:18
arena (3)
    13:21;14:2,6
arise (1)
    197:3
arising (1)
    248:18
Armour (1)
    200:21
around (2)
    22:17;92:21
arranged (1)
    243:19
arrangement (2)
    21:5;26:18
arranging (1)
    132:10
arrears (1)
    20:21
articulated (1)
    241:3
articulating (1)
    192:20
ASAP (1)
    134:17
assemble (1)
    29:16
assembling (1)
    141:20
assert (1)
    187:21
asserting (1)
    187:17

asset (3)
    210:13;265:21;266:2
assignment (1)
    243:20
assist (3)
    13:4;21:13;62:8
assistance (1)
    61:21
assistant (1)
    33:5
assistant's (1)
    33:6
assisting (2)
    153:5;271:6
associated (1)
    45:5
Associates (9)
    154:14;155:8;164:19;
    165:14;171:14;173:2;181:5,
    11;182:8
assume (11)
    11:3;143:4;175:4;176:2;
    193:15;194:3,13,17;195:4;
    196:8;227:12
assuming (2)
    142:19;195:15
assured (1)
    82:20
AT&T (3)
    151:6,7,10
Atlanta (1)
    23:20
attached (4)
    145:16;148:9;157:9;171:13
Attachment (2)
    145:9,17
attempt (1)
    239:10
attend (2)
    169:2,4
attention (10)
    181:6;206:18;207:1,5;
    228:11;244:4,9;247:18;249:6;
    270:14
attorney (33)
    27:18;92:10;109:17;113:5;
    119:18;127:2;137:19,21;
    138:2;142:5;151:18;153:1,19;
    154:2;157:20;161:1;165:2,5,
    10;170:7;171:2,4;180:12,21;
    188:12;189:4;191:2;192:10;
    195:2,3;199:8;240:13;262:20
attorneys (3)
    165:20;174:7;180:8
attorney's (4)
    165:12,16;166:3,4
Auchincloss (1)
    171:11
auction (5)
    114:13,21;115:3;185:12;
    264:19
Auctioneers (1)
    139:9

authority (1)
    160:15
authorization (1)
    240:20
authorize (1)
    158:10
authorized (5)
    158:16;160:5;191:14,18;
    240:19
authorizing (2)
    182:5,10
avoid (2)
    119:13;264:12
aware (31)
    75:17;79:11;82:3;97:19;
    98:1;126:20;139:10,21;
    146:13;151:16;152:7;154:2;
    156:3;159:1;169:20;174:9;
    181:10,15;196:1,15;197:3,20;
    200:5;205:9,10;217:10,12;
    263:2,3,7;269:2
away (2)
    9:2;84:12

                 B

back (23)
    38:17,18;53:11;72:9;77:7;
    82:10;89:12;101:12,17;
    105:17;108:1;157:9,12,19;
    162:4;163:10;189:11;191:5;
    239:7;242:6,20;243:7,18
balance (2)
    19:5,8
Ballard (3)
    28:8,13;186:20
Balley (3)
    64:14;146:4;248:20
Baltimore (40)
    5:12;6:21;7:6;27:18;78:20;
    79:4,9,10;80:21;81:10,12,14,
    16;82:13,14,17;83:2,4,16;
    84:6;85:21;97:5,6;101:3;
    104:21;122:19;123:13;
    129:17;142:14;143:20;146:6,
    19;147:6;149:1;176:7;179:1,
    15;248:19;263:19;264:2
bank (2)
    17:8,9
bankruptcies (1)
    214:11
Bankruptcy (88)
    74:2,4,8;98:12;103:16,20;
    104:2,5,11,15;124:9,12,20,21;
    125:5,14;126:5,21;127:3,7,8,
    14;128:3;135:3;137:19,21;
    138:2,20;139:16,20;140:1,2;
    141:21;142:9,10,12;143:16;
    145:1;147:2,3;153:20;156:10;
    161:8;167:13;168:18,21;
    169:3,9,14,16,21;170:6;
    174:11;181:18;182:3,9;
    185:16,19;214:9,13,15;215:4;

Min-U-Script®                                    Gore Brothers Reporting & Videoconferencing                          (278) allow - Bankruptcy
                                                 410 837 3027 - Nationwide - www.gorebrothers.com

                                                                                                                              672

**217:**7,18;218:21;219:6;
221:20;223:5,17,20;224:4;
235:6,10,15;236:9,12,18;
237:17;238:2,9,18;239:9;
259:20;268:5;269:6,11;271:6,
10
**bar (1)**
117:3
**based (12)**
51:6;52:9;67:21;123:3;
129:19,20;192:9;196:3,17;
198:18;212:14;262:2
**basically (2)**
99:13;227:18
**basis (15)**
54:6;59:3;79:7,14,19;
123:12;142:16;143:21;
188:15;198:13,14,17;220:18,
19;221:7
**Bates (2)**
154:21;155:5
**battle (1)**
186:18
**became (3)**
12:4,9;217:10
**become (5)**
12:1;97:19;98:1;170:6;
225:1
**began (2)**
113:20;125:19
**begin (4)**
10:11;107:6;120:12;143:1
**beginning (9)**
92:12;169:20;174:19;
182:17;207:16;208:3;212:17;
233:7;256:7
**begins (10)**
45:21;47:13;49:17,21;
99:20;100:13;112:2;157:8;
244:10;247:19
**begun (1)**
114:12
**behalf (7)**
79:8,9;99:7;237:19;249:19,
19;250:4
**behalves (2)**
240:4,18
**belaboring (1)**
204:14
**belief (4)**
77:18;82:1;124:5,19
**believes (1)**
200:12
**belonged (1)**
123:14
**belt (1)**
14:6
**beneath (1)**
107:5
**benefit (1)**
44:5
**benefiting (1)**
70:8

**besides (1)**
22:19
**best (7)**
86:21;96:9;235:5,13;
238:15;253:8,13
**better (2)**
33:9;182:18
**beyond (4)**
231:3;232:5;256:16;257:2
**bidder (1)**
265:11
**big (4)**
17:20;30:6,7;32:12
**biggest (1)**
27:7
**Bill (10)**
53:8,9,10,17,19;164:1,3,4;
168:15;181:12
**billed (1)**
181:13
**Billig (3)**
115:3;139:9;163:7
**bills (1)**
168:4
**bit (5)**
40:9;69:13;100:15,17;
214:19
**black (1)**
256:1
**block (3)**
253:14,21;254:3
**blood (1)**
186:13
**blue (1)**
256:1
**board (8)**
32:7;197:12;198:6;199:18;
200:18;201:10;202:12;203:19
**boils (1)**
186:13
**bones (3)**
188:7;189:13;265:8
**Borden (5)**
78:5,11;146:6;179:13;
248:21
**borrow (2)**
21:5;88:18
**borrowed (1)**
88:12
**borrower (8)**
43:8,17;44:10;117:6,17;
118:6;119:1;206:16
**borrowing (1)**
43:5
**both (7)**
36:17;121:21;130:19;
131:2;163:13;183:8;227:6
**bottom (12)**
39:16;92:11;107:4;112:2;
115:2;119:5;120:12;135:20;
145:20;174:19;177:5;244:16
**bought (6)**
51:17;105:15;225:11;

265:12,20,21
**Boulevard (1)**
8:12
**bound (2)**
82:18;83:17
**box (2)**
164:15;165:7
**boy (1)**
131:12
**brain (3)**
27:8;40:12,13
**Branch (9)**
42:19;43:1,2,4,7,17;74:21;
117:7,12
**break (4)**
11:12,13;69:12;164:6
**breaking (1)**
97:10
**breaks (2)**
11:11,16
**brief (2)**
106:20;256:2
**briefly (1)**
176:1
**bring (3)**
72:20;128:13;132:9
**bringing (2)**
79:8,14
**broke (2)**
151:2;250:17
**brothers (1)**
250:18
**brought (6)**
80:3;90:3,8;97:4;104:5;
128:11
**budgets (1)**
55:12
**Building (1)**
193:16
**bunch (1)**
247:6
**Burton (10)**
78:4,7,8,10;106:9,13;
112:20;146:5;179:13;248:20
**B-U-R-T-O-N (1)**
78:7
**business (8)**
5:13;12:18;13:10,11;45:5,
11;167:17;173:18
**busy (1)**
169:6
**BUTLER (3)**
5:3,10;274:13
**buy (8)**
17:8;71:7;105:17;110:4;
210:18;265:14,17;266:3
**buying (2)**
264:11;265:2

**C**

**calculated (1)**
199:12

**calculation (1)**
211:10
**California (1)**
23:20
**call (6)**
59:16;71:7;96:10,11,12;
170:17
**called (10)**
5:4;13:19;23:14,18,19;
43:7;45:7;58:3;63:12;225:11
**calls (7)**
51:21;94:3;96:4,7;124:1;
193:21;262:16
**came (21)**
20:12;88:9,10,13;100:15,
17;113:19;123:7;154:19;
155:3,4,17,20,21;186:9;
215:6;259:15;260:15;263:16;
265:11
**can (76)**
10:10,20;11:16;12:4;27:3;
31:5;34:10;38:6;40:8;41:15,
17;44:4;49:4,18;54:10;55:5;
57:17;69:1,2;80:10;81:21;
87:21;100:14;103:2;108:21;
109:21;110:20;116:20;122:5,
15,16;123:6;134:16;135:6,12;
136:7;140:15;144:11;152:3;
157:9,13;161:9;166:11;167:1,
8,9,16;174:14;175:4;180:1,2;
188:2,6,13,17,19,21;189:7,12;
203:12;206:3;207:7;219:13;
221:2;240:12;241:4,13;244:7;
247:9;249:21;253:3;255:9;
258:14;268:12,15;270:16
**capacities (1)**
179:11
**capacity (3)**
254:10,13,16
**capital (89)**
20:13;21:3;23:12;25:1,11;
29:10;33:20;34:15;45:8,11,
16,21;47:4,13;48:5,8,18,20;
49:11,17,21;50:5,19;62:5,7,
13;63:2;64:5,11;66:2,11,16;
67:17;68:9,18;71:14;72:11,
16,21;73:2,7;78:11,14;79:4,
12;80:2,11;82:15,21;83:3,9,
11;84:17;89:6,10;90:1;92:21;
93:3;97:4,9,14,15;104:21;
109:12;113:13;123:19;
129:16;141:8;142:14;143:20;
146:5,18;147:5;149:1;179:12;
207:19;208:6,6,18;209:12,16;
224:15;227:1;228:2;232:21;
243:1;248:19;263:18;264:2
**capitals (1)**
103:19
**Capital's (2)**
47:14;49:12
**Cara (17)**
129:3;152:17,19;156:9,11,
12;157:8,15;163:16;164:1,3,

Appeal: 15-1671    Doc: 25-2    Filed: 09/28/2015    Pg: 222 of 248

Citigroup Global Markets Realty Corp. v.    Document 61-3    Filed 04/15/15    Page 74 of 95 Thomas Butler Fore - Vol. 1
Patrick Turner, et al                                                                                    February 17, 2015

19;165:13;168:17;229:11;
230:3;262:20
**carbon (1)**
99:10
**card (1)**
40:14
**care (1)**
202:4
**career (1)**
167:17
**Carlisle's (1)**
54:19
**Carlyle (21)**
54:17;56:5;125:13,16,17,
17;213:18;215:14,17;216:6;
217:13,16;219:19;220:19;
221:12;223:3,4,9;224:2;
260:17;261:6
**carrier (2)**
151:5,7
**case (31)**
7:15;9:3,8;10:17;67:1;
69:17;91:10,13;98:15;124:20,
21;133:6;138:9,13,20;140:18,
20;141:1;156:10;161:8;
168:4;194:1;196:7;199:10,13;
202:6,19;240:12,15;263:10;
266:16
**cases (12)**
6:7,9,9,10;7:14;90:15,16;
128:6;142:10;167:21;180:19;
241:1
**cash (4)**
22:16,19;88:11;231:13
**caused (2)**
218:2;237:17
**causing (1)**
238:18
**cc'd (1)**
145:6
**CEO (2)**
200:21;202:11
**certain (7)**
53:11;63:7;75:20;76:5;
98:14;106:4;220:17
**CERTIFICATE (1)**
274:1
**certify (1)**
274:3
**CFO (1)**
167:7
**CFO's (1)**
167:8
**chance (3)**
10:15;108:18;152:4
**change (7)**
87:6;101:16;102:4;197:8,
10,14;221:2
**changes (2)**
148:11;178:1
**Chapter (32)**
124:15,21;126:5;131:16;
133:1;138:8;153:19;167:12;

170:6;215:5,7,13,15,18,20;
216:7,15;217:2,13;218:8;
221:19;235:21;236:1,1,13;
239:9;259:20;260:6,20;
263:10;266:18;271:9
**characterize (2)**
58:10;234:19
**Charlow (3)**
115:2,7;195:5
**Charlow's (1)**
115:4
**chart (5)**
41:6;42:16,20;43:1;252:16
**chasing (1)**
273:3
**check (4)**
166:18;167:11;170:17;
176:3
**checks (2)**
182:14;273:14
**choose (1)**
166:3
**Christine (1)**
203:17
**chronology (2)**
61:12;259:9
**circuit (1)**
59:8
**circulated (1)**
112:14
**circumstance (1)**
6:14
**circumstances (12)**
7:5;61:18,20;75:20;76:6,15,
16;97:8;167:16;198:3;
213:12;234:18
**circumvent (1)**
224:18
**Cirque (6)**
18:5,6,9,11,13,16
**citations (1)**
142:11
**Citi (20)**
19:15,18,21;20:2;44:16;
47:5;48:2,10;66:17;92:18;
114:20;115:11;179:11;180:9;
207:19;208:7;211:13,19;
212:6;256:9
**Citibank (27)**
17:10;20:14;21:5,8;22:10;
24:18;69:10;77:13,20;80:6,7,
9;93:16;97:15;110:4;117:3,
17;118:7;119:1;121:2;
122:10;207:3;224:19;228:8;
248:18;270:19,21
**Citigroup (17)**
71:3,7,16;93:5,13;97:7,21;
98:2;113:20;114:11;122:13,
19;123:14;256:20;259:11;
264:12;265:13
**Citigroup's (1)**
94:10
**City (1)**

6:21
**Civil (4)**
6:9,10;7:15;15:4
**claim (35)**
122:5,12,16,20;123:20;
129:8;155:20;161:6,11;
190:19;191:9;192:5;193:6,18;
194:8,19;195:11,18;196:1,11,
15;197:3,20;198:4,8;199:15;
200:6,11,12;201:3,12,21;
202:14;204:1;250:17
**claimed (1)**
8:8
**claiming (2)**
8:3;123:12
**claims (9)**
63:7;130:12;187:3,15,18,
21;188:5;198:18;199:7
**clarification (1)**
110:3
**clear (8)**
104:17;110:8;142:6;
158:20;191:6;193:14;198:16;
267:18
**clearly (4)**
57:8,13;68:13;137:7
**client (1)**
111:10
**clients (1)**
249:18
**client's (1)**
250:4
**closing (10)**
46:10,11,14,15;120:19;
121:7;122:4;185:6,10;232:20
**clue (1)**
221:2
**coach (2)**
188:16;220:12
**coaching (1)**
188:18
**code (8)**
98:12;139:16,20;140:3;
142:12;145:2;147:3;169:3
**collaborative (1)**
234:20
**collateral (4)**
43:20;208:15,15;210:8
**collect (2)**
148:15;149:14
**collecting (2)**
51:10;142:7
**collection (7)**
50:7,17;51:11,12,17;53:18;
209:14
**collective (2)**
240:4,18
**combined (1)**
35:5
**comfortable (1)**
140:21
**coming (1)**
85:16

**comment (4)**
126:3;177:7,19;255:4
**commissioned (2)**
70:13,17
**commitment (1)**
251:1
**committed (1)**
66:11
**common (1)**
42:7
**communicate (5)**
119:17;124:19;128:7;
260:17;262:19
**communicated (3)**
123:7;156:9;158:14
**communicating (9)**
119:18;127:7;143:16;
147:2;150:16;157:6;170:1;
172:4;263:3
**communication (1)**
267:10
**communications (10)**
61:19;79:21;123:2,3;140:6;
189:5;195:3;199:9;229:6;
263:2
**companies (3)**
130:11;162:17;173:11
**company (17)**
12:19;13:13,19;23:18;
50:13;55:9,10;60:12;87:15;
88:9;99:14;167:13;168:3,21;
202:1;250:18;260:7
**competent (1)**
245:1
**competitive (1)**
159:6
**complaining (2)**
136:7;181:11
**complaint (3)**
190:7,10;246:18
**complete (2)**
157:13;207:16
**completed (3)**
10:13;86:15;246:16
**completely (3)**
9:15;190:21;240:14
**complied (3)**
39:7;55:7;56:11
**comports (1)**
119:11
**Comstock (2)**
23:17;242:17
**concern (2)**
238:20;239:6
**concerned (2)**
126:6;217:6
**concerning (1)**
105:7
**conclude (2)**
123:8,11
**concluded (2)**
123:18;273:19
**conclusion (4)**

674

Appeal: 15-1671    Doc: 25-2    Filed: 09/28/2015    Pg: 223 of 248

Citigroup Global Markets Realty Corp. v. Document 61-3   Filed 04/15/15   Page 7 of 95   Thomas Butler Fore - Vol. 1
Patrick Turner, et al                                                                        February 17, 2015

52:1;124:2;143:3;194:1
**conditions (5)**
50:6,16;57:10;209:13,17
**conducted (1)**
266:2
**conduit (1)**
171:3
**conference (2)**
94:2;96:4
**confident (1)**
82:7
**confidential (4)**
68:15,16;69:8,19
**Confidentiality (8)**
62:19;63:8;69:11;74:20;
75:18;78:18;80:19;83:5
**confirm (3)**
117:11;118:6;172:20
**confirmation (4)**
98:8;117:2;118:13,21
**confirmed (2)**
83:12,14
**conflating (1)**
144:2
**conflicts (1)**
91:5
**confused (2)**
89:20;164:5
**confusing (1)**
136:7
**connected (1)**
42:16
**connection (11)**
28:18;45:12;62:7;90:4,9;
138:19;221:19;229:15;
235:15;248:17;271:9
**consent (3)**
54:4;138:3;263:9
**consequence (2)**
222:10,14
**consider (4)**
66:3,15;141:9;262:18
**considering (3)**
14:3;15:9;185:21
**consist (1)**
239:15
**consistent (1)**
121:5
**conspiracy (2)**
82:1,14
**conspired (1)**
124:6
**constituted (1)**
97:18
**construction (16)**
12:19;14:4,16;15:1,3;
129:2;158:7;159:2,4;162:16;
164:2;165:9,14;168:21;244:1;
263:4
**consultant (1)**
83:10
**consultant/project (1)**
152:20

**consultants (2)**
82:21;83:9
**consulting (1)**
160:16
**contact (7)**
114:20;115:10,21;126:16,
18;171:15;228:8
**contained (1)**
214:8
**contemplated (3)**
214:16;215:4;233:1
**contemplating (3)**
14:16,18,21
**contest (1)**
11:10
**context (1)**
170:19
**Continue (6)**
59:5,9,13,17;82:6;208:17
**contract (14)**
77:19;79:10;80:9;121:2;
122:6,7,9,13,16,18,20;123:13,
21;227:7
**contracted (1)**
77:13
**Contractors (1)**
193:16
**contracts (1)**
55:14
**contribute (1)**
24:4
**contributed (7)**
22:12,20;23:3;26:10,13;
272:4,13
**contributing (2)**
46:4,19
**contributions (1)**
242:4
**control (3)**
176:12;186:17;266:12
**controlled (1)**
50:14
**conversation (10)**
98:2;219:19;221:12;223:3,
4,9;264:3,5;267:6,8
**conversations (11)**
94:13;95:14;97:20;98:9;
104:20;163:16;187:7;214:18;
215:2;224:2;233:14
**convert (3)**
235:21;236:13;239:8
**converting (1)**
263:10
**convey (2)**
36:13;102:4
**conveyed (1)**
69:3
**convinced (1)**
124:14
**cooperated (1)**
262:14
**cooperating (2)**
262:17,18

**copied (9)**
108:6;116:18;120:2,4;
136:20;158:3;172:2;177:14;
178:11
**copies (1)**
139:11
**copy (12)**
36:15;92:17;97:1;99:10;
116:13;157:18;247:14;
257:12,14;258:14,14,20
**corner (4)**
39:17;91:21;99:6;111:2;
154:9;157:1;164:13
**corporation (2)**
13:13;254:11
**corrections (1)**
274:7
**correctly (1)**
80:17
**correspond (1)**
111:18
**correspondence (1)**
40:6
**corresponding (4)**
91:16;93:16,19;108:10
**corresponds (1)**
42:6
**cost (2)**
22:21;184:6
**costs (1)**
231:18
**counsel (25)**
27:21;28:3,5;92:10;95:1;
127:3;130:18;140:1;179:11;
180:16;185:21;186:6;187:7;
189:5;199:9;205:20;206:1;
236:17;242:9;243:8,11;
262:20;269:7,11,17
**counsel's (1)**
82:7
**count (3)**
30:16;71:19,21
**countersued (1)**
9:2
**County (2)**
13:2,18
**couple (6)**
20:11;30:3;97:4;148:16;
149:16;151:4
**course (5)**
13:3;103:16;124:21;
150:13;213:10
**court (20)**
9:10,12,12,13,17;11:5;
36:19;73:19;74:1,2,3,4,8,17;
77:6,9;172:19;181:18;182:9;
185:16
**courthouse (1)**
265:11
**covenant (2)**
63:9;70:7
**covered (3)**
82:20;83:4,10

**cowboy (2)**
103:7;105:2
**cowboys (21)**
78:2;82:2,2;91:13;103:5;
104:8;108:11;113:16;140:19,
19;141:8;178:19,21;185:5;
224:8,18;226:11;227:18;
229:10;247:5;264:9
**cowboys' (1)**
240:15
**craving (1)**
186:16
**created (2)**
63:15,21
**creative (1)**
184:5
**creditor (8)**
129:3,4;130:4;136:8;
157:15;165:18;217:1;262:16
**creditors (38)**
126:11,15;128:18;129:1;
134:16;135:2,8;137:12;
141:20;142:8,8;143:12,13;
146:15;153:20;158:8,11,17;
160:1,16;161:2,6,11;169:2;
219:12;224:4;233:3,6;238:2;
261:16;262:5;266:13,15;
267:15;268:17;269:3;271:5,8
**criminal (1)**
6:9
**cross-examine (1)**
205:21
**crosshairs (1)**
132:21
**CRP (1)**
48:11
**current (3)**
5:13;20:18;110:3
**currently (1)**
136:9
**customarily (1)**
252:7
**customary (1)**
253:14
**cut (2)**
67:18;132:5
**cutting (1)**
68:6
**CWG (3)**
23:14;24:14;25:9

## D

**dad's (1)**
204:11
**Dale (9)**
78:4,6;105:2,5,21;146:5;
179:13;225:10;248:21
**damage (3)**
27:8;40:12,13
**damages (1)**
161:12
**Daschle (3)**

675

Appeal: 15-1671    Doc: 25-2    Filed: 09/28/2015    Pg: 224 of 248

Citigroup Global Markets Realty Corp. v. Thomas Butler Fore - Vol. 1
Case 1:14-cv-00557-JFM   Document 61-3   Filed 04/15/15   Page 76 of 95
February 17, 2015

Patrick Turner, et al

195:15;196:3;197:11
**date (38)**
29:10,11;48:21;101:2,2;
108:21;125:3;144:18;147:20;
172:20;173:4;211:13,18;
212:2,3,5,9,12,17;213:8,9;
215:11;219:15,16;221:9,16;
222:20;223:15;256:12;259:5,
7,15;270:19,19,20,21;271:2;
272:17
**dated (10)**
29:9,10,11;61:1;116:14;
134:15;148:2;170:7;181:7;
183:15
**dates (5)**
21:20;32:11,19;257:10;
260:5
**day (13)**
9:19;11:11;24:1;106:3;
138:12;144:21;147:1;149:11;
204:12;211:14;226:19;256:7;
264:18
**days (12)**
32:2;58:21;148:16;149:16;
211:8,9,14;212:16;213:1,2;
270:20;271:2
**de (6)**
18:5,6,9,11,13,16
**deadline (12)**
48:10,21;212:7;256:15,18,
20;257:2;259:5,17;271:15;
272:4,13
**deal (19)**
53:10;54:7;60:20;67:19;
68:6;71:3;80:9;89:13;100:19;
141:17;224:11,12,15;226:10;
229:10;242:17;244:3;256:18;
273:7
**dealing (5)**
62:2;108:13;140:19;226:4;
227:19
**deals (1)**
139:20
**dealt (1)**
115:14
**Debbie (2)**
135:21;137:1
**debt (4)**
75:20;76:5,17;239:18
**debtor (4)**
171:5;236:17;237:20;
239:11
**debts (3)**
136:14,16;137:4
**Decaris (4)**
88:16,18,21;89:8
**D-E-C-A-R-I-S (1)**
88:17
**December (7)**
12:8;29:9;61:11;92:21;
93:6;94:8;129:15
**decided (1)**
130:2

**decision (4)**
133:10,16;134:3;259:21
**decisions (4)**
55:11,13;60:13;241:4
**Deed (1)**
43:13
**deep (1)**
17:12
**default (1)**
93:8
**defend (1)**
168:4
**defendant (3)**
6:11;7:20,21
**defendants (2)**
74:14;77:6
**defended (1)**
206:8
**defer (1)**
205:6
**defined (4)**
208:11;212:1,2,3
**defines (1)**
141:14
**definitely (1)**
94:19
**degree (1)**
44:9
**deliver (1)**
185:15
**Department (1)**
70:8
**departments (1)**
6:20
**depending (1)**
198:3
**depends (2)**
176:17;232:20
**DEPONENT (1)**
274:1
**deposed (6)**
6:6,7,15;7:11,17;9:4
**deposing (1)**
79:17
**deposit (4)**
120:18,21;121:1,18
**deposition (14)**
6:2;7:12;9:7;10:8;11:19;
25:6;39:2;49:8;88:4;135:15;
166:10,18;192:1;273:19
**depositions (2)**
205:11,15
**describe (1)**
97:12
**described (3)**
11:19;80:16;246:17
**describes (1)**
60:10;207:3
**designate (2)**
240:3,7
**designating (1)**
240:9
**designed (2)**

68:13;202:18
**details (3)**
17:3;70:1;263:15
**determine (1)**
251:3
**determined (1)**
239:8
**develop (2)**
87:18;266:9
**developed (3)**
20:10;28:4;68:17
**development (40)**
12:5;13:20,21;14:2,3;17:7,
14;18:18;24:5;26:16;33:18;
35:2,4;40:21;42:8;43:3,4;
45:5;54:11;64:6;65:21;74:21;
81:18;99:14;117:7,12;133:15;
134:2;150:14;151:21;159:4;
173:12;213:13;248:16;
251:21;252:4,12,13;254:10,
17
**developments (1)**
87:10
**Deveney (4)**
27:14,15;45:15;64:3
**Deveney's (1)**
27:21
**dictate (1)**
241:11
**difference (3)**
188:8;189:14,16
**different (7)**
10:21;84:3,4;87:15;111:2;
155:17;227:9
**digging (1)**
183:3
**diligence (1)**
93:2
**direct (13)**
69:9;97:6;206:18;207:1,5;
231:4,6;232:6;244:4,9;
247:18;249:6;270:14
**directed (1)**
235:1
**directing (1)**
113:15
**direction (1)**
96:16
**directly (4)**
71:3;108:13;165:1;171:15
**dirt (1)**
15:4
**disadvantage (1)**
191:13
**disagree (1)**
205:16
**disagreed (3)**
241:8;242:5,8
**disagreement (3)**
183:5,16;218:16
**disagreements (1)**
183:10
**disclose (1)**

19:14
**disconcerting (1)**
225:4
**discretion (1)**
210:20
**discuss (3)**
103:15;131:6;193:1
**discussed (7)**
16:18;226:5;234:15,18;
266:17,20;267:2
**discussing (3)**
19:14,18;151:10
**discussion (17)**
13:3;106:20;180:20;
185:18;204:15;219:8;223:4,8,
10,15;224:3;241:19;255:5;
256:2;260:4,5,19
**discussions (19)**
20:9;39:10;75:16;86:7,8;
92:20;97:7,16,17;129:16,20;
150:14;160:1;214:10;215:3;
259:20;260:1,8,12
**dismissed (3)**
74:9;138:9,13
**disposition (3)**
50:8,18;209:15
**dispute (3)**
130:19;131:3;140:19
**disqualify (1)**
186:20
**distinction (1)**
54:9
**distinguished (1)**
34:6
**District (3)**
74:2;77:6,9
**Dixie (11)**
129:2;132:7;158:7;159:2,4;
162:16;164:2;165:9,14;
168:21;263:4
**Dixie's (2)**
249:17;250:3
**DLA (11)**
102:18;109:18;111:7,13,14;
112:18;113:8;151:18;155:21,
21;156:1
**DLA000037 (1)**
111:5
**docket (1)**
182:3
**document (27)**
27:10;39:12,13;40:5;42:11,
16;51:6;52:14;57:18;58:2,9,
11;60:9,11;75:4;99:5;107:3;
108:19;120:10;138:6;155:19;
162:9;174:18;210:7;211:21;
214:7;271:18
**documentation (1)**
129:21
**documents (32)**
29:16,17;30:12,18;31:3,10,
17,19;33:2,10;35:13;36:20;
37:4,9;40:3;47:15;48:2,9;

Appeal: 15-1671   Doc: 25-2   Filed: 09/28/2015   Pg: 225 of 248

Citigroup Global Markets Realty Corp. v.   Case 1:14-cv-00557-JFM   Document 61-3   Filed 04/15/15   Page 77 of 95   Thomas Butler Fore - Vol. 1
Patrick Turner, et al                                                                        February 17, 2015

49:13;52:1;71:16;111:14;
156:1;208:6;210:18;212:8;
217:8;250:4;254:20;255:5;
262:2;272:18
**dollar (2)**
20:3;101:18
**dollars (11)**
20:3;44:8;49:14;71:15;
72:17;88:6;101:10;238:19;
242:5;265:13;272:20
**done (17)**
18:7,8,14,15;35:6;64:2,3;
70:15;85:11;86:20;87:5;
100:19;167:21;168:4;236:15;
238:16;244:3
**door (2)**
267:3;268:7
**Doug (13)**
72:11;84:1;89:15,16;90:1;
92:13;99:16,17;103:4,7,11;
146:4;248:20
**Douglas (1)**
202:10
**Dowers (10)**
78:4,6,10;105:2,6;106:9;
146:5;179:13;225:11;248:21
**Dowers' (1)**
105:21
**down (12)**
9:17,18;11:6;49:15;57:18;
69:12;97:10;150:14;156:21;
164:6;208:3;244:2
**draft (6)**
99:20,21;103:14;112:14;
185:15;186:19
**drafted (4)**
27:13;75:4;110:2;146:2
**draw (2)**
141:18;228:11
**Drive (1)**
5:14
**drop (1)**
170:17
**dropped (1)**
147:18
**dubious (1)**
253:12
**due (3)**
85:6;93:2;208:8
**duly (1)**
5:4
**During (12)**
7:3;13:3;31:18;43:13;
149:13;151:9;173:12;213:10;
225:6;226:6;228:3;233:7

**E**

**earlier (6)**
39:2;62:12;117:5;211:15,
17;270:18
**early (7)**
12:3;21:21;26:11;83:15;

98:12;140:3;169:20
**earned (1)**
185:7
**easy (1)**
44:12
**eat (1)**
88:1
**Ed (3)**
64:14;146:4;248:19
**Edward (1)**
201:8
**effective (2)**
124:15,21
**effectuate (1)**
89:7
**effort (2)**
150:21;234:20
**efforts (5)**
90:9;110:4;119:13;226:9;
239:15
**Eight (7)**
7:2,8;20:3;49:13;66:9,10;
101:18
**either (7)**
10:20;81:21;108:6;139:3;
189:18;189:9;238:17
**electronically (1)**
36:14
**element (1)**
264:16
**elicit (1)**
202:18
**else (23)**
22:18;23:21;25:12,21;
34:17;40:1;52:11;77:3;88:15;
96:11;102:15;103:2;174:2;
176:13;190:9;192:21;205:17;
206:21;227:5;228:3,6;260:17;
268:3
**else's (6)**
130:15;165:20;166:3,4;
167:18;225:5
**email (69)**
33:18,18,19;34:1,4,6,9,11,
19;35:2,5;89:18;91:20;92:6,
12;99:2,10,16;100:1,2,7,11,
13;104:12;106:15;107:6;
108:21;109:5;110:2,16;
116:12,16,18;118:20;120:11;
134:14;136:19;139:5,7;
144:15;145:13;146:9;147:13;
151:17;157:7;162:14;170:5;
171:11;174:18,20;175:5;
177:4,6,11,14;179:6,7,10;
185:13;219:10,16;221:16;
222:2,3;228:11;237:2;249:11;
254:9,15
**emails (23)**
30:1;33:14,15;34:5,18;
35:9;36:3,13;37:9;38:4,8,14;
40:6;120:2;127:6;134:10;
222:21;223:2;245:21;251:5;
252:7;253:18;254:2

**emergency (1)**
273:4
**employed (1)**
6:20
**employee (1)**
53:4
**employees (2)**
26:14;261:20
**employee's (1)**
53:7
**enables (1)**
97:1
**end (10)**
9:19;10:8,14;17:11;41:17;
182:17;204:12;225:9;227:21;
250:8
**ending (1)**
270:18
**ends (1)**
270:16
**endurance (1)**
11:10
**enforce (3)**
206:17;210:20;227:12
**enforcement (4)**
50:7,17;209:14;227:10
**engaged (3)**
159:4;229:20;240:17
**engagement (2)**
90:19;269:14
**engineering (1)**
15:4
**enough (2)**
44:12;250:9
**enter (1)**
58:6
**entered (3)**
39:9;56:7;60:21
**entering (1)**
71:6
**entire (5)**
150:13;173:13;210:13;
213:20;248:5
**entities (9)**
44:13,20;45:1,9;50:19;
68:18;98:11;112:20;119:19
**entitle (1)**
44:20
**entitled (10)**
8:3,8;46:18;62:19;182:8;
206:2,5,10;243:19;256:21
**entity (17)**
13:14;42:1,6,18;43:5,8;
45:7;50:14;51:18;63:14;
77:12,19;87:17;128:18;133:2,
4,9
**entry (1)**
82:4
**environment (2)**
69:14;70:8
**environmental (4)**
69:7,21;70:1,6
**equity (8)**

8:4,8;87:10,17;89:9;133:9;
184:1;207:19
**Errata (1)**
274:8
**escrow (1)**
84:11
**establish (1)**
214:17
**established (1)**
71:12
**Estate (8)**
146:6;149:1;210:15,16;
248:19;265:12,17,21
**Evelius (2)**
116:14;179:8
**even (17)**
11:13;58:4;75:3;80:15;
83:10;115:6,16;133:19;184:7;
190:17;214:14;238:12;
241:11;262:3;263:20;270:21;
271:21
**evening (1)**
176:1
**event (4)**
18:13;54:16;56:3;216:5
**events (1)**
6:14
**eventual (1)**
87:17
**eventually (6)**
11:20,21;22:3;44:7;63:15;
256:16
**everybody (5)**
84:12;273:15
**everybody's (1)**
141:4
**evidence (6)**
126:1;142:19;144:2;
199:13;202:6,19
**evidences (1)**
57:14
**exact (3)**
31:12;215:11;260:4
**exactly (4)**
253:2,5;261:4;270:16
**EXAMINATION (8)**
5:7;206:11;231:4;256:3,5;
263:21;270:12;271:14
**examine (1)**
152:4;270:11
**examined (2)**
5:6;274:4
**example (8)**
33:9;53:2;142:6;193:15;
251:12;252:20;254:8;262:19
**excavating (1)**
159:5
**Excel (2)**
136:1;261:21
**except (1)**
246:16
**exception (2)**
11:14;26:5

677

Citigroup Global Markets Realty Corp. v.
Patrick Turner, et al

Thomas Butler Fore - Vol. 1
February 17, 2015

excerpts (1)
  206:13
exchange (22)
  21:7;56:18;57:4,7,9;58:5;
  59:20;60:6;84:10;91:20;
  92:12;120:3,12;139:5;144:21;
  157:7;170:5;171:11;174:18;
  177:4;179:7;213:7
exchanges (1)
  108:7
exchanging (1)
  142:11
exclusive (7)
  58:6;59:21;60:6,10;134:1,
  6;259:13
exclusivity (9)
  56:16;57:5,11;211:5,7;
  212:15;213:7;256:19;270:14
Excuse (7)
  149:17;227:15;229:1;
  235:21;236:12;249:20;258:7
execute (1)
  250:4
executed (2)
  62:18;256:12
exercise (2)
  66:17;257:1
Exhibit (76)
  29:9,11,12;39:2,6,8;40:16,
  17;57:21;62:12,14;66:8;
  67:15;74:19;76:2;78:19;
  80:13,18;91:20,20;96:16;
  98:20;99:2;108:16;110:21;
  111:1;112:14;114:9,15;
  116:12;118:16;120:8,10;
  134:13;135:18;139:5;144:12,
  14,14,15;145:1;147:10,12;
  148:6,20;151:13;152:16;
  154:8;156:19,21;161:21;
  162:2,10,11;163:5;164:7;
  166:12,13,15,18;169:19;
  171:10;172:9;174:17;177:1,3;
  181:4,4;183:12,14,14;206:19;
  236:20,21;245:19;257:17
Exhibits (5)
  29:3,5,8;39:14;258:10
existed (2)
  70:21;71:1
existence (2)
  70:18;200:11
expand (1)
  10:21
expanded (1)
  148:21
expectation (2)
  46:9;93:1
expenses (4)
  136:1;137:7;231:19;232:19
expert (1)
  194:10
expire (1)
  271:1
expired (3)

68:2;134:6;243:5
explain (1)
  202:17
explaining (3)
  111:9,16;154:18
explanation (2)
  111:19;269:13
exploration (1)
  14:5
explore (1)
  40:8
exploring (4)
  13:2,20;214:13;260:6
express (1)
  238:20
expressed (1)
  180:6
extend (6)
  256:7;272:3,12,15,15,21
extended (7)
  212:7;256:16;257:2,9;
  259:7;270:21;271:15
extending (1)
  257:4
extension (2)
  259:10,12
extensions (3)
  93:11;272:1,17
extent (6)
  79:21;123:1;187:5;188:11;
  189:2;195:1

## F

face (4)
  94:17,17;220:9;254:15
face-to-face (1)
  94:5
facilitate (1)
  262:4
fact (30)
  47:4;51:13;72:16;75:3;
  83:8;92:9;97:4,20;98:1,3;
  101:17;120:3;131:7,15;132:5;
  133:7,14,21;144:1;151:16;
  159:1;173:11;174:9;184:4;
  187:13;210:1;236:16;253:8;
  254:18;255:13
facts (3)
  10:17;11:9;144:1
factual (1)
  221:7
fading (1)
  256:1
fairly (4)
  17:12;91:14;186:18;233:13
faith (2)
  37:12,16
fall (3)
  16:4;17:11;243:1
fallen (2)
  56:5;69:10
familiar (1)

253:20
far (1)
  20:21
father (1)
  204:18
favor (2)
  127:13;206:20
February (37)
  31:9;32:5;61:1;121:8;
  127:21;144:19;145:5;147:20;
  149:11,14;151:17;156:5;
  157:7;162:5,20;163:7;169:11;
  170:8;176:10;178:18;181:7,
  11;212:13,18;225:9;230:3;
  233:9;236:10;237:1,6,7,13,
  18;259:14;264:13;265:10;
  271:3
Federal (3)
  9:12;74:1,17
fee (7)
  172:16,18;183:5;184:21;
  243:21,21;251:1
feel (4)
  11:12;130:14;270:6;274:7
feeling (1)
  128:4
feelings (1)
  192:21
fees (12)
  165:12,16,20;166:3,4;
  167:12,18;243:18;244:1;
  256:12;259:10,12
felt (4)
  80:17;128:16;131:10;273:2
few (5)
  205:18;256:4;257:9;
  262:16;264:3
Fields (6)
  112:20;113:2,17;151:18;
  179:7;180:16
Fields@Markfieldslawcom (1)
  112:21
fight (1)
  242:1
figure (3)
  69:3;245:11,15
figured (1)
  69:2
file (31)
  35:5;98:11;125:14;126:9;
  132:15;133:1,4;135:2;137:12;
  161:2;165:17;167:18;168:7;
  185:14,15;215:20;216:7,14;
  217:1,13;218:8;236:11;238:2,
  18;250:19;259:21;262:5;
  266:15;268:18;269:3,18
filed (20)
  73:20,21;74:16;82:5;132:6,
  7,8;138:3,4;153:21;162:15;
  166:6;169:9;174:11;224:4;
  237:17,17;238:4;246:18;
  247:3
files (6)

29:21;30:2,3,6;31:17;
  157:20
filing (20)
  124:19,20;125:5;126:5;
  127:8;134:9;161:7,13;167:12;
  169:21;215:15;217:7,17;
  218:20;219:6;221:19;238:9,
  17;261:13;266:17
final (5)
  96:16;244:10;246:11,13,15
finalize (2)
  148:15;149:15
finance (7)
  24:5,10;66:5,6;67:9;250:13,
  14
financed (1)
  224:11
Financial (2)
  230:7;231:9
financing (13)
  14:17,18;23:4,6;26:15;48:4,
  5;55:13;62:9;66:16;90:10;
  243:19,21
find (19)
  18:4;26:14;30:12;34:18;
  47:3,6;50:1;59:16;90:9;
  127:3;171:2,7;172:10;219:13;
  229:9;244:7;264:10;269:6,10
finding (2)
  137:12;262:4
fine (4)
  106:16;118:1;184:17;270:9
finish (4)
  10:11,16;57:1;152:1
firm (3)
  102:15,16;116:8
first (64)
  5:4;6:1,19;10:9;12:4;16:5,
  6;18:1;19:4,13;20:8,19;21:19,
  21;25:13;31:17;46:3;53:7;
  61:13;64:6;72:1;74:5,7,19;
  76:4,10;83:1;97:19;98:3;
  107:5;112:1;113:1;114:5;
  116:20;128:12,21;130:8;
  133:11;139:6;144:15;146:8;
  149:13;153:13;159:16;162:1;
  169:8;171:10,11;174:19;
  175:19;179:7;180:12;233:9;
  238:13;243:13;245:4,8,16,17,
  19;246:3,6;249:14;256:6
five (5)
  135:12;148:5;151:8;166:7;
  191:20
fledged (1)
  14:4
flows (1)
  231:14
folder (2)
  30:7,8
follow (3)
  10:9;263:20;264:21
followed (4)
  9:20,21;92:3;178:11

Appeal: 15-1671    Doc: 25-2    Filed: 09/28/2015    Pg: 227 of 248

Citigroup Global Markets Realty Corp. v. Document 61-3    Filed 04/15/15    Page 79 of 95 Thomas Butler Fore - Vol. 1
Patrick Turner, et al                                                                February 17, 2015

**following (5)**
211:14;236:9,9;250:5;
270:20
**follows (2)**
5:6;101:2
**forbearance (9)**
20:14,18;21:9,13;77:1;
93:11;256:8;257:7,8
**FORE (24)**
5:3,10,16;29:3,7;39:5,14;
42:12;64:7,20;65:15;166:13;
194:9;205:18;206:1,12;214:6;
248:14;249:18;250:4;255:1;
271:4,15;274:13
**F-O-R-E (1)**
5:10
**Fore-claim (1)**
39:17
**foreclosure (17)**
105:16;113:21;114:3,6,13;
115:18;119:13;124:9,17;
139:11;143:17;163:1;264:12;
265:9;266:1,7;270:1
**foregoing (1)**
274:4
**Fore's (1)**
155:19
**forgotten (1)**
146:12
**form (31)**
142:21;164:11;209:19;
210:4,10,17,21;212:11;214:5;
217:19;219:2,7;221:21;223:6;
224:5,20;225:20;226:2,7;
230:1;231:15,20;232:5,10,15;
233:5,12;235:3;240:1;242:11;
255:2
**formation (1)**
89:13
**formed (2)**
45:14,16
**former (8)**
195:15;196:9;197:1;201:8,
18;202:10;203:18;262:20
**forum (1)**
187:21
**forward (8)**
36:8;37:20;38:9;60:19;
125:19;126:21;159:3;205:11
**forwarded (7)**
107:6,16,18;137:2;171:21;
175:12;269:15
**forwarding (2)**
136:5;172:5
**forwards (1)**
115:9
**found (7)**
30:15,21;31:6;35:7,9;36:4;
218:1
**founded (1)**
178:5
**founder (1)**
200:21

**four (1)**
7:15
**fourth (2)**
17:12;172:9
**FRANK (577)**
12:6;15:11;17:16;20:5;
24:7;25:14;26:20;27:4;28:16;
30:14,19;31:4,11,14;32:1,10,
18;33:11;34:12,20;35:10,21;
36:5,7,10,15,16,21;37:6,8,14,
17,19;38:1,5,8,10,12,16,17;
40:2,4;41:5,10,13,14,19;
42:10,21;43:9,14,21;44:17;
45:2;46:20;48:13,17;49:18;
50:1,2,21;51:5,19,21;52:20;
54:14;55:2,16,18;56:20;57:1,
6,16;58:9,12,14,17;59:2,5,9,
13,17;60:3,8;61:13,16,20;
62:3,6;66:4,14,20;67:11,20;
68:8,19;69:16;70:10;73:12,
18;74:6,10;75:2,7,11,14,21;
76:7;77:10,16;78:12,21;79:5,
8,13,20;80:14;81:1,7,13,19;
82:16;83:7,13,18;84:13,19;
85:4,10;86:3,10,13,18;87:2,7,
9,11,19;88:8;89:17;90:3,6,8,
11,20;91:16;92:12;93:7;
94:12,18;95:6,11,15,19;96:2,
5,10,13;97:11;98:10;99:3,21;
100:3,13;101:14,20;102:13;
104:5,7,9,13,16;107:13,14,20;
108:1,9;109:3,8,19;110:1,13,
16,18;111:8,11,16;112:7,13,
17;113:15;114:2;115:20;
116:1,7,9,12;117:1,9,10,11,
13,16,18;118:9,20;119:7,12,
15,20;120:5,14;121:18,21;
122:19,21;123:9,12;124:1,8;
125:18,21;126:12,12,14;
127:3,4,7,10,15,17;128:1,14;
129:14,14,18;130:13,18,20;
131:2,4,9;132:14;133:5,12,
18;134:5,14;135:1,4,7,9;
136:6;137:4,6,14;138:5,10;
139:2,7,10,15;140:2,6,8;
141:7,12,20;142:2,7,13,15,18;
143:1,9,11,14,15,18,21;
144:15;145:4,12,14,19;146:2,
14,16,20;147:2,3,4,7,14,17;
148:7;149:9,11,15,19,20,21;
150:13,19;151:17;152:1,5,9,
13;154:4,5,16,20;155:2,5,9,
13;156:4,6,9,11;157:4,6,8,13,
19;158:1,6,10,13,16,19;159:2,
7,18;160:3,6,8,15,18;161:3;
162:5,18;163:3,10,12;164:10;
167:14;168:10;170:1,3,7,11,
13,21;171:6,12,12,20;172:4,
11;173:3,14;174:10;175:3,16,
19,21;176:6,8,11,16;177:6,15,
18,18,21;178:2,9,13,14,20;
179:9,16,20;180:10,17,18;
181:6;182:11,15;183:5,16,17,

18;184:1,2,11,14;185:14,17,
21;186:10,11,19;187:1,5,19;
188:10,15,18,21;189:4,6,7;
190:11,15,21;191:6,17;192:8;
193:7,9,19,21;194:6,9,15,21;
195:8,12,19;196:2,5,12,16,19;
197:6,15,19;198:10,14,17;
199:1,4,6,12,19,21;200:1,3,4,
7,20;201:4,14;202:2,15;
203:2,7;204:2,8;205:5,18;
206:1,6,9,11;207:7,10,13,14;
208:20;209:2,5,9;214:20;
215:1;220:9,11,16;221:1,4,6;
222:9,13,17,19;227:16;231:5;
234:6,7;237:4,9;244:16,18;
245:4,7,10,13,16,19;246:2,6,
10,19;248:4;251:15,19,20;
254:14,21;255:8;257:3,12,14,
18,21;258:3,7,11,19;260:8;
261:8,10,15,17,19;262:1,4,6,
15;263:1,6,17,18;264:1,7,7,
14,20;265:4,15,19;266:4,15,
19;267:4,7,9,14,16,18;268:1,
8,12,17,19;269:1,2,4,6,8,10,
14,17,19,21;270:2,5,9,12;
271:13,18;272:6;273:10,16
**Frank's (8)**
84:11;91:5;96:16;103:11;
162:11;183:5;256:4;263:21
**free (1)**
235:20
**freeze (1)**
122:5
**Frey (2)**
149:17;150:1
**Friday (1)**
169:21
**Friedman (3)**
112:18;113:15;151:18
**Frieman (2)**
171:13;173:2
**front (5)**
29:7;204:18;247:14;248:1;
257:16
**frustrated (1)**
180:3
**Frye (17)**
129:3;152:17,19;156:11,12;
157:5,8,12,18;158:7;162:16;
164:1,19;165:13;168:17;
229:11;262:20
**Frye's (1)**
164:3
**fuck (1)**
179:17
**full (5)**
5:8;17:6;38:16;97:17;226:6
**fully (2)**
14:4;67:6
**fund (3)**
23:15;25:3;67:4
**funded (2)**
54:16;56:3

**Funding (3)**
24:20;25:10;250:14
**funds (4)**
47:14;49:12;232:9,13
**further (10)**
103:15,19;104:14,20;204:6,
15;244:2;270:4;271:13;
273:18
**future (4)**
54:7;56:7;60:19;232:21
**fuzzy (1)**
16:3
**FYI (1)**
179:16

**G**

**gain (1)**
82:4
**Gallagher (2)**
116:14;179:8
**gave (18)**
26:1;35:19;37:16;38:8;
53:3,5;80:4,5,20;106:3;133:8;
155:15;203:7;244:8;257:12;
263:12;267:12;271:16
**GEJlawcom (1)**
116:13
**Generally (3)**
6:16;151:19;248:14
**gentleman (2)**
8:3;13:7
**gentleman's (1)**
8:5
**gentlemen (3)**
78:1;150:9;248:7
**George (2)**
196:9,17
**George's (3)**
13:2,16,18
**gets (2)**
103:11;244:6
**Getz (3)**
8:7,18,20;9:3,8
**G-E-T-Z (1)**
8:7
**ghostwriting (6)**
141:7;142:13;143:19;
144:10;146:17;147:4
**given (11)**
40:2;51:13;87:9,16;93:13;
184:4;232:3;236:5;262:16;
268:7;274:5
**giving (3)**
11:4;178:14;220:21
**glasses (1)**
220:21
**Glen (2)**
115:2;195:4
**Global (1)**
123:14
**goatee (1)**
182:21

679

**God (1)**
  252:2
**goes (1)**
  124:8
**Gollogly (1)**
  180:13
**good (12)**
  15:13;26:19;37:12,16;
  42:19;50:3;92:18;155:13;
  171:12;181:2;186:18;273:5
**Gordon (3)**
  74:9;138:8,12
**gosh (1)**
  91:2
**got'em (1)**
  136:21
**governor (4)**
  196:9;197:11;201:8;203:18
**granted (1)**
  119:16
**Greg (1)**
  230:14
**grew (1)**
  26:12
**ground (2)**
  9:14;10:9
**group (20)**
  14:15;15:16,19;23:19;
  24:17;26:6,7;54:17;113:14;
  125:14;213:18;228:2;233:11;
  252:1,4,12,13;254:17;260:17;
  261:7
**grouped (1)**
  157:5
**groups (1)**
  84:4
**guarantee (8)**
  76:17,19,21;217:17;218:2,
  3;219:1;263:11
**guaranteed (2)**
  75:20;76:5
**guarantor (1)**
  44:10
**guess (15)**
  43:15;52:21;67:7;68:10;
  83:21;90:17;102:21;104:10;
  137:21;159:14;176:17;178:4;
  211:17;215:20;230:8
**guessing (1)**
  44:5
**guy (3)**
  72:11;88:16;90:1
**guys (4)**
  80:8;84:4;89:20;180:4
**guy's (1)**
  28:9

### H

**half (7)**
  20:3;49:13;66:9,10;101:18;
  111:20;148:5
**hand (10)**

**handed (2)**
  39:1;62:11;98:19;135:17;
  147:9;156:18;179:4;222:15;
  245:14;251:16
**handed (2)**
  139:4;258:11
**handing (2)**
  40:15;110:21
**handling (2)**
  86:8;170:2
**hands (1)**
  87:6
**handwriting (5)**
  166:21;167:1,4,5,8
**handwritten (1)**
  65:7
**happen (3)**
  51:16;262:9;266:5
**happened (9)**
  52:9;55:3;56:8;67:2,7;
  125:4;230:17;250:16;268:10
**happening (3)**
  106:3;110:6;178:18
**happens (1)**
  107:12
**happy (3)**
  11:13;71:20;218:10
**Harbor (51)**
  12:1,2;24:6,6,6;26:15,16;
  41:4,4;43:18,19,20;44:13,20;
  63:3,4;75:5,9;92:7,10;99:7;
  107:3;108:20;113:21;114:1;
  120:11;129:9;130:5,12;135:8;
  136:17;138:1,3,7,19;139:12;
  140:1;142:8;154:3;170:7;
  173:17;174:18;177:4;181:5;
  182:5;254:19,20;255:7;266:8,
  9;269:7,11
**harmless (2)**
  161:6,11
**Haskins (1)**
  88:14
**head (3)**
  11:6;198:21;199:3
**hear (2)**
  61:19;83:20
**heard (7)**
  72:12;121:6;153:15;
  159:12,13,16,19
**hearing (2)**
  116:4;199:5
**heavens (1)**
  273:13
**height (1)**
  233:10
**held (5)**
  47:5;106:20;169:3;256:2;
  265:9
**help (10)**
  32:21;110:20;125:6,11,20;
  126:9;144:11;153:14;174:14;
  227:20
**helpful (2)**
  137:11;240:15

**helping (7)**
  15:17;61:21;62:9;131:8;
  153:6,7,10
**helps (1)**
  40:14
**hereby (1)**
  274:3
**hereof (1)**
  270:20
**here's (1)**
  156:1
**hey (4)**
  15:9;71:7;130:17;131:7
**high (1)**
  265:11
**himself (1)**
  10:2
**hired (1)**
  138:18
**Hobson (5)**
  13:7,17;16:12,13;63:15
**hold (9)**
  161:6,11;199:16;221:1;
  228:17;244:6;247:21;249:9;
  255:18
**holder (1)**
  89:9
**holding (1)**
  57:20
**Holdings (21)**
  29:12;33:17;34:2,11,15,19;
  35:4;42:2,15,15;44:21;45:4,
  14;50:12;54:21;55:1,9,10;
  58:7;60:1;134:2
**home (2)**
  5:11;58:21
**honestly (5)**
  73:14;105:10;162:8;
  169:17;179:2
**hoped (1)**
  179:17
**horizontal (3)**
  14:16;15:1,2
**Horse (1)**
  80:3
**hospital (3)**
  204:11;207:9;255:14
**hours (2)**
  106:4;148:5
**house (1)**
  115:3
**hundred (5)**
  41:2;100:21;101:12;102:2;
  225:3
**hypothecate (1)**
  193:11
**hypothecated (1)**
  56:7
**hypothetical (4)**
  193:5;194:10;198:18;199:6
**hypothetically (6)**
  193:15;194:3,17;195:4,15;
  196:8

### I

**idea (16)**
  33:12;44:1;54:15;65:13;
  75:8;78:16;89:11;106:10;
  110:19;116:10;136:12;
  137:15;163:15;169:15;
  173:19;237:12
**identification (3)**
  29:4;166:14;252:7
**identified (5)**
  37:12;38:4,8;95:14,18
**identifies (1)**
  52:5
**identify (6)**
  95:19;142:8;143:13;
  190:19;191:9;269:3
**IDOT (1)**
  43:13
**IHW (3)**
  92:1,6;155:15
**IHW0001042 (1)**
  118:19
**IHW0001257 (1)**
  145:16
**IHW0001259 (1)**
  147:13
**II (12)**
  12:2;24:6;26:16;41:4;
  43:20;44:13;63:4;75:9;114:1;
  207:15;259:4;266:9
**ii's (1)**
  208:1
**imagine (1)**
  193:4
**immediately (5)**
  165:9;207:17,18;208:4,5
**impact (2)**
  133:16;134:3
**important (2)**
  10:18;266:6
**improper (3)**
  58:18;152:10,13
**improperly (2)**
  161:7,12
**in-box (2)**
  251:6,8
**incidence (1)**
  241:13
**incidences (1)**
  128:10
**include (4)**
  231:18;232:2,14;233:3
**included (4)**
  108:12;232:21;233:6;264:9
**including (5)**
  55:12;91:17;208:15;
  248:18;250:1
**incredibly (1)**
  49:15
**Indemnity (1)**
  43:13                                    680

Appeal: 15-1671    Doc: 25-2    Filed: 09/28/2015    Pg: 229 of 248

Citigroup Global Markets Realty Corp., et al v    Document 61-3    Filed 04/15/15    Page 81 of 95    Thomas Butler Fore - Vol. 1
Patrick Turner, et al                                                                February 17, 2015

**independent (3)**
    27:18;95:1;130:18
**indicate (1)**
    11:2
**indicated (1)**
    14:14
**indication (5)**
    60:20;93:14;154:13;254:8,
    15
**individual (1)**
    227:6
**individually (4)**
    77:14;140:21;227:3,4
**inducements (6)**
    158:11,17,21;160:2,6,16
**infer (1)**
    117:14
**information (15)**
    68:16;69:7,8,14;80:5,20;
    115:10,11;126:16,18;182:17;
    229:6;261:20;262:4,17
**in-house (1)**
    262:20
**initial (2)**
    73:21;173:9
**Initially (9)**
    21:17;22:1;26:11;131:15;
    214:16;215:5,14
**Inner (51)**
    12:1,1;24:5,6;26:15,15;
    41:3,4;43:18,19,19;44:13,19;
    63:3,4;75:5,9;92:7,10;99:7;
    107:3;108:19;113:21;114:1;
    120:11;129:9;130:5,12;135:8;
    136:17;138:1,2,7,19;139:12;
    140:1;142:8;154:3;170:7;
    173:17;174:18;177:4;181:5;
    182:5;254:19,20;255:6;266:8,
    9;269:7,11
**inquired (1)**
    125:13
**ins (1)**
    129:20
**insensitive (1)**
    255:13
**insisted (1)**
    242:3
**instances (2)**
    7:10;52:16
**instead (1)**
    132:15
**instruct (23)**
    58:18;59:4,15;123:1,6;
    187:7;188:11,19;189:9,10;
    192:8;194:21;196:5,19;
    198:10;200:1;201:5,15;202:3,
    16;204:3;266:14;267:14
**instructed (3)**
    264:1,7;267:5
**instructing (4)**
    79:20;191:3,7;214:18
**instruction (27)**
    36:8;189:9;191:4;192:14,

15;195:13,20;196:13;197:7,
15;200:7,13,15;201:5,6,15,16;
202:3,7,16;203:5,6,8,11,15;
204:3,4
**instructions (4)**
    170:18;267:12;268:1,7
**intend (2)**
    206:3,10
**intended (1)**
    93:14
**intense (1)**
    233:13
**intent (1)**
    178:16
**intention (2)**
    57:17;211:2
**intentions (1)**
    94:10
**interest (13)**
    15:16;42:7;46:17;54:19;
    55:15;56:6;87:10,17;128:5,
    10;213:13;240:11;252:14
**interested (2)**
    15:12;250:9
**interesting (1)**
    107:11
**Interestingly (1)**
    111:17
**interests (3)**
    141:4;227:9;240:13
**interfere (1)**
    10:5
**interference (1)**
    246:17
**internally (1)**
    242:1
**interpose (1)**
    10:3
**interrupting (1)**
    209:5
**into (16)**
    17:12;35:5;39:9;44:8;56:7;
    58:6;60:21;71:6;80:8;82:4;
    84:11;208:7;223:12,13
**introduce (3)**
    15:15,19,21
**introduced (6)**
    12:11,13;15:6;61:6,10;83:8
**introducing (1)**
    80:8
**invest (1)**
    101:8
**invested (1)**
    88:7
**investing (1)**
    15:10
**Investment (15)**
    23:19;24:16;25:9;26:6,7;
    40:9;56:19;57:4;63:3;89:9;
    101:18;132:2,4;217:2;239:17
**Investments (32)**
    5:18;186:21;187:4,15,18;
    188:1,9;189:15,19;190:13,20;

191:10,15;192:6;193:8,17;
194:5,18;195:6,17;196:4,10;
197:5;198:7,9;199:16;201:2,
12,20;202:14;203:20;265:10
**investor (3)**
    91:12;115:15;230:12
**investors (4)**
    229:16;231:8,10;239:20
**involuntary (63)**
    124:20;125:14,20;126:9;
    128:12,13;129:5;132:6,11,15;
    133:11,17;134:4,9;137:13;
    138:4;139:20;142:10,12;
    143:13,18;146:15;147:4;
    153:21;156:10;157:21;
    158:12,18;159:3;161:7,13;
    162:15;164:2,8,13;165:17;
    166:5;168:18;169:9;171:3;
    218:20;221:20;223:5,9,16,20;
    224:3;236:9,12;237:17;238:2,
    17;259:21;261:13;262:5;
    266:15;267:15;268:5,18;
    269:3,18;271:6,10
**involved (21)**
    8:9;12:5,10;28:13;43:12;
    59:21;61:14,17,20;62:3;
    70:19,20;75:15;78:11;109:10;
    140:17;153:9;226:9;233:15;
    260:3;262:18
**involvement (1)**
    12:3
**involves (5)**
    79:21;123:2;187:6;191:1,2
**iPhone (1)**
    107:13
**irrelevant (6)**
    187:20;191:1;194:1;196:7;
    199:10;204:10
**issue (5)**
    32:12;69:6;176:14;177:17;
    235:2
**issued (2)**
    92:8,8
**issues (1)**
    199:7
**itched (1)**
    183:1

## J

**January (43)**
    32:3,4,9,17;76:8;83:15;
    98:4,12;101:2,11,16;104:6,
    19;109:1,11;110:1;113:8;
    116:15;119:12;120:13;
    127:20;129:15;134:15;135:7;
    136:2;139:6,6,12;140:3;
    214:9,11;215:10;216:4;
    219:17;221:15,17;223:1;
    224:7,10;225:8,9,10;233:8
**Jeanine (3)**
    175:13,14,17
**Jeff (7)**

24:16;137:16,18;156:4;
170:18;171:13,15
**Jeffrey (5)**
    154:14;155:7;181:5,10;
    182:7
**Jerry (1)**
    171:11
**Jersey (4)**
    7:16;8:16;9:11;203:18
**Jessica (3)**
    33:7,8;35:14
**Jim (2)**
    27:14;45:15
**Joe (1)**
    8:7
**John (1)**
    194:3
**join (4)**
    129:5;156:9;158:11,17
**joined (1)**
    159:2
**joint (2)**
    136:14;137:4
**Jones (3)**
    116:14;179:8;230:15
**Judge (8)**
    58:21;59:16;74:9;138:8,12;
    204:19;205:10,16
**judgment (1)**
    238:21
**judgments (1)**
    273:5

## K

**KBF-Frye-000001 (1)**
    157:1
**keep (12)**
    58:12;81:5;103:6;133:10,
    17;134:3;150:10;208:20;
    209:2;247:14;250:7;273:14
**Kenilworth (1)**
    5:14
**Kennedy (4)**
    24:20;25:10;141:5;250:13
**Kenneth (16)**
    35:20;107:20;108:1;
    118:20;119:7;120:13;139:2;
    144:15;147:14;149:21;157:4;
    174:9;177:6;181:6;266:14;
    267:14
**Kenny (32)**
    35:19,20;61:17;107:13;
    109:3;110:12;112:19;118:10;
    119:7;128:4;129:2;130:15;
    131:7,10;137:4;141:7;156:4,
    13,15;157:13;170:15,16;
    174:12;175:12;176:12;
    180:20;181:1;183:7;186:17;
    244:8;247:6;261:8
**kept (3)**
    259:16,18;272:19
**Kevin (1)**

681

Appeal: 15-1671    Doc: 25-2      Filed: 09/28/2015      Pg: 230 of 248

Citigroup Global Markets Realty Corp., v.
Patrick Turner, et al

Case 1:14-cv-00557-TFM   Document 61-3   Filed 04/15/15   Page 82 of 95

Thomas Butler Fore - Vol. 1
February 17, 2015

200:19
**key (3)**
99:14;264:11,16
**KG (1)**
179:9
**kidding (1)**
69:20
**Kilar (3)**
174:20;175:2,6
**K-I-L-A-R (1)**
174:20
**kind (4)**
88:20;132:21;140:11;160:6
**knew (11)**
91:15;98:3;117:6;126:15;
141:19;142:6;144:8;159:9,11;
221:11;242:19
**knowing (3)**
160:12;174:1;192:18
**knowledge (18)**
70:4;79:2,11;127:5;154:20;
155:10,11;156:8;160:7;
191:11;228:5;235:5,13;238:8,
15;253:8,13;271:7

**L**

**land (2)**
44:14,16
**last (23)**
11:18;28:10;32:2,4;144:21;
151:3,4;159:14;190:4;211:7;
212:15;244:10,13,16,18;
245:5,7;246:17,18;247:19;
249:13;255:5;270:15
**late (2)**
76:8;224:10
**later (4)**
115:9;140:1;211:15;237:13
**latest (1)**
92:17
**law (5)**
59:8;102:15,16;116:8;
179:9
**lawsuit (17)**
5:19;7:16,18;73:17;74:5,7,
13,15,16;79:8,14;123:16;
168:9;187:20;191:1;240:16;
247:2
**lawyer (25)**
10:1;28:17,18;35:21;36:1;
37:5;39:20;96:6;130:9,15,16;
131:8,11;132:13,14;141:5,6;
142:9;143:16;147:2;165:21;
190:3,4,14;235:6
**lawyers (2)**
127:7;141:21
**lead (2)**
199:12;202:5
**leader (1)**
195:16
**Leading (2)**
210:5;231:11

**leads (2)**
83:3;156:14
**learn (6)**
19:8,17;44:11;76:4;114:5;
215:12
**learned (8)**
17:1;114:11,11;115:18;
153:2;215:7;217:9,16
**learning (1)**
105:20
**leasing (1)**
55:13
**least (7)**
112:12;124:13;137:10;
151:19;208:1;248:15
**leave (1)**
207:9
**leaving (1)**
7:6
**led (1)**
215:12
**leeway (1)**
119:17
**left (3)**
5:17;49:20;132:18
**left-hand (2)**
164:18;165:8
**legal (22)**
52:1,6;90:12,14;124:2;
132:9;141:21;142:4;143:3,5,
6;167:18;168:4;187:6;
188:12;189:4;191:1;192:10;
193:21;195:2;199:7,8
**legally (2)**
141:14;142:5
**lend (2)**
21:12,16
**lender (9)**
47:3,6;114:18,18;115:21;
124:16;242:19;250:13;271:12
**lenders (2)**
23:8,10;24:4;232:3
**lender's (2)**
116:8;233:1
**lengthy (1)**
256:5
**less (2)**
208:9;219:6
**letter (11)**
90:19;91:4;131:1;145:17,
20;146:1;148:10,21;149:7;
181:4;269:14
**letterdocX (1)**
145:9
**letters (6)**
141:7;142:13;143:19,19;
146:17;147:5
**level (1)**
63:3
**Levine (6)**
109:6,14;110:2,17;112:12,
13
**Lewis (8)**

116:8,13;117:2,11;118:13,
20;119:7;229:6
**liability (5)**
13:13;126:6;202:1;218:21;
262:10
**lied (1)**
82:3
**liked (1)**
182:13
**limitations (1)**
240:19
**limited (3)**
13:13;55:12;201:21
**limits (1)**
240:19
**line (8)**
64:11,16;65:3,14,20;
141:18;145:21;208:3
**link (2)**
115:3;139:8
**list (16)**
24:2;126:11;134:16;135:1,
8;137:11;141:20;142:7;
143:12;146:15;190:17;
219:12;261:16;262:16;271:5,
8
**listening (1)**
198:20
**litigation (9)**
72:20;84:7,10;91:13;181:1;
184:4;185:5;191:16;264:9
**little (13)**
16:3;40:9,10;69:13;131:7;
136:7;180:7;188:6;189:13;
207:15;244:7;259:4;265:7
**LLC (82)**
5:18;8:14;12:2;24:6,6;
29:10;40:21;41:4,4;42:2,8,15,
15;43:3,4,19,20;50:12;63:3,4,
12,13,18;64:5,5,7,17;65:21;
75:1,5,9;77:12;114:1,1;117:7,
12;120:11;129:9;133:15;
135:8;136:17;138:3,7,19;
149:2,2;151:21,21;154:3;
164:19;165:14;173:17;
179:15;181:6;186:21;187:4,
15,18;188:4;190:13,20;
191:10,12,15;192:6,19;
193:17;194:5,18;195:6,17;
196:10;197:5;198:8,9;199:16;
201:20;202:14;203:20;
241:21;248:16,16
**LLCs (1)**
8:15
**loan (50)**
14:21,21;20:3;21:8,19;
40:5;43:12;46:14;47:15;48:1,
9,19;49:13;51:9;54:6;57:8,13,
15,19;58:3,4,5;59:20;60:7;
71:16;89:12;93:8;117:3,17;
118:7;119:1;126:6;128:9;
206:16,17,19;207:4,4;208:6;
210:18;212:8;217:2,8;232:18;

239:16;242:21;243:17;256:8,
15;259:13
**locate (2)**
269:1,17
**located (5)**
33:10;35:14;37:4,11;
138:18
**long (9)**
7:1;24:1;25:18;72:9;151:7;
159:5;183:8;211:7;212:14
**longer (2)**
149:7;224:15
**longstanding (1)**
186:12
**look (15)**
29:20;47:11;49:15;60:15;
91:21;154:8;172:8;175:1;
212:1;223:12,13;230:16;
245:13;251:11;257:17
**looked (4)**
20:8;29:21;33:13;34:8
**looking (11)**
10:17;11:9;19:21;32:8;
40:20;48:5;49:10;107:7;
184:1;212:2;220:20
**looks (6)**
106:16;109:1;158:2;
167:10;175:12;183:19
**lose (1)**
250:20
**lost (4)**
27:8;40:11;128:20;151:2
**lot (15)**
22:10,20,21;23:11;27:8;
48:14;85:18,19;115:14;132:8;
169:6;183:9;213:21;226:18;
234:17
**lots (1)**
24:10
**love (1)**
127:19
**lower (7)**
39:16;41:7;91:21;99:6;
111:1;154:8;156:21
**lunch (1)**
88:3
**Luther (3)**
147:10;148:20;154:7

**M**

**Maglev (7)**
197:13;198:6;199:18;
200:18;201:9;202:12;203:19
**mail (1)**
155:21
**maintained (1)**
63:8
**major (3)**
55:11;60:13;133:15
**majority (1)**
195:16
**makes (2)**

682

Citigroup Global Markets Realty Corp. v.    Document 61-3    Filed 04/15/15    Page 8 of 95
Patrick Turner, et al

Thomas Butler Fore - Vol. 1
February 17, 2015

98:14;230:13

**making (5)**
58:13;104:1;152:7;220:9;
273:5
**management (1)**
244:1
**manager (2)**
64:14;152:20
**manager/consultant (1)**
153:4
**managing (3)**
41:2,3;42:8
**manila (1)**
30:8
**many (10)**
6:4,6;30:12;31:9;33:9;
71:11;143:2;213:1;233:21;
251:5
**Marc (6)**
153:16,18;163:17;164:4;
165:5,10
**March (11)**
73:4;178:19;212:8,9,18,19,
20;256:17;257:2;259:6,14
**Mark (8)**
112:18,20;113:1;151:18,18;
156:4;166:11;179:7
**marked (38)**
29:3,8;39:2,14;40:15;
62:11;91:19;98:20;106:11,17;
108:15;110:21;114:8;116:11;
118:15;120:7;134:13;135:17;
139:4;147:9;151:12;152:15;
154:7;155:20;156:1,18;
161:20;162:2;163:4;166:13,
17;169:18;171:9;176:21;
179:4;181:3;183:11;206:13
**marketing (1)**
55:12
**Markets (1)**
123:14
**Mary (1)**
197:1
**Maryland (3)**
5:15;70:8;74:18
**match (1)**
270:7
**material (3)**
234:3,8,14
**materials (2)**
37:20;231:7
**Matt (1)**
179:8
**matter (6)**
103:14;187:13;225:1;
226:5;227:14;267:19
**matters (4)**
50:7;209:13;212:7;248:18
**maturity (7)**
211:13,18;212:2,3,5,9;
270:19
**may (27)**
12:7;59:4;64:2,3;69:18;

72:12;77:13;126:16;136:15;
159:19;181:12;184:7,15;
209:19;210:5,10,21;223:6;
231:15,20;232:6,10,15;
239:12;243:14;250:11;255:4
**maybe (12)**
10:21;40:10;69:2;80:12;
91:3;136:16;137:11;153:13;
159:14;166:20;178:4;242:13
**MCCORMACK (254)**
5:7,16;25:4,7,15;27:1,5;
29:6;38:15,19,21;41:12,16,
21;49:5,9;50:3,4;51:3;56:21;
57:2,3;58:12,15,20;59:3,7,11,
13,15,17,19;76:2;79:16;88:2,
5;89:18;95:8,13,17,21;96:3;
111:9,12,17,21;123:6,10;
124:3;126:2;135:13,16;
142:16,20;143:7,10;144:6,7;
149:19,21;150:2,4,6;152:3,6,
14;154:18;155:1,3,7,11,14;
156:2;166:7,11,16;178:21;
188:13,16,19;189:3,6,8;
190:1;191:20;192:2,11,13;
198:13,15,20;199:2,5,11,14,
20;200:2,5,10,14;202:4,20,21;
203:4,10,14;204:6,17;205:2,
20;206:4,7,12;207:7,11,12,21;
208:19,21;209:3,7,11,19;
210:4,10,17,21;211:3,11;
212:11;213:3;214:5,7,17,21;
217:19;218:11;219:2,7,10;
220:4,8,12,14,20;221:2,5,21;
222:4,8,11,15,17;223:6;224:5,
20;225:20;226:2,7;227:15,17;
228:4;229:8;230:1,19;231:3,
11,15,20;232:5,10,15;233:5,
12,18,21;234:5;235:3,7,11,17;
236:19;237:1,7;239:12;240:1,
21;242:11;243:4;244:12,14,
17,20;245:2,6,9,11,15,17,21;
246:2,4,8,10,13;247:1,13,21;
248:6;249:4,9;250:7;251:7,
13,17;252:8;253:1,5,16;
254:5,12,18;255:1,2,9,12,17,
20;256:3;257:11,15,19;258:2,
5,16;259:1;267:1,6,8,11,13,
21;268:6,11,14,16;270:4,8,10;
271:4,14;272:10,11;273:18
**McGeogh (9)**
5:17;209:6;220:13;222:7;
223:18;230:20;252:2;257:13;
258:9
**mean (96)**
15:2,8,8;17:2;22:13;23:21;
24:10;25:18;26:5;27:9,17;
28:7;30:20;33:2;34:13,14;
40:5;44:4;46:9;47:8;52:3;
53:20;56:2,15;67:15;69:7;
75:21;76:12;84:9;85:7,19;
88:10;90:15;93:1,21;98:16;
102:1;103:9;104:18;106:7,14;
107:15;110:12;113:6,12,14;

117:20;118:4,8;128:4,15;
129:19;132:19;136:10,18;
141:13;146:21;153:12;
156:11;158:21;159:13;
160:20;176:17;178:4,10,16;
180:2,20;182:16;183:7;
189:20;190:16;211:2;212:18;
213:20;215:18;216:18;
217:20;221:8,11;225:8,9;
226:13;227:11;230:9;234:17,
19;236:14;239:5;251:8;
259:9;260:11;265:20;271:11,
21;273:2
**means (9)**
41:11;92:6;117:16;118:10;
142:3;179:18;180:17;197:21;
203:2
**meant (3)**
41:20;117:19;118:2
**measure (1)**
185:2
**meat (3)**
188:7;189:13;265:7
**mechanism (2)**
272:16,21
**media (3)**
174:10;176:11;178:15
**meet (6)**
16:6,7,7;94:17;148:14;
149:10
**meeting (18)**
16:19;18:2;19:7,13;20:8;
23:7,8;83:14;101:3;102:6,9;
103:3;104:4;149:13;150:7;
169:2;242:16;243:9
**meetings (6)**
20:12;85:21;94:5;95:2,9;
163:19
**member (8)**
41:2,3;42:9;64:20;200:18;
201:9;202:11;203:18
**members (4)**
63:17;179:14;198:6;199:17
**Memorandum (10)**
28:14;66:8,19;129:11;
206:15;243:16;256:13,21;
273:1,7
**memory (2)**
98:16;110:7
**mention (1)**
12:3
**mentioned (3)**
13:4;218:9;268:4
**mess (2)**
250:19;258:10
**message (7)**
107:5,6;112:2,3;150:16;
157:18;170:9
**messages (3)**
110:8;151:1,1
**messed (1)**
228:13
**messy (1)**

244:7
**met (13)**
16:9;20:19;23:14,17,17,18,
20;82:19;104:6;150:9;
238:13;243:13,14
**Michael (2)**
179:13;248:21
**Michelle (1)**
5:17
**mid (1)**
76:8
**Middle (11)**
42:19;43:1,2,4,7,17;74:21;
117:6,11;132:20;175:11
**might (9)**
40:1;103:17;135:7;190:10;
198:2;213:12;223:11;229:2;
238:20
**Mike (3)**
78:4,5;146:5
**mild (1)**
183:19
**million (23)**
19:12;20:1,2,3;22:17;
26:13;44:8;49:14;54:16;66:9,
10;71:15;72:17;88:6;101:10,
12,17,18;174:7;238:19;242:5;
265:13;272:20
**million-six (2)**
259:10,12
**Mine (4)**
28:2;182:20;249:10;258:7
**minimum (3)**
172:16,18;184:12
**minor (1)**
205:7
**minute (4)**
208:21;222:4;246:17;
254:12
**minutes (6)**
49:6;87:21;115:9;135:12;
166:8;264:4
**misfortune (2)**
48:14,15
**mishear (1)**
149:18
**misspell (1)**
246:14
**misstating (1)**
144:1
**mistake (1)**
10:14
**mitigate (1)**
184:5
**mixed (2)**
8:15;84:3
**modification (1)**
51:8
**moment (4)**
39:5;98:21;203:13;204:9
**Monday (1)**
169:21
**money (63)**     683

Appeal: 15-1671    Doc: 25-2    Filed: 09/28/2015    Pg: 232 of 248

Citigroup Global Markets Realty Corp., v ... Document 61-3   Filed 04/15/15   Page 84 of 95 Thomas Butler Fore - Vol. 1
Patrick Turner, et al                                                                                February 17, 2015

9:1;15:9;21:5,8,12;22:3,10,
21;24:4;46:4,6,18;48:16;
52:10,17,18;53:3,4,5;54:2;
56:4;57:8,12;67:17;85:18,19;
87:6;88:10,12;89:11;105:18;
131:17;136:9,11;173:10;
174:2,5,5;180:21;181:20;
182:1,5;210:2;213:6;239:6,6;
242:6,20;243:6;250:20;
256:11;271:16,16,16;272:4,4,
5,13,13,14,19;273:3,9

**monies (3)**
173:8,12;256:7
**month (6)**
32:4;159:14;184:11,13,17;
213:11
**months (2)**
102:2;153:14
**moot (1)**
204:21
**more (23)**
15:8;22:3;24:9;40:10;
54:16;84:14;132:2,4;137:11;
176:14;182:16;192:16;
261:19;271:16,16,16;272:4,4,
5,13,13,14;273:9
**morning (5)**
120:13;136:6;148:15;
171:12;248:8
**morons (1)**
121:13
**mortgage (2)**
44:15;71:8
**most (4)**
10:3;190:13;234:14;253:19
**mostly (1)**
176:2
**Motz (2)**
58:21;204:19
**Motz's (2)**
205:10,16
**MOU (1)**
257:14
**moved (2)**
74:8,8
**moving (1)**
125:19
**much (16)**
19:4,8,11,21;20:15;21:15;
22:6,11;70:3;101:8;105:18;
168:12;183:3;213:6;225:2,5
**Multiple (1)**
226:19
**mutual (9)**
51:7;62:19;75:17;78:17;
80:18;83:4;86:19;87:1,4
**mutuality (1)**
74:19
**mutually (4)**
50:5,16;209:12,17
**myself (1)**
238:4

## N

**name (28)**
5:8,16;8:6;12:15,16;16:15;
28:9,10;33:6,20;34:2;53:7;
65:8;72:11;78:5;83:21;
132:18;133:10,17;134:3;
137:20;153:15;164:18;165:1,
8,10;180:13;273:13
**named (2)**
88:16;177:12
**nature (2)**
132:20;192:20
**NDA (9)**
67:14,15,21;68:7;75:21;
80:4;82:3;123:16;226:21
**near (1)**
164:16
**necessarily (1)**
106:15
**necessary (4)**
21:8;240:5;270:1;274:8
**need (7)**
11:5,7,12;43:15;128:6;
204:16;228:18
**needed (5)**
22:9;215:19,20;229:18;
261:19
**negotiate (9)**
69:9;80:8;115:21;116:8;
134:1;141:2,3;213:19;239:20
**negotiated (3)**
67:5;229:10;242:16
**negotiation (4)**
28:14,19;241:19;242:21
**negotiations (12)**
17:8;18:21;97:14;108:11;
180:4;213:17;224:9;227:20;
228:1;229:15,19;240:4
**neighborhood (1)**
26:11
**Neil (6)**
5:20;75:13,15;238:13;
243:12;247:12
**Neither (1)**
134:15
**Nevertheless (6)**
247:20;248:3,9,10,13;
261:15
**New (11)**
7:16;8:16;9:11,15;26:14;
47:3;130:9;196:9;203:18;
230:15;250:18
**next (21)**
10:13;20:7;22:6;36:1;42:1;
44:20;107:11;115:18;120:7;
148:16;149:11,16;165:7,7;
166:12;207:16;208:17;
209:10;213:10;247:19;273:4
**nicotine (1)**
186:16
**nobody (1)**

130:17
**nods (1)**
11:6
**non-circumvention (1)**
63:9
**Nondisclosure (7)**
62:20;74:20;75:18;78:18;
80:19;83:5;123:19
**none (4)**
38:3,7;125:21;214:2
**Nope (1)**
138:16
**nor (1)**
134:15
**Northeast (7)**
197:13;198:6;199:18;
200:18;201:9;202:12;203:19
**Northwest (1)**
202:11
**notation (3)**
42:8;111:2;154:9
**note (64)**
17:8;18:21;19:5,15,19;47:5,
14;48:1,6,9;49:13;50:8,18;
51:9,10,14,16,17;52:7,13;
53:3,6,14;57:13,14;66:5,6;
67:5,18;71:16;77:13,20;
105:17;110:5;124:6;208:6,7,
8,9,9,10,11,16,16;209:15,18;
210:2,9,15,20;212:8;213:16;
224:19;225:11;232:18;
241:20;248:18;264:11,18;
265:3,14,17,20;266:3
**notes (5)**
150:10;222:5;251:14;
258:8,12
**notice (1)**
114:4
**notified (1)**
38:13
**November (3)**
68:4;129:15;241:15
**number (22)**
31:12,13;39:3;57:8,8;
106:4;112:14;118:16;120:8;
156:5;190:16;206:19;208:1;
228:16;240:11,12;244:4;
257:21;258:2,4,6;259:2
**numbered (1)**
155:18
**numbers (1)**
155:20
**numeral (2)**
207:15;259:4

## O

**Oakey (2)**
179:8;180:8
**oath (1)**
28:12
**object (16)**
26:20;27:4;42:10;51:5;

141:12;142:18;143:21;152:5,
9;188:10,13,17;193:10;206:3;
231:3;270:8
**objected (1)**
143:2
**objecting (1)**
134:8
**Objection (309)**
12:6;15:11;17:16;20:5;
24:7;28:16;30:14,19;31:4,11,
14;32:1,10,18;33:11;34:12,
20;35:10;36:10,16,21;37:14;
38:1,5,10;40:4;41:5;42:21;
43:9,14,21;44:17;45:2;46:20;
48:13,17;50:21,21;51:19,21;
52:20;54:14;55:2,16,18;
56:20,21;57:6,16;58:9,16;
60:3,8;61:16;66:4,14,20;
67:11,20;68:8;69:16;
70:10;74:6,10;75:2,7,11,14;
76:7;77:10,16;78:12,21;79:5,
13;80:14;81:1,7,13,19;82:16;
83:7,13,18;84:13,19;85:4;
86:3,13,18;87:2,7,11,19;88:8;
90:6;93:7;96:13;97:11;100:3;
101:14,20;104:7,9,16;107:14;
109:8,19;110:18;111:8;112:7;
114:2;116:1,9;117:1,9,13,18;
118:9;119:15,20;120:5;
122:21;124:1;125:21;126:14;
127:4,10,17;128:14;129:18;
130:13,20;131:2,4,9;133:5,12,
18;134:5;135:4,9;137:6,14;
138:5,10;140:8,14;141:11;
142:2,15,17;143:14;144:1;
145:14,19;146:16,20;147:7,
17;148:7;149:9;154:5,16;
156:6;158:1,13,19;159:7,18;
160:3,8,18,19;161:3;162:18;
163:3,12;164:10;167:14;
168:10;170:3,11,21;171:6;
172:11;173:3,14;175:3,21;
176:8,16;178:2,5,9;180:10,
18;182:11,15;184:2,14;
185:17;186:11;187:1,5,19;
190:11,15,21;191:17;192:8;
193:7,9,19,21;194:6,9,15,21;
195:8,12,19;196:2,5,12,16,19;
197:6,16,19;198:10;199:19;
200:8,20;201:4,14;202:2,15;
204:2;209:19;210:4,10,17,21;
211:11;212:11;213:3;214:5;
217:19;218:11;219:2,7;
220:20;221:21;223:6;224:5,
20;225:20;226:2,7;229:8;
230:1;231:11,15,20;232:5,10,
15;233:5,12;235:3,7,11,17;
239:12;240:1,21;242:11;
243:4;247:1;249:4;251:7;
252:8;253:16;254:12;255:2;
257:3;261:10,17;262:1,6,15;
263:1,6;264:14,20;265:4,15,
19;266:4;267:16;268:19;

684

Appeal: 15-1671    Doc: 25-2    Filed: 09/28/2015    Pg: 233 of 248

Citigroup Global Markets Realty Corp. v    Case 1:14-cv-00557-JFM    Document 61-3    Filed 04/15/15    Page 85 of 95    Thomas Butler Fore - Vol. 1
Patrick Turner, et al                                                                                                    February 17, 2015

269:4,8,19;270:2;271:18;
273:10
**objections (2)**
10:3,4;58:13;130:5
**obligations (2)**
43:5;217:8
**obtain (2)**
110:3;229:19
**obtained (2)**
182:4;235:20
**obviously (5)**
97:14;120:2;185:10;
200:11;259:9
**occasion (2)**
94:2;242:15
**occasionally (2)**
150:18,20
**occasions (2)**
6:4;91:16
**occupied (1)**
225:3
**occupy (5)**
225:2,5,14,17,21
**occur (5)**
121:7;211:16;213:14;
241:14;270:18
**occurred (1)**
216:3
**October (5)**
183:15;185:14,20;186:1,2
**off (20)**
25:4;51:9;61:8,12;106:19,
20;132:18;133:10,17;134:3;
147:18;170:17;176:2,11;
182:20;203:12;204:8;232:18;
233:2;256:2
**offer (3)**
24:18;86:16;160:15
**offered (3)**
21:11;106:6;160:2
**offering (1)**
21:7
**office (4)**
16:9;20:12;27:20;30:3
**officer (3)**
6:5,8;7:11
**offices (1)**
27:17
**often (2)**
226:17;238:14
**old (1)**
230:16
**Ominsky (15)**
125:19;126:13;153:16,18;
154:3;163:17,20;164:4;165:5,
10,13;166:19;167:9;168:13,
15
**Ominsky's (2)**
156:4;167:12
**once (7)**
44:19;69:2;115:18;239:8;
243:14;265:1;266:1
**one (65)**

6:1;10:10;35:5,5,6,8;39:4,
12;45:1,9,21;47:13,21;49:11;
53:8;63:11;65:18;81:4;87:13,
16;99:6,14;101:7,19;109:15;
113:16;120:18;124:14;133:4;
134:16;136:19;144:3;148:2;
151:2,3;155:19;161:17;
162:11;180:19;183:15,19;
184:7;185:4;192:16;198:5;
205:5;207:8;219:11;222:18;
228:18;229:2;233:16;240:11;
241:13;248:1;249:15;250:18;
251:14,16,18;253:6,19;
256:19;264:11;273:3
**ones (3)**
95:8,18;96:1
**ongoing (2)**
86:2;173:17
**only (27)**
10:7,9;11:14;39:13;42:13;
49:16;51:17;52:5;59:3;62:17;
68:5;77:17;102:11;111:19;
117:19;133:3;162:21;173:12;
175:4;192:4,5;204:12;231:7;
241:4;248:6;254:1;258:3
**Open (1)**
258:5
**opened (3)**
257:19;267:2;268:7
**operating (3)**
54:12;63:19;232:21
**operations (1)**
173:18
**opinion (5)**
140:9;201:13;203:21;
206:6,9
**opportunity (4)**
71:3;105:17;124:6;223:11
**opposed (8)**
34:5;126:4;261:12;262:3,7,
11,12,13
**option (2)**
257:1,5
**oral (7)**
72:3,13,21;105:6,9,21;
272:7
**orally (3)**
11:5;72:1;106:6
**order (4)**
36:19;82:3;182:5,9
**ordering (1)**
204:19
**organization (2)**
42:20;252:16
**organized (2)**
127:15;171:3
**organizing (1)**
231:7
**original (10)**
39:3,4;112:2;118:20;
243:16;255:21;256:1;257:11;
258:12,12
**originally (1)**

125:13
**originals (4)**
247:14;255:9,19,20
**others (7)**
24:12;50:15;79:9
**ought (1)**
130:9
**ours (2)**
122:6,17
**out (30)**
23:19,20;62:5;66:18;67:6,8,
18;68:6;69:2,3;74:8;88:9,9;
108:2;127:3;129:20;132:5,14;
179:16;184:6;186:17;218:1;
229:9;245:11,15;248:18;
259:17,18;264:10;273:8
**outcomes (1)**
52:6
**outstanding (1)**
19:4
**over (23)**
9:14;16:8;26:12;32:2,6;
101:1,13;105:19;116:8;119:5;
130:5;133:15;139:5;181:12;
183:5;204:15;220:20;222:11;
241:19,19;242:21;248:11;
266:12
**oversees (1)**
99:14
**owe (2)**
136:9,11
**owed (12)**
50:19;51:16;52:10,17,18;
53:3,4,5;54:2;85:19;136:9;
233:2
**owes (1)**
85:18
**own (6)**
47:8;51:14;54:19;116:7;
224:19;271:7
**owned (6)**
12:1;43:19;44:13;50:14;
113:21;266:8
**owner (2)**
41:3;42:6
**owners (1)**
70:7
**ownership (3)**
14:15;15:16,19
**owning (1)**
173:20

**P**

**PA (1)**
181:5
**package (1)**
233:1
**page (33)**
45:19;54:10;55:5;56:9;
60:15;64:10;103:10;107:4;
112:2;115:2;118:19;119:5,6;
135:20;144:15;147:13;

148:20,20;164:15,16;170:10;
171:10;174:19;175:11;177:5;
212:3;245:20;246:3,7;257:18,
19;258:3,5
**pages (2)**
155:16;172:9
**paid (16)**
85:2;89:12;167:17;168:3,7;
172:21;173:1,10;181:20;
182:1,8,10;238:19;243:17;
251:1;256:12
**paper (1)**
36:15
**papers (3)**
185:14,15;186:19
**paragraph (39)**
45:20;47:11;49:11,16;
54:11;55:6;56:12,15;64:6;
172:13,15;206:18;207:2,2;
208:3;212:3;244:19;245:5,7,
8,16,17,20;246:3,6;247:19;
248:6;249:14;257:17,18,20,
21;258:1,2,4,6;259:2;270:5,
13
**parcel (1)**
11:20
**parcels (2)**
11:21;173:21
**parens (1)**
250:1
**parent (2)**
179:14;255:14
**part (12)**
6:17;10:3;26:17;57:10;
125:9;132:2,4,19;133:10;
185:4,5;248:6
**participate (4)**
94:12;249:18;250:3;262:21
**participation (1)**
213:13
**particular (3)**
207:1,6;232:3
**parties (19)**
61:14;63:11;77:5;80:4;
82:8;83:15;113:6;117:21;
120:1;121:2;122:10,13;
140:17;165:17;213:20;227:7,
11;229:15;260:2
**partner (4)**
88:13;109:17;112:18;168:2
**Partners (18)**
63:12,13,14,17;64:1,5,5,17;
78:13;81:17;109:12;149:1;
151:21;227:3;229:16;239:21;
241:5;248:16
**partnership (4)**
8:14;60:21;119:8;250:17
**party (14)**
7:18;55:14;75:1,6,10,13;
141:2;150:4;167:19;168:9;
205:21;206:5;234:16;239:17
**past (1)**
241:16

685

Appeal: 15-1671     Doc: 25-2         Filed: 09/28/2015      Pg: 234 of 248
Citigroup Global Markets Realty Corp. v.     Document 61-3     Filed 04/15/15     Page 86 of 95     Thomas Butler Fore - Vol. 1
Patrick Turner, et al                                                                           February 17, 2015

**Pat (78)**
16:1,6,13,14,20;17:18;
34:15;65:10;76:11,12,12;
90:18;102:10,11,12;105:6,16,
21;107:19;108:2;109:3;
114:20;116:4;117:2,21;
118:20;119:6;126:4;130:5;
131:14;134:16,20,20;135:21;
136:13;137:5;140:21;141:8,
10;145:6,7,8;147:14;151:20;
153:6,10;158:2,5;169:9;
170:16,19;171:21;174:2;
175:10,13,16;176:14;177:6;
180:20;223:12,13,14;226:14,
14,14;227:3;240:12;241:3,7;
242:3;248:15;252:7;259:11;
260:16;261:3,4,12,15

**Pataki (3)**
196:9,17;197:11

**Paterakis (1)**
194:4

**Patrick (20)**
5:19;11:19;64:7;65:4;
67:18;81:17;90:14;99:13;
107:12;145:8,21;147:18;
149:4;170:20;174:10;175:8;
178:7;181:6;205:9;252:10

**Pat's (8)**
16:9;128:10;130:15;
131:11;141:5;176:15;245:18;
254:2

**pause (2)**
10:14;253:4

**pay (18)**
21:5,8;53:11;84:20;121:4;
161:1;164:1,3;165:12,16,20;
166:2,4;168:12;173:6,8;
174:7;184:13

**paying (7)**
51:9;84:11,18;93:10;
232:18;233:2;265:13

**payment (2)**
89:4;167:12

**payments (7)**
20:14,19;21:6,9,13;243:18;
259:15

**PC (1)**
167:10

**pending (1)**
11:15

**Pennsylvania (1)**
201:9

**people (28)**
24:11;71:11;84:16;85:21;
99:15;104:8,21;109:15;
113:11;115:15;119:17;128:7,
17;132:14,15,17;141:8;
167:13;168:5;179:1;183:8;
189:17,18;190:16;193:2;
233:15;234:12;238:18

**per (1)**
184:11

**percent (8)**

---

41:2,3;42:7;100:21;101:13;
102:2,3;225:3

**percentage (2)**
8:4;87:17

**performed (1)**
165:13

**performing (2)**
141:21;142:4

**Perhaps (8)**
33:12;89:19;98:7;102:19;
109:20;148:14;151:11;223:18

**period (25)**
7:3;32:3;56:16;57:5,11;
58:7;60:2,10;101:1,13;
143:11;151:9;173:13;212:15;
225:6,7,10;226:6;228:3;
233:7,9;256:8;270:14,16,18

**periods (1)**
144:2

**permit (2)**
216:6;217:13

**person (6)**
16:7;52:17;103:7;114:20;
235:15;241:4

**personal (8)**
34:4,5,8;79:2;155:10,11;
262:10;271:7

**personally (1)**
75:19

**personnel (4)**
22:21;23:1,2;26:14

**persons (1)**
148:21

**Peters (3)**
197:1,4,12

**petition (6)**
133:11;134:4;143:13;
161:2;164:9,13

**petitioner (2)**
164:19;165:8

**petitioning (3)**
158:8;161:6,11

**petitions (4)**
139:20;142:12;143:18;
147:4

**phone (1)**
96:5

**phones (2)**
151:2,4

**phonetic (1)**
166:20

**piece (2)**
63:16;84:10

**pile (2)**
228:13;249:8

**ping-pong (1)**
270:7

**Piper (8)**
102:18;109:18;111:7,13,14;
112:18;113:8;151:18

**Piper's (1)**
155:21

**place (10)**

---

18:10;52:4,7;56:5;105:19;
124:15;214:2;216:11;221:12;
257:16

**placed (1)**
29:7

**places (1)**
88:10

**Plaintiff (3)**
5:19;7:20;168:8

**plaintiffs (2)**
73:6,12

**plan (1)**
266:8

**Plank (3)**
194:14,17;200:19

**planned (1)**
17:7

**plans (2)**
187:9,11

**play (1)**
133:9

**players (2)**
40:14;80:3

**playing (1)**
179:16

**please (20)**
10:11,15,20;59:14;60:15;
89:17;112:19;145:12;152:2;
157:13;170:16;171:15;195:9;
203:13;209:10;246:6;247:6,9;
249:14;270:17

**pledged (2)**
43:20;44:10

**pm (6)**
88:4;135:15;148:3;166:10;
192:1;273:19

**point (19)**
11:11;17:20;97:3,6;105:20;
126:8;130:2;193:2;204:13,14;
205:1,7;224:17;228:9;243:7;
262:8,11;264:15;272:19

**police (6)**
6:5,8,19;7:6,11;227:18

**ponied (1)**
273:8

**portion (6)**
62:1;85:16;88:13;225:14,
17,21

**position (3)**
102:5;119:16;193:5

**possession (1)**
255:6

**possibility (2)**
98:10;261:6

**possible (12)**
33:8;81:19;104:1,5;142:10;
160:5,9,11,14;214:14;215:7,
13

**possibly (3)**
202:5,18;253:17

**potential (9)**
52:5;198:17;199:6;214:10;
221:19;229:16;230:12;

---

239:20;271:9

**potentially (6)**
55:4;167:7;185:6;189:19;
244:1;260:19

**PowerPoint (1)**
16:21

**practicing (1)**
27:15

**preceding (1)**
98:7

**predated (1)**
223:3

**predicated (1)**
214:12

**preexisting (1)**
12:21

**preparation (1)**
234:3

**prepare (3)**
231:9,13;233:17

**prepared (4)**
194:10;202:19;234:9,11

**preparing (1)**
137:12

**presence (2)**
201:1;205:12

**present (8)**
94:18;95:1;205:15;260:8,
10,11,14;261:8

**presentation (1)**
16:21

**president (9)**
12:16;14:9,20;15:18;
202:11;252:11,11;254:10,17

**press (1)**
244:21

**Presumably (1)**
230:7

**presume (5)**
44:18;70:11;93:21;167:15;
175:15

**presumption (1)**
52:3

**presupposed (1)**
213:14

**prevented (1)**
68:9

**previous (1)**
100:18

**previously (3)**
39:1;98:19;106:18

**price (3)**
120:18;121:3,4

**prices (1)**
159:5

**primarily (2)**
69:6;226:13

**Prince (3)**
13:2,16,17

**principal (23)**
86:12;89:5;109:12;190:12;
192:5;193:6,16;194:4,18;
195:5,16;196:4,10,18;197:4;

Min-U-Script®                    Gore Brothers Reporting & Videoconferencing                    (292) Pat - principal
                                 410 837 3027 - Nationwide - www.gorebrothers.com

686

Appeal: 15-1671    Doc: 25-2    Filed: 09/28/2015    Pg: 235 of 248

Citigroup Global Markets Realty Corp. v    Document 61-3    Filed 04/15/15    Page 87 of 95    Thomas Butler Fore - Vol. 1
Patrick Turner, et al                                                                                    February 17, 2015

**198:3,7;201:1,11,19;202:13;
203:19;208:8
principals (9)**
23:7;73:8;179:12;188:3,9;
189:15;191:12;192:18;199:17
**prior (19)**
48:21;192:7;207:18;208:4,
5;214:11;222:3;223:4,8;
224:2;225:12;234:15;236:8;
237:16;238:14;243:5;259:20;
260:5,18
**privilege (2)**
59:4;188:15
**privileged (3)**
79:15;200:11;267:10
**probably (10)**
7:15;27:7;61:11;73:4;
92:14;98:3;151:10;173:7;
180:6;213:11
**problem (4)**
27:2;41:17;204:18;258:16
**proceed (1)**
131:16
**proceeding (1)**
77:9
**PROCEEDINGS (2)**
5:1;114:4
**process (2)**
9:16;246:16
**produce (4)**
9:20;10:7;36:19;255:7
**produced (10)**
92:7,9;99:7;107:3;108:19;
111:14;120:11;174:18;177:4;
254:19
**product (6)**
188:12;189:5;191:2;
192:10;195:2;199:8
**production (1)**
154:15
**productions (1)**
18:17
**project (54)**
8:4,9,11,16;12:11,13;13:1,
17;14:4,5,10;15:7,10,13,14;
16:21;17:2,3,5;21:14;33:1;
47:7;48:19;55:11,14,15;56:8;
62:10;63:16;70:2;85:18;88:7;
105:7;115:5;117:4,6,17;
118:7;119:2;153:3;168:2;
176:7;15;184:1;190:4;192:19;
231:2;235:16;239:17;246:16;
250:13,14;255:6;272:5
**projections (3)**
231:13,18;232:2
**promise (1)**
81:5
**promised (6)**
26:21;81:10,15,17;87:9;
159:2
**promissory (10)**
50:18;52:13;53:3,5,14;
57:13,14;71:15;208:8;264:11

**prompted (1)**
256:4
**pronouns (1)**
234:1
**Properties (5)**
77:12;188:4;191:12;
192:19;241:21
**Property (62)**
5:18;11:20,21;17:15;19:1;
20:8;42:2,14,15;43:19;50:11;
54:21;55:9;58:7;60:1;70:7,9,
19;113:21;114:12;119:14;
134:1,2;139:12;173:21;
186:21;187:4,15,18;188:1,9;
189:15,19;190:13,19;191:10,
15;192:6;193:8,17;194:4,18;
195:5,17;196:4,10;197:4;
198:7,9;199:16;201:2,11,20;
202:13;203:20;210:13;
242:18;264:19;265:1,1,10;
266:8
**proposal (5)**
100:15,16;105:6,14,21
**proposed (9)**
101:4;109:5;110:2;122:12;
126:21;160:1;177:11,19;
178:6
**proposing (1)**
101:8
**prosecuting (1)**
6:17
**prosecution (1)**
6:18
**prospective (3)**
23:8,10;24:3
**protect (5)**
131:17;217:2;239:6,7;
240:11
**provide (16)**
47:14;49:12;68:18;72:17;
90:17;118:12;126:11,12;
158:10,17;174:4,5;210:7;
229:14;235:9,14
**provided (9)**
69:14;70:12;99:21;126:16,
18;211:4;234:16;261:15;
271:8
**provides (2)**
55:17;60:11
**providing (10)**
66:16;90:12;139:15;140:2;
143:5,6;156:4;231:7;262:4;
271:5
**provision (3)**
46:5;56:2;211:4
**provisions (2)**
48:10;142:12
**pry (1)**
108:2
**public (4)**
70:4;9;114:12;264:19
**published (1)**
176:4

**PUD (1)**
17:6
**pulling (1)**
33:2
**purchase (22)**
18:21;47:5;48:1,6,8,9,21;
66:17;67:18;71:15;121:4;
207:18,19;208:4,5;212:7;
256:9,16;257:1,4;259:5,13
**purchased (2)**
52:8;241:20
**purchasing (1)**
19:15
**Purina (1)**
59:7
**purpose (6)**
43:8;77:19;229:5;230:3;
265:2,6
**purposes (3)**
29:4;140:7;166:13
**pursuant (3)**
66:7;131:16;210:3
**pursue (4)**
82:6;130:4,11;264:8
**pushed (1)**
273:8
**pushing (2)**
259:16,18
**put (15)**
18:13;39:20;44:7,15;53:14;
121:2;154:13,21;155:5,15;
174:7;188:6;189:13,19;265:7
**puts (2)**
191:12;252:7
**putting (3)**
15:5;205:6;272:19

**Q**

**qualified (3)**
128:15,16;189:8
**qualify (1)**
191:13
**quantity (1)**
226:18
**quarter (1)**
17:12
**quarterbacking (1)**
180:20
**Quest (2)**
103:7;104:6
**quick (1)**
270:5
**quit (2)**
153:12;186:14
**quite (1)**
214:19
**quote (2)**
31:10;176:3
**quoting (1)**
242:3

**R**

**raise (1)**
66:12
**rate (1)**
46:17
**rather (2)**
113:17;163:13
**reach (1)**
25:21
**reached (2)**
86:12,19
**reaction (2)**
246:21;247:2
**read (41)**
41:17;46:4;55:21;92:11;
96:20,21;103:13;108:18;
116:20;119:10;138:15;152:3;
166:20;167:1,8;189:11;191:5;
206:12,13;209:10;211:4;
212:4;244:11;248:5,6;249:2,
13,20;250:10;270:16;274:3
**reading (7)**
104:18;107:15,15;120:12;
152:1;246:1;250:10
**ready (1)**
135:2
**Real (8)**
146:6;149:1;210:15,16;
248:19;265:12,17,21
**realized (1)**
262:8
**really (29)**
21:10;25:17;26:19;32:19;
63:19;68:20;84:1;85:7;97:17;
100:6;104:3;105:11;110:9;
117:15;121:13;125:6;130:18;
136:13;156:16;158:20;162:3;
169:6;180:21;181:1;225:9;
238:13;263:15;264:16;270:11
**reason (5)**
98:17;135:6;204:12;240:9;
249:7
**reasonable (1)**
111:19
**reasons (1)**
81:4
**recall (85)**
8:21;9:5,11;12:16;17:17,
21;18:19;19:16;22:10;25:17;
28:5;29:1,13;30:20;46:21;
47:1;68:20;69:1;70:16;73:16,
19;77:4,11;83:19;84:1;85:7;
95:3,4;100:4,6;101:21;
105:14,20;106:12,14;110:15;
115:19;131:5;21;132:8;
134:11;139:13;140:4;149:12,
13;150:3,7;152:11;156:7;
159:8,9,13,21;160:21;161:14,
15,17;162:6,14;163:2,6,18;
168:11,14,16;169:1;174:12;
185:18;187:20;188:8;219:3;

Min-U-Script®                    Gore Brothers Reporting & Videoconferencing                    (293) principals - recall
                                   410 837 3027 - Nationwide - www.gorebrothers.com
687

Appeal: 15-1671   Doc: 25-2   Filed: 09/28/2015   Pg: 236 of 248

Citigroup Global Markets Realty Corp., v.   Case 1:14-cv-00557-JFM   Document 61-3   Filed 04/15/15   Page 8 of 20   Thomas Butler Fore - Vol. 1
Patrick Turner, et al                                                                                                                            February 17, 2015

226:18;228:6;229:18;230:21;
234:17;237:21;238:12;241:2,
17;260:9;261:11;264:5;
269:20;271:11
**recapitalization (1)**
  246:15
**receive (3)**
  26:17;27:9;101:12
**received (8)**
  25:8;26:16;27:7;31:18;
  39:13;58:5;85:14;263:8
**receiving (3)**
  29:13;106:12;142:11
**recent (1)**
  190:13
**recess (6)**
  25:5;49:7;88:3;135:14;
  166:9;191:21
**recession (1)**
  17:13
**recipient (1)**
  175:5
**recite (1)**
  198:15
**recited (2)**
  198:14;211:21
**recognize (2)**
  65:7,11
**recollection (13)**
  31:2;33:9;40:1;61:5;87:1;
  92:19;96:9;100:18;103:21;
  114:10;179:4;183:21;246:20
**recommended (1)**
  154:3
**record (19)**
  5:9;25:4;70:9;106:19,21;
  144:5;176:2,11;181:18;182:3;
  198:16;203:12;204:9;205:5,7,
  13;256:2;268:15;274:5
**recourse (1)**
  124:15
**recover (1)**
  89:9
**redevelopment (1)**
  8:16
**reduced (1)**
  72:14
**Redwell (1)**
  30:7
**Redwells (1)**
  247:7
**reference (5)**
  46:3;104:10;147:3;214:8,8
**references (6)**
  103:16,19;104:1,14;140:2;
  215:2
**referred (3)**
  68:7;78:1;214:7
**referring (5)**
  54:13;62:14;120:20,21;
  272:6
**refers (1)**
  54:11

**refinance (10)**
  17:2;18:21;21:14;46:16;
  47:2;48:19;62:1;119:14;
  213:16;240:14
**refinanced (1)**
  89:14
**refinancing (1)**
  51:9
**reflect (3)**
  199:8;205:13;249:3
**reflected (1)**
  101:6
**refresh (6)**
  61:5;103:21;114:10;179:3;
  183:21;246:20
**refuse (1)**
  216:1
**refused (1)**
  216:6
**refusing (1)**
  185:14
**regard (5)**
  128:3;178:19,20;263:18;
  264:1
**regarding (3)**
  110:4;112:19;259:20
**regardless (3)**
  216:19,21;262:9
**reiterate (2)**
  248:10,13
**relate (1)**
  144:3
**Related (21)**
  23:20;29:17;30:4;34:14,17;
  55:14;71:16;76:21,21;87:15;
  94:20;110:10;119:19;128:8;
  130:16;185:19;221:9;230:6;
  232:19;257:8;267:19
**relates (2)**
  60:18;226:11
**relating (2)**
  70:9;255:6
**relations (2)**
  174:10;178:15
**relationship (13)**
  12:21;14:17,19;79:6,12;
  82:19;83:2;97:9;106:8;115:4;
  129:3;186:13;192:7
**relationships (2)**
  79:3;189:17
**relative (3)**
  51:13;176:18;232:19
**relay (2)**
  40:2;125:2
**releases (1)**
  87:4
**relevance (3)**
  69:16;81:20;143:1
**relevant (2)**
  157:14;202:18
**relief (2)**
  98:11;164:16
**remedies (1)**

130:4
**remember (99)**
  8:2;16:15;17:18;18:6;19:6;
  21:1,11,20;22:7;23:21;25:9,
  14;28:10,20;30:15,16,17;
  31:7,12,15;32:11,19;36:17;
  62:4;64:2;70:16;73:14,15;
  91:3;94:8,16,21;96:6,8,11,14;
  100:20;102:19;104:3;105:10,
  11;106:2,15;114:7;115:14,16;
  116:2,3,4,6;125:3;146:11;
  153:12,12;156:17;159:20;
  161:4,19;162:3,8,9,12;
  167:17;168:19;169:10,12,17;
  170:4;179:2;181:9;184:7;
  215:10;216:4,12;217:11;
  218:4,6;219:3,8,9;221:15,17;
  222:1;223:14;227:4;228:10;
  230:7;236:4;237:21;238:12;
  239:2;257:10;260:2,3,4,9;
  263:15,16;264:3
**remembers (3)**
  25:16;95:9;96:1
**reminded (1)**
  218:2
**Rendell (1)**
  201:8
**rented (1)**
  18:12
**reorganization (1)**
  239:10
**reorganize (1)**
  266:12
**reorganized (1)**
  133:9
**rep (2)**
  16:10,16
**repaid (3)**
  46:10,14;54:2
**repay (1)**
  52:14
**repaying (2)**
  232:18,19
**repayment (2)**
  46:6,8
**repeat (4)**
  10:20;38:6;122:15;161:9
**repeatedly (1)**
  220:15
**rephrase (3)**
  43:15;143:7;192:16
**replaced (1)**
  151:3
**replacing (2)**
  185:21,21
**reporter (11)**
  9:17;11:6;29:5;47:19;
  166:15;175:2;176:6;183:2;
  189:12;191:8;249:21
**represent (9)**
  5:17;138:19;151:20;171:5;
  179:12;205:9;236:17;248:14,
  15

**representation (4)**
  91:6,6;152:8;172:19
**representative (2)**
  72:12;224:14
**represented (15)**
  28:8,8;73:16;91:9;128:5,9;
  138:7;142:5;151:19;180:9,13;
  242:8,9;249:3;263:4
**representing (25)**
  10:2;28:13;61:14;90:16;
  113:8,10;117:3,16;118:6,21;
  119:8,12;120:1;127:15;128:2;
  129:15;130:10;140:7,10,12,
  21;141:10,14;163:11;186:20
**represents (1)**
  117:11
**request (5)**
  13:21;164:16;171:12;
  208:7;221:18
**requested (3)**
  117:2;118:21;217:13
**require (2)**
  232:8;234:2
**required (2)**
  36:19;233:16
**requires (1)**
  199:7
**research (1)**
  29:20
**researched (2)**
  29:17,19
**reserve (1)**
  133:1
**resigned (1)**
  262:13
**resolution (1)**
  264:8
**resolve (4)**
  119:13;224:10,12;227:20
**resolved (2)**
  74:5;186:14
**respect (10)**
  209:14;224:8;227:10,14;
  231:2;233:10;235:10,14;
  238:8;268:2
**respectfully (1)**
  205:16
**respecting (2)**
  50:7,16
**respond (2)**
  106:4;115:10
**responds (6)**
  108:1;121:17,21;175:16;
  177:21;179:16
**response (18)**
  37:20;38:16;39:13;92:7;
  111:15;112:17;114:17,19;
  119:6;139:14;154:15;216:17,
  18;217:3;218:8,10;252:3;
  254:19
**responses (1)**
  162:11
**responsibility (2)**

688

Min-U-Script®            Gore Brothers Reporting & Videoconferencing     (294) recapitalization - responsibility
                          410 837 3027 - Nationwide - www.gorebrothers.com

Appeal: 15-1671    Doc: 25-2    Filed: 09/28/2015    Pg: 237 of 248

Citigroup Global Markets Realty Corp. v    Case 1:14-cv-00557-FM    Document 61-3    Filed 04/15/15    Page 8 of 95    Thomas Butler Fore - Vol. 1
Patrick Turner, et al                                                                                    February 17, 2015

231:1,6
**responsive (10)**
29:16;30:12;34:18;35:9,15;
36:4,8;37:8,13;151:1
**rest (1)**
250:11
**restate (1)**
52:21
**restrained (1)**
68:5
**restrict (1)**
190:17
**restrictions (1)**
206:20
**restroom (1)**
49:4
**restructure (1)**
239:18
**result (1)**
242:2
**resulted (1)**
39:9
**resumed (6)**
25:6;49:8;88:4;135:15;
166:10;192:1
**retained (2)**
236:17;237:11
**retainer (8)**
170:16;171:4,14,20;172:12,
14;173:1;237:3
**retention (1)**
172:5
**retired (1)**
7:7
**return (8)**
100:21;101:7,13;102:2,3;
249:15,17;250:2
**reveal (2)**
195:1;266:19
**revealing (1)**
187:6
**reveals (2)**
188:12;189:2
**review (6)**
34:11;39:6;98:21;145:12;
146:3;171:14
**reviewing (1)**
108:17
**reviews (1)**
120:9
**revision (1)**
148:10
**rewrite (2)**
178:6,10
**Rhodes (14)**
99:11,13;102:12;103:1;
134:20;145:7,8;147:18;163:8;
175:13,17;226:14;231:5;
232:14
**Rhodes' (2)**
226:1;231:1
**R-H-O-D-E-S (1)**
99:11

**Rich (5)**
109:6,14;110:2,17;112:12
**Richard (3)**
78:8;112:13;248:20
**Rick (5)**
78:4,6;112:20;146:5;
179:13
**rid (1)**
182:21
**ridiculous (2)**
196:6;221:5
**right (106)**
9:14;12:20;14:6;16:18;
21:15;24:3;25:19;40:13;
45:19;46:3;47:21;49:10,20,
21;51:11;53:12;54:18;55:8;
57:12,18;59:21;60:6;61:13;
62:2,12;63:9,21;69:21;70:12;
73:5;74:11,12;80:13;84:18;
88:11;91:15;103:8;105:3;
106:8;108:18;112:1,11;
119:19;121:17;123:11;133:1,
8;135:20;140:7;144:8;146:10,
12,19;147:6,12;148:19;164:8,
12;165:1,9,19;166:2;167:5,
11;168:6;171:9,19;174:17;
177:3;179:6;180:5,8;183:14;
192:3;193:4;202:20;203:2;
205:2,15;206:16;212:10;
214:21;227:12;228:17;
230:18;237:10;245:6;246:11;
248:7,12;249:7;255:16;
256:17;259:2,13,16,19;262:5;
266:6,21;268:14;270:11;
271:17,20;272:14;273:1
**rightful (1)**
190:7
**right-hand (8)**
39:17;49:20;91:21;99:6;
111:2;154:8;157:1;164:12
**rights (9)**
10:2;58:6;66:18;133:14,20;
134:1,6;209:16;242:18
**rise (9)**
190:10;193:6,18;196:11;
201:2,12,21;202:14;203:21
**Road (3)**
5:12;25:18;244:2
**roads (1)**
15:5
**Rob (5)**
13:7,16;16:12,13;63:15
**Robert (2)**
249:12;263:4
**Rodney (1)**
201:18
**role (1)**
14:1
**roll (1)**
247:6
**rolled (1)**
210:12
**Roman (3)**

207:15;208:1;259:4
**round (3)**
266:15;267:14;268:17
**routinely (1)**
150:10
**Rowan (1)**
8:12
**Rugby (1)**
5:12
**rules (2)**
9:15;10:9
**ruling (2)**
205:10,16
**running (1)**
233:8
**Ruther (137)**
5:20;10:1;11:18;39:2,6,8;
40:15,17,20;41:1;42:2;44:20;
47:11;49:10;50:15;54:10;
56:9;57:20;62:12,14;66:7;
67:15;68:1,2,7;73:9;75:13,19;
76:4,16;78:19;80:13,18;83:6;
87:21;91:19,20;92:9;96:15;
98:20;99:2,7;106:11,12,18,
19;107:2,7;108:15;110:21;
111:1;114:8,15;116:11,12;
118:15;120:8,10;134:14,14;
135:12,17;139:4;140:14;
141:11;144:12,14;147:12;
148:6;149:17,20;150:1,5;
151:12,13;152:15;154:9;
155:15;156:18;160:19;162:2,
11;163:5;164:7,8;169:18;
171:9,10;172:9;174:15,17;
177:1,3;179:4,6;181:4,4;
183:6,11,14;193:10;203:12;
204:10,21;205:4;206:14,14;
207:8;219:14,14,15;222:2,20;
223:2;228:12;229:11;238:7,
11;243:13;244:4;247:8,9;
249:6;251:11;252:20,21;
253:9,10,11;254:4,9;255:4,11,
15;257:16;258:18;270:13
**Ruther's (1)**
186:8

**S**

**sale (16)**
19:18;55:13,15;113:21;
114:12;119:14;143:17;163:1;
264:12,19;265:9;266:1,7,12,
12;270:1
**same (50)**
29:10,11;42:17,18;78:18;
92:8;106:3;107:6;136:6;
141:11,19;148:21;160:19;
162:12,14;195:8,12,12,19,19;
196:12,12;197:6,6,15,15;
198:10;199:19;200:7,7,17,20;
201:4,4,14,14;202:2,2,15,15;
204:2,2;252:19;253:1,2,5,9,9;
254:6;274:4

**sat (1)**
24:1
**saw (8)**
16:21;61:4;108:2;132:13;
144:21;162:1;185:11;230:6
**saying (14)**
22:15;51:6;52:14;57:12;
80:15;82:11;94:9;100:14;
118:1;131:2;144:10;184:11;
220:19;263:5
**scam (1)**
251:3
**scenario (1)**
128:8
**scenarios (1)**
232:3
**scheduled (1)**
264:13
**Schiller (2)**
166:19;167:9
**Schulman (3)**
162:5;249:12;263:4
**Schwarz (5)**
109:7,12;112:10;146:4;
248:20
**scope (2)**
231:4;232:6
**score (1)**
40:14
**Scott (2)**
194:13,17
**search (10)**
31:16;33:16;34:10;35:1,3,6,
8,8;150:21
**searched (3)**
33:17;34:13,14
**searches (1)**
37:3
**Seated (1)**
5:17
**second (14)**
74:13,16;82:10;103:11;
108:7;118:19;128:19;143:2;
172:8;229:1;236:10;249:20;
258:1,3
**seconds (1)**
148:3
**secret (5)**
68:16,21;69:4;81:5,6
**Secretary (3)**
197:2,12;201:19
**section (5)**
60:16;139:16,19;211:3;
212:5
**sections (1)**
157:14
**secure (6)**
20:13;23:6;48:18;62:9;
210:2;239:16
**secured (5)**
19:1;47:8;208:14;210:15,
15
**securing (2)**

689

Appeal: 15-1671    Doc: 25-2    Filed: 09/28/2015    Pg: 238 of 248

Citigroup Global Markets Realty Corp. v. Case 1:14-cv-00557-JFM   Document 61-3   Filed 04/15/15   Page 9 of 95   Thomas Butler Fore - Vol. 1
Patrick Turner, et al
February 17, 2015

23:4;208:15
**seeing (3)**
    39:21;146:13;162:13
**seeking (4)**
    21:2,4;186:19;224:18
**seem (1)**
    134:16
**seems (1)**
    176:9
**sell (2)**
    20:2;207:4
**senate (1)**
    195:16
**senator (2)**
    195:16;197:11
**send (12)**
    36:14,15;37:8;100:2,7;
    103:15;114:20;134:16;136:8;
    146:18;157:9;261:21
**sending (5)**
    115:2;135:21;137:10;
    139:10;179:10
**sends (2)**
    107:12;115:8
**sense (1)**
    230:13
**sent (15)**
    38:14;100:10;106:13;
    110:16;111:18;146:2;151:17;
    163:7,10;230:3,14;237:5,7;
    261:18;269:14
**sentence (15)**
    49:16,21;103:11;116:20;
    152:2;175:20;207:16;208:18;
    209:10;244:10,18;245:8;
    249:13;250:7;270:15
**sentences (1)**
    180:7
**separate (3)**
    33:19;34:1;95:1
**series (2)**
    5:21;9:16
**seriously (4)**
    82:9;84:7,9;230:20
**seriousness (1)**
    84:15
**served (2)**
    111:13;265:2
**serves (1)**
    110:7
**services (7)**
    141:21;142:4;143:5,6;
    165:13;235:9,14
**set (4)**
    43:8;66:18;77:19,21
**setting (2)**
    127:8;237:2
**settle (1)**
    84:10
**settled (6)**
    7:17;8:17;86:1,4;158:6;
    184:16
**settlement (4)**

8:20;86:6;241:19,20
**several (1)**
    219:13
**sewer (1)**
    15:5
**shakes (1)**
    11:6
**shaking (2)**
    198:21;199:3
**shall (8)**
    45:21;47:13;50:5;172:20;
    208:7,14,16;209:12
**Shanska (1)**
    61:7
**share (1)**
    54:20
**shared (2)**
    27:20;80:20
**sharing (1)**
    147:3
**shaved (1)**
    182:20
**sheet (7)**
    24:14,17,20;25:2,12;26:1;
    274:8
**sheets (4)**
    24:11,12,13;25:9
**Sherman (3)**
    14:18;115:11,13
**short (1)**
    153:11
**shovel (1)**
    223:19
**show (28)**
    42:20;49:6,18;91:19;
    106:11,17;108:15;114:8;
    116:11;118:15;120:7;127:6;
    134:13;152:15;154:7;161:20;
    162:10;163:4;164:6;169:18;
    171:8;176:21;181:3,19;182:4;
    183:11;219:14;258:19
**showed (1)**
    219:10
**showing (6)**
    136:8;166:17;222:5;
    251:13,15,18
**shown (2)**
    214:7;252:16
**side (8)**
    49:20;70:13;83:16;86:9;
    97:9;164:18;165:8;243:1
**sides (2)**
    130:19;131:3
**sight (1)**
    18:1
**sign (7)**
    78:17;87:4;91:4;92:18;
    131:1;157:9;170:16
**signatories (1)**
    226:21
**signature (15)**
    64:11,16;65:3,7,10,14,17,
    20;145:21;171:15;252:6,19;

253:14,21;254:3
**signed (15)**
    27:12;28:4;64:14,20;65:17;
    75:18;76:1,2;91:1;145:18;
    149:4;173:3;213:5;237:5;
    252:10
**significant (1)**
    178:6
**similar (3)**
    11:8,8;78:19
**simple (3)**
    80:2;91:14;136:8
**simply (1)**
    38:12
**simultaneous (1)**
    91:5
**simultaneously (1)**
    130:10
**single (1)**
    77:18
**Sirody (32)**
    125:19;126:12;137:16,18;
    138:18;139:7,11,15,21;142:9,
    11;143:16;144:21;145:1;
    147:1;154:10,14;155:7;156:4;
    170:6,10,13;171:13,13;173:2,
    8;181:5,10;182:8;185:15;
    237:11;269:14
**Sirody's (2)**
    172:5;237:3
**sister (1)**
    255:15
**site (6)**
    17:19,20;18:3,12,14,18
**sitting (5)**
    31:8;36:1;187:14;190:18;
    191:8
**situation (6)**
    110:3;131:13;140:17;
    184:16;241:2,17
**situations (2)**
    193:12;198:18
**six (1)**
    153:13
**Skanska (14)**
    12:11,14,14,17,18,21;13:17,
    21;14:8,9,20;16:10,16;61:8
**Skanska's (1)**
    14:1
**skinny (1)**
    30:8
**Slater (1)**
    201:18
**small (3)**
    30:10,11;121:18
**smart (1)**
    266:13
**smoking (1)**
    186:14
**snow (1)**
    58:21
**Soland (2)**
    166:20;167:10

**sold (3)**
    105:18;264:19;265:1
**sole (1)**
    210:20
**Soleil (6)**
    18:6,6,9,11,13,16
**Solely (2)**
    235:1;248:17
**solution (1)**
    184:8
**somebody (19)**
    28:9,21;35:17;52:14;53:2;
    86:5;88:14;104:1;133:3;
    136:14;141:14;165:20;166:3;
    167:18;168:7,8;192:6;258:11;
    263:9
**someone (8)**
    28:13;70:13;166:4;177:12;
    179:9;193:5;219:5;240:3
**sometime (4)**
    127:2;162:7;236:10;242:14
**sometimes (2)**
    43:7;186:13
**somewhere (1)**
    22:17
**soon (1)**
    169:16
**Sora (9)**
    13:19;33:17,18;34:6,11,19;
    35:2,4,4
**SoraDevelopmentcom (1)**
    99:11
**sorry (11)**
    47:20;110:16;156:12;
    183:2;206:14;207:20;212:21;
    223:21;233:18;250:2;258:5
**sort (4)**
    21:4;22:8;32:6;90:17
**sound (1)**
    11:7
**sounds (1)**
    74:12
**source (4)**
    173:12,16;218:16;236:3
**sources (1)**
    232:8
**Spahr (3)**
    28:8,13;186:20
**speak (8)**
    10:10;173:4;199:1;226:15,
    17;238:11;240:3,18
**speaking (5)**
    58:13,15;142:9;176:6,11
**speaks (4)**
    52:1;58:9;60:4;271:18
**special (1)**
    43:7
**specific (3)**
    24:9;128:10;272:17
**specifically (13)**
    15:21;21:15;23:5;30:2;
    31:21;54:11;55:6;56:12;62:3;
    77:8;83:12;118:18;192:15

**690**

Min-U-Script®                          **Gore Brothers Reporting & Videoconferencing**                          **(296) seeing - specifically**
                                       **410 837 3027 - Nationwide - www.gorebrothers.com**

Appeal: 15-1671    Doc: 25-2    Filed: 09/28/2015    Pg: 239 of 248

Citigroup Global Markets Realty Corp. v.    Document 61-3    Filed 04/15/15    Page 91 of 95    Thomas Butler Fore - Vol. 1
Patrick Turner, et al                                                                                       February 17, 2015

**specifics (1)**
8:2
**specify (2)**
127:17;268:3
**spell (1)**
89:17
**spend (1)**
66:11
**spent (1)**
259:9
**spirited (1)**
183:8
**split (1)**
208:7
**spoke (3)**
169:8;176:1;217:15
**spoken (4)**
168:17,20;186:6;238:13
**sponsor (1)**
150:4
**spreadsheet (3)**
136:1,8;261:21
**stack (1)**
244:6
**stages (3)**
12:3;244:10;246:11
**stamp (2)**
154:21;155:6
**stamped (2)**
155:4,17
**standpoint (2)**
119:21;141:3
**stands (2)**
111:7;157:4
**start (6)**
32:8;53:9;72:19;107:4;
246:1;248:11
**started (3)**
18:7;97:16;250:18
**starting (5)**
148:19;207:15;248:2,7,9
**starts (2)**
204:19;246:10
**state (4)**
5:8;9:12,13;143:3
**stated (1)**
58:4
**statement (8)**
144:4;178:7;205:5;244:21;
245:3;246:5,9,21
**States (4)**
197:2;201:19;246:13,15
**stating (1)**
151:19
**status (4)**
16:20;17:4;70:2;110:4
**stays (1)**
58:21
**steal (2)**
124:6;190:4
**Steenland (1)**
202:10
**Stein (7)**

23:19;24:16,16;25:9;26:5,6,
7
**step (1)**
20:7
**steps (2)**
126:9;270:1
**Steve (4)**
28:10;174:20;175:2;177:12
**sticker (1)**
39:4
**Still (15)**
49:10;79:6;86:2;93:10;
105:16;140:6;146:17;147:20;
149:4;262:3;264:18;265:12;
266:2,7,8
**stole (1)**
80:9
**stop (13)**
123:17;124:9,17;131:18,20;
132:10;162:21;207:10,10;
221:4;246:2;266:6;270:1
**stopped (2)**
113:20;238:17
**straight (1)**
103:6
**strange (2)**
131:13;171:2
**strategies (1)**
187:12
**strategy (14)**
125:17;148:16;149:15;
187:6,10;188:12;189:4;191:2;
192:10,12;195:2;199:8;
227:19;266:17
**strike (1)**
229:13
**strong (1)**
241:21
**strongly (1)**
242:5
**structure (4)**
17:2;43:12;44:2,5
**structured (2)**
60:21;207:5
**stuff (6)**
30:4;128:9;132:21;169:7;
257:9;260:18
**subject (8)**
99:16;139:7;170:14;
172:19;177:6;206:20;217:16;
226:5
**subjected (1)**
238:21
**submitted (1)**
30:20
**subpoena (16)**
29:9,10,11;30:13;34:19;
35:15;36:4,9,18;37:13,21;
92:8;111:13,15;154:15;
254:19
**subpoenas (6)**
29:16,18;31:19;35:9;39:14;
92:9

**subsequently (1)**
215:15
**substantial (4)**
148:10;225:14,17,21
**substitute (1)**
258:15
**succeed (2)**
213:17,18
**succeeded (2)**
185:10;213:15
**success (4)**
184:21;185:3,7;243:21
**sue (6)**
73:2,11,11;80:11;131:8;
168:8
**sued (9)**
8:1,3;73:3;74:15;77:6,7,8;
81:4;168:3
**suggest (4)**
58:19;130:9;193:5;204:13
**suggested (2)**
125:16;184:8
**suggesting (1)**
122:20
**suing (2)**
81:11;140:19
**suit (4)**
73:21;82:5;167:18;168:8
**suite (1)**
5:14
**Sullivan (1)**
166:19
**sum (1)**
48:11
**summary (1)**
70:1
**Sun (2)**
176:7;244:21
**Sunpaper (1)**
177:7
**Sunpapers (1)**
178:7
**support (5)**
125:6,11;215:15,18;231:7
**supportive (1)**
125:4
**suppose (4)**
71:9;160:11;195:4;237:15
**supposed (1)**
92:14
**sure (31)**
13:15;24:1;34:8;35:16;
46:21;49:5;88:2;91:18;
100:14;103:4;105:1;111:18;
118:2;125:8;129:7;134:21;
135:13;137:3;142:20;150:18;
173:10;181:21;182:2;185:9;
192:3,17;204:20;220:6;243:6;
247:13;256:19
**surprise (5)**
100:15,17;127:9,11;139:1
**suspect (2)**
160:20;224:17

**suspected (2)**
98:5,6,7;225:12
**Swirnow (1)**
193:15
**sworn (1)**
5:4

---

## T

**table (1)**
222:16
**talented (1)**
174:12
**talk (5)**
19:3;118:1;169:11;184:21;
261:6
**talked (6)**
12:2;23:21;83:21;87:14;
216:8;260:16
**talking (22)**
22:14;39:10;41:7;49:19;
51:15;84:16;86:5;91:12;95:7,
8,16;114:19;121:15;122:8;
123:12;124:12;141:20;225:7;
245:4;246:4;256:19;257:7
**talks (1)**
184:20
**team (1)**
6:17
**technical (1)**
10:4
**technically (2)**
91:9;111:14
**telephone (6)**
16:8;94:3,13;156:5;226:15,
17
**telling (6)**
17:18;104:13;129:8;130:3;
188:21;202:17
**ten (2)**
30:18;49:6
**tense (1)**
242:21
**term (13)**
24:11,11,13,14,17,20;25:2,
8,12;26:1;31:18;212:1,2
**terminated (2)**
106:1,16
**terms (29)**
19:14,17;33:2;34:10;35:2,
8;46:6,8;50:6,16;53:12,14;
78:19,19;86:21;87:1;89:2,3,4;
100:19;101:3,5;105:9;142:4;
186:9;207:3;209:13;231:7;
239:16
**test (2)**
58:21;59:2
**testified (1)**
5:6
**testifying (3)**
51:1;111:8;154:16
**testimony (5)**
10:14;11:4;28:12;217:15;

691

Appeal: 15-1671    Doc: 25-2    Filed: 09/28/2015    Pg: 240 of 248

Citigroup Global Markets Realty Corp. v.    Case 1:14-cv-00557-JFM   Document 61-3   Filed 04/15/15   Page 92 of 95   Thomas Butler Fore - Vol. 1
Patrick Turner, et al    February 17, 2015

274:5
**texted (1)**
255:15
**Thanks (1)**
170:18
**theory (1)**
82:13
**Therefore (1)**
188:4
**thereof (1)**
211:14
**thinking (2)**
9:5;97:2
**third (14)**
49:16;148:20;172:9,13,15;
229:15;234:16;244:9,13,16,
17,18;245:5,7
**THOMAS (6)**
5:3,10;64:7,20;65:15;
274:13
**though (5)**
147:20;174:13;196:15;
241:11;262:3
**thought (12)**
15:13;37:13;38:19;77:1;
101:11;102:1;150:1;165:18;
221:13,14,14;230:5;271:5
**thoughts (3)**
148:15;149:14;199:5
**threat (2)**
191:14,18
**threatening (1)**
181:15
**three (12)**
25:13;39:14;78:1;120:19;
163:11;179:10,13;198:5;
208:1;220:13,14;259:13
**three-year (1)**
101:1
**throughout (1)**
11:11
**Tiderock (31)**
29:10,12;33:20;34:2,14,15,
15;44:21;45:4,7,11,14,16;
47:4;48:5,8,18,20;54:21;
55:10;66:11,16;89:5,6,9;
208:9,14;209:18;210:2,8,14
**Tidewater (1)**
50:19
**tier (1)**
41:7
**timeframe (4)**
94:20;95:6,11,20
**timeframes (1)**
95:15
**times (5)**
6:6;9:6;97:4;101:7;143:2;
183:9,15;220:13,15;226:19;
233:16;239:19;241:7,10;
257:9
**timing (1)**
239:2
**Timothy (1)**

5:16
**today (14)**
6:1;9:17;22:14,15;31:8;
39:10;92:19;117:5;130:3;
187:14,17;190:18;191:9;
199:15
**Todd (1)**
203:17
**together (5)**
33:3;47:10;60:12;239:10,
20
**told (41)**
14:9;16:20;25:8;26:10;
36:11;38:7,13;69:1;72:8,10;
76:10;80:16;95:9;117:5;
131:19;132:3;139:1;168:12;
189:1;197:11;216:6,13;218:5,
7;219:5,5;220:15;224:13,14;
225:11;239:5;240:18;256:6;
261:1,2,8;264:6,7;268:9,13,20
**Tom (11)**
116:8;117:2;118:20;119:7,
7;134:15;195:15;196:3;
248:14;249:18;250:4
**tomorrow (1)**
148:15
**took (8)**
80:20;105:15;186:8;214:2;
216:10,13;221:12;250:18
**top (7)**
96:15;103:10;147:12;
164:16;170:9;249:7,10
**topic (3)**
260:12,15;263:16
**tossed (1)**
184:6
**total (5)**
21:17;22:11;30:16;31:7;
88:6
**totally (4)**
187:19;194:1;196:7;199:9
**tow (1)**
171:21
**Towle (2)**
89:15;92:14
**T-O-W-L-E (2)**
89:18;92:14
**Towler (15)**
89:16,19,21;90:1;92:15,20;
99:18;100:1,8,11,13,16;
103:4;146:4;248:20
**Towson (1)**
5:15
**transaction (14)**
24:5;43:12;44:8;45:12;
60:1;61:15;89:8;90:4;108:10;
109:11;110:10;185:6,11;
250:20
**transactions (1)**
232:4
**transcript (6)**
9:20;10:8;11:8;41:16;
138:15;274:4

**transfer (3)**
50:8,17;209:14
**transmit (1)**
35:18
**transmittal (1)**
107:17
**transmitted (1)**
229:12
**Transportation (2)**
197:2;201:19
**Trauner (3)**
84:1,5;89:21
**tricked (2)**
80:7,8
**tried (3)**
71:11;190:4;255:7
**trigger (1)**
218:21
**triggered (2)**
217:17;262:10
**triggering (1)**
263:10
**Trojan (1)**
80:3
**Troller (1)**
84:4
**trouble (1)**
11:2
**true (3)**
38:12;68:10;274:5
**Trust (2)**
43:13;248:21
**trustworthy (1)**
176:2
**truth (3)**
5:5,5,6
**truthful (1)**
11:4
**try (11)**
10:12;26:14;49:12;115:21;
132:10;167:9;192:16;224:11;
250:2;255:18;264:9
**trying (30)**
12:15;13:4;15:15;20:13;
31:1;32:14,16;44:6,8,11;47:6;
48:18;100:20;105:14;108:2;
128:12;141:2;153:14;184:5;
193:2;209:7;220:12;224:9,11;
227:20;229:7,9;230:5;239:16;
245:11
**turn (11)**
45:19;54:10;55:5;56:9;
64:10;115:1;118:18;119:5;
148:19;164:15;250:11
**turned (5)**
29:18;31:6,10,20;40:7
**Turner (214)**
5:19;10:2;11:19;16:1,14;
18:20;19:13,18;20:10,19;
21:2;26:18;27:11;28:3,14;
34:16;39:9;50:14,15;55:8;
61:6;64:7;65:4;67:18;68:5,6,
17;70:20;71:6;72:5,10;75:19;

76:5,12,13,14;81:17;85:17;
89:8;90:14;91:7,9,17;92:13;
93:13,20;94:3,6,15,18,21;
95:4,10;96:5,6,10,17,19;
98:10;99:3;100:10;102:11;
103:1;104:13,20;105:6;
107:12,18,19;108:2;9;109:4;
110:11,15;115:8,9,18,20;
116:4,13;117:10,21;118:12,
20;119:6,19;121:17;122:1;
123:14,20;125:2,4,20;127:13;
129:16;130:5,10;131:6,12;
132:9;133:8;134:8,15;136:1,
5;137:5;140:7,10,12;141:8,
10;142:1,13;143:6,12,19;
145:6,8,9,21;146:2,14,18;
147:5,14;148:9;149:5,10,15;
150:17;151:20;158:2;160:5,
17;162:20;163:8,14;169:9;
170:1,20;172:1,5;174:10;
175:8,10,16;177:6,18,18;
178:1,7,14,14;181:6;183:17;
205:9,14;206:21;213:19;
215:16;216:6,14;218:17,19;
219:4;223:14;226:14;227:3,6;
228:5;235:19;236:11,16;
237:2,8,10,18;238:5,16;239:8,
9;241:11;242:8;243:2,8;
248:15;251:21;252:4,10,12,
13,20;253:9;254:9,10,15,17;
259:11;260:6;261:3,12,15,20;
263:8;267:7;269:2,10,15;
271:6,17;272:3,12;273:6,14
**Turner's (13)**
28:1;50:19;51:18;60:12;
65:8,10;170:2;177:11,14,19;
217:3;225:18;253:14
**turning (1)**
251:17
**twelve (1)**
153:13
**two (19)**
44:19;53:5;54:2;89:20;
101:1,6,15;108:7;120:18;
133:4;134:6;137:10;158:7;
211:15;240:12;243:5;245:2,
21;270:5
**two-page (1)**
144:14
**type (2)**
214:15;215:3
**typed (1)**
65:8
**types (4)**
6:7,13;7:14;155:17

**U**

**uh-uh (1)**
11:7
**Ultimately (5)**
21:10,11;83:9;186:8;251:3
**un-Bates (1)**

692

155:17
**uncertain (1)** 184:4
**unclear (1)** 79:6
**under (24)** 6:14;22:9;28:12;58:2;69:10;75:20;76:5,16;80:4;82:18,20;89:6;98:11;100:19;126:6;128:8;129:11;169:3;200:21;208:8;213:12;217:8;242:4;256:21
**underneath (2)** 65:8,18
**understands (1)** 272:10
**understood (9)** 11:3;36:18;41:12;44:9;46:13;80:17;94:9;104:12;234:6
**undertake (3)** 116:7;235:9,14
**undertakings (1)** 47:21
**undertook (1)** 160:15
**underwrite (1)** 14:15
**unique (1)** 68:16
**unit (1)** 17:7
**United (2)** 197:1;201:18
**unless (3)** 52:18;53:18;193:1
**unmarked (2)** 222:18;258:20
**unsecured (2)** 208:16;233:6
**unsigned (1)** 157:15
**up (29)** 7:16;22:15;24:1;42:20;43:8;57:20;71:7;77:19,21;82:10;84:3;92:11;104:5;120:12;121:2;127:8;184:5;210:12;227:21;228:13;250:17;260:13,15;262:7;263:16;266:15;267:14;268:17;273:9
**upon (1)** 192:9
**upper (1)** 164:12
**upset (6)** 131:15;217:4,5,6;219:6;239:3
**USA (2)** 12:12,14
**use (7)** 8:15;34:5;35:1,2;49:4;204:15;222:17

**used (3)** 34:7,11;252:20
**uses (2)** 232:8,13
**Utah (1)** 62:5
**utilized (1)** 129:2

**V**

**vacant (2)** 17:20;173:21
**valuable (1)** 68:16
**value (2)** 242:3;264:18
**variations (1)** 137:11
**variety (4)** 47:9;87:14;88:10;117:21
**various (5)** 8:15;17:3;189:17;193:12;232:3
**venture (1)** 46:4
**verbal (1)** 220:21
**verbally (1)** 71:17
**version (7)** 244:15,20;245:6,9,18;246:5,8
**versions (1)** 245:2
**viable (1)** 266:7
**vice (2)** 14:8;15:18
**Victor (12)** 109:6,7,7,10,11;110:2,16;112:6,9,10;146:4;248:20
**view (3)** 127:16;140:12;193:20
**viewed (1)** 141:5
**violated (1)** 81:5;123:19
**violation (4)** 80:12,18;123:16;189:20
**virtue (1)** 82:18
**Vision (83)** 23:12;25:1,10,20;62:5,7,13,16;63:2;64:5,11;66:2,15;67:3,4,9,17;68:9,18;69:7,9,15;70:14;71:2,5,14;72:11,16,21;73:2,7;78:11,14;79:4,12;80:2,11,19;81:4;82:2,15,21;83:3,9,11;84:17,21;85:1;90:1;92:21;93:3;97:4,9,14,15;103:7;104:6,21;109:12,16;113:13;123:19;128:8;129:16;141:8;

142:14;143:20;146:5,18;147:5;149:1;179:12;180:13;224:8,15;227:1;228:1;233:10;247:5;248:19;263:18;264:2;267:20
**Vision-Warhorse (1)** 235:1
**visit (1)** 18:1

**W**

**wait (13)** 10:11,12;128:19;207:21,21,21;208:21;222:4;244:12;251:13;254:12;267:1,1
**waiting (1)** 113:20
**waived (1)** 205:14
**waivers (1)** 87:4
**waiving (1)** 91:5
**walked (1)** 9:2
**walking (1)** 84:12
**Walston (1)** 59:7
**wants (4)** 184:11;207:8,9;247:10
**Warhorse (58)** 77:11,15,17,18;78:20;79:3,9,10;80:3,21;81:9,11,14,16;82:8,12,14,17;83:2,4,16;84:6,16;85:21;86:2;97:5,6,16,20;104:21;113:6,11;121:2,4,15;122:9,13,18;123:13,15;129:17;142:14;143:20;146:6,6,18;147:5;149:1,2;178:21;179:14,15;228:2;233:11;248:19;263:19;264:2;267:19
**Warhorse's (2)** 122:14;123:21
**water (1)** 15:5
**waterfront (2)** 18:9,16
**way (20)** 38:4;40:2;72:9;124:14;130:1;138:8;139:3;146:21;147:8;155:3;160:12;161:17;162:21;174:1;188:2;192:20;201:2;227:9;248:12;253:3
**ways (3)** 24:10;47:9;184:5
**website (3)** 115:3;139:9;163:7
**week (9)** 11:18;20:17;93:10;149:14;169:13;186:14;233:9;236:10;246:18

**weeks (2)** 98:7;259:13
**weird (1)** 131:7
**welcome (1)** 59:2
**weren't (9)** 104:4;110:8;120:4;156:3;167:19;168:9;260:14;272:16,18
**West (50)** 12:1,2;24:6,6;26:15,16;41:4,4;43:18,19,20;44:13,20;63:3,4;75:5,9;92:7,10;99:8;107:3;108:20;114:1;120:11;129:9;130:5,12;135:8;136:17;138:1,3,7,19;139:12;140:1;142:9;154:3;170:7;173:17;174:18;177:4;181:5;182:6;254:19,20;255:7;266:9,9;269:7,11
**Westport (106)** 5:18;13:5;14:9,15;15:1;23:7;24:5;26:16;34:15;40:21;42:1,1,7,14,15;43:5;50:8,11;54:21;55:9;58:7;60:1;61:14;63:12,13,14,17,21;64:5,6,16;65:21;68:17;81:17,18;87:18;105:7;113:5;117:4,17;118:7;119:1;133:15;134:1,2;137:8;150:13;151:20,21;152:21;153:5;173:21;176:7;185:6,11;186:20;187:4,15,18;188:1,3,9;189:15,18;190:12,19;191:10,12,15;192:5,19;193:8,16;194:4,18;195:5;117;196:4,10;197:4;198:7,9;199:16;201:2,11,20;202:13;203:20;208:10,11,16;209:15;213:14,20;227:2,3;231:2;235:16;241:4,5,21;242:4;248:16,16;252:14;265:10
**Westport/Turner/Fore (2)** 179:11;180:17
**Westport's (2)** 130:15;141:6
**Westportwaterfrontcom (1)** 135:21
**what's (29)** 43:7;52:2;62:11;107:11;110:21;116:11;120:7;134:13;135:17;139:4;142:16;144:18;147:9;152:15;154:7;156:18;162:1;163:4;166:17;169:18;171:8;176:21;179:4;181:3;183:11;198:13;208:19;209:4;222:20
**whatsoever (1)** 252:14
**whenever (2)** 242:20;253:9
**Whereupon (1)** 5:2

693

Appeal: 15-1671    Doc: 25-2    Filed: 09/28/2015    Pg: 242 of 248

Citigroup Global Markets Realty Corp. v.    Case 1:14-cv-00557-JFM    Document 61-3    Filed 04/15/15    Page 94 of 95    Thomas Butler Fore - Vol. 1
Patrick Turner, et al    February 17, 2015

**whichever (1)**
95:21
**Whitman (1)**
203:17
**whole (3)**
5:5;249:21;265:21
**who's (1)**
214:17
**whose (3)**
27:21;167:5;193:5
**wife (1)**
175:14
**willing (2)**
20:2;265:13
**willingness (2)**
249:17;250:3
**wiring (1)**
170:17
**wish (1)**
58:17
**withdraw (1)**
181:16
**withdrawing (1)**
181:19
**withdrawn (1)**
106:1
**within (1)**
159:14
**without (10)**
54:4;71:5;108:3;160:6,14,
16;191:11;192:18;205:11;
263:10
**witness (32)**
5:4;6:13,16;39:7;49:4;55:7;
56:11;108:17;120:9;150:3;
158:15;182:20;189:16;191:7;
192:9;196:6;198:12;200:9;
204:7;206:8;236:21;244:13;
245:1;246:1,12,14;248:2;
255:18,21;258:21;266:21;
270:6
**word (6)**
41:6;43:1;51:12;107:5;
179:20;207:17
**words (2)**
39:17;80:7
**work (21)**
15:4;18:7,8,10,11,14,15,17;
67:8;87:15;132:20;153:8;
159:5;189:5;191:2;192:10;
195:2;199:8;228:7;239:10;
251:8
**worked (1)**
226:6
**working (11)**
13:1,8,17;14:14;15:13;
17:1;23:4;62:5,9;224:10;
226:14
**works (1)**
44:2
**Wow (1)**
26:19
**WPH (5)**

49:17;50:5,11;209:12,16
**write (2)**
145:4;150:14
**writes (1)**
157:12
**writing (14)**
72:14;92:12;110:3;134:10;
143:18;157:19;180:16;222:5,
11;229:3;233:17;254:9,16;
273:14
**written (10)**
38:15;88:20;90:19;182:14;
185:13;234:3,8,14;272:6,9
**wrote (3)**
118:11;136:19;162:5

## Y

**year (8)**
61:8,11;101:7,19;114:4;
186:1;241:15,16
**years (11)**
7:2,8,15;26:12;54:2;
101:15;134:7;151:4,8;182:21;
243:5
**York (1)**
196:9
**Yup (1)**
7:9

## 0

**000001 (1)**
39:18
**0000590 (1)**
92:3
**000090 (1)**
154:10

## 1

**1 (13)**
29:3,5,8,9;39:14;40:16,17;
41:1;57:8;127:20;147:20;
208:2;258:4
**1:33 (1)**
88:4
**10 (3)**
98:12;101:16;208:2
**10:48 (1)**
120:13
**100 (2)**
5:14;41:2
**1041 (1)**
119:5
**10th (6)**
101:2,11;104:6,19;214:9;
233:8
**11 (23)**
138:8;170:6;208:2;215:5,7,
13,15,18,20;216:7,15;217:13;
218:8;221:19;235:21;236:1,
13;239:9;259:20;260:6,20;

263:10;271:9
**11:24 (1)**
136:6
**11:35 (1)**
25:5
**11:39 (1)**
25:6
**1122 (1)**
5:14
**11th (3)**
163:7;212:19;237:1
**12 (19)**
39:3,6,8;40:20;42:2;44:20;
47:11;49:10;54:10;56:10;
57:21;66:8;68:1,2;102:2;
206:14,19;257:17;270:13
**12:08 (1)**
49:7
**12:14 (1)**
49:8
**12:57 (1)**
88:3
**1261 (1)**
148:20
**12th (3)**
121:8;170:8;208:3
**13 (11)**
62:12,14;67:15;68:7;74:19;
76:2;78:19;80:13,18;83:6;
206:14
**13th (1)**
208:3
**14 (2)**
115:9;186:3
**15 (1)**
182:21
**16 (8)**
91:20,20;96:16;212:8;
256:17;257:2;259:6,14
**16th (9)**
32:4,9,17;212:9,21;237:6,7,
13,18
**17 (6)**
56:12,15;98:20;99:2;211:3;
270:13
**17- (1)**
270:5
**17th (1)**
31:9
**18 (3)**
106:11,12;107:7
**180,000 (1)**
251:10
**18th (3)**
109:1;110:1;113:8
**19 (2)**
106:18;107:2
**1992 (1)**
7:4
**19th (1)**
113:9
**1st (2)**
144:19;145:5

## 2

**2 (18)**
29:3,5,8,11;39:15;45:20;
57:9;64:10;208:2;212:3;
257:17,18,19,20,21;258:2,6;
259:2
**2/12 (3)**
120:19;121:8;122:5
**2:31 (1)**
135:14
**2:37 (1)**
135:15
**20 (3)**
31:3;108:16;112:14
**200 (2)**
102:3;213:11
**2000 (2)**
7:4,6
**2010 (1)**
61:11
**2011 (15)**
12:8;16:4;17:11,12;61:2;
91:3;212:8,9,13;230:21;
256:17;257:2;259:6,14;271:3
**2012 (8)**
9:9;21:21;26:12;61:17;
68:5;92:21;93:6;94:8
**2013 (34)**
73:3,4;76:9;83:15;98:4,12;
109:1,11;110:1;113:9;116:15;
120:13;121:10;127:21;
134:15;135:7;136:2;139:6;
140:3;144:19;147:21;149:11;
151:17;156:5;157:7;170:8;
176:10;178:19;214:9;215:10;
224:7;230:4;264:13;265:10
**2014 (9)**
29:9;162:7;181:7,11;
183:15;186:2;241:16;242:13,
14
**21 (3)**
110:21;111:1;148:2
**21204 (1)**
5:15
**21210 (1)**
5:12
**22 (3)**
114:9,15;251:11
**23 (4)**
61:1;116:12,12;229:1
**23rd (6)**
183:15;185:14,20;212:13;
259:14;271:2
**24 (4)**
118:16;253:9,10,11
**25 (5)**
120:8,10;213:2;222:2,20
**25th (5)**
98:4,8;212:18;214:11;
225:10
**26 (6)**

694

Appeal: 15-1671    Doc: 25-2    Filed: 09/28/2015    Pg: 243 of 248

Case 1:14-cv-00557-JFM   Document 61-3   Filed 04/15/15   Page 95 of 95

Citigroup Global Markets Realty Corp. v.
Patrick Turner, et al

Thomas Butler Fore - Vol. 1
February 17, 2015

134:14,14,14;219:14,15;
223:2
**27 (4)**
135:18;219:14;254:4,9
**27th (2)**
176:10;185:20
**28 (3)**
116:15;139:5;145:1
**28th (2)**
119:12;127:21
**29 (6)**
29:9;120:13;134:15;135:7;
152:16;229:11
**29th (4)**
139:6,12;219:17;223:1
**2nd (1)**
149:11

---

### 3

**3 (13)**
29:3,5,8,12;39:15;45:19;
47:11;49:11;206:18;207:2;
208:2,3;258:5
**3:02 (1)**
115:7
**3:17 (1)**
166:9
**3:35 (1)**
166:10
**30 (6)**
32:2;87:21;144:12,14;
148:6;212:16
**300K (1)**
121:18
**303 (1)**
139:19
**303b3a (1)**
139:16
**31 (4)**
140:3;147:10,12;148:20
**3-1 (1)**
207:2
**31st (1)**
139:6
**32 (2)**
154:8,9
**33 (6)**
151:12,13;247:8,11,15;
248:2
**34 (2)**
156:19,21
**35 (6)**
161:21;162:2;228:14,16,19;
249:6
**38 (1)**
162:11
**39 (2)**
164:7,8

---

### 4

**4 (5)**

54:10;166:13,15,18;208:2
**4:00 (1)**
191:21
**4:13 (1)**
192:1
**41 (1)**
163:5
**42 (1)**
169:19
**43 (4)**
171:9,10;172:9;228:15
**4300 (1)**
5:12
**44 (4)**
174:15,17;228:12,15
**45 (15)**
32:2;177:1,3;228:12,15;
244:4,8,12;245:2,19;247:9,10,
12;252:20;253:1
**46 (3)**
228:12,18,19
**47 (5)**
179:4,6;228:15,17;252:21
**4th (1)**
181:7

---

### 5

**5 (1)**
208:2
**5:42 (1)**
273:19
**50 (2)**
181:4,4
**54 (2)**
183:12,14

---

### 6

**6 (4)**
54:11;55:5;60:15;208:2
**6.7 (2)**
55:6;60:17
**6:36 (1)**
148:2
**60 (6)**
42:7;211:8,9,14;270:20;
271:2
**60-day (1)**
271:15

---

### 7

**7 (12)**
124:15,21;126:5;131:16;
133:1;153:19;156:5;167:12;
208:2;217:2;236:1;266:18
**7th (3)**
92:21;151:17;230:4

---

### 8

**8 (2)**

56:9;208:2
**8,000 (1)**
155:16
**8th (4)**
157:7;162:5,20;169:11

---

### 9

**9 (1)**
208:2
**93-year-old (1)**
204:11

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

WESTPORT PROPERTY INVESTMENTS     *
                                             *
                                           *
         v.                           *       Civil No. – JFM-14-557
                                           *
PATRICK TURNER, ET AL.               *
                                    ******

**MEMORANDUM**

Plaintiff has filed a motion for summary judgment.  The motion has been fully briefed.
The motion will be granted.

There can be no question that through the activities of  Kenneth Frank, Inner Harbor
West LLC cooperated in the filing of bankruptcy proceedings against it *inter alia* inducing one
of the petitioning creditors, Dixie Construction, to file the petition by promising Dixie
Construction that it would be paid for doing additional site work.[1]  Unless he was engaging in
unethical behavior (a fact that should not be assumed) Frank represented not only Thomas Fore
but also Patrick Turner and Inner Harbor West LLC.  During the course of his representation he
solicited the names of creditors to bring an involuntary petition against Inner Harbor West LLC
to stop the anticipated foreclosure of the property in which it held an interest.  Frank also
communicated with Jeffery Sirody, who eventually became the bankruptcy counsel for Inner
Harbor West LLC, regarding the filing of the bankruptcy case.  Sirody kept in contact with Frank
concerning the progress of the bankruptcy proceedings, and Sirody advised Frank of Turner's

---

[1] It is also noteworthy that one of the petitioning creditors for the bankruptcy proceedings was
one of Inner Harbor West LLC's former attorneys.

696

obligation to convert the involuntary Chapter 7 bankruptcy to a case under Chapter 11.[2]

A separate order granting plaintiff's motion for summary judgment is being entered

herewith.

Date: 5/15/15

J. Frederick Motz
United States District Judge

---

[2] Even if Frank's activities were not themselves sufficient to establish the involvement of Inner Harbor West LLC's and Turner's participation in the filing of the bankruptcy proceedings, the role played by the partnership's prior attorney instituting an involuntary bankruptcy proceeding against Inner Harbor West LLC may have itself been sufficient to establish the partnership's involvement in the filing of the bankruptcy proceedings. *See 187 S Houtanyan Blvd. Holdings, LLC v. Starman*, 2012 WL 683379 (E.D. Mich. March 2, 2012).

DISTRICT OF MARYLAND
U.S. DISTRICT COURT
FILED
AT BALTIMORE
CLERK'S OFFICE

697

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

WESTPORT PROPERTY INVESTMENTS         *
                                      *
                                      *
          v.                          *        Civil No. – JFM-14-557
                                      *
PATRICK TURNER, ET AL.                *
                                   ******

### ORDER

For the reasons stated in the accompanying memorandum, it is, this 15 day of May 2015

ORDERED

1.  Plaintiff's motion for summary judgment (document 57) is granted; and

2.  Judgment is entered in favor of plaintiff against defendants.


J. Frederick Motz
United States District Judge

BY _____ DEPUTY

AT BALTIMORE
CLERK'S OFFICE

2015 MAY 15  AM 11:46

DISTRICT OF MARYLAND
U.S. DISTRICT COURT
FILED

698

Case 1:14-cv-00557-JFM   Document 67   Filed 05/19/15   Page 1 of 1
Case 1:14-cv-00557-JFM   Document 66-1   Filed 05/18/15   Page 1 of 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Baltimore Division)

| | | |
|---|---|---|
| WESTPORT PROPERTY INVESTMENTS, LLC, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Case No. 1:14-cv-557-JFM |
| PATRICK TURNER, *et al.*, | * | |
| | * | |
| Defendants. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## JUDGMENT

IT IS, this ___ day of _____, 2015, by the United States District Court for the District of Maryland, ORDERED that JUDGMENT is entered in favor of Plaintiff Westport Property Investments, LLC and against Defendants Neil J. Ruther and Patrick W. Turner, jointly and severally, in the amount of $42,695,643.68 (consisting of principal in the amount of $29,900,552.20, plus interest in the amount of $10,338,263.79 through January 31, 2015, plus late charges in the amount of $2,011,940.80, plus attorneys' fees through January 31, 2015 in the amount of $444,886.89), plus interest at the contract rate from January 31, 2015.


J. Frederick Motz
United States District Judge


BY_____DEPUTY
CLERK'S OFFICE
AT BALTIMORE
2015 MAY 19 AM 11:33
DISTRICT OF MARYLAND
U.S. DISTRICT COURT
FILED

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

WESTPORT PROPERTY INVESTMENTS                    *
Plaintiff

          vs.                                    *        Civil Action No. 1:14-cv-557 JFM

PATRICK TURNER, et al.                           *
Defendant

\*\*\*\*\*\*

## NOTICE OF APPEAL

Notice is hereby given that (fill in names of **all** parties who are appealing) Neil Ruther

_____, plaintiff(s)/defendant(s) in the above captioned

case, hereby appeals to the United States Court of Appeals for the Fourth Circuit the (circle one)

order/judgment entered in this case on May 19, 2015

_____.

June 16, 2015
Date

Signature

Matthew G. Hjortsberg          #24949
Name (Print or Type)

29 W. Susquehanna Avenue, Suite 600
Address

Towson, Maryland  21204
City/State/Zip

410-583-2400          410-583-2437
Phone No.                            Fax No.

Notice of Appeal - Civil (Rev. 01/2001)